## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

NIKKI S. CARTER,
  address omitted per LCvR 5.1,

A.W.,
  address omitted per LCvR 5.1,

  and

COUNCIL OF PARENT ATTORNEYS
AND ADVOCATES, INC.,
  263 Driftwood Lane,
  Solomons, MD 20688,

    *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
EDUCATION,
  400 Maryland Ave SW,
  Washington, D.C. 20202,

LINDA MCMAHON, Secretary of Education,
  400 Maryland Ave SW,
  Washington, D.C. 20202,

  and

CRAIG TRAINOR, Acting Assistant Secretary for
Civil Rights,
  400 Maryland Ave SW,
  Washington, D.C. 20202,

    *Defendants*.

Case No. 1:25-cv-744

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

## I.  INTRODUCTION

1. Public education is a foundational building block of our democracy. It is through the educational process that students learn not only about the world around them, but also how to engage and participate as productive members of society. Unfortunately, for far too many

students in the United States, educational institutions are not places of safety, refuge, and support, but rather places of discrimination, harassment, and violence. For these students, and their families, the promise of American democracy is too often betrayed by the very institutions they are supposed to trust.

2. Recognizing the central importance of a quality, non-discriminatory education to the well-being and growth of our country's young people, in 1979, Congress created the United States Department of Education (the "Department"). Congress found that education is essential to the development of individuals and the country as a whole—and that no student should be denied access to quality educational opportunities due to their race, creed, color, national origin, or sex. The Department was charged with expanding educational access for all students, supporting state and local education efforts, encouraging community engagement in education programs, and conducting research to improve education quality.

3. Within the Department, the Office for Civil Rights ("OCR") is charged with "ensur[ing] equal access to education and [] promot[ing] educational excellence through vigorous enforcement of civil rights in our nation's schools."[1] For decades, as part of this crucial mandate, and in accordance with federal law, including Title VI of the Civil Rights Act of 1964 ("Title VI"), Title IX of the Education Amendments of 1972, as amended ("Title IX"), Section 504 of the Rehabilitation Act of 1973, as amended ("Section 504"), and Title II of the Americans with Disabilities Act ("Title II") and their implementing regulations,[2] OCR has received,

---

[1] U.S. Dep't of Educ., *Office for Civil Rights (OCR)* (Jan. 19, 2025), https://www.ed.gov/about/ed-offices/ocr; *see also* Kristen A. Graham, Susan Snyder & Maddie Hanna, *What the Department of Education Cuts Mean for Local Schools*, Philadelphia Inquirer (Mar. 12, 2025), https://www.inquirer.com/education/us-education-department-cuts-trump-administration-20250312.html.

[2] 34 C.F.R. Part 100, 34 C.F.R. Part 106, 34 C.F.R. Part 104, and 28 C.F.R. Part 35, respectively.

investigated, and resolved complaints submitted by members of the public alleging discrimination on the basis of race, sex, disability, and other protected characteristics. Students and families' ability to have their civil rights complaints thoroughly reviewed in a prompt, impartial, and non-discriminatory manner is integral to the mission of OCR. In 2024 alone, OCR received nearly 23,000 such complaints.[3]

4. The current presidential administration, however, is committed to eliminating the Department. President Trump campaigned on abolishing the Department and, within his first several weeks in office, his administration has taken steps to effectuate that promise, including mass firings of Department staff and the termination of dozens of education-related contracts worth nearly one billion dollars.[4] These actions harm students and their families, who rely on the Department to ensure their access to educational opportunities, as required by the federal civil rights laws Congress charges OCR to enforce.

5. The Office for Civil Rights and its complaint and investigation processing functions have fallen under attack. Following President Trump's inauguration, Department leadership has engaged in a series of actions that have obstructed the processing of complaints from the public.

---

[3] Collin Binkley, *Education Department Layoffs Gut Its Civil Rights Office, Leaving Discrimination Cases In Limbo*, Associated Press (Mar. 12, 2025), https://apnews.com/article/trump-education-department-layoffs-civil-rights-8cbf463cce765f497c10d688ab4d51e1.

[4] *See* Dana Goldstein, *Could Trump Shut Down the Department of Education?*, N.Y. Times (Nov. 13, 2024), https://www.nytimes.com/2024/11/13/us/trump-close-department-of-education.html; Michael C. Bender & Dana Goldstein, *Education Department Fires 1,300 Workers, Gutting Its Staff*, N.Y. Times (Mar. 11, 2025), https://www.nytimes.com/2025/03/11/us/politics/trump-education-department-firings.html; Cory Turner, *Trump Is Weighing Big Cuts to the U.S. Department of Education*, NPR (Feb. 4, 2025), https://www.npr.org/2025/02/03/nx-s1-5282233/trump-to-make-big-cuts-to-education-department; Michael C. Bender, *Asked if U.S. Needs Education Department, Its Head Says 'No'*, N.Y. Times (Mar. 7, 2025), https://www.nytimes.com/2025/03/07/us/politics/education-department-mcmahon-trump.html.

Shortly after the inauguration, the Department abruptly froze all OCR investigations, abdicating its responsibility to process and investigate civil rights complaints filed by families nationwide seeking equal access to education.  On February 20, 2025, Acting Assistant Secretary for Civil Rights Craig Trainor released the hold on complaints alleging only disability-based discrimination, while continuing to bar OCR staff from advancing the cases of students and families seeking accountability for race- and sex- based claims under Title VI and Title IX, including complaints implicating race- or sex-based discrimination alongside disability-based discrimination.

6.    Even as OCR generally stopped investigating complaints from the public based on race or sex discrimination, it cherry-picked and, on its own initiative, began targeted investigations into purported discrimination against white and cisgender students, including through the establishment of an "End DEI" (short for "End Diversity, Equity, and Inclusion") portal to solicit information for use in potential investigations into programs designed to benefit transgender students and students of color.[5]

7.    While Secretary McMahon did, on March 6, 2025, declare an end to the "pause" on OCR complaint processing that had nullified the OCR complaint process for students and families across the country, within days, she stymied the prompt processing of their complaints in a new way: by decimating OCR's workforce, including by eliminating seven of twelve regional offices and leaving skeleton staffing at the remaining offices, leaving students and families with little

---

[5] U.S. Dep't of Educ., *U.S. Department of Education Launches "End DEI" Portal* (Feb. 27, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-launches-end-dei-portal.

chance of their complaints being processed and investigated and sabotaging OCR's ability to fulfil its statutory and regulatory mandate to enforce civil rights laws in schools.[6]

8.   This assault on OCR has taken place against a backdrop of explicit hostility towards students of color and LGBTQI+ students on the part of the Trump administration.  Through a series of press releases, policy statements, and executive orders, the administration has made clear its contempt for the civil rights of marginalized students.  For example, in a February 14, 2025 Dear Colleague Letter regarding interpretation of civil rights laws, Acting Assistant Secretary Trainor alleged that, in recent years, U.S. educational institutions have discriminated against white students, and made clear the administration's intent to attack DEI initiatives and other disfavored efforts to achieve "diversity, racial balancing, social justice, or equity."[7]

9.   The Department's actions are causing significant harm.  Without even minimally adequate staffing, OCR cannot fulfil its mandate and move complaint investigation and processing forward.  OCR has abdicated its responsibility to enforce civil rights protections, leaving students who should be able to trust and rely on their government to protect and defend their rights to instead endure discriminatory and unsafe learning environments without recourse.

