**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | |
|---|---|
| NIKKI S. CARTER, | ) |
| A.W., | ) |
| | ) |
| K.D., *on behalf of herself and her minor child*, M.W., | ) Case No. 1:25-cv-744-PLF |
|      address omitted per LCvR 5.1, | ) |
| | ) |
| Melissa Combs., *on behalf of herself and her minor child*, D.P., | ) **FIRST AMENDED COMPLAINT FOR** |
|      address omitted per LCvR 5.1, | ) **DECLARATORY AND** |
| | ) **INJUNCTIVE RELIEF[1]** |
| A.M., | ) |
|      address omitted per LCvR 5.1, | ) |
| Elizabeth Stewart-Williams, | ) |
|      address omitted per LCvR 5.1, | ) |
| A.S., | ) |
|      address omitted per LCvR 5.1, | ) |
| Amy Cupp, *on behalf of herself and her minor child*, G.C., | ) |
|      address omitted per LCvR 5.1, | ) |
| | ) |
|        and | ) |
| COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, INC., | ) |
| | ) |
|        *Plaintiffs*, | ) |
| v. | ) |
| UNITED STATES DEPARTMENT OF EDUCATION, | ) |
| | ) |
| LINDA MCMAHON, Secretary of Education, | ) |
| | ) |
|        and | ) |
| CRAIG TRAINOR, Acting Assistant Secretary for Civil Rights, | ) |
|        *Defendants*. | ) |

---

[1] Plaintiffs file this First Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(A).

## I.    INTRODUCTION

1.    Public education is a foundational building block of our democracy.  Through the educational process, students learn not only about the world around them, but also how to engage and participate as productive members of society.  All students deserve access to safe schools where they can learn free from discrimination.  Unfortunately, for far too many students in the United States, educational institutions are not places of safety, refuge, and support, but rather places of discrimination, harassment, and violence.  For these students and their families, the promise of opportunity and American democracy is too often betrayed by the very institutions entrusted to protect them.  This is especially true for students of color, students with disabilities, female students, and LGBTQ+ students.

2.    Recognizing the central importance of a quality, non-discriminatory education to the well-being and growth of our country's young people, in 1979, Congress created the United States Department of Education (the "Department").  Congress found that education is essential to the development of individuals and the country as a whole—and that no student should be denied access to quality educational opportunities due to their race, creed, color, national origin, or sex.  The Department was charged with expanding educational access for all students, supporting state and local education efforts, encouraging community engagement in education programs, and conducting research to improve education quality.

3.    Within the Department, the Office for Civil Rights ("OCR") is charged with "ensur[ing] equal access to education and [] promot[ing] educational excellence through vigorous enforcement of civil rights in our nation's schools."[2]  For decades, as part of this crucial

---

[2] U.S. Dep't of Educ., *Office for Civil Rights (OCR)* (Jan. 19, 2025), https://www.ed.gov/about/ed-offices/ocr; *see also* Kristen A. Graham, Susan Snyder & Maddie

mandate, and in accordance with federal law, including Title VI of the Civil Rights Act of 1964

("Title VI"), Title IX of the Education Amendments of 1972, as amended ("Title IX"), Section

504 of the Rehabilitation Act of 1973, as amended ("Section 504"), and Title II of the Americans

with Disabilities Act ("Title II") and their implementing regulations,[3] OCR has received,

investigated, and resolved complaints submitted by members of the public alleging

discrimination on the basis of race, sex, disability, and other protected characteristics.  This

service is available without financial cost to students and families.  Students and families' ability

to have their civil rights complaints thoroughly reviewed in a prompt, impartial, and non-

discriminatory manner is integral to the mission of OCR.  In 2024 alone, OCR received 22,687

complaints from the public.[4]

    4.    The current presidential administration, however, is committed to eliminating the

Department.  President Trump campaigned on abolishing the Department and, within his first

several weeks in office, his administration has taken steps to effectuate that promise, including

mass firings of Department staff and the termination of dozens of education-related contracts

worth nearly one billion dollars.[5]  These actions harm students and their families, who rely on the

---

Hanna, *What the Department of Education Cuts Mean for Local Schools*, Philadelphia Inquirer (Mar. 12, 2025), https://www.inquirer.com/education/us-education-department-cuts-trump-administration-20250312.html.

[3] 34 C.F.R. Part 100, 34 C.F.R. Part 106, 34 C.F.R. Part 104, and 28 C.F.R. Part 35, respectively.

[4] U.S. Dep't of Educ., Office for Civil Rights, *2024 Fiscal Year Annual Report: Report to the President and Secretary of Education* (2024) at 8, https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf.

[5] *See* Dana Goldstein, *Could Trump Shut Down the Department of Education?*, N.Y. Times (Nov. 13, 2024), https://www.nytimes.com/2024/11/13/us/trump-close-department-of-education.html; Michael C. Bender & Dana Goldstein, *Education Department Fires 1,300 Workers, Gutting Its Staff*, N.Y. Times (Mar. 11, 2025), https://www.nytimes.com/2025/03/11/us/politics/trump-education-department-firings.html; Cory Turner, *Trump Is Weighing Big Cuts to the U.S. Department of Education*, NPR (Feb. 4, 2025), https://www.npr.org/2025/02/03/nx-s1-5282233/trump-to-make-big-cuts-to-education-

Department to ensure their access to educational opportunities, as required by the federal civil rights laws Congress charges OCR to enforce.

5.    The Office for Civil Rights and its complaint and investigation processing functions have fallen under attack.  Following President Trump's inauguration, Department leadership has engaged in a series of actions that have obstructed the processing of complaints from the public. Shortly after the inauguration, the Department abruptly froze all OCR investigations, abdicating its responsibility to process and investigate civil rights complaints filed by students and families nationwide seeking equal access to education.  On February 20, 2025, Acting Assistant Secretary for Civil Rights Craig Trainor released the freeze on complaints alleging only disability-based discrimination, while continuing to bar OCR staff from advancing the cases of students and families seeking accountability for race- and sex-based claims under Title VI and Title IX, including complaints implicating race- or sex-based discrimination alongside disability-based discrimination.

6.    Even as OCR generally stopped investigating complaints from the public based on race or sex discrimination, it cherry-picked and, on its own initiative, began targeted investigations into purported discrimination against white and cisgender students, including through the establishment of an "End DEI" (short for "End Diversity, Equity, and Inclusion")

---

department; Michael C. Bender, *Asked if U.S. Needs Education Department, Its Head Says 'No'*, N.Y. Times (Mar. 7, 2025), https://www.nytimes.com/2025/03/07/us/politics/education-department-mcmahon-trump.html.

portal to solicit information for use in potential investigations into programs designed to ensure equal access to education for transgender students and students of color.[6]

7.      While Secretary McMahon did, on March 6, 2025, declare an end to the "pause" on OCR complaint processing that had nullified the OCR complaint process for students and families across the country, within days, she stymied the prompt processing of their complaints in a new way: by decimating OCR's workforce, including by eliminating seven of twelve regional offices and leaving skeleton staffing at the remaining offices, leaving students and families with little chance of their complaints being processed and investigated and sabotaging OCR's ability to fulfill its statutory and regulatory mandate to enforce civil rights laws in schools.[7]

8.      This assault on OCR has taken place against a backdrop of explicit hostility towards students of color and LGBTQ+ students on the part of the Trump administration.  Through a series of press releases, policy statements, and executive orders, the administration has made clear its contempt for the civil rights of historically marginalized students.  For example, in a February 14, 2025 Dear Colleague Letter regarding the Department's interpretation of civil rights laws, Acting Assistant Secretary Trainor alleged that, in recent years, U.S. educational institutions have discriminated against white students on the basis of race, and made clear the

---

[6] U.S. Dep't of Educ., *U.S. Department of Education Launches "End DEI" Portal* (Feb. 27, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-launches-end-dei-portal.
[7] *See* Jodi S. Cohen & Jennifer Smith Richards, *Massive Layoffs at the Department of Education Erode Its Civil Rights Division*, ProPublica (Mar. 12, 2025), https://www.propublica.org/article/education-department-civil-rights-division-eroded-by-massive-layoffs.

administration's intent to attack DEI initiatives and other disfavored efforts to achieve "diversity, racial balancing, social justice, or equity."[8]

9.    The Department's actions are causing significant harm.  Without even minimally adequate staffing, OCR cannot fulfill its mandate and move complaint investigation and processing forward.  OCR has abdicated its responsibility to enforce civil rights protections, leaving students who should be able to trust and rely on their government to protect and defend their rights to instead endure discriminatory and unsafe learning environments without recourse.

10.    Students with disabilities feel with force the Department's failure to protect students across the country.  Historically, the majority of complaints OCR receives have raised allegations regarding disability; OCR has played an especially important role in ensuring that students with disabilities are able to enforce their right to a non-discriminatory public education.[9]

11.    In addition, the attack on the Department and OCR is not felt equally across students and their communities.  It disproportionately harms students of color, women and girls, and LGBTQ+ students.

12.    This lawsuit seeks to hold the Department accountable for ensuring that schools are places where all students can learn and thrive.  Plaintiffs Nikki S. Carter, A.W.,[10] K.D.,[11] on behalf of herself and her minor child, M.W., Melissa Combs, on behalf of herself and her minor

---

[8] U.S. Dep't of Educ., *Dear Colleague Letter: Title VI of the Civil Rights Act in Light of Students for Fair Admissions v. Harvard* (Feb. 14, 2025), https://www.ed.gov/media/document/dear-colleague-letter-sffa-v-harvard-109506.pdf.

[9]  U.S. Dep't of Educ., Office for Civil Rights, *2024 Fiscal Year Annual Report: Report to the President and Secretary of Education* (2024) at 8, https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf.

[10] Plaintiffs have sought permission to use initials for Plaintiff A.W.

[11] Plaintiffs will seek permission to use initials for Plaintiff K.D.

child, D.P.,[12] A.M.,[13] Elizabeth Stewart-Williams, A.S.,[14] Amy Cupp, on behalf of herself and her minor child, G.C., and the Council of Parent Attorneys and Advocates, Inc., on behalf of itself and its members, bring this action against Defendants the U.S. Department of Education, Secretary of Education Linda McMahon, and Acting Assistant Secretary for Civil Rights Craig Trainor.  Plaintiffs challenge the evisceration of students' and families' access to OCR's statutorily and regulatorily mandated complaint investigation process through the gutting of OCR's workforce and closure of regional offices, as well as the particular impact on people of color and LGBTQ+ individuals.  The Department's actions run afoul of the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*, exceed Defendants' lawful authority, and violate the Equal Protection guarantee under the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  Plaintiffs therefore seek declaratory and injunctive relief holding Defendants' actions unlawful and ordering Defendants to restore the investigation and processing capacity of OCR and to process complaints from the public promptly and equitably in accordance with OCR's statutory and regulatory obligations.

## II.    JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under federal law, including the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*, and the United States Constitution.  Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 702, 704.  Plaintiffs' claims for declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201 and 2202, 5 U.S.C. §§ 705 and 706, and Federal Rules of Civil Procedure 57 and 65.

---

[12] Plaintiffs will seek permission to use pseudonymous initials for Plaintiff D.P.
[13] Plaintiffs will seek permission to use initials for Plaintiff A.M.
[14] Plaintiffs will seek permission to use initials for Plaintiff A.S.

14.    Venue is proper in this District pursuant to 28 U.S.C. 1391(e) because this action seeks relief against federal agencies and officials acting in their official capacities, at least one of the Defendants is headquartered in Washington, D.C., and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

### III.    PARTIES

15.    Plaintiff Nikki S. Carter is a Black parent of three children and a long-time advocate for students with disabilities in her Alabama community.  In September 2022, Ms. Carter filed a complaint with OCR alleging discrimination on the basis of race and retaliation for her work as a parent advocate.  Due to her race and her advocacy on behalf of students, her children's school district, the Demopolis City School System, twice banned Ms. Carter from school district properties.  These bans prevented her both from fully engaging in her children's education, such as by attending parent-teacher conferences and school events, and from continuing her community advocacy at onsite meetings.  In December 2022, OCR opened an investigation under Title VI and Section 504.  As a result of Defendants' obstruction of OCR's complaint investigation and processing functions, OCR stopped investigating and processing Ms. Carter's complaint.  Ms. Carter has received no indication that the investigation has resumed.