10. Further, OCR's actions discriminate on the basis of race, sex, sexual orientation, and gender identity.  The attack on the Department and OCR is not felt equally across students and

---

[6] *See* Jodi S. Cohen & Jennifer Smith Richards, *Massive Layoffs at the Department of Education Erode Its Civil Rights Division*, ProPublica (Mar. 12, 2025), https://www.propublica.org/article/education-department-civil-rights-division-eroded-by-massive-layoffs.

[7] U.S. Dep't of Educ., *Dear Colleague Letter: Title VI of the Civil Rights Act in Light of Students for Fair Admissions v. Harvard* (Feb. 14, 2025), https://www.ed.gov/media/document/dear-colleague-letter-sffa-v-harvard-109506.pdf.

their communities. It disproportionately harms students of color, women and girls, and LGBTQI+ students.

11. This lawsuit seeks to hold the Department accountable for ensuring that schools are places where all students can learn and thrive. Plaintiffs Nikki S. Carter, A.W.,[8] and the Council of Parent Attorneys and Advocates, Inc., on behalf of itself and its members, bring this action against Defendants the U.S. Department of Education, Secretary of Education Linda McMahon, and Acting Assistant Secretary for Civil Rights Craig Trainor. Plaintiffs challenge the evisceration of students' and families' access to OCR's statutorily and regulatorily mandated complaint investigation process through the gutting of OCR's workforce and closure of regional offices, as well as the particular impact on students of color, female students, and LGBTQI+ students. The Department's actions run afoul of the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*, exceed Defendants' lawful authority, and violate the Equal Protection guarantee under the Due Process Clause of the Fifth Amendment to the U.S. Constitution. Plaintiffs therefore seek declaratory and injunctive relief holding Defendants' actions unlawful and ordering Defendants to restore the investigation and processing capacity of OCR and to process complaints from the public promptly and equitably in accordance with OCR's statutory and regulatory obligations.

## II.    JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under federal law, including the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*, and the United States Constitution. Plaintiffs' claims for declaratory and injunctive relief

---

[8] Plaintiffs will seek permission to use initials for Plaintiff A.W.

are authorized under 28 U.S.C. §§ 2201 and 2202, 5 U.S.C. §§ 705 and 706, and Federal Rules of Civil Procedure 57 and 65.

13. Venue is proper in this District pursuant to 28 U.S.C. 1391(e) because this action seeks relief against federal agencies and officials acting in their official capacities, at least one of the Defendants is headquartered in Washington, D.C., and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## III.    PARTIES

14. Plaintiff Nikki S. Carter is a Black parent of three children and a long-time advocate for students with disabilities in her community.  In September 2022, Ms. Carter filed a complaint with OCR alleging discrimination on the basis of race and retaliation for her work as a parent advocate.  Due to her race and her advocacy on behalf of students, her children's school district, the Demopolis City School System, twice banned Ms. Carter from school district properties. These bans prevented her both from fully engaging in her children's education, such as by attending parent-teacher conferences and school events, and from continuing her community advocacy at onsite meetings.  In December 2022, OCR opened an investigation under Title VI of the Civil Rights Act of 1964 and Section 504 of the Rehabilitation Act.  As a result of Defendants' obstruction of OCR's complaint investigation and processing functions, OCR stopped investigating and processing Ms. Carter's complaint.  Ms. Carter has received no indication that the investigation has resumed.

15. Plaintiff A.W. is the parent of a student who experienced sexual assault and harassment by a classmate.  When the school failed to address the situation, A.W. withdrew her child from school for their safety.  In October 2023, A.W. filed a complaint with OCR on behalf of her child alleging discrimination on the basis of sex and disability, seeking to hold the school accountable

and to ensure that other students do not suffer similar harm.  In June 2024, OCR opened an investigation under Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act, and Title II of the Americans with Disabilities Act.  As a result of Defendants' obstruction of OCR's complaint investigation and processing functions, OCR stopped investigating and processing A.W.'s complaint.  A.W. has received no indication that the investigation has resumed.

16. Plaintiff Council of Parent Attorneys and Advocates, Inc. ("COPAA") is a national not-for-profit membership organization whose membership comprises parents of children with disabilities, their attorneys, and their advocates.  COPAA's mission is to protect and enforce the legal and civil rights of students with disabilities and their families.  COPAA's primary goal is to secure appropriate educational services for children with disabilities in accordance with federal laws.  As part of this mission, COPAA seeks to protect the rights of children with disabilities to be free from discrimination based on their disability, race, sex, sexual orientation, and gender identity, and to receive a free and appropriate public education.

17. COPAA accomplishes its mission by, among other activities, providing resources, training, and information to members to assist them in obtaining a free appropriate public education and equal educational opportunity for children with disabilities; helping parents and advocates file administrative complaints; helping parents and advocates find attorneys and legal resources as they advocate for their children's legal rights; educating the public and policymakers, including federal agencies, about the experiences of children with disabilities and their families; and educating COPAA members about developments in the federal civil rights laws and policies affecting the education of children with disabilities.  COPAA frequently advises, trains, and assists parents, attorneys, and advocates filing complaints with OCR.

18. COPAA has more than 3,500 members located across the United States. Membership is open to all persons who are interested in furthering COPAA's purposes and who pay annual dues as required. COPAA's Board of Directors is composed exclusively of COPAA members.

19. COPAA has active members nationwide. As parents, advocates, and attorneys for students with disabilities, COPAA's members rely on the Department to enforce the rights of students with disabilities to receive an education free from discrimination. COPAA's members have filed pending OCR complaints concerning discrimination on the basis of disability, including complaints alleging both disability-based and race- and/or sex-based discrimination in schools.

20. Plaintiffs Nikki S. Carter and A.W. are members of COPAA.

21. As a result of Defendants' obstruction of OCR's complaint investigation and processing functions, OCR stopped processing COPAA members' complaints.

22. COPAA brings this action as an organizational plaintiff. The Department's actions have made achieving COPAA's mission to ensure equal access to education more difficult, time-consuming, and resource-intensive. Because of Defendants' obstruction of OCR's complaint investigation and processing functions, COPAA has expended time and resources it would have devoted to advocating on behalf of students with disabilities to responding to calls and emails about OCR's actions, and tracking and analyzing the impact on members' pending complaints.

23. COPAA also brings this action on behalf of its active members with pending OCR complaints. COPAA's membership includes parents, attorneys, and advocates who have stalled pending OCR complaints. For example, a COPAA member attorney representing a COPAA member parent filed an OCR complaint in September 2024 raising allegations of discrimination under both Section 504 and Title VI on behalf of an English language learner student in

Maryland.  OCR opened that investigation on December 9, 2024.  As a result of Defendants'

obstruction of OCR's complaint investigation and processing functions, OCR stopped

investigating and processing the complaint.  The COPAA members have received no indication

that the investigation has resumed.  Another COPAA member in Michigan represents families

with more than a dozen complaints, all assigned to the now-shuttered Cleveland office, and now

frozen with no updates available.

24. Defendant United States Department of Education is an agency of the United States

government.  The Department of Education is headquartered in Washington, D.C.

25. Defendant Linda McMahon is the Secretary of the Department of Education.  She is sued

in her official capacity only.  Secretary McMahon maintains an office at 400 Maryland Ave SW,

Washington, D.C. 20202.

26. Defendant Craig Trainor is the Acting Assistant Secretary for Civil Rights.  He is sued in

his official capacity only.  Acting Assistant Secretary Trainor maintains an office at 400

Maryland Ave SW, Washington, D.C. 20202.