16.    Plaintiff A.W. is the parent of an Alabama student who experienced sexual assault and harassment by a classmate.  When the school failed to address the situation, A.W. withdrew her child from school for their safety.  In October 2023, A.W. filed a complaint with OCR on behalf of her child alleging discrimination on the basis of sex and disability, seeking to hold the school accountable and to ensure that other students do not suffer similar harm.  In June 2024, OCR opened an investigation under Title IX, Section 504, and Title II.  As a result of Defendants' obstruction of OCR's complaint investigation and processing functions, OCR stopped

investigating and processing A.W.'s complaint. A.W. has received no indication that the investigation has resumed.

17.    Plaintiff M.W. is a sixteen-year-old Black student. Pursuant to Fed. R. Civ. P. 17(c)(2), M.W. appears through her Next Friend and parent, Plaintiff K.D. In April 2023, as a middle school student in a California public school, M.W. experienced discrimination by a school administrator and harassment by staff and other students based on her race. M.W. and K.D. reported the harassment to school officials, who failed to adequately respond. On May 15, 2023, K.D. filed a complaint with OCR on behalf of her child, alleging discrimination on the basis of race. On July 31, 2023, OCR opened an investigation into the school's disproportionate discipline and response to the harassment under Title VI. As a high school student in the same school district, M.W. now continues to face harassment based on her race. But, as a result of Defendants' obstruction of OCR's complaint investigation and processing functions, including the closure of the San Francisco regional office handling K.D.'s complaint, OCR stopped its investigation. K.D. and M.W. have received no indication that the investigation has resumed.

18.    Plaintiff D.P. is an LGBTQ+ high school student in Connecticut. Pursuant to Fed. R. Civ. P. 17(c)(2), D.P. appears through their Next Friend and parent, Plaintiff Melissa Combs. When they were in middle school, D.P. experienced discrimination and harassment from both school staff and other students targeting their gender/sexual identity. D.P.'s experience is part of a pattern of discrimination and harassment targeting LGBTQ+ students in the school district where they live. On June 10, 2022, after the school district failed to address this discrimination and harassment, Ms. Combs filed a complaint with OCR on behalf of D.P. and other LGTBQ+ students who had experienced discrimination and harassment on the basis of their gender/sexual identity in violation of Title IX. On August 10, 2022, Ms. Combs received a letter stating that

OCR was opening an investigation into her complaint. As a result of Defendants' obstruction of OCR's complaint investigation and processing functions, including the closure of the Boston regional office handling Ms. Combs' complaint, OCR stopped its investigation. Ms. Combs and D.P. have received no indication that the investigation has resumed.

19.     Plaintiff A.M. is the parent of a Michigan student who experienced sexual assault and harassment by a classmate while in middle school. When the school failed to address the situation, A.M. withdrew her daughter from school for her daughter's physical safety and mental health. In January 2023, A.M. filed a complaint with OCR on behalf of her child alleging discrimination on the basis of sex as a result of the district's failure to adequately respond to her formal complaint, as well as the district's failure to appropriately train its personnel on Title IX investigations. OCR opened an investigation in response to A.M.'s complaint in May 2023. As a result of Defendants' obstruction of OCR's complaint and processing functions, including the closure of the Cleveland regional office handling A.M.'s complaint, OCR stopped its investigation. Although A.M.'s case has been transferred to the Denver regional office, she has received no indication that the investigation has resumed.

20.     Plaintiff A.S. is an eighteen-year-old high school graduate who served as the captain on her Texas high school track team. A.S. is Black. She experienced sexual harassment and assault by another student on her team that the school failed to address. Plaintiff Elizabeth Stewart-Williams is A.S.'s mother. She filed an OCR complaint on her daughter's behalf on February 20, 2024, alleging discrimination on the basis of sex and race in violation of Title IX and Title VI. On July 24, 2024, OCR conducted a mediation, which failed, and on July 29, 2024, OCR opened the complaint under a new case number. As a result of Defendants' obstruction of OCR's complaint investigation and processing functions, including the closure of the Dallas

regional office handling Ms. Stewart-Williams' complaint, OCR stopped its investigation. Ms. Stewart-Williams and A.S. have received no indication that the investigation has resumed.

21.    Plaintiff G.C. is a twelve-year-old sixth-grade student diagnosed with multiple disabilities who receives special education services, including academic, social and emotional, and behavioral supports, pursuant to an individualized education program in her Indiana public school. Pursuant to Fed. R. Civ. P. 17(c)(2), G.C. appears through her Next Friend and parent, Plaintiff Amy Cupp. During the current school year, school staff subjected G.C. to multiple incidents of restraint and seclusion, including one incident that resulted in bruising from the restraint used. On December 6, 2024, Ms. Cupp contacted the Chicago OCR office for assistance, and staff encouraged her to file a complaint via the online portal. On January 14, 2025, OCR indicated that it would open an investigation and informed Ms. Cupp that she would receive an official notification letter soon. As a result of Defendants' obstruction of OCR's complaint investigation and processing functions, including the closure of the Chicago regional office, OCR stopped processing Ms. Cupp's complaint. Ms. Cupp has received no indication that her complaint is being processed or investigated.

22.    Plaintiff Council of Parent Attorneys and Advocates, Inc. ("COPAA") is a national not-for-profit membership organization whose membership comprises parents of children with disabilities, their attorneys, and their advocates. COPAA's mission is to protect and enforce the legal and civil rights of students with disabilities and their families. COPAA's primary goal is to secure appropriate educational services for children with disabilities in accordance with federal laws. As part of this mission, COPAA seeks to protect the rights of children with disabilities to be free from discrimination based on their disability, race, sex, sexual orientation, and gender

identity, and to receive the free and appropriate public education to which they are legally entitled.

23.     COPAA accomplishes its mission by, among other activities, providing resources, training, and information to members to assist them in obtaining a free appropriate public education and equal educational opportunity for children with disabilities; helping parents and advocates file administrative complaints; helping parents and advocates find attorneys and legal resources as they advocate for their children's legal rights; educating the public and policymakers, including federal agencies, about the experiences of children with disabilities and their families; and educating COPAA members about developments in the federal civil rights laws and policies affecting the education of children with disabilities.  COPAA frequently advises, trains, and assists parents, attorneys, and advocates filing complaints with OCR.

24.     COPAA has more than 3,600 members located across the United States.  Membership is open to all persons who are interested in furthering COPAA's purposes and who pay annual dues as required.  COPAA's Board of Directors is composed exclusively of COPAA members.

25.     COPAA has active members nationwide.  As parents, advocates, and attorneys for students with disabilities, COPAA's members rely on the Department to enforce the rights of students with disabilities to receive an education free from discrimination.  COPAA's members have filed pending OCR complaints concerning discrimination on the basis of disability, including complaints alleging both disability-based and race- and/or sex-based discrimination in schools.

26.     Plaintiffs Nikki S. Carter, A.W., and Melissa Combs are members of COPAA.

27.     As a result of Defendants' obstruction of OCR's complaint investigation and processing functions, OCR stopped processing COPAA members' complaints.

28.     COPAA brings this action as an organizational plaintiff.  The Department's actions have made achieving COPAA's mission to ensure equal access to education more difficult, time-consuming, and resource-intensive.  Because of Defendants' obstruction of OCR's complaint investigation and processing functions, COPAA has expended time and resources it would have devoted to advocating on behalf of students with disabilities to responding to calls and emails about Defendants' actions, as well as addressing inquiries about, tracking, and analyzing the impact of Defendants' actions on its members' pending complaints.

29.     COPAA has also been forced to expend resources updating its training materials, retraining its members on alternative and state complaint processes, and altering its recommendations and advice on the likely efficacy of an OCR complaint, which has required additional expenditures on staff and diverted resources from direct assistance to members. COPAA has expended time and resources that it otherwise could have dedicated to its efforts to secure equal access to education.

30.     COPAA also brings this action on behalf of its active members with pending OCR complaints.  COPAA's membership includes parents, attorneys, and advocates who have pending stalled OCR complaints.  For example, a COPAA member attorney representing a COPAA member parent filed an OCR complaint in September 2024 raising allegations of discrimination under both Section 504 and Title VI on behalf of an English language learner student in Maryland.  OCR opened that investigation on December 9, 2024.  As a result of Defendants' obstruction of OCR's complaint investigation and processing functions, including the closure of the Philadelphia regional office handling the COPAA members' complaint, OCR stopped its investigation.  The COPAA members have received no indication that the investigation has resumed.  Another COPAA member in Michigan represents families with more

than a dozen complaints assigned to a number of closed offices.  Most of those complaints are frozen with no updates available.

31.    Defendant United States Department of Education is an agency of the United States government.  The Department of Education is headquartered in Washington, D.C.

32.    Defendant Linda McMahon is the Secretary of the Department of Education.  She is sued in her official capacity only.  Secretary McMahon maintains an office at 400 Maryland Ave SW, Washington, D.C. 20202.

33.    Defendant Craig Trainor is the Acting Assistant Secretary for Civil Rights.  He is sued in his official capacity only.  Acting Assistant Secretary Trainor maintains an office at 400 Maryland Ave SW, Washington, D.C. 20202.

### IV.    FACTUAL ALLEGATIONS

***The Department was Created to Ensure Equal Access to Educational Opportunities
and to Remedy Discrimination in Schools through OCR***

34.    Congress established the Department of Education in 1979, finding in part that "there is a continuing need to ensure equal access for all Americans to educational opportunities of a high quality," and that "such educational opportunities should not be denied because of race, creed, color, national origin, or sex."[15]

35.    The functions of the Department had previously been spread across various federal agencies, including the Department of Health, Education, and Welfare, the predecessor agency to the Department of Health and Human Services.  Congress found that there was a need to create the Department because "the dispersion of education programs across a large number of Federal

---

[15] Department of Education Organization Act, Pub. L. No. 96–88, § 101, 93 Stat. 668, 669 (1979).

agencies has led to fragmented, duplicative, and often inconsistent Federal policies relating to education."[16]

36.     At the time Congress created the Department of Education, it also created an Office for Civil Rights within the Department to "assume responsibility for [] carrying out the nation's civil rights laws in education," specifically referencing "such provisions as Title VI of the Civil Rights Act of 1964 (racial and ethnic discrimination) [and] Title IX of the Education Amendments of 1972 (sex discrimination)."[17]

37.     The Department of Education is charged with enforcing various civil rights laws prohibiting discrimination in all programs and activities that receive federal financial assistance, including Title VI, 42 U.S.C. §§ 2000d *et seq.*; Title IX, 20 U.S.C. §§ 1681 *et seq.*; and Section 504, 29 U.S.C. § 794, and Title II, 42 U.S.C. §§ 12131, *et seq.*, which prohibit discrimination based on disability.

38.     With respect to race- and sex-based discrimination in particular, Title VI and Title IX explicitly direct the Department of Education, as an agency that extends federal financial assistance to education programs, to effectuate their anti-discrimination provisions.  42 U.S.C. § 2000d-1 ("Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity by way of grant, loan, or contract . . . is . . . directed to effectuate the provisions of [Title VI]."); 20 U.S.C. § 1682 ("Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract . . . is . . . directed to effectuate the provisions of [Title IX] with respect to such program or activity.").

---

[16] *Id.* at 670.
[17] S. Rep. No. 96-49, at 35-36 (Mar. 27, 1979).