## IV.    FACTUAL ALLEGATIONS

### *The Department was Created to Ensure Equal Access to Educational Opportunities and to Remedy Discrimination in Schools through OCR*

27. Congress established the Department of Education in 1979, finding in part that "there is a

continuing need to ensure equal access for all Americans to educational opportunities of a high

quality," and that "such educational opportunities should not be denied because of race, creed,

color, national origin, or sex."[9]

---

[9] Department of Education Organization Act, Pub. L. No. 96–88, tit. I, § 101, 93 Stat.
669 (1979).

28. The functions of the Department had previously been spread across various federal agencies, including the Department of Health, Education, and Welfare, the predecessor agency to the Department of Health and Human Services.  Congress found that there was a need to create the Department because "the dispersion of education programs across a large number of Federal agencies has led to fragmented, duplicative, and often inconsistent Federal policies relating to education."[10]

29. At the time Congress created the Department of Education, it also created an Office for Civil Rights within the Department to "assume responsibility for carrying out the nation's civil rights laws in education," specifically referencing "such provisions as Title VI of the Civil Rights Act of 1964 (racial and ethnic discrimination) [and] Title IX of the Education Amendments of 1972 (sex discrimination)."[11]

30. The Department of Education is charged with enforcing various civil rights laws prohibiting discrimination in all programs and activities that receive federal financial assistance, including Title VI of the Civil Rights Acts of 1964 ("Title VI"), 42 U.S.C. §§ 2000d *et seq.*; Title IX of the Education Amendments of 1972, as amended ("Title IX"), 20 U.S.C. §§ 1681 *et seq.*; and Section 504 of the Rehabilitation Act of 1973, as amended ("Section 504"), 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act ("Title II"), 42 U.S.C. §§ 12131, *et seq.*, which prohibit discrimination based on disability.

31. With respect to race- and sex-based discrimination in particular, Title VI and Title IX explicitly direct the Department of Education, as an agency that extends federal financial assistance to education programs, to effectuate their anti-discrimination provisions.  42 U.S.C.

---

[10] *Id.*
[11] S. Rep. No. 96-49, at 35 (Mar. 27, 1979).

§ 2000d-1 ("Each Federal department and agency which is empowered to extend Federal

financial assistance to any program or activity by way of grant, loan, or contract . . . is . . .

directed to effectuate the provisions of [Title VI]."); 20 U.S.C. § 1682 ("Each Federal

department and agency which is empowered to extend Federal financial assistance to any

education program or activity, by way of grant, loan, or contract . . . is . . . directed to effectuate

the provisions of [Title IX] with respect to such program or activity.").

32. The mission of OCR is "to ensure equal access to education and to promote educational

excellence through vigorous enforcement of civil rights in the nation's schools."[12]

33. Federal regulations require OCR to investigate and resolve potential violations of, *inter*

*alia*, Title VI, Section 504, Title IX, and Title II.  *See* 34 C.F.R. Parts 100, 104, 106, and 28

C.F.R. Part 35.[13]  The implementing regulations for Title VI specify that "[t]he responsible

Department official or his designee will make a prompt investigation whenever a compliance

review, report, complaint, or any other information indicates a possible failure to comply with

this part," and that the investigation must "include, where appropriate, a review of the pertinent

practices and policies of the recipient, the circumstances under which the possible

noncompliance with this part occurred, and other factors relevant to a determination as to

whether the recipient has failed to comply with this part."  34 C.F.R. § 100.7(c).  The regulations

require OCR to enforce Section 504 and Title IX using the same procedures.  34 C.F.R.

---

[12] U.S. Dep't of Educ., *Office for Civil Rights (OCR)* (Jan. 19, 2025),
https://www.ed.gov/about/ed-offices/ocr; *see also* Kristen A. Graham, Susan Snyder & Maddie
Hanna, *What the Department of Education Cuts Mean for Local Schools*, Philadelphia Inquirer
(Mar. 12, 2025), https://www.inquirer.com/education/us-education-department-cuts-trump-
administration-20250312.html.
[13] OCR is additionally required to investigate and resolve potential violations of the Age
Discrimination Act and the Boy Scouts of America Equal Access Act under 34 C.F.R. Part 110
and 34 C.F.R Part 108, respectively.

§ 104.61; 34 C.F.R. § 106.81.[14]  For complaints under Title II, OCR must "promptly review the complaint to determine whether it has jurisdiction over the complaint under section 504" and, if so, "promptly notify" complainants and public entities of the receipt and acceptance of complaints, and "process the complaint according to its procedures for enforcing section 504." 28 C.F.R. § 35.171.

34. Pursuant to Section 203(b)(1) of the Department of Education Organization Act, the Assistant Secretary for Civil Rights must "make an annual report . . . identifying significant civil rights or compliance problems as to which such Office has made a recommendation for corrective action."[15]

35. In line with its mandate, OCR has developed well-established policies and procedures for the receipt, processing, investigation, and prompt resolution of civil rights complaints, as described in its Case Processing Manual.[16]

36. OCR's Early Mediation Process ("EMP") allows for facilitated settlement discussion between parties soon after a complaint is filed.[17]  If complainants indicate their interest in EMP

---

[14] *See also* U.S. Dep't of Educ., *OCR Case Processing Manual* (Feb. 19, 2025) at 20, https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf (explaining that "the regulations implementing Title VI . . . . require OCR to investigate complaints that are filed with the agency," and that this requirement "is incorporated by reference in the regulations implementing other statutes enforced by OCR," including those implementing Title IX and Section 504).

[15] Department of Education Organization Act, Pub. L. No. 96–88, tit. I, §101, 93 Stat. 669 (1979).

[16] *See* U.S. Dep't of Educ., *OCR Case Processing Manual* (Feb. 19, 2025), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf; *see also Questions and Answers on OCR's Complaint Process*, U.S. Department of Education (accessed Feb. 20, 2025), available at: https://www.ed.gov/laws-and-policy/civil-rights-laws/civil-rights-faqs/questions-and-answers-on-ocrs-complaint-process ("OCR's role is to . . . promptly resolve complaints."). This is not a new requirement.  *See* U.S. Dep't. of Educ., *OCR Case Processing Manual* (Aug. 26, 2020), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm-20202608.pdf.

[17] U.S. Dep't of Educ., *Discrimination Complaint Form* (2023), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/complaintform.pdf.

by checking the appropriate box on the online complaint form when they file their complaint, OCR can determine if the complaint is appropriate for resolution through the EMP.[18]  Mediation is a form of complaint resolution that OCR offers as an alternative to its investigation process, where "a staff member from OCR who is trained in mediation assists the parties to reach a negotiated resolution of the complaint" and "helps the parties to find a mutually acceptable resolution" to the complaint.[19]

37. OCR's Rapid Resolution Process ("RRP") is an expedited case processing approach available to staff working in any of OCR's statutory areas, designed to accelerate resolution of complaints.  Per the Case Processing Manual, "[f]or cases in RRP, the [OCR] Regional Office must ensure expeditious completion in accordance with statute, regulations, and case processing procedures."[20]

38. Congress has allocated a $140 million budget to OCR to perform its authorized functions. OCR's budget requests and justifications make clear that these functions include, in substantial part, OCR's enforcement work.  For example, OCR's 2025 budget request states that "[s]ince fiscal year 2009, the number of [discrimination] complaints has almost tripled," and explains that "[r]equested funds would ensure program support to resolve complaints of discrimination filed by the public and ensure that institutions receiving Federal financial assistance comply with the civil rights laws enforced by OCR." [21]  The budget request further specifies that the "funds would