39.     The mission of OCR is "to ensure equal access to education and to promote

educational excellence through vigorous enforcement of civil rights in the nation's schools."[18]

40.     Federal regulations require OCR to investigate and resolve potential violations of,

*inter alia*, Title VI, Section 504, Title IX, and Title II.  *See* 34 C.F.R. Parts 100, 104, 106, and 28

C.F.R. Part 35.[19]  The implementing regulations for Title VI specify that "[t]he responsible

Department official or his designee will make a prompt investigation whenever a compliance

review, report, complaint, or any other information indicates a possible failure to comply with

this part," and that the investigation must "include, where appropriate, a review of the pertinent

practices and policies of the recipient, the circumstances under which the possible

noncompliance with this part occurred, and other factors relevant to a determination as to

whether the recipient has failed to comply with this part."  34 C.F.R. § 100.7(c).  The regulations

require OCR to enforce Section 504 and Title IX using the same procedures.  34 C.F.R.

§ 104.61; 34 C.F.R. § 106.81.[20]  For complaints under Title II, OCR must "promptly review the

complaint to determine whether it has jurisdiction over the complaint under section 504" and, if

so, "promptly notify" complainants and public entities of the receipt and acceptance of

---

[18] U.S. Dep't of Educ., *Office for Civil Rights (OCR)* (Jan. 19, 2025),
https://www.ed.gov/about/ed-offices/ocr; *see also* Kristen A. Graham, Susan Snyder & Maddie
Hanna, *What the Department of Education Cuts Mean for Local Schools*, Philadelphia Inquirer
(Mar. 12, 2025), https://www.inquirer.com/education/us-education-department-cuts-trump-
administration-20250312.html.
[19] OCR is additionally required to investigate and resolve potential violations of the Age
Discrimination Act and the Boy Scouts of America Equal Access Act under 34 C.F.R. Part 110
and 34 C.F.R Part 108, respectively.
[20] *See also* U.S. Dep't of Educ., *OCR Case Processing Manual* (Feb. 19, 2025) at 21,
https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf (explaining that "the
regulations implementing Title VI . . . require OCR to investigate complaints that are filed with
the agency," and that this requirement "is incorporated by reference in the regulations
implementing other statutes enforced by OCR," including those implementing Title IX and
Section 504).

complaints, and "process the complaint according to its procedures for enforcing section 504."

28 C.F.R. § 35.171.

41.    Like other federal agencies, the Department of Education sets performance targets

pursuant to the Government Performance and Results Act ("GPRA").  OCR's GPRA

performance targets include that OCR will resolve 80% of complaints within 180 days of

receipt.[21]

42.    Pursuant to Section 203(b)(1) of the Department of Education Organization Act, the

Assistant Secretary for Civil Rights must "make an annual report . . . identifying significant civil

rights or compliance problems as to which such Office has made a recommendation for

corrective action."[22]

43.    In line with its mandate, OCR has developed well-established policies and procedures

for the receipt, processing, investigation, and prompt resolution of civil rights complaints, as

described in its Case Processing Manual.[23]

44.    OCR's Early Mediation Process ("EMP") allows for facilitated settlement discussion

between parties soon after a complaint is filed.[24]  If complainants indicate their interest in EMP

by checking the appropriate box on the online complaint form when they file their complaint,

---

[21]  U.S. Dep't of Educ., *Office For Civil Rights Fiscal Year 2025 Budget Request* (2025) at 26,
https://www.ed.gov/media/document/ocr-fiscal-year-2025-budget-request-39373.pdf.
[22]  Department of Education Organization Act, Pub. L. No. 96–88, §101, 93 Stat. 669,
673 (1979).
[23]  *See* U.S. Dep't of Educ., *OCR Case Processing Manual* (Feb. 19, 2025),
https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf; *see also* U.S. Dep't of
Educ., *Questions and Answers on OCR's Complaint Process* (accessed Feb. 20, 2025), available
at: https://www.ed.gov/laws-and-policy/civil-rights-laws/civil-rights-faqs/questions-and-
answers-on-ocrs-complaint-process ("OCR's role is to . . . promptly resolve complaints.").  This
is not a new requirement.  *See* U.S. Dep't. of Educ., *OCR Case Processing Manual* (Aug. 26,
2020), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm-20202608.pdf.
[24]  U.S. Dep't of Educ., *Discrimination Complaint Form*
(2023), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/complaintform.pdf.

OCR can determine if the complaint is appropriate for resolution through the EMP.[25]  Mediation is a form of complaint resolution that OCR offers as an alternative to its investigation process, where "a staff member from OCR who is trained in mediation assists the parties to reach a negotiated resolution of the complaint" and "helps the parties to find a mutually acceptable resolution" to the complaint.[26]

45.    OCR's Rapid Resolution Process ("RRP") is an expedited case processing approach available to staff working in any of OCR's statutory areas, designed to accelerate resolution of complaints.  Per the Case Processing Manual, "[f]or cases in RRP, the [OCR] Regional Office must ensure expeditious completion in accordance with statute, regulations, and case processing procedures."[27]

46.    Congress has allocated a $140 million budget to OCR to perform its authorized functions.  OCR's budget requests and justifications make clear that these functions include, in substantial part, OCR's enforcement work.  For example, OCR's 2025 budget request states that "[s]ince fiscal year 2009, the number of [discrimination] complaints has almost tripled," and explains that "[r]equested funds would ensure program support to resolve complaints of discrimination filed by the public and ensure that institutions receiving Federal financial assistance comply with the civil rights laws enforced by OCR." [28]  The budget request further

---

[25] U.S. Dep't of Educ., *Complaint Processing Procedures* (2022),
 https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/complaints-how.pdf.
[26] *Id*.
[27] *See* U.S. Dep't of Educ., *OCR Case Processing Manual* (Feb. 19, 2025) at 12,
https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf.
[28] U.S. Dep't of Educ., *Department of Education Fiscal Year 2025 President's Budget* (2025) at
69, https://www.ed.gov/sites/ed/files/about/overview/budget/budget25/summary/25
summary.pdf; U.S. Dep't of Educ., *Office for Civil Rights Fiscal Year 2025 Budget Request*
(2025), https://www.ed.gov/sites/ed/files/about/overview/budget/budget25/justifications/dd-
ocr.pdf.

specifies that the "funds would support a full time equivalent (FTE) level of 643 [staff][29] and provide resources necessary for OCR to deliver on its statutory and regulatory mandates."[30]

47.     Before the current administration's attack on the ability of OCR to fulfill its mandate, most of OCR's statutory and regulatory investigation and enforcement functions were assigned to its twelve regional enforcement offices: Washington D.C., Atlanta, Boston, Chicago, Cleveland, Dallas, Denver, Kansas City, New York, Philadelphia, San Francisco, and Seattle. "These enforcement offices [were] organized into 4 divisions carrying out OCR's core work— preventing, identifying, ending, and remedying discrimination against American students."[31]

48.     In Fiscal Year 2024, OCR had 588 FTE staff.[32]  Over half were investigative staff, who are responsible for handling complaints alleging discrimination based on race, gender, disability, and sexual orientation, and most had caseloads of fifty or more during Fiscal Year 2024.[33]  Further, prior to the staffing cuts, it was projected that the average case load per

---

[29] The Department of Education's budget requests over the years have consistently included funding for OCR staff to resolve complaints filed by the public.  For example, the Department requested funds for 523 FTE in 2018, 529 FTE in 2019, and 619 FTE in 2020.  *See* U.S. Dep't of Educ., *Office for Civil Rights Fiscal Year 2018 Budget Summary and Background Information* (2018), https://www.ed.gov/sites/ed/files/about/overview/budget/budget18/summary/18summary.pdf; U.S. Dep't of Educ., *Office for Civil Rights Fiscal Year 2019 Budget Summary and Background Information* (2019), https://www.ed.gov/sites/ed/files/about/overview/budget/budget19/summary/19summary.pdf; and U.S. Dep't of Educ., *Office for Civil Rights Fiscal Year 2020 Budget Summary* (2020), https://www.ed.gov/sites/ed/files/about/overview/budget/budget20/summary/20summary.pdf.
[30] U.S. Dep't of Educ., *Office for Civil Rights Fiscal Year 2025 Budget Request* (2025), https://www.ed.gov/sites/ed/files/about/overview/budget/budget25/justifications/dd-ocr.pdf.
[31] U.S. Dep't of Educ., *About the Office for Civil Rights* (2025), https://www.ed.gov/about/ed-offices/ocr/about-ocr.
[32] U.S. Dep't of Educ., Office for Civil Rights, *2024 Fiscal Year Annual Report: Report to the President and Secretary of Education* (2024) at 8, https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf.
[33] *See* U.S. Dep't of Educ., *Office for Civil Rights Fiscal Year 2025 Budget Request* (2025), https://www.ed.gov/sites/ed/files/about/overview/budget/budget25/justifications/dd-ocr.pdf;

investigative staff member in Fiscal Year 2025 "w[ould] become unmanageable at 71 cases."[34]

49.    Under that prior staffing level, OCR investigators struggled to meet the Department of Education's GPRA target, which sets 180 days as a goal for 80% cases to be resolved.[35]  Upon information and belief, in Fiscal Year 2024, ten of the twelve regional offices failed to meet that standard.

50.    In Fiscal Year 2024, OCR received 22,687 complaints.[36]  As of January 2025, there were more than 12,000 pending investigations.[37]

### *Contrary to OCR's Mandate and Purpose, Defendants Systemically Obstructed OCR's Investigation and Enforcement Functions by Imposing a General Freeze on Investigations while Directing Resources to Cases of Political Interest*

51.    Following the inauguration, OCR's investigation of discrimination complaints essentially grounded to a halt.[38]  OCR instructed employees that they could continue reviewing files, but barred staff from communicating with students, families, and schools involved in their cases and instructed them to cancel scheduled meetings and mediations.  This freeze stopped the investigation and processing of students' and families' complaints in their tracks.  Because all

---

Declaration of Catherine E. Lhamon at 8, *State of New York v. McMahon,* No. 1:25-cv-10601 (D. Mass. Mar. 13, 2025).

[34] *See* U.S. Dep't of Educ., *Office for Civil Rights Fiscal Year 2025 Budget Request* (2025), https://www.ed.gov/sites/ed/files/about/overview/budget/budget25/justifications/dd-ocr.pdf.

[35] U.S. Dep't of Educ., Office for Civil Rights, *GPRA,* https://www.ed.gov/about/ed-offices/ocr/gpra (last visited Apr. 8, 2025); *see also* U.S. Dep't of Educ., *Office For Civil Rights Fiscal Year 2025 Budget Request* (2025) at 26, https://www.ed.gov/media/document/ocr-fiscal-year-2025-budget-request-39373.pdf.

[36] U.S. Dep't of Educ., Office for Civil Rights, *2024 Fiscal Year Annual Report: Report to the President and Secretary of Education* (2024) at 8, https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf.

[37] U.S. Dep't of Educ., *Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools* (accessed Mar. 13, 2025), https://ocrcas.ed.gov/open-investigations.

[38] Jennifer Smith Richards & Jodi S. Cohen, *"We've Been Essentially Muzzled": Department of Education Halts Thousands of Civil Rights Investigations Under Trump*, ProPublica (Feb. 13, 2025), https://www.propublica.org/article/department-of-education-civil-rights-office-investigations.

external communications with students, families, and schools were frozen, OCR staff could not request documents, conduct interviews, participate in meetings or mediations, negotiate resolution agreements, issue letters of finding, or take other steps to investigate or resolve complaints.

52.     At the same time, however, OCR affirmatively opened selected investigations targeting programs and actions designed to combat discrimination against students of color and LGBTQ+ students and provide them with equal access to educational opportunities.  Many are "directed investigations," meaning they were initiated by the agency, rather than by individual students and their families and advocates.

53.     For example, on January 27, 2025, OCR opened an investigation into the Ithaca City School District for sponsoring the Students of Color United Summit, an event designed to "provide a safe space for" and to "celebrate and uplift students of color" as part of its inclusion and support efforts.[39]  OCR agreed to open an investigation based on allegations that this event supporting students of color was "discriminatory" against white students.[40]

---

[39] Maddy Vogel, *Trump-Era Education Department Launches Investigation into Ithaca Schools Over Alleged Racial Exclusion*, Ithaca.com (Feb. 4, 2025), https://www.ithaca.com/news/ithaca/trump-era-education-department-launches-investigation-into-ithaca-schools-over-alleged-racial-exclusion/article_b1635a08-e2af-11ef-85e6-7760bf2508d6.html.