---

[18] U.S. Dep't of Educ., *Complaint Processing Procedures* (2022),
 https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/complaints-how.pdf.
[19] U.S. Dep't of Educ., *Discrimination Complaint Form* (2023),
 https://www.ed.gov/sites/ed/files/about/offices/list/ocr/complaintform.pdf.
[20] *See* U.S. Dep't of Educ., *OCR Case Processing Manual* (Feb. 19, 2025) at 12,
 https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf.
[21] U.S. Dep't of Educ., *Department of Education Fiscal Year 2025 President's Budget* (2025) at
 69,

support a full time equivalent (FTE) level of 643 [staff][22] and provide resources necessary for

OCR to deliver on its statutory and regulatory mandates."[23]

39. Most of OCR's statutory and regulatory investigation and enforcement functions have

been assigned to its twelve regional enforcement offices: Washington D.C., Atlanta, Boston,

Chicago, Cleveland, Dallas, Denver, Kansas City, New York, Philadelphia, San Francisco, and

Seattle. "These enforcement offices are organized into 4 divisions carrying out OCR's core

work—preventing, identifying, ending, and remedying discrimination against American

students."[24]

40. As of the beginning of January 2025, OCR had around 600 staff members handling

complaints alleging discrimination based on race, gender, disability, and sexual orientation, and

---

https://www.ed.gov/sites/ed/files/about/overview/budget/budget25/summary/25summary.pdf;
U.S. Dep't of Educ., *Office for Civil Rights Fiscal Year 2025 Budget Request* (2025),
https://www.ed.gov/sites/ed/files/about/overview/budget/budget25/justifications/dd-ocr.pdf.
[22] The Department of Education's budget requests over the years have consistently included
funding for OCR staff to resolve complaints filed by the public. For example, the Department
requested funds for 523 FTE in 2018, 529 FTE in 2019, and 619 FTE in 2020. *See* U.S. Dep't of
Educ., *Office for Civil Rights Fiscal Year 2018 Budget Summary and Background Information*
(2018),
https://www.ed.gov/sites/ed/files/about/overview/budget/budget18/summary/18summary.pdf;
U.S. Dep't of Educ., *Office for Civil Rights Fiscal Year 2019 Budget Summary and Background
Information* (2019),
https://www.ed.gov/sites/ed/files/about/overview/budget/budget19/summary/19summary.pdf;
and U.S. Dep't of Educ., *Office for Civil Rights Fiscal Year 2020 Budget Summary* (2020),
https://www.ed.gov/sites/ed/files/about/overview/budget/budget20/summary/20summary.pdf.
[23] U.S. Dep't of Educ., *Office for Civil Rights Fiscal Year 2025 Budget Request* (2025),
https://www.ed.gov/sites/ed/files/about/overview/budget/budget25/justifications/dd-ocr.pdf.
[24] U.S. Dep't of Educ., *About the Office for Civil Rights* (2025), https://www.ed.gov/about/ed-
offices/ocr/about-ocr.

most already had caseloads of 50 or more.[25]  OCR currently has about 20,000 open cases[26] and

12,000 pending investigations.[27]

### Contrary to OCR's Mandate and Purpose, Defendants Systemically Obstructed OCR's Investigation and Enforcement Functions by Imposing a General Freeze on Investigations while Directing Resources to Cases of Political Interest

41. Following the inauguration, OCR's investigation of discrimination complaints essentially

ground to a halt.[28]  OCR instructed employees that they could continue reviewing files, but

barred staff from communicating with students, families, and schools involved in their cases and

instructed them to cancel scheduled meetings and mediations.  This freeze stopped the

investigation and processing of students' and families' complaints in their tracks.  Because all

external communications with students, families, and schools were frozen, OCR staff could not

request documents, conduct interviews, participate in meetings or mediations, negotiate

resolution agreements, issue letters of finding, or take other steps to investigate or resolve

complaints.

42. At the same time, however, OCR affirmatively opened selected investigations targeting

programs and actions intended to support students of color and LGBTQI+ students.  Many are

---

[25] Tyler Kingkade & Adam Edelman, *What the Education Department Layoffs Could Mean for Students with Disabilities*, NBC News (Mar. 12, 2025), https://www.nbcnews.com/news/us-news/education-department-layoffs-students-disabilities-rcna196114.

[26] Collin Binkley, *Education Department Layoffs Gut Its Civil Rights Office, Leaving Discrimination Cases In Limbo*, Associated Press (Mar. 12, 2025), https://apnews.com/article/trump-education-department-layoffs-civil-rights-8cbf463cce765f497c10d688ab4d51e1.

[27] U.S. Dep't of Educ., *Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools* (accessed Mar. 13, 2025), https://ocrcas.ed.gov/open-investigations.

[28] Jennifer Smith Richards & Jodi S. Cohen, *"We've Been Essentially Muzzled": Department of Education Halts Thousands of Civil Rights Investigations Under Trump*, ProPublica (Feb. 13, 2025), https://www.propublica.org/article/department-of-education-civil-rights-office-investigations.

"directed investigations," meaning they were initiated by the agency, rather than by individual students and their families and advocates.

43. For example, on January 27, 2025, OCR opened an investigation into the Ithaca City School District for sponsoring the Students of Color United Summit, an event designed to "provide a safe space for" and to "celebrate and uplift students of color" as part of its inclusion and support efforts.[29]  OCR alleged that this event supporting students of color was "discriminatory" against white students.

44. On January 28, 2025, OCR announced it had opened an investigation into Denver Public Schools for creating a gender-neutral bathroom in an effort to support transgender students.[30]

45. And on February 6, 2025, OCR announced that it had opened investigations into three universities for allowing transgender students to participate in sports on teams that match their gender identities.  It characterized this support of transgender students as "radical transgender ideology" and intentionally misgendered trans students who participated in sports at the three universities.[31]

46. Other investigations remained frozen.  OCR offered no public explanation for its abandonment of its well-established policy, practice, and procedure of investigating, processing,

---

[29] Maddy Vogel, *Trump-Era Education Department Launches Investigation into Ithaca Schools Over Alleged Racial Exclusion*, Ithaca.com (Feb. 4, 2025), https://www.ithaca.com/news/ithaca/trump-era-education-department-launches-investigation-into-ithaca-schools-over-alleged-racial-exclusion/article_b1635a08-e2af-11ef-85e6-7760bf2508d6.html.
[30] U.S. Dep't of Educ., *U.S. Department of Education Launches Investigation into Denver Public Schools for Converting Girl's Restroom to All-Gender Facility* (Jan. 28, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-launches-investigation-denver-public-schools-converting-girls-restroom-all-gender-facility.
[31] U.S. Dep't of Educ., *U.S. Department of Education to Investigate Title IX Violations in Athletics* (Feb. 6, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-investigate-title-ix-violations-athletics.

and resolving discrimination complaints from the public, and instead advancing only selected complaints aligned with the administration's political agenda.

47. On February 20, 2025, OCR issued a memorandum lifting the freeze as to "complaints that allege only disability-based discrimination (i.e., complaints that do not allege other statutory violations)." Complaints filed by members of the public alleging race- and sex-based discrimination, including complaints on behalf of students with disabilities alleging race- and sex-based discrimination in conjunction with disability-related claims, remained stalled. The memorandum did not provide any reason or rationale for this updated policy.