[40] Letter from U.S. Dep't of Educ., Office for Civil Rights, to William A. Jacobson, President, Legal Insurrection Foundation (Jan. 27, 2025), https://equalprotect.org/wp-content/uploads/2024/08/EPP-v.-Ithaca-City-School-District-OCR-Letter-Opening-Investigation-1-27-2025.pdf.

54.     On January 28, 2025, OCR announced it had opened an investigation into Denver Public Schools for creating a gender-neutral bathroom in an effort to support transgender students.[41]

55.     On February 6, 2025, OCR announced that it had opened investigations into three universities for allowing transgender students to participate in sports on teams that match their gender identities.  It characterized this support of transgender students as "radical transgender ideology" and intentionally misgendered trans students who participated in sports at the three universities.[42]

56.     On February 12, 2025, OCR announced it had opened investigations into several school districts in Virginia for policies supporting transgender students, including policies allowing transgender students to use restroom and locker room facilities that align with their gender identities.[43]

57.     Also on February 12, 2025, OCR announced it had opened investigations into high school athletic leagues in California and Minnesota for policies allowing transgender students to participate on athletic teams that align with their gender identities.[44]

---

[41] U.S. Dep't of Educ., *U.S. Department of Education Launches Investigation into Denver Public Schools for Converting Girl's Restroom to All-Gender Facility* (Jan. 28, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-launches-investigation-denver-public-schools-converting-girls-restroom-all-gender-facility.
[42] U.S. Dep't of Educ., *U.S. Department of Education to Investigate Title IX Violations in Athletics* (Feb. 6, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-investigate-title-ix-violations-athletics.
[43] Letter from Dan Greenspahn, Team Leader, Team I, U.S. Dep't of Educ. Office for Civil Rights, to Ian D. Prior, Senior Advisor, Am. First Legal Found. (Feb. 12, 2025), https://media.aflegal.org/wp-content/uploads/2025/02/14102615/C-LON-11-25-1305-1309.pdf.
[44] U.S. Dep't of Educ., *U.S. Department of Education Launches Title IX Investigations into Two Athletic Associations* (Feb. 12, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-launches-title-ix-investigations-two-athletic-associations.

58.     Other investigations remained frozen.  OCR offered no public explanation for its abandonment of its well-established policy, practice, and procedure of investigating, processing, and resolving discrimination complaints from the public, and instead advancing only selected complaints aligned with the administration's political agenda.

59.     On February 20, 2025, OCR issued a memorandum lifting the freeze as to "complaints that allege only disability-based discrimination (i.e., complaints that do not allege other statutory violations)."  Complaints filed by members of the public alleging race- and sex-based discrimination, including complaints on behalf of students with disabilities alleging race- and sex-based discrimination in conjunction with disability-related claims, remained stalled.  The memorandum did not provide any reason or rationale for this updated policy.

60.     On February 21, 2025, OCR announced that it had opened an investigation into the Maine Department of Education and a school district in Maine regarding their policies supporting transgender student athletes.[45]

61.     On February 27, 2025—as it continued to freeze investigations into cases from the public alleging race, sex, or intersectional discrimination—the Department of Education launched an "End DEI" (short for "End Diversity, Equity, and Inclusion") portal.  The portal

---

[45] Letter from Bradley Burke, Reg'l Dir., Office for Civil Rights, U.S. Dep't of Educ., to Pender Makin, Comm'r, Me. Dep't of Educ. (Mar. 19, 2025), https://www.ed.gov/media/document/letter-of-finding-maine-doe-109602.pdf; U.S. Dep't of Educ., *Office for Civil Rights Launches Title IX Violation Investigations into Maine Department of Education and Maine School District* (Feb. 21, 2025), https://www.ed.gov/about/news/press-release/office-civil-rights-launches-title-ix-violation-investigations-maine-department-of-education-and-maine-school-district.

purports to collect "reports of discrimination based on race or sex in publicly-funded K-12 schools" from parents, students, teachers, and the broader community.[46]

62.     The press release makes clear that the portal solicits information for use in potential investigations targeting programs designed to combat discrimination against LGBTQ+ students and students of color and provide them with equal access to educational opportunities.  Tiffany Justice, Co-Founder of Moms for Liberty, explained that the Department was soliciting information about the use of "critical theory"—a reference to the recognition of systemic racism against people of color in society—and "rogue sex education and divisive ideologies"—a reference to recognizing and affirming the identities of LGBTQ+ people—in public schools for the purpose of "identify[ing] potential areas for investigation."  Research demonstrates that culturally responsive curricula and teaching practices can provide effective support for students of color, and that instructional materials, assignments, and texts drawing on students' background knowledge supports student comprehension.[47]

63.     On February 28, 2025, OCR opened an investigation against Tumwater School District for allowing a transgender female student to play on the girls' basketball team.[48]

---

[46] U.S. Dep't of Educ., *U.S. Department of Education Launches "End DEI" Portal* (Feb. 27, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-launches-end-dei-portal.
[47] *See, e.g.*, Thomas Dee & Emily Penner, *The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum*, 54 Am. Educ. Res. J. 127, 127 (2017), https://files.eric.ed.gov/fulltext/EJ1132535.pdf; *Understanding Culturally Responsive Teaching*, New Am., https://www.newamerica.org/education-policy/reports/culturally-responsive-teaching/understanding-culturally-responsive-teaching/ (last visited Apr. 8, 2025) (discussing and citing studies).
[48] U.S. Dep't of Educ., *Office for Civil Rights Launches Title IX Investigation Into Washington State School District* (Mar. 3, 2025), https://www.ed.gov/about/news/press-release/office-civil-rights-launches-title-ix-investigation-washington-state-school-district; *see also* U.S. Dep't of Educ., *Letter to Tumwater School District* (Feb. 28, 2025), https://www.ed.gov/media/document/letter-tumwater-school-district-february-2025-109531.pdf.

64.    In pausing thousands of complaints filed by the public while initiating and advancing

selected investigations based on the administration's political priorities, OCR abdicated its

responsibility to equitably consider complaints filed by students and their families in a

nondiscriminatory manner, politicized its work, and undermined its credibility as a neutral fact

finder.

65.    According to OCR press releases, during the pause on investigations,[49] OCR opened

twenty-one cases.  Of those cases, fourteen targeted policies designed to provide equal

educational opportunities for transgender students.  Only one case addressed discrimination

against students with disabilities.[50]

66.    Upon information and belief, OCR's directed investigations have not followed typical

procedures or protocols.  Unlike in typical investigations, upon information and belief, OCR has

issued press releases upon opening certain cases, even before conducting investigations.  These

press releases included language that suggests predetermined conclusions and featured

statements from individuals and groups that align with the administration's political agenda.[51]

This practice contravenes OCR's policies in its Case Processing Manual ("CPM"), which

promise that OCR will serve as a neutral fact finder.[52]  In addition, OCR has begun to resolve its

---

[49] All investigations were paused until February 20, 2025.  The pause on disability investigations
was lifted on February 20, 2025, while the pause on non-disability investigations was lifted on
March 6, 2025.

[50] Brooke Schultz, *See Which Schools Trump's Education Department Is Investigating and Why*,
EducationWeek (Mar. 28, 2025), https://www.edweek.org/policy-politics/see-which-schools-
trumps-education-department-is-investigating-and-why/2025/03.

[51] *See e.g.*, U.S. Dep't of Educ., *U.S. Department of Education Launches Investigation into
Maine Department of Education for Alleged FERPA Violations* (Mar. 28, 2025)*,*
https://www.ed.gov/about/news/press-release/us-department-of-education-launches-
investigation-maine-department-of-education-alleged-ferpa-violations.

[52] U.S. Dep't of Educ., *OCR Case Processing Manual* (Feb. 19, 2025) at 20,
https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf.

directed investigations with unusual speed and without the support and analysis contemplated by
the CPM.  OCR's letter of finding to the Maine Department of Education, for example, does not
articulate the legal standard it relied upon to reach the novel determination that the Title IX
regulations categorically bar schools from letting transgender students participate on any athletic
team consistent with their gender identity, nor does it provide relevant evidence necessary to
support such a determination, as required by section 303 of the CPM.[53]  Additionally, the letter
does not appear to reflect a review or consideration of evidence submitted by the Maine
Department of Education or interviews with its personnel, as generally contemplated by section
702 of the CPM.[54]

67.    On March 6, 2025, Secretary McMahon sent an email to OCR Enforcement staff
"lifting the pause on the processing of complaints in all areas of OCR's practice."[55]  Secretary
McMahon's email provided no explanation for her message or any justification or rationale for
imposing the freeze in the first place.

### Defendants' Actions Culminated in the Decimation of OCR's Workforce, which Prevents OCR from Performing Its Statutory Duties

68.    On March 11, 2025, less than a week after her email lifting the freeze on complaint
processing that had nullified the OCR complaint process for historically marginalized students

---

[53] Letter from Bradley R. Burke, Reg'l Dir., Office for Civil Rights, U.S. Dep't of Educ., to
Pender Makin, Comm'r, Me. Dep't of Educ. (Mar. 19, 2025),
https://www.ed.gov/media/document/letter-of-finding-maine-doe-109602.pdf.
[54] *Id.*
[55] That Secretary McMahon, rather than the Acting Assistant Secretary for Civil Rights, issued
the order instructing OCR to unfreeze investigations is highly unusual, as the Secretary does not
have the authority to do so.  The Department of Education Organization Act provides that the
Secretary shall delegate OCR's enforcement authority to the Assistant Secretary for Civil Rights.
*See* Department of Education Organization Act, Pub. L. No. 96–88 § 203, 93 Stat. 669,
672 (1979).

and families across the country, Secretary McMahon moved to make it practically impossible for OCR to effectuate its statutory duties.

69.     This time, the change was permanent.  Secretary McMahon eliminated seven of twelve regional offices and decimated OCR's workforce through an unprecedented Reduction in Force ("RIF"), leaving skeleton staffing at the remaining offices.  The Boston, Chicago, Cleveland, Dallas, New York, Philadelphia, and San Francisco offices were eliminated.  Around half of OCR employees—at least 243 union-eligible staff members and an unknown number of supervisors—were told they would be laid off and placed on administrative leave as of March 21, 2025, and that their employment would be terminated around June 9, 2025.[56]  More broadly, Defendants terminated a total of 1,300 Department employees and reduced Department staff to about half of its size at the time President Trump took office.[57]

70.     Upon information and belief, Defendants have also eliminated all but one of the Enforcement Directors.  Previously, there were four Enforcement Directors, each in charge of three Regional Offices.

71.     Upon information and belief, OCR's case management and document management systems were developed in-house, and Defendants laid off all OCR information technology staff responsible for maintaining and updating those systems.

72.     OCR employees that Defendants fired or placed on administrative leave immediately lost access to the case management and document management systems and were unable to send or reply to external emails.  Upon information and belief, Defendants created no standard

---

[56] *See* Jodi S. Cohen & Jennifer Smith Richards, *Massive Layoffs at the Department of Education Erode Its Civil Rights Division*, ProPublica (Mar. 12, 2025), https://www.propublica.org/article/education-department-civil-rights-division-eroded-by-massive-layoffs.

[57] *Id.*

mechanism for employees from closed offices to transfer their cases. Upon information and belief, most employees whom Defendants fired or placed on administrative leave were unable to meaningfully transfer their cases. Upon information and belief, OCR employees typically store draft documents and informal notes on their Department computers, rather than storing all case-related documents on the case and document management systems. Accordingly, upon information and belief, many such files and information were lost as a result of the March 11, 2025 Reduction in Force, because affected employees could not add them to the system to make them available to staff receiving transferred cases.