48. On February 27, 2025—as it continued to freeze investigations into cases from the public alleging race, sex, or intersectional discrimination—the Department of Education launched an "End DEI" (short for "End Diversity, Equity, and Inclusion") portal. The portal purports to collect "reports of discrimination based on race or sex in publicly-funded K-12 schools" from parents, students, teachers, and the broader community.[32]

49. The press release makes clear that the portal solicits information for use in potential investigations targeting programs designed to combat discrimination against LGBTQI+ students and students of color and provide them with equal access to educational opportunities. Tiffany Justice, Co-Founder of Moms for Liberty, explained that the Department was soliciting information about the use of "critical theory"—a reference to the recognition of systemic racism against people of color in society—and "rogue sex education and divisive ideologies"—a reference to recognizing and affirming the identities of LGBTQI+ people—in public schools for the purpose of "identify[ing] potential areas for investigation." Research demonstrates that

---

[32] U.S. Dep't of Educ., *U.S. Department of Education Launches "End DEI" Portal* (Feb. 27, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-launches-end-dei-portal.

culturally responsive curricula and teaching practices can provide effective support for students of color, and that instructional materials, assignments, and texts drawing on students' background knowledge shapes comprehension.[33]

50. On February 28, 2025, OCR opened an investigation against Tumwater School District for allowing a transgender student who identifies as female to play on the girls' basketball team.[34]

51. In pausing thousands of complaints filed by the public while initiating and advancing selected investigations based on the administration's political priorities, OCR abdicated its responsibility to equitably consider complaints filed by students and their families, politicized its work, and undermined its credibility as a neutral fact finder.

52. On March 6, 2025, Secretary McMahon sent an email to OCR Enforcement staff "lifting the pause on the processing of complaints in all areas of OCR's practice."[35]  Secretary McMahon's email provided no explanation for her message or any justification or rationale for imposing the freeze in the first place.

---

[33] *See, e.g.*, Thomas Dee & Emily Penner, *The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum*, 54 Am. Educ. Res. J. 127, 127 (2017), https://files.eric.ed.gov/fulltext/EJ1132535.pdf; *Understanding Culturally Responsive Teaching*, *New Am.*, https://www.newamerica.org/education-policy/reports/culturally-responsive-teaching/understanding-culturally-responsive-teaching/ (discussing and citing studies).
[34] U.S. Dep't of Educ., *Office for Civil Rights Launches Title IX Investigation Into Washington State School District* (Mar. 3, 2025), https://www.ed.gov/about/news/press-release/office-civil-rights-launches-title-ix-investigation-washington-state-school-district; *see also* U.S. Dep't of Educ., *Letter to Tumwater School District* (Feb. 28, 2025), https://www.ed.gov/media/document/letter-tumwater-school-district-february-2025-109531.pdf.
[35] That Secretary McMahon, rather than the Acting Assistant Secretary for Civil Rights, issued the order instructing OCR to unfreeze investigations is highly unusual, as the Secretary does not have the authority to do so.  The Department of Education Organization Act provides that the Secretary shall delegate OCR's enforcement authority to the Assistant Secretary for Civil Rights. *See* Department of Education Organization Act, Pub. L. No. 96–88, tit. I, §101, 93 Stat. 669 (1979), § 203.

### *Defendants' Actions Culminated in the Decimation of OCR's Workforce, which Prevents OCR from Performing Its Statutory Duties*

53. On March 11, 2025, less than a week after her email announcing that the freeze on OCR complaint processing that had nullified the complaint process for students and families across the country was lifted, Secretary McMahon moved to make it practically impossible for OCR to effectuate its statutory duties.

54. This time, the change was permanent.  Secretary McMahon eliminated seven of twelve regional offices and decimated OCR's workforce, leaving skeleton staffing at the remaining offices.  The Boston, Chicago, Cleveland, Dallas, New York, Philadelphia, and San Francisco offices were eliminated.  Around half of OCR employees—at least 243 union-eligible staff members and an unknown number of supervisors—were told they would be laid off and placed on administrative leave as of March 21, 2025, and that their employment would be terminated around June 9, 2025.[36]  More broadly, Secretary McMahon terminated a total of 1,300 Department employees and reduced Department staff to about half of its size at the time President Trump took office.[37]

55. Upon information and belief, Secretary McMahon knowingly decimated OCR's staffing to a point where the caseload exceeds any approximation of reasonableness.  The gutting of

---

[36] Jodi S. Cohen & Jennifer Smith Richards, *Massive Layoffs at the Department of Education Erode Its Civil Rights Division*, ProPublica (Mar. 12, 2025), https://www.propublica.org/article/education-department-civil-rights-division-eroded-by-massive-layoffs.

[37] *Id.*

OCR's staff means that no complainant has a fair shot at accessing an OCR investigation. Anyone who files any claim is unlikely to secure relief from OCR.

56. Upon information and belief, the elimination of offices and staff has the purpose and effect that OCR cannot fulfill its statutory and regulatory functions to enforce civil rights in schools.  Catherine Lhamon, who oversaw OCR under former Presidents Barack Obama and Joe Biden, reported to ProPublica: "What you've got left is a shell that can't function."  Civil rights investigators who remain employed at OCR said it now will be "virtually impossible" to resolve discrimination complaints.[38]

57. Katie Dullum, a former OCR deputy director, reported to ProPublica that, "This is devastating for American education and our students.  This will strip students of equitable education, place our most vulnerable at great risk and set back educational success that for many will last their lifetimes. The impact will be felt well beyond this transitional period."[39]

58. Brittany Coleman, an attorney with the Dallas regional office whose position was eliminated, reported to NBC News that with fewer staff members, students with disabilities fighting for accommodations for test-taking, for example, will have to wait longer for help from the Department, and that such help could arrive too late.[40]

---

[38] *Id.*
[39] *Id.*
[40] Tyler Kingkade & Adam Edelman, *What the Education Department Layoffs Could Mean for Students with Disabilities*, NBC News (Mar. 12, 2025), https://www.nbcnews.com/news/us-news/education-department-layoffs-students-disabilities-rcna196114.

59. Another Department of Education employee said to ABC News, "I don't know how [students with disabilities] will be serviced," and was confident that those students "will not be helped."[41]

60. One OCR attorney explained to ProPublica: "Part of OCR's work is to physically go to places.  As part of the investigation, we go to schools, we look at the playground, we see if it's accessible . . . .  We show up and look at softball and baseball fields.  We measure the bathroom to make sure it's accessible.  We interview student groups.  It requires in-person work.  That is part of the basis of having regional offices.  Now, California has no regional office."[42]  Another attorney still working at the Department said: "OCR simply will not be investigating violations any more.  It is not going to happen.  They will not have the staff for it."  That attorney also added that investigations were "extremely time and labor intensive."[43]

### *The Attack on OCR is One Piece of the Administration's Plans to Eliminate the Department of Education and to Target Programs and Activities that Support People of Color and LGBTQI+ Individuals*

61. Defendants' abdication of their statutorily mandated obligation to conduct investigations must be understood in the context of the administration's broader goals.  President Trump's campaign promised an administration that would dismantle the Department of Education, end Diversity, Equity, and Inclusion efforts, and turn civil rights enforcement on its head, using civil rights laws to target programs that aim to support students of color and LGBTQI+ students.