73.    Upon information and belief, OCR staff at some remaining open offices have been unable to access and/or make changes to files in the document management and case management systems for cases that are allegedly being transferred to them from the closed offices.

74.    Defendants targeted some of the most effective OCR regional offices for closure. For instance, upon information and belief, in the Midwest, the Cleveland and Chicago offices resolved approximately forty-four and thirty-six cases per investigator, respectively, from January through September 2024 and were targeted for closure, while Kansas City resolved 31.35 cases per investigator during that time period and remains open. In the South, upon information and belief, Dallas resolved 38.15 cases per investigator and was targeted for closure, while Atlanta resolved only 20.95 cases per investigator but remains open. And on the West Coast, upon information and belief, San Francisco resolved 40.54 cases per investigator and was targeted for closure, while Seattle resolved only 26.08 cases per investigator and remains open.

75.    Upon information and belief, Defendants knowingly decimated OCR's staffing to a point where the caseload exceeds any approximation of reasonableness. The gutting of OCR's

staff means that no complainant has a fair shot at accessing an OCR investigation. Anyone who files any claim is unlikely to secure relief from OCR. A report by Senator Bernie Sanders, Ranking Member of the Health, Education, Labor, and Pensions Committee, estimates that OCR caseloads will reach an average of eighty-six open cases per investigator.[58] That number is an underestimate of caseloads because it includes only cases in which OCR decides to open an investigation, rather than all complaints filed—which must each be evaluated by OCR. Catherine Lhamon, who served as Assistant Secretary for Civil Rights under both the Obama and Biden administrations, estimates that caseloads will reach 120 cases per investigator.[59] In her experience, even fifty cases per investigator is an untenable caseload.[60] Upon information and belief, caseloads in at least one open OCR office have reached as high as over 200-300 cases per investigator with the transferred and reassigned cases from closed offices.

76.    Upon information and belief, the elimination of offices and staff has the purpose and effect that OCR cannot fulfill its statutory and regulatory functions to enforce civil rights in schools. Former Assistant Secretary Lhamon reported to ProPublica: "What you've got left is a shell that can't function."[61] Civil rights investigators who remain employed at OCR said it now will be "virtually impossible" to resolve discrimination complaints.[62]

---

[58] Minority Staff of S. Comm. on Health, Education, Labor and Pensions, *President Trump's Decision to Gut the Office for Civil Rights has Left Over 46 Million Students Without Protection from Discrimination* (Mar. 27, 2025) at 2, https://www.sanders.senate.gov/wp-content/uploads/03.27.25-OCR-Report-Draft-v9.pdf.

[59] Declaration of Catherine E. Lhamon at 8, *State of New York v. McMahon,* No. 1:25-cv-10601 (D. Mass. Mar. 13, 2025).

[60] *Id*.

[61] *See* Jodi S. Cohen & Jennifer Smith Richards, *Massive Layoffs at the Department of Education Erode Its Civil Rights Division*, ProPublica (Mar. 12, 2025), https://www.propublica.org/article/education-department-civil-rights-division-eroded-by-massive-layoffs.

[62] *Id*.

77.     Katie Dullum, a former OCR deputy director, reported to ProPublica that, "This is devastating for American education and our students.  This will strip students of equitable education, place our most vulnerable at great risk and set back educational success that for many will last their lifetimes.  The impact will be felt well beyond this transitional period."[63]

78.     Brittany Coleman, an attorney with the Dallas regional office whose position was eliminated, reported to NBC News that with fewer staff members, students with disabilities fighting for accommodations for test-taking, for example, will have to wait longer for help from the Department, and that such help could arrive too late.[64]

79.     Another Department of Education employee said to ABC News, "I don't know how [students with disabilities] will be serviced," and was confident that those students "will not be helped."[65]

80.     One OCR attorney explained to ProPublica: "Part of OCR's work is to physically go to places.  As part of the investigation, we go to schools, we look at the playground, we see if it's accessible . . . .  We show up and look at softball and baseball fields.  We measure the bathroom to make sure it's accessible.  We interview student groups.  It requires in-person work.  That is part of the basis of having regional offices.  Now, California has no regional office."[66]  Another attorney still working at the Department said: "OCR simply will not be investigating violations

---

[63] *Id.*

[64] Tyler Kingkade & Adam Edelman, *What the Education Department Layoffs Could Mean for Students with Disabilities*, NBC News (Mar. 12, 2025), https://www.nbcnews.com/news/us-news/education-department-layoffs-students-disabilities-rcna196114.

[65] Arthur Jones II, *'Upsetting': Civil Servants Across the US Part of Department of Education's Mass Layoffs*, ABC News (Mar. 12, 2025), https://abcnews.go.com/Politics/upsetting-civil-servants-us-part-department-educations-mass/story?id=119710915.

[66] *See* Jodi S. Cohen & Jennifer Smith Richards, *Massive Layoffs at the Department of Education Erode Its Civil Rights Division*, ProPublica (Mar. 12, 2025), https://www.propublica.org/article/education-department-civil-rights-division-eroded-by-massive-layoffs.

any more.  It is not going to happen.  They will not have the staff for it."  That attorney also added that investigations were "extremely time and labor intensive."[67]

### The Attack on OCR is One Piece of the Administration's Plans to Eliminate the Department of Education

81.     Defendants' abdication of their statutorily mandated obligation to conduct investigations must be understood in the context of the administration's broader goals.  President Trump's campaign promised an administration that would dismantle the Department of Education, end Diversity, Equity, and Inclusion efforts, and turn civil rights enforcement on its head, using civil rights laws to target programs that aim to ensure equal educational opportunity for students of color and LGBTQ+ students.[68]

82.     Shutting down the Department of Education has been a central talking point for President Trump.  On the campaign trail, Trump emphasized that he would remove "the radical zealots and Marxists" he claimed have "infiltrated" the Department.[69]  In a video posted to social media in October 2023, Trump said, "[o]ne . . . thing I'll be doing very early in the administration is closing up the Department of Education in Washington D.C., and sending all education and education work and needs back to the states."[70]  In September, 2024, during a rally

---

[67] *Id.*

[68] President Donald J. Trump, *Fact Sheet: President Donald J. Trump Empowers Parents, States, and Communities to Improve Education Outcomes*, The White House (Mar. 20, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-empowers-parents-states-and-communities-to-improve-education-outcomes/; *Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI*, The White House (Jan. 22, 2025), https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-protects-civil-rights-and-merit-based-opportunity-by-ending-illegal-dei/.

[69] Meridith McGraw, *Trump Unveils New Education Policy Loaded with Culture War Proposals*, Politico (Jan. 26, 2023), https://www.politico.com/news/2023/01/26/trump-unveils-education-policy-culture-war-00079784.

[70] Steve Inskeep & Taylor Haney, *What Trump's Pledge To Close Dept. of Education Means For Students, GOP-Led States*, NPR (updated Nov. 15, 2024), https://www.npr.org/2024/11/14/nx-s1-5181966/a-look-at-the-potential-impact-of-shutting-down-the-department-of-education.

in Wisconsin, he said, "I say it all the time, I'm dying to get back to do this.  We will ultimately eliminate the federal Department of Education."[71]  In December, in an interview in TIME Magazine, Trump stated that he wanted "to move the schools back to the states" and implement "[a] virtual closure of [the] Department of Education."[72]

83.    Hours after being confirmed, Secretary McMahon sent an email to all Department of Education staff entitled "Our Department's Final Mission."  She wrote in that message:  "Our job is to respect the will of the American people and the President they elected, who has tasked us with accomplishing the elimination of bureaucratic bloat here at the Department of Education—a momentous final mission—quickly and responsibly."[73]  Secretary McMahon made this message available to the public by posting it on the Department of Education's website.

84.    In case there was any ambiguity, Secretary McMahon doubled down on her intention to dismantle the Department of Education during an interview with Fox News several days later, on March 7, 2025.  When asked, during her first interview since being confirmed to her position, whether the United States needs its Department of Education, her response was clear and unequivocal: "No, we don't."[74]  Secretary McMahon's unilateral decision to gut OCR and to take actions to shutter the Department of Education are wholly unsupported by any legitimate facts, data, and reasoned basis and run contrary to her obligations under federal civil rights laws.

---

[71] Katie Lobosco, *Trump Wants to Shut Down the Department of Education. Here's What That Could Mean*, CNN (Dec. 12, 2024), https://www.cnn.com/2024/09/20/politics/department-of-education-shut-down-trump/index.html.

[72] TIME, *Donald Trump's 2024 Person of the Year Interview: Transcript*, TIME (Dec. 12, 2024), https://time.com/7201565/person-of-the-year-2024-donald-trump-transcript/.

[73] U.S. Dep't of Educ., *Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission.

[74] Michael C. Bender, *Asked if U.S. Needs Education Department, Its Head Says 'No'*, N.Y. Times (Mar. 7, 2025), https://www.nytimes.com/2025/03/07/us/politics/education-department-mcmahon-trump.html.

85.    On March 20, 2025, President Trump issued an Executive Order directing the Secretary of Education to "take all necessary steps to facilitate the closure of the Department of Education."[75]  It also directs the Secretary of Education to ensure that any entity receiving federal Department of Education funds terminate their use of DEI and "programs promoting gender ideology."[76]

86.    The March 11, 2025, decision to gut OCR, in contravention of OCR's obligations to promptly investigate all discrimination complaints within its jurisdiction, is part and parcel of Defendants' "Final Mission" to effectuate President Trump's subsequent executive order and end the Department of Education.

### The Attack on OCR Is Part of the Administration's Plan to Target Programs and Activities that Ensure Equal Educational Opportunities for Students of Color and LGBTQ+ Students

87.    Similarly, Defendants' obstruction of students' and families' access to OCR's investigation and complaint processing functions while selectively advancing cases on behalf of white and cisgender students and families fits within the administration's demonstrated agenda of targeting programs, activities, and initiatives designed to ensure equal educational opportunities for students of color and LGBTQ+ students.

88.    For example, on the day of his inauguration, President Trump issued the "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" Executive Order, directing the Executive Branch to interpret "sex" as referring to

---

[75] Exec. Order No. 14242, 90 Fed. Reg. 13679 (Mar. 20, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/03/improving-education-outcomes-by-empowering-parents-states-and-communities/.

[76] *Id.*

"an individual's immutable biological classification as either male or female" under all federal laws and administration policy.[77]

89.    On January 29, 2025, President Trump signed the "Ending Radical Indoctrination in K-12 Schooling" executive order, directing federal agencies to withhold federal funding from institutions that directly or indirectly promote "discriminatory equity ideology"—including through policies that recognize and ameliorate racial discrimination—under the guise of enforcing compliance with Title VI.[78]

90.    On February 5, 2025, President Trump signed the "Keeping Men Out of Women's Sports" executive order, directing federal agencies to rescind all funds from educational programs and institutions that allow transgender students to participate on sports teams aligning with their gender identity.[79]

91.    On February 14, 2025, OCR issued a Dear Colleague letter regarding its interpretation of civil rights law and intended enforcement under Title VI and the Equal Protection Clause."[80] The letter alleges that U.S. educational institutions in recent years have discriminated against white students and contorts civil rights law to command the dismantling of protections for students of color.

---

[77] Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/.
[78] Exec. Order No. 14190, 90 Fed. Reg. 8853 (Jan. 29, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-indoctrination-in-k-12-schooling/.
[79] Exec. Order No. 14201, 90 Fed. Reg. 9279 (Feb. 5, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/02/keeping-men-out-of-womens-sports/.
[80] U.S. Dep't of Educ., *Dear Colleague Letter: Title VI of the Civil Rights Act in Light of Students for Fair Admissions v. Harvard* (Feb. 14, 2025), https://www.ed.gov/media/document/dear-colleague-letter-sffa-v-harvard-109506.pdf.