---

[41] Arthur Jones II, *'Upsetting': Civil Servants Across the US Part of Department of Education's Mass Layoffs*, ABC News (Mar. 12, 2025), https://abcnews.go.com/Politics/upsetting-civil-servants-us-part-department-educations-mass/story?id=119710915.

[42] Jodi S. Cohen & Jennifer Smith Richards, *Massive Layoffs at the Department of Education Erode Its Civil Rights Division*, ProPublica (Mar. 12, 2025), https://www.propublica.org/article/education-department-civil-rights-division-eroded-by-massive-layoffs.

[43] *Id.*

62. Shutting down the Department of Education has been a central talking point for President Trump.  On the campaign trail, Trump emphasized that he would remove "the radical zealots and Marxists" he claimed have "infiltrated" the Department.[44]  In a video posted to social media in October 2023, Trump said, "[o]ne . . . thing I'll be doing very early in the administration is closing up the Department of Education in Washington D.C., and sending all education and education work and needs back to the states."[45]  In September, 2024, during a rally in Wisconsin, he said, "I say it all the time, I'm dying to get back to do this.  We will ultimately eliminate the federal Department of Education."[46]  In December, in an interview in TIME Magazine, Trump stated that he wanted "to move the schools back to the states" and implement "[a] virtual closure of [the] Department of Education."[47]

63. In a draft executive order aimed at dismantling the Department, President Trump calls on Secretary McMahon to "take all necessary steps" to facilitate the closure of the Department[48] and specifically instructs the Secretary to terminate any remaining diversity, equity and inclusion programs.[49]

---

[44] Meridith McGraw, *Trump Unveils New Education Policy Loaded with Culture War Proposals*, Politico (Jan. 26, 2023), https://www.politico.com/news/2023/01/26/trump-unveils-education-policy-culture-war-00079784.

[45] Steve Inskeep & Taylor Haney, *What Trump's Pledge To Close Dept. of Education Means For Students, GOP-Led States*, NPR (Nov. 15, 2024), https://www.npr.org/2024/11/14/nx-s1-5181966/a-look-at-the-potential-impact-of-shutting-down-the-department-of-education.

[46] Katie Lobosco, *Trump Wants to Shut Down the Department of Education. Here's What That Could Mean*, CNN (Dec. 12, 2024), https://www.cnn.com/2024/09/20/politics/department-of-education-shut-down-trump/index.html.

[47] *TIME, Donald Trump's 2024 Person of the Year Interview: Transcript*, TIME (Dec. 12, 2024), https://time.com/7201565/person-of-the-year-2024-donald-trump-transcript/.

[48] Laura Meckler, *Draft Executive Order Calls for Closing Education Dept.*, Washington Post (Mar. 6, 2025), https://www.washingtonpost.com/education/2025/03/05/trump-close-education-department-executive-order/.

[49] Michael C. Bender, *Why Republicans Want to Dismantle the Education Department*, N.Y. Times (Mar. 6, 2025), https://www.nytimes.com/2025/03/06/us/politics/trump-republicans-education-department.html.

64. Hours after being confirmed, Secretary McMahon sent an email to all Department of Education staff entitled "Our Department's Final Mission."  She wrote in that message:  "Our job is to respect the will of the American people and the President they elected, who has tasked us with accomplishing the elimination of bureaucratic bloat here at the Department of Education—a momentous final mission—quickly and responsibly."[50]  Secretary McMahon made this message available to the public by posting it on the Department of Education's website.

65. In case there was any ambiguity, Secretary McMahon doubled down on her intention to dismantle the Department of Education during an interview with Fox News several days later, on March 7, 2025.  When asked, during her first interview since being confirmed to her position, whether the United States needs its Department of Education, her response was clear and unequivocal: "No, we don't."[51]

66. The March 11, 2025 decision to gut OCR, in contravention of OCR's obligations to promptly investigate all discrimination complaints within its jurisdiction, is part and parcel of Defendants' "Final Mission" to end the Department of Education.

67. Similarly, Defendants' obstruction of students' and families' access to OCR's investigation and complaint processing functions while selectively advancing cases on behalf of white and cisgender students and families fits within the administration's demonstrated agenda of targeting programs, activities, and initiatives designed to support people of color and LGBTQ+ individuals.

---

[50] U.S. Dep't of Educ., *Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission.

[51] Michael C. Bender, *Asked if U.S. Needs Education Department, Its Head Says 'No'*, N.Y. Times (Mar. 7, 2025), https://www.nytimes.com/2025/03/07/us/politics/education-department-mcmahon-trump.html.

68. For example, on the day of his inauguration, President Trump issued the "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" Executive Order, directing the Executive Branch to interpret "sex" as referring to "an individual's immutable biological classification as either male or female" under all federal laws and administration policy.

69. On January 29, 2025, President Trump signed the "Ending Radical Indoctrination in K-12 Schooling" executive order, directing federal agencies to withhold federal funding from institutions that directly or indirectly promote "discriminatory equity ideology"—including through policies that recognize and ameliorate racial discrimination—under the guise of enforcing compliance with Title VI.

70. On February 5, 2025, President Trump signed the "Keeping Men Out of Women's Sports" executive order, directing federal agencies to rescind all funds from educational programs and institutions that allow transgender students to participate on sports teams aligning with their gender identity.

71. On February 14, 2025, OCR issued a Dear Colleague letter regarding its interpretation of civil rights law and intended enforcement under Title VI and the Equal Protection Clause."[52] The letter alleges that U.S. educational institutions in recent years have discriminated against white students and contorts civil rights law to command the dismantling of protections for students of color.

72. On February 17, 2025, the Department announced that it had terminated over $600 million in teacher training grants focused on various "divisive ideologies," including "anti-

---

[52] U.S. Dep't of Educ., *Dear Colleague Letter: Title VI of the Civil Rights Act in Light of Students for Fair Admissions v. Harvard* (Feb. 14, 2025), https://www.ed.gov/media/document/dear-colleague-letter-sffa-v-harvard-109506.pdf.

racism," DEI, and instruction on white supremacy.  The materials included training on "[a]cknowledging and responding to systemic forms of oppression and inequity, including racism, ableism, 'gender-based' discrimination, homophobia, and ageism."[53]

73. On March 1, 2025, OCR published a set of FAQs intended to clarify elements of the February 14 Dear Colleague Letter.[54]  OCR made clear that it planned to target "social-emotional learning," "culturally responsive teaching," and similar programs that are backed by evidence showing they improve school climates for students of color and LGBTQI+ students.  Despite research demonstrating that such practices benefit all students,[55] the FAQs make clear that OCR considers programs that effectively support students of color to be evidence of discrimination, listing "statistics demonstrating a pattern of the policy or decision having a greater impact on members of a particular race" and schools' efforts to further "equity" as evidence of race discrimination.

---

[53] U.S. Dep't of Educ., *U.S. Department of Education Cuts Over $600 Million in Divisive Teacher Training Grants* (Feb. 17, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-cuts-over-600-million-divisive-teacher-training-grants.

[54] *See* U.S. Dep't of Educ., *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act* (February 28, 2025), https://www.ed.gov/media/document/frequently-asked-questions-about-racial-preferences-and-stereotypes-under-title-vi-of-civil-rights-act-109530.pdf; *see also* U.S Dep't of Educ., *U.S. Department of Education Releases Frequently Asked Questions on Dear Colleague Letter About Racial Preferencing* (Mar. 1, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-releases-frequently-asked-questions-dear-colleague-letter-about-racial-preferencing.