92.    On February 17, 2025, the Department announced that it had terminated over $600 million in teacher training grants focused on various "divisive ideologies," including "anti-racism," DEI, and instruction on white supremacy.  The materials included training on "[a]cknowledging and responding to systemic forms of oppression and inequity, including racism, ableism, 'gender-based' discrimination, homophobia, and ageism."[81]

93.    On March 1, 2025, OCR published a set of Frequently Asked Questions ("FAQs") intended to clarify elements of the February 14 Dear Colleague Letter.[82]  OCR made clear that it planned to target "social-emotional learning," "culturally responsive teaching," and similar programs that are backed by evidence showing they improve school climates for students of color and LGBTQ+ students.[83]  Despite research demonstrating that such practices benefit all students,[84] the FAQs make clear that OCR considers programs that effectively ensure educational opportunities for students of color to be evidence of discrimination, listing "statistics

---

[81] U.S. Dep't of Educ., *U.S. Department of Education Cuts Over $600 Million in Divisive Teacher Training Grants* (Feb. 17, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-cuts-over-600-million-divisive-teacher-training-grants.

[82] *See* U.S. Dep't of Educ., *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act* (Mar. 1, 2025), https://www.ed.gov/media/document/frequently-asked-questions-about-racial-preferences-and-stereotypes-under-title-vi-of-civil-rights-act-109530.pdf; *see also* U.S Dep't of Educ., *U.S. Department of Education Releases Frequently Asked Questions on Dear Colleague Letter About Racial Preferencing* (Mar. 1, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-releases-frequently-asked-questions-dear-colleague-letter-about-racial-preferencing.

[83] *Id.*

[84] *See, e.g.*, Joseph A. Durlak, et al., *The Impact of Enhancing Students' Social and Emotional Learning: A Meta-Analysis of School-Based Universal Interventions*, 82 Child Dev. 405 (2011), https://srcd.onlinelibrary.wiley.com/doi/10.1111/j.1467-8624.2010.01564.x; Thomas Dee & Emily Penner, *The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum*, 54 Am. Educ. Res. J. 127 (2017), https://files.eric.ed.gov/fulltext/EJ1132535.pdf.

demonstrating a pattern of the policy or decision having a greater impact on members of a particular race" and schools' efforts to further "equity" as evidence of race discrimination.[85]

94.    Throughout the time Defendants froze investigations into other Title IX and Title VI complaints, OCR opened investigations almost exclusively into programs that ensure equal educational opportunities for students of color and LGBTQ+ students.

95.    In Secretary McMahon's "Final Mission" memo, she suggests—without any analysis or evidence—that American education is infiltrated by "political ideologies, special interests, and unjust discrimination."[86]  She then lauds President Trump for his executive orders that supposedly "combat[] critical race theory, DEI, gender ideology, [and] discrimination in admissions, promot[e] school choice for every child, and restor[e] patriotic education and civics."[87]

96.    And since the March 11 decimation of OCR's workforce, Defendants have weaponized the skeleton staff that is left at OCR to attack students who share identities that the Administration disfavors, rather than to perform its statutorily required duties.  Despite the drastic gutting of OCR's staff and its failure to investigate and resolve complaints filed with the closed regional offices, OCR has continued to initiate cases targeting programs ensuring equal educational opportunities for transgender students and students of color.

---

[85] *See* U.S. Dep't of Educ., *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act* (Feb. 28, 2025), https://www.ed.gov/media/document/frequently-asked-questions-about-racial-preferences-and-stereotypes-under-title-vi-of-civil-rights-act-109530.pdf.

[86] U.S. Dep't of Educ., *Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission.

[87] *Id.*

97.     On March 14, 2025, OCR opened investigations into forty-five universities for partnering with a program that encourages students of color to pursue graduate degrees and into seven universities for administering scholarship programs supporting students of color.[88]

98.     On March 20, 2025, OCR opened investigations into the Illinois State Board of Education and Chicago Public Schools regarding their policies supporting transgender students.[89]

99.     On March 25, 2025, OCR opened a similar investigation into Portland Public Schools and the Oregon School Activities Association.[90]

100.    On April 3, the Department of Education announced that it is requiring all state and local educational agencies that receive federal financial assistance to certify that they do not use "certain" DEI practices that it alleges violate federal law.[91]  The Department has not clarified what these "certain" DEI practices are, and to what extent it believes that programs that ensure equal educational opportunity for students of color, such as culturally responsive curricula, fall into this category.

---

[88] U.S. Dep't of Educ., *Office for Civil Rights Initiates Title VI Investigations into Institutions of Higher Education* (Mar. 25, 2025), https://www.ed.gov/about/news/press-release/office-civil-rights-initiates-title-vi-investigations-institutions-of-higher-education-0.

[89] U.S. Dep't of Educ., *OCR Launches Investigations into Illinois DOE, the Chicago Public School District 299, and Deerfield Public Schools District 109 Over Reported Title IX Violations* (Mar. 20, 2025), https://www.ed.gov/about/news/press-release/ocr-launches-investigations-illinois-doe-chicago-public-school-district-299-and-deerfield-public-schools-district-109-over-reported-title-ix.

[90] U.S. Dep't of Educ., *Office of Civil Rights Launches Title IX Investigations into Portland Public Schools and the Oregon School Activities Association* (Mar. 25, 2025), https://www.ed.gov/about/news/press-release/office-civil-rights-launches-title-ix-investigations-portland-public-schools-and-oregon-school-activities-association.

[91] U.S. Dep't of Educ., *Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and SFFA v. Harvard* (Apr. 3, 2025), https://www.ed.gov/media/document/reminder-of-legal-obligations-undertaken-exchange-receiving-federal-financial-assistance-and-request-certification-under-title-vi-and-sffa-v-harvard-april-3.

101.    On April 4, 2025, the U.S. Department of Justice ("DOJ") and Department of Education announced a "Title IX Special Investigations Team" composed of both DOJ and OCR personnel that will "protect students, and especially female athletes, from the pernicious effects of gender ideology in school programs and activities."[92]  It threatens "there's a new sheriff in town" for schools that work to ensure equal educational opportunity for transgender student athletes by allowing them, like cisgender students, to participate on sports teams that align with their gender identity.[93]

### OCR's Actions Harm Students and Families Seeking Civil Rights Enforcement

102.    Defendants' actions—including pausing investigations and then closing seven of the twelve OCR regional offices so that there are too few investigators to actually investigate civil rights complaints, and directing any surviving enforcement resources to politicized investigations—mean that complainants do not have a meaningful shot at OCR investigating their claims in a prompt, fair, consistent, and impartial manner.  Defendants have abdicated OCR's statutory responsibility to students and families to enforce the nation's civil rights statutes in American public schools.

103.    Families who have filed complaints with the reasonable expectation that OCR will follow its legal mandates and longstanding practice of investigating and processing their cases have been left without any information about the status of their complaints or the prospect of obtaining relief.  This includes families of students who urgently need accommodations so that they may meaningfully participate in the classroom and fully and equitably access educational

---

[92] U.S. Dep't of Just., *U.S. Department of Education and U.S. Department of Justice Announce Title IX Special Investigations Team* (Apr. 4, 2025), https://www.justice.gov/opa/pr/us-department-education-and-us-department-justice-announce-title-ix-special-investigations.
[93] *Id.*

services, such as one student with a disability who has been denied supplementary aids for this entire school year.  Upon information and belief, another student with a disability who filed a complaint with OCR has been out of school for more than a year and is owed a significant amount of compensatory education.  Both of those complaints were assigned to the Cleveland regional office, which has been closed.

104.    When complainants have called or emailed for an update from OCR, many have received no answers.  OCR has postponed scheduled meetings and mediations without explanation to students, families, or schools.  OCR is depriving students and their families and advocates of access to a critical forum for their discrimination complaints to be heard.

105.    Although as of April 1, 2025, the Department has set up out of office email responses for eliminated staff, those emails are inaccurate and misleading.  The emails state that the employee "is currently engaged in closing out their work activities and responsibilities as part of a planned transition.  They are working to ensure a smooth handover of key matters."

106.    That statement is false.  Eliminated employees are not "closing out their work activities" – they are on forced administrative leave, have lost access to all Department email, computers, and case and document management systems, and are unable to work.  The statement misleads complainants and recipients regarding the impact of the decimation of OCR.

107.    Moreover, to date, OCR's website has not been updated to reflect office closures. The site continues to list outdated contact information for offices that have been eliminated and still directs individuals to file a complaint with the shuttered enforcement offices in their area.[94]

---

[94] *See e.g.*, U.S. Dep't of Educ., *Office for Civil Rights Complaint Assessment System,* https://ocrcas.ed.gov/contact-ocr?field_state_value=657 (last visited Apr. 8, 2025).

108.   The initial freeze in processing Title VI and Title IX complaints and the permanent

gutting of OCR's staff and regional offices disproportionately harm students of color, female

students, and LGBTQ+ students, and their families and advocates, who are deprived of a vital

pathway to seek vindication of their civil rights and safe and equal access to the nation's schools.

Upon information and belief, a disproportionate number of OCR complaints alleging Title VI

and Title IX violations that have been obstructed pursuant to these actions were filed on behalf of

students of color, women and girls, and LGBTQ+ students.  For instance, OCR's 2024 Report

stated that Black students represented 37% of students who reported being harassed or bullied on

the basis of race, despite representing only 15% of the total K-12 student population, and that

girls accounted for 63% of students who reported being harassed or bullied on the basis of sex,

despite making up only 49% of the total K-12 student enrollment.[95]

109.   Upon information and belief, OCR's opened directed investigations target programs

aiming to ensuring equal educational opportunity for students of color and LGBTQ+ students

and disproportionately benefit white and cisgender students at the expense of students of color

and LGBTQ+ students.

110.   Plaintiff Nikki S. Carter filed an OCR complaint after her children's school district

barred her from school property, blocking her from picking up and dropping off her children at

school, participating in-person in meetings and conferences, delivering medications, signing her

children out of school when sick, and participating in public meetings as a parent, community

member, and advocate.  The complaint explains that the district blocked Ms. Carter, a Black

parent, from school property following a confrontation with a white staff member but did not

---

[95] U.S. Dep't of Educ., Office for Civil Rights, *2024 Fiscal Year Annual Report: Report to the President and Secretary of Education* (2024) at 17-18, https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf.

impose the same restrictions on a white parent who had a similar confrontation with the same staff member.  It also alleges that the district sought to retaliate against Ms. Carter for her advocacy on behalf of students with disabilities in her community.  In December 2022, OCR notified Ms. Carter that the agency was opening an investigation into whether the school district subjected her and other Black parents to different treatment based on race, in violation of Title VI, and whether the school district retaliated against her in violation of Section 504.

111.   OCR stopped processing Ms. Carter's complaint during the freeze on investigating Title VI and Title IX claims.  Ms. Carter has not received subsequent updates or any indication that OCR is proceeding with any investigation into her complaint.  Upon information and belief, now, the decimation of OCR's workforce means that OCR cannot process Ms. Carter's complaint in a prompt and equitable manner.  As a result, she is left without resolution of her discrimination and retaliation claims or any avenue for pursuing accountability for the school district.  Ms. Carter intends to continue her advocacy for students and families and has reason to believe that the school district's discrimination and retaliation will continue if OCR does not intervene.

112.   Plaintiff A.W. filed an OCR complaint after her child's school failed to appropriately respond to the sexual harassment and assault her child experienced, failed to sufficiently protect students from such harm, retaliated against A.W. and her child for filing related complaints, and discriminated against A.W.'s child when they experienced significant emotional harm following the sexual harassment and assault, leading A.W. to withdraw them from school.  In June 2024, OCR notified A.W. that the agency was opening an investigation into whether the school responded to reports of sexual assault and harassment of A.W.'s child and other students consistent with Title IX, whether the school retaliated against A.W. and her child in violation of

Title IX, and whether the school discriminated against A.W.'s child based on disability, in violation of Section 504 and Title II.