[55] *See, e.g.*, Joseph A. Durlak, et al., *The Impact of Enhancing Students' Social and Emotional Learning: A Meta-Analysis of School-Based Universal Interventions*, 82 Child Dev. 405, 405 (2011), https://srcd.onlinelibrary.wiley.com/doi/10.1111/j.1467-8624.2010.01564.x; Thomas Dee & Emily Penner, *The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum*, 54 Am. Educ. Res. J. 127, 127 (2017), https://files.eric.ed.gov/fulltext/EJ1132535.pdf.

***OCR's Actions Harm Students and Families Seeking Civil Rights Enforcement***

74. Defendants' actions—including pausing investigations and then closing seven of the twelve OCR regional offices so that there are too few investigators to actually investigate, and directing any surviving enforcement resources to politicized investigations—mean that complainants do not have a fair shot at OCR investigating their claims in a prompt, fair, consistent, and impartial manner.  Defendants have abdicated OCR's responsibility to students and families to enforce the nation's civil rights statutes in American public schools.

75. Families who have filed complaints with the reasonable expectation that OCR will follow its legal mandates and longstanding practice of investigating and processing their cases have been left without any information about the status of their complaints or the prospect of obtaining relief.  This includes families of students who urgently need accommodations or are seeking a resolution that would allow them to return to the classroom.[56]  When complainants have called or emailed for an update from OCR, they have received no answers.  OCR has postponed scheduled meetings and mediations without explanation to students, families, or schools.  OCR is depriving students and their families and advocates of access to a critical forum for their discrimination complaints to be heard.

76. The freeze in processing Title VI and Title IX complaints and the gutting of OCR's staff and field offices disproportionately harm students of color, LGBTQI+ students, and female students, and their families and advocates, who are deprived of a vital pathway to seek vindication of their civil rights and safe and equal access to the nation's schools.  On information

---

[56] Jennifer Smith Richards & Jodi S. Cohen, *"We've Been Essentially Muzzled": Department of Education Halts Thousands of Civil Rights Investigations Under Trump*, ProPublica (Feb. 13, 2025), https://www.propublica.org/article/department-of-education-civil-rights-office-investigations.

and belief, the majority of OCR complaints that have been obstructed pursuant to these actions were filed on behalf of students of color, LGBTQI+ students, and female students.  On information and belief, directed investigations that OCR has opened target programs aiming to support students of color and LGTBQ+ students and disproportionately benefit white and cisgender students.

77. Plaintiff Nikki S. Carter filed an OCR complaint after her children's school district twice barred her from school property, blocking her from picking up and dropping off her children at school, participating in-person in meetings and conferences, delivering medications or signing her children out of school when sick, and participating in public meetings as a parent, community member, and advocate.  The complaint explains that the district blocked Ms. Carter, a Black parent, from school property following a confrontation with a white staff member, but did not impose the same restrictions on a white parent who had a similar confrontation with the same staff member.  It also alleges that the district sought to retaliate against Ms. Carter for her advocacy on behalf of students with disabilities in her community.  In December 2022, OCR notified Ms. Carter that the agency was opening an investigation into whether the school district subjected her and other Black parents to different treatment based on race, in violation of Title VI, and whether the school district retaliated against her in violation of Section 504.

78. OCR stopped processing Ms. Carter's complaint during the freeze on investigating Title VI and Title IX claims.  Ms. Carter has not received subsequent updates or any indication that OCR is proceeding with any investigation into her complaint.  On information and belief, now, the decimation of OCR's workforce means that OCR cannot process Ms. Carter's complaint in a prompt and equitable manner.  As a result, she is left without resolution of her discrimination and retaliation claims or any avenue for pursuing accountability for the school district.  Ms. Carter

intends to continue her advocacy for students and families and has reason to believe that the school district's discrimination and retaliation will continue if OCR does not intervene.

79. Plaintiff A.W. filed an OCR complaint after her child's school failed to appropriately respond to the sexual harassment and assault her child experienced, failed to sufficiently protect students from such harm, retaliated against A.W. and her child for filing related complaints, and discriminated against A.W.'s child when they experienced significant emotional harm following the sexual harassment and assault, leading A.W. to withdraw them from school. In June 2024, OCR notified A.W. that the agency was opening an investigation into whether the school responded to reports of sexual assault and harassment of A.W.'s child and other students consistent with Title IX, whether the school retaliated against A.W. and her child in violation of Title IX, and whether the school discriminated against A.W.'s child based on disability, in violation of Section 504 and Title II.

80. OCR stopped processing A.W.'s complaint pursuant to the freeze in processing Title VI and Title IX complaints. On February 23, 2025, A.W. emailed her OCR contact requesting an update and was informed on February 24, 2025, that she would receive "an update as soon as possible." A.W.'s follow-up message, stating, "I'd like to know today if [my case] is at least still open," went unanswered. A.W. described learning about OCR's decision to freeze processing of Title IX claims as a "gut punch" after "so many dead ends." A.W. has not received any subsequent updates or indication that OCR is proceeding with any investigation into her complaint. And, on information and belief, now, the decimation of OCR's workforce means that OCR cannot process A.W.'s complaint in a prompt and equitable manner. As a result, she is left without resolution of her family's discrimination and retaliation claims, accountability for the school, and protection for the students who are still enrolled.

81. The schools against which Ms. Carter and A.W. filed OCR complaints each receive federal financial assistance are therefore subject to Title VI, Title IX, and Section 504. They are also both public entities within the meaning of Title II.

82. COPAA members similarly report that investigations, resolution sessions, and mediations for disability-related violations have been halted, canceled, or postponed. On information and belief, because of the decimation of OCR's workforce, COPAA has parent members whose pending complaints OCR cannot resolve while their children continue to face discrimination and hostile environments or are denied equal access to education. On information and belief, because of the decimation of OCR's workforce, COPAA also has attorney and advocate members who have had their complaint processing obstructed and can no longer access this administrative process to vindicate their clients' rights, putting them at risk of losing clients and revenue. One COPAA member has voiced that they would rather use the state complaint system because OCR is not functioning.

83. One COPAA advocate member in Michigan represents more than a dozen families with pending complaints formerly handled by the Cleveland regional office. Among these families, one had a mediation canceled in February and another was preparing for an early mediation to be held on March 19, 2025. At least one family has a pending complaint alleging a failure to provide supplementary aids for a student with a disability; that student is in limbo, unable to fully and equitably access educational services until the claims are addressed.

84. As a result of first the freeze in investigations and now the decimation of OCR's workforce, COPAA's mission to provide resources and training and to assist its members in obtaining a free appropriate public education and equal educational opportunity for children with disabilities has been significantly frustrated. To address its frustrated mission, COPAA has been

forced to divert its resources and time to addressing concerns from its members about Defendants' actions and tracking the impact of those actions on COPAA members.

## V.    CAUSES OF ACTION

### Count One
### Violation of the Administrative Procedure Act –
### Arbitrary and Capricious Agency Action

85. Plaintiffs reallege and incorporate by reference all paragraphs above.

86. Under the APA, courts shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

87. Defendants' decimation of OCR's ability to process and investigate complaints through elimination of OCR regional offices and staff constitutes a final reviewable agency action under the APA.

88. Defendants' decimation of OCR's ability to process and investigate complaints is arbitrary and capricious.

89. First, Defendants did not articulate a reasoned basis for their decision to sabotage OCR's ability to fulfil its statutory and regulatory functions, nor did they articulate a reason why specific regional offices and staff were eliminated.