113.    OCR stopped processing A.W.'s complaint pursuant to the freeze in processing Title VI and Title IX complaints.  On February 23, 2025, A.W. emailed her OCR contact requesting an update and was informed on February 24, 2025, that she would receive "an update as soon as possible."  A.W.'s follow-up message, stating, "I'd like to know today if [my case] is at least still open," went unanswered.  A.W. described learning about OCR's decision to freeze processing of Title IX claims as a "gut punch" after "so many dead ends."  A.W. has not received any subsequent updates or indication that OCR is proceeding with any investigation into her complaint.  And, upon information and belief, now, the decimation of OCR's workforce means that OCR cannot process A.W.'s complaint in a prompt and equitable manner.  As a result, she is left without resolution of her family's discrimination and retaliation claims, accountability for the school, and protection for the students who are still enrolled.

114.    Plaintiff K.D. filed an OCR complaint after her child, Plaintiff M.W., experienced disproportionate discipline and harassment based on her race on May 15, 2023.  After M.W. tried to break up a fight between her friend and a white student, her middle school principal identified M.W. as the aggressor to law enforcement and accused her of stomping on and kicking the white student.  Even after seeing video evidence to the contrary, the principal still gave M.W. a three-day suspension, which became part of M.W.'s school record.  As a result of the incident and suspension, other students harassed M.W., including threatening via social media to physically harm M.W.  Fearing for her safety, M.W. stayed at home pursuing "independent study" for more than two weeks after the incident.  Upon her return to school, the administration gave M.W. a safety plan that required her to have no contact with the students who had threatened her, or face

suspension, expulsion, or other disciplinary measures.  K.D. and M.W. had to negotiate to remove the no-contact provision.  As a result of these incidents, M.W. attended several months of therapy.  The harassment, however, did not stop, either that school year, or after M.W. transitioned to a high school in the same district.  In the current school year, students have referred to M.W. using racial epithets in class and on social media.  They have called her "n*gger," "black monkey," and "b*tch," asked her if her "ops" (opponent) is the Ku Klux Klan, and played whipping sounds for M.W. to hear during a history class on slavery.  M.W. and K.D. reported the harassment to teachers and administrators, but the school district did not take meaningful action to end the harassment.

115.    On July 31, 2023, OCR notified K.D. that they were investigating whether the school district "disciplined the Student more harshly than a white student who engaged in more serious conduct (fighting)" and whether it "subjected the Student to a hostile environment on the basis of race when it did not respond reasonably, timely and effectively to notice of harassment of the Student on the basis of race, including the use of racial epithets and other racially offensive harassment in her physical education class, and on social media."  In December 2024, OCR sent a proposed voluntary resolution agreement to the school district, but the district did not agree to the proposal and the case remained in the investigation phase.

116.    OCR stopped processing K.D. and M.W.'s complaint during the freeze on investigating Title VI and Title IX claims, and their case was then affected by the San Francisco regional office closure.  Since the office closure, K.D. has received no information indicating that OCR's investigation is ongoing.  Upon information and belief, the decimation of OCR's workforce means that OCR cannot process K.D. and M.W.'s complaint in a prompt and equitable manner.  As a result, they are left without resolution of their discrimination claims,

accountability for the school district, or correction of the ongoing harassment and resulting emotional harm that M.W. is experiencing in her current school setting.

117.   Plaintiff Melissa Combs filed an OCR complaint on June 10, 2022, after her child, Plaintiff D.P., and other LGBTQ+ students at their school experienced discrimination and harassment based on gender/sexual identity.  The complaint alleges that faculty in the district said that identifying as LGBTQ+ was a "mental illness" and penalized students for taking part in the National Day of Silence, an annual day of action to spread awareness about the effects of bullying and harassment on LGBTQ+ students.  The students were subjected to frequent and pervasive homophobic and transphobic slurs by their classmates during class, and told to "go die" and "go kill" themselves multiple times.  In another incident, a student attempted to yank a Pride Flag from D.P.'s neck.  The school failed to effectively address the harassment.  On August 10, 2022, OCR notified Ms. Combs that it was opening an investigation based on Ms. Combs' complaint.  As a result of the discrimination and harassment D.P. experienced at their local public school, Ms. Combs chose to move them to a school located outside their home school district, twenty-five to forty minutes, depending on traffic, away from their home, to safeguard their mental health and ability to access their education.  If Ms. Combs and D.P. received the relief requested in their OCR complaint, Ms. Combs would return D.P. to their local public school.

118.   OCR stopped processing Ms. Combs and D.P.'s complaint during the freeze on investigating Title VI and Title IX claims, and their case was then affected by the Boston regional office closure.  On March 11, 2025, Ms. Combs emailed OCR asking about her case. She has not received a response.  Upon information and belief, the decimation of OCR's workforce means that OCR cannot process Ms. Combs and D.P.'s complaint in a prompt and

equitable manner.  As a result, they are left without resolution of their discrimination claims,

accountability for the school district, or the opportunity to return to their home school with

improved policies and protections in place.

119.   Plaintiff A.M. filed an OCR complaint after her child's school district failed to

adequately and timely respond to and investigate her report of sexual assault and harassment of

her thirteen-year-old daughter.  A.M. reported to the school district that her child was sexually

assaulted by a male classmate in a bathroom at a high school in the district, and was additionally

subject to unwanted touching, inappropriate gestures, and solicitation of pictures of her body.  As

a result of the district's inadequate investigation and response, A.M.'s child experienced frequent

victim-shaming, bullying, and harassment by classmates.  A.M.'s daughter did not want to return

to school and experienced a decline in her mental health that eventually led her to self-harm.

Consequently, A.M. transferred her daughter to a different school for eighth grade and then

withdrew her daughter from school altogether during her freshman year due to her daughter's

mental health treatment and hospitalizations.  Because of the school district's inadequate

response, A.M.'s daughter is unable to attend the high school located less than two blocks from

her house and A.M. must drive about half an hour each way to take her daughter to school.

120.   A.M. filed her OCR complaint in January 2023.  In March 2023, OCR facilitated a

mediation with the school district, but it was unsuccessful.  In May 2023, OCR notified A.M.

that it was opening an investigation into whether the district was deliberately indifferent to her

child's sexual harassment, and whether the district's personnel were properly trained in Title IX

investigations.  OCR stopped processing A.M.'s complaint during the freeze on investigating

Title VI and Title IX claims, and her case was then affected by the closure of the Cleveland

regional office.  On March 17, 2025, A.M. was notified that her case had been transferred to the

Denver office.  Despite this notification, however, A.M. has not received any updates as to the status of the investigation.  Upon information and belief, the decimation of OCR's workforce means that OCR cannot process A.M.'s complaint in a prompt and equitable manner.  As a result, she and her daughter are left without resolution of their claims, accountability for the school district, or the opportunity to return to their home school with improved policies and protections in place.

121.    Plaintiff Elizabeth Stewart-Williams filed her complaint on behalf of her daughter, Plaintiff A.S., on February 20, 2024, after A.S. was subjected to sexual harassment and assault by another student at school throughout the fall semester of 2023.  The other student continuously inappropriately touched A.S., including by "grabbing her butt," looked at A.S above and below the stall doors while she was in the locker room bathroom, and provoked her. A.S. wanted this behavior to stop and had repeatedly reported the harassment and assault to her track coach.  In response to A.S.'s decision to report the harassment and assault she experienced, A.S.'s coaches told her that she was "not a leader," "not focused," "too emotional," and needed to "let it go."  Instead of addressing the assault and harassment, A.S.'s coach retaliated against A.S. and removed her from her position as captain of the track team.  In addition, other students threatened violence against A.S. and called her names.  The school district refused to take the matter seriously and did not conduct a Title IX investigation.  As a result, A.S. has endured frequent episodes of crying, depression, anxiety, fatigue, shame, guilt, agitation, irritability, loss of appetite, lack of confidence, and extreme stress, causing hives.  As a result, A.S. and Ms. Stewart-Williams were forced to move out of the school district so that A.S. would be eligible to attend another school in Texas and qualify to play sports.  A.S. and Ms. Stewart-Williams were forced to stay in temporary housing for a period of time.  Ms. Stewart-Williams has been forced

to take extensive time away from work and has incurred significant therapy costs for A.S.  A.S. is still dealing with harassment by her former track teammates.

122.    In her complaint, Ms. Stewart-Williams asks OCR to compel Little Elm Independent School District to conduct an appropriate, impartial Title IX investigation, to take disciplinary actions against the perpetrator and coach, to conduct sexual harassment and assault and Title IX training for staff and students, to achieve athletic culture change, and to provide compensation for the therapy costs incurred.

123.    On July 24, 2024, OCR conducted a mediation, but it was unsuccessful.  OCR last contacted Ms. Stewart-Williams on December 11, 2024, with an update from the investigator assigned to her case.  Ms. Stewart-Williams has not received any indication since then that her claim is being processed or investigated.  On April 4, 2025, Ms. Stewart-Williams reached out to the investigator for an update.  She received a bounce-back stating that "Elhouty, Samire is currently engaged in closing out their work activities and responsibilities as part of a planned transition.  They are working to ensure a smooth handover of key matters."  Upon information and belief, that investigator has been placed on administrative leave and is not "currently engaged in closing out their work activities and responsibilities."  Upon information and belief, the decimation of OCR's workforce means that OCR cannot process Ms. Stewart-Williams and A.S.'s complaint in a prompt and equitable manner.  As a result, they are left without resolution of their harassment claims, accountability for the school district, or access to the compensation for therapy services that they seek.

124.    Plaintiff Amy Cupp filed an OCR complaint on December 6, 2024, after school staff subjected her child, Plaintiff G.C., who has several identified disabilities, to multiple incidents of restraint and seclusion.  Most of these incidents were poorly documented and in one incident,

four staff, including a wrestling coach, restrained G.C., causing bruising on her upper arm.  Staff members have often restrained and secluded G.C. for behaviors such as attempting to leave the room, verbally refusing to follow school staff's commands, throwing things, or having a tantrum and lying on the floor.  During this school year, Ms. Cupp estimates that G.C. has been restrained fifteen times and secluded fourteen times[96] for a total of twenty-three hours and six minutes.

125.    After Ms. Cupp filed her OCR complaint, she discovered that G.C.'s school had inappropriately altered G.C.'s Individualized Education Program (IEP) without her consent, including by requiring Ms. Cupp to allow the school to remove G.C. from school if behavioral interventions were unsuccessful and to waive G.C.'s procedural rights with respect to these prospective exclusions.  Ms. Cupp refused to sign the IEP that included these provisions.  The school district, Norwell Community Schools, then used this refusal as a pretext to file a retaliatory complaint against Ms. Cupp with the Indiana Department of Education, which proceeded to mediation.  After mediation, the school district was required to implement the previously agreed upon IEP without the objectionable provisions.

126.    Ms. Cupp finally made the decision to shorten G.C.'s school day as a necessary measure to protect G.C. from and limit her exposure to further restraint and seclusion.  Since February 24, 2025, G.C. attends ABA therapy in the morning and only attends her school for two hours each day in the afternoon.  If Ms. Cupp and G.C. received the relief requested in their OCR complaint, Ms. Cupp would return G.C. to full school days.

127.    On December 16, 2024, OCR scheduled a teleconference to obtain additional information from Ms. Cupp.  After the interview, Ms. Cupp and the OCR investigator continued

---

[96] Ms. Cupp's estimation for seclusion includes all instances where school staff either placed G.C. alone in a locked room, or placed G.C. alone in a room with a closed door and G.C. asked to leave.

to exchange emails providing updated information.  On January 14, 2025, OCR notified Ms. Cupp that they were "going to open [her] allegations in [her] complaint" and that Ms. Cupp "should receive an official notification letter soon."  On February 28, 2025, Ms. Cupp emailed the OCR investigator to ask if the investigator was allowed to communicate with families again after the complaint processing freeze.  On March 10, 2025, the OCR investigator responded asking Ms. Cupp for a time to discuss the case.  On March 11, 2025, Ms. Cupp had a phone call with the OCR investigator, who informed her that the investigator had drafted the opening letter and was waiting for approval, so Ms. Cupp should receive it within a week.  Since the Chicago regional office closure, Ms. Cupp has received no update about the processing and/or investigation of her complaint.  Upon information and belief, the decimation of OCR's workforce means that OCR cannot process Ms. Cupp and G.C.'s complaint in a prompt and equitable manner.  As a result, they are left without resolution of their discrimination claims, accountability for the school district, or the opportunity for G.C. to participate fully and safely in a regular school setting.