90. Second, Defendants failed to consider or acknowledge the serious reliance interests implicated by their decision, including the impact on families awaiting resolution of their complaints to access needed accommodations, return to the classroom, and remedy discrimination.

91. Third, Defendants failed to offer a reasoned analysis justifying their departure from well-established procedures governing OCR's investigation and processing of complaints.

**Count Two**
**Violation of the Administrative Procedure Act –**
**Agency Action Not in Accordance with Law**

92. Plaintiffs reallege and incorporate by reference all paragraphs above.

93. Under the APA, courts shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

94. Defendants' decimation of OCR's ability to process and investigate complaints through elimination of OCR regional offices and staff constitutes a final reviewable agency action under the APA.

95. Defendants' decimation of OCR's ability to process and investigate complaints is not in accordance with law.

96. First, the sabotage of OCR's ability to fulfill its statutory and regulatory functions contradicts Congress's express command in federal law that the Department of Education effectuate the protections of Title VI and Title IX. *See* 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682.

97. Second, the Impoundment Control Act of 1974, 2 U.S.C. §§ 681– 688, and other federal statutes obligate the executive branch to spend funds that Congress has appropriated on the programs for which Congress made appropriations, and if it does not, to follow a set procedural path based on defined reasons. 2 U.S.C. §§ 683, 684; 31 U.S.C. §§ 1301(a), 1512(c)(1). Defendants' decimation of OCR's ability to process and investigate complaints is unlawful in that it summarily halts enforcement of federal civil rights statutes that Congress has appropriated funds for OCR to vindicate.

98. Third, the decimation of OCR's ability to process and investigate complaints obstructs OCR's ability and obligation to "make a prompt investigation" in response to indications of

possible failures to comply with Title VI, Title IX, and Section 504, and, for Title II, to

"promptly review" complaints, "promptly notify" complainants and public entities of the receipt

and acceptance of complaints, and "investigate complaints for which it is responsible," rendering

OCR in violation of its own rules and regulations.  *See* 28 C.F.R §§ 35.171, 35.172; 34 C.F.R

§ 100.7(c); 34 C.F.R. § 106.81; 34 C.F.R § 104.61.

**Count Three**
**Violation of the Administrative Procedure Act –**
**Action Unlawfully Withheld or Unreasonably Delayed**

99. Plaintiffs reallege and incorporate by reference all paragraphs above.

100.    Under the APA, a reviewing court shall "compel agency action unlawfully

withheld or unreasonably delayed."  5 U.S.C. § 706(1).

101.    Defendants' decimation of OCR's ability to process and investigate complaints

through elimination of OCR regional offices and staff constitutes a final reviewable agency

action under the APA.

102.    OCR is required to "make prompt investigation" in response to indications of

possible failures to comply with Title VI, Title IX, and Section 504.  34 C.F.R § 100.7(c); 34

C.F.R. § 106.81; 34 C.F.R § 104.61.  For Title II complaints, OCR is required to "promptly

review the complaint to determine whether it has jurisdiction over the complaint under section

504," accept all completed complaints over which it has jurisdiction, and "promptly notify the

complainant and the public entity of the receipt and acceptance of the complaint."  28 C.F.R

§ 35.171.

103.    By decimating OCR's ability to process and investigate complaints through

elimination of OCR regional offices and staff, Defendants have actively obstructed OCR's

ability to meet its obligation to make prompt investigations and functionally halted

33

investigations. Defendants thus cannot promptly investigate complaints and have unlawfully withheld and/or unreasonably delayed investigations of complaints within OCR's jurisdiction.

**Count Four**
**Ultra Vires Agency Action**

104.     Plaintiffs reallege and incorporate by reference all paragraphs above.

105.     Federal courts may set aside agency action or inaction that exceeds an agency's powers, including action or inaction that violates a clear and mandatory statutory command or that lacks a contemporaneous, reasoned justification.

106.     The decimation of OCR's ability to process and investigate complaints violates the clear mandates of Title VI, 42 U.S.C. § 2000d-1, and Title IX, 20 U.S.C. § 1682, to effectuate the provisions of those statutes.

107.     Defendants have not supported their decimation of OCR's ability to process and investigate complaints with a contemporaneous, reasoned justification.

108.     As a result, Defendants' decimation of OCR's ability to process and investigate complaints exceeds Defendants' lawful authority and should be set aside.

**Count Five**
**Violation of the Equal Protection Guarantee under the**
**Fifth Amendment to the U.S. Constitution**

109.     Plaintiffs reallege and incorporate by reference all paragraphs above.

110.     The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws and protects individuals from discrimination on the basis of race, sex, sexual orientation, and gender identity.

111.     Defendants' actions discriminate on the basis of race, sex, sexual orientation, and gender identity.

112.     Defendants' actions are motivated by the discriminatory purpose of thwarting race- and sex- based discrimination complaints filed by or on behalf of students of color, LGBTQI+ students, and female students while advancing claims on behalf of white, male, and cisgender claimants that are aligned with the Trump administration's policy preferences and targeting programs and practices that aim to support students of color, LGBTQI+ students, and female students.

113.     Discriminatory purpose and intent is evident from Defendants' actions themselves, as well as the circumstances leading up to them; the various departures from normal OCR procedures; the inconsistencies with OCR's statutory mandates; the patterns of action taken by the administration against people of color, women and girls, and LGBTQI+ individuals; and the disproportionate impact of Defendants' actions on complainants asserting claims on behalf of people of color, women and girls, and LGBTQI+ individuals.

114.     This discriminatory purpose is not a legitimate governmental interest. Defendants' actions and inactions cannot survive under rational basis review, let alone the heightened scrutiny required by the intentionally discriminatory conduct at issue.

115.     Plaintiffs have been injured and continue to be injured because Defendants' actions and inactions subject them to discrimination on the basis of race, sex, sexual orientation, and gender identity and deprive them of equal access to OCR's civil rights complaint procedures.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1. Assert jurisdiction over this action;

2. Declare the Defendants' decimation of OCR's ability to process and investigate complaints unlawful because it violates the APA, exceeds Defendants' statutory authority, and violates the Fifth Amendment to the U.S. Constitution;

3. Enter a permanent injunction:

    a. Compelling Defendants to restore the investigation and processing capacity of OCR and to process OCR complaints promptly and equitably;

    b. Ordering additional appropriately tailored remedies to ensure Defendants' future compliance with their obligations, such as periodic public reporting to this Court regarding OCR's processing and enforcement of complaints; and

    c. Retaining continuing jurisdiction to oversee compliance with the Court's order;

4. Award to Plaintiffs their costs and reasonable attorneys' fees; and

5. Grant such other equitable relief as the Court deems just and proper.


Dated: March 14, 2024             Respectfully submitted,


                       /s/ Johnathan Smith
                       Johnathan Smith (D.C. Bar No. 1029373)
                       National Center for Youth Law
                       818 Connecticut Ave NW, Suite 425
                       Washington, D.C. 20006
                       (202) 868-4782
                       jsmith@youthlaw.org

                       Pallavi Bugga*
                       National Center for Youth Law
                       1212 Broadway, Suite 600
                       Oakland, CA 94610
                       (510) 835-8098

Selene Almazan-Altobelli*
Council of Parent Attorneys and Advocates, Inc.
PO Box 6767
Towson, MD 21285
844-426-7224, ext. 702
Selene@copaa.org

*motion for *pro hac vice* admission forthcoming

*Counsel for Plaintiffs*