128.    The schools against which Ms. Carter, A.W., K.D., Ms. Combs, A.M., Ms. Stewart-Williams and A.S., and Ms. Cupp filed OCR complaints each receive federal financial assistance and are therefore subject to Title VI, Title IX, and Section 504.  They are also public entities within the meaning of Title II.

129.    COPAA members similarly report that investigations, resolution sessions, and mediations for disability-related violations have been halted, canceled, or postponed.  Upon information and belief, because of the decimation of OCR's workforce, COPAA has parent members whose pending complaints OCR cannot resolve while their children continue to face discrimination and hostile environments or are denied equal access to education.  Upon

information and belief, because of the decimation of OCR's workforce, COPAA also has attorney and advocate members who have had their complaint processing obstructed and can no longer access this administrative process to vindicate their clients' rights, putting them at risk of losing clients and revenue. One COPAA member has voiced that they would rather use their state's complaint system because OCR is not functioning. Absent OCR, many families do not have access to any alternative mechanism to file complaints concerning violations of Section 504, because many analogous state systems are designed to investigate violations of the Individuals with Disabilities Education Act ("IDEA"), rather than Section 504.

130.    One COPAA advocate member in Michigan represents more than a dozen families with pending complaints formerly handled in multiple regional offices, including the Cleveland regional office. Among these families, one had a mediation canceled in February and another was preparing for an early mediation to be held on March 19, 2025. These families have received no update on their canceled mediations or cases. At least one family has a pending complaint alleging a failure to provide supplementary aids for a student with a disability; that student is in limbo, unable to fully and equitably access educational services until the claims are addressed.

131.    As a result of first the freeze in investigations and now the decimation of OCR's workforce, COPAA's mission to provide resources and training and to assist its members in obtaining a free appropriate public education and equal educational opportunity for children with disabilities has been significantly frustrated. To address its frustrated mission, COPAA has been forced to divert its resources and time to addressing concerns from its members about Defendants' actions and tracking the impact of those actions on COPAA members. COPAA has had to update its training materials for its twelve-week online training course for new attorneys,

its materials for its two-day in-person skills training for new attorneys, and its webinars for members on Section 504.  COPAA also had to add information regarding closed OCR offices and information on filing state complaints in lieu of OCR complaints to its Special Education Advocacy Training (SEAT) curriculum.

132.    As Defendants render the OCR complaint process meaningless, students continue to suffer harm.  While their complaints remain unprocessed, uninvestigated, and unresolved, students are forced to endure ongoing discrimination, harassment, and harm.  Many families have had to take drastic measures such as shortening their child's school day or withdrawing their child from school and transferring them to a different district much farther from their home. The lack of investigation and enforcement leaves these students vulnerable and denies them their right to a safe and equitable education, which directly contravenes the responsibilities and obligations of the Department as described in federal civil rights laws.

## V.    CAUSES OF ACTION

### Count One
### Violation of the Administrative Procedure Act –
### Arbitrary and Capricious Agency Action
*[brought by All Plaintiffs against All Defendants]*

133.    Plaintiffs reallege and incorporate by reference all paragraphs above.

134.    Under the APA, courts shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

135.    Defendants' decimation of OCR's ability to process and investigate complaints through elimination of OCR regional offices and staff constitutes a final reviewable agency action under the APA.

136.    Defendants' decimation of OCR's ability to process and investigate complaints is arbitrary and capricious.

137.    First, Defendants did not articulate a reasoned basis for their decision to sabotage OCR's ability to fulfill its statutory and regulatory functions, nor did they articulate a reason why specific regional offices and staff were eliminated.

138.    Second, Defendants failed to consider or acknowledge the serious reliance interests implicated by their decision, including the impact on families awaiting resolution of their complaints to access needed accommodations, return to the classroom, and remedy discrimination.

139.    Third, Defendants failed to offer a reasoned analysis justifying their departure from well-established procedures governing OCR's investigation and processing of complaints.

140.    Fourth, in gutting OCR's ability to process civil rights complaints, Defendants relied on facts inconsistent with Congress's delegation of authority and directives to the agency.

**Count Two**
**Violation of the Administrative Procedure Act –**
**Agency Action Not in Accordance with Law**
*[brought by All Plaintiffs against All Defendants]*

141.    Plaintiffs reallege and incorporate by reference all paragraphs above.

142.    Under the APA, courts shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

143.    Defendants' decimation of OCR's ability to process and investigate complaints through elimination of OCR regional offices and staff constitutes a final reviewable agency action under the APA.

144.    Defendants' decimation of OCR's ability to process and investigate complaints is not in accordance with law.

145.    First, the sabotage of OCR's ability to fulfill its statutory and regulatory functions contradicts Congress's express command in federal law that the Department of Education effectuate the protections of Title VI and Title IX.  *See* 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682.

146.    Second, the decimation of OCR's ability to process and investigate complaints obstructs OCR's ability and obligation to "make a prompt investigation" in response to indications of possible failures to comply with Title VI, Title IX, and Section 504, and, for Title II, to "promptly review" complaints, "promptly notify" complainants and public entities of the receipt and acceptance of complaints, and "investigate complaints for which it is responsible," rendering OCR in violation of its own rules and regulations.  *See* 28 C.F.R §§ 35.171, 35.172; 34 C.F.R § 100.7(c); 34 C.F.R. § 106.81; 34 C.F.R § 104.61.

### Count Three
### Violation of the Administrative Procedure Act –
### Action Unlawfully Withheld or Unreasonably Delayed
*[brought by All Plaintiffs against All Defendants]*

147.    Plaintiffs reallege and incorporate by reference all paragraphs above.

148.    Under the APA, a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

149.    Defendants' decimation of OCR's ability to process and investigate complaints through elimination of OCR regional offices and staff constitutes a final reviewable agency action under the APA.

150.    OCR is required to "make prompt investigation" in response to indications of possible failures to comply with Title VI, Title IX, Section 504, and Title II.  34 C.F.R § 100.7(c); 34 C.F.R. § 106.81; 34 C.F.R § 104.61; 28 C.F.R § 35.171.  For Title II complaints, OCR is also

required to "promptly review the complaint to determine whether it has jurisdiction over the complaint under section 504," accept all completed complaints over which it has jurisdiction, and "promptly notify the complainant and the public entity of the receipt and acceptance of the complaint." 28 C.F.R § 35.171.

151.    By decimating OCR's ability to process and investigate complaints through elimination of OCR regional offices and staff, Defendants have actively obstructed OCR's ability to meet its obligation to make prompt investigations and functionally halted investigations. Defendants thus cannot promptly investigate complaints and have unlawfully withheld and/or unreasonably delayed investigations of complaints within OCR's jurisdiction.

**Count Four**
**Ultra Vires Agency Action**
*[brought by All Plaintiffs against All Defendants]*

152.    Plaintiffs reallege and incorporate by reference all paragraphs above.

153.    Federal courts may set aside agency action or inaction that exceeds an agency's powers, including action or inaction that violates a clear and mandatory statutory command or that lacks a contemporaneous, reasoned justification.

154.    The decimation of OCR's ability to process and investigate complaints violates the clear mandates of Title VI, 42 U.S.C. § 2000d-1, and Title IX, 20 U.S.C. § 1682, to effectuate the provisions of those statutes.

155.    Defendants have not supported their decimation of OCR's ability to process and investigate complaints with a contemporaneous, reasoned justification.

156.    As a result, Defendants' decimation of OCR's ability to process and investigate complaints exceeds Defendants' lawful authority and should be set aside.

**Count Five**
**Violation of the Equal Protection Guarantee under the**
**Fifth Amendment to the U.S. Constitution**
*[brought by Plaintiffs Nikki S. Carter, K.D., M.W., Melissa Combs, D.P, and A.S.*
*against All Defendants]*

157.    Plaintiffs reallege and incorporate by reference all paragraphs above.

158.    The Due Process Clause of the Fifth Amendment prohibits the federal government

from denying equal protection of the laws and protects individuals from discrimination on the

basis of race, sex, sexual orientation, and gender identity.

159.    Defendants' actions discriminate on the basis of race, sex, sexual orientation, and

gender identity.

160.    Defendants' actions are motivated, at least in part, by the discriminatory purpose of

thwarting race- and sex-based discrimination complaints filed by or on behalf of students of

color or LGBTQ+ students while advancing claims on behalf of white or cisgender claimants

that are aligned with the Department's preferences and preferred groups, including the targeting

of programs and practices that aim to ensure equal educational opportunity for students of color

or LGBTQ+ students.

161.    Discriminatory purpose and intent are evident from Defendants' recently enacted

policies and practices to treat Plaintiffs complaining of discrimination as people of color or

LGBTQ+ individuals differently from other peer complainants, which constitute discrimination

under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252,

265 (1977).  The circumstances leading up to the recent policy and practice changes reflect an

intent to undermine OCR's investigations for people of color or LGBTQ+ individuals, while

advantaging complaints filed by white or cisgender complainants, including those challenging

programs and services that provide equal educational opportunities to historically marginalized

students.  Discrimination is also evident from the various departures from normal OCR procedures; policies and practices that fail to align and even conflict with OCR's statutory mandates; the stated intentions and patterns of action taken by the administration and Defendants against people of color and LGBTQ+ individuals; and the disproportionate impact of Defendants' actions on complainants asserting claims on behalf of people of color or LGBTQ+ individuals.

162.    Defendants' discrimination against Plaintiffs cannot be justified with a compelling, important, or legitimate governmental interest.  Defendants' actions and inactions cannot survive rational basis review, let alone the heightened and strict scrutiny required by the intentionally discriminatory conduct at issue.

163.    Plaintiffs have been injured and continue to be injured because Defendants' actions and inactions subject them to discrimination on the basis of race, sex, sexual orientation, and gender identity and deprive them of equal access to OCR's civil rights complaint procedures.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1. Assert jurisdiction over this action;

2. Declare the Defendants' decimation of OCR's ability to process and investigate complaints unlawful because it violates the APA, exceeds Defendants' statutory authority, and violates the Fifth Amendment to the U.S. Constitution;

3. Enter a preliminary and permanent injunction:

    a.  Compelling Defendants to restore the investigation and processing capacity of OCR and to process OCR complaints promptly and equitably;

  b. Ordering additional appropriately tailored remedies to ensure Defendants'
future compliance with their obligations, such as periodic public reporting to
this Court regarding OCR's processing and enforcement of complaints; and

  c. Retaining continuing jurisdiction to oversee compliance with the Court's
order;

4. Award to Plaintiffs their costs and reasonable attorneys' fees pursuant to 28 U.S.C.
§ 2412; and

5. Grant such other equitable relief as the Court deems just and proper.

Dated: April 10, 2025      Respectfully submitted,

/s/ Johnathan Smith
Johnathan Smith (D.C. Bar No. 1029373)
David G. Hinojosa (D.C. Bar No. 1722329)
Nina Monfredo*
National Center for Youth Law
818 Connecticut Ave NW, Suite 425
Washington, D.C. 20006
(202) 868-4782
jsmith@youthlaw.org
dhinojosa@youthlaw.org

Freya Pitts*
Hong Le*
Pallavi Bugga**
National Center for Youth Law
1212 Broadway, Suite 600
Oakland, CA 94610
(510) 835-8098

Selene Almazan-Altobelli**
Council of Parent Attorneys and Advocates, Inc.
PO Box 6767
Towson, MD 21285
844-426-7224, ext. 702
Selene@copaa.org

*motion for *pro hac vice* admission forthcoming
**motion for *pro hac vice* admission submitted

*Counsel for Plaintiffs*