UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NIKKI S. CARTER, *et al.*,

  Plaintiffs,

v.

U.S. Department of Education, *et al.*,

  Defendants.

Case No. 1:25-cv-744-PLF

**DECLARATION OF DOE DECLARANT 3**

### DECLARATION OF DOE DECLARANT 3

I, Doe Declarant 3, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am providing this declaration pursuant to 5 U.S.C. § 2302(b)(8) and (b)(9).

2. I am a senior attorney at the Office for Civil Rights ("OCR"), of the United States Department of Education ("Department"), Cleveland field office. I have been in this position for over 18 years. Before this position, I worked at a non-profit, and was an attorney at the U.S. Department of Justice, Antitrust Division. I have a J.D. and a bachelor's degree.

3. In 2021, I took a 10-month data science training program with the Department of Education's Office of the Chief Data Officer and as part of the Department of Education's implementation of the Foundation for Evidence-based Policymaking Act of 2018.

4. As a senior attorney, I was the lead attorney on 36 active investigations into complaints regarding civil rights violations at K-12 and institutions of higher education in Ohio and Michigan. During active investigations, my tasks included reviewing complaints, making determinations regarding whether the complaints were appropriate for investigation, drafting data and document requests, reviewing documents, preparing for and conducting witness interviews, analyzing and synthesizing facts, drafting internal memos and external correspondence, and negotiating resolution agreements.

5. I was responsible for monitoring 12 resolution agreements and their implementation.

1

I provided technical assistance to public entities, parents and guardians, students, and the public on civil rights issues.

6. In addition to my legal work as senior attorney, as part of my regular day-to-day duties, I was also responsible for creating, maintaining, obtaining data for, analyzing, and internally publishing nationwide OCR data dashboards.

7. I regularly obtained data for and published the following data categories on the dashboards, including:

    a) the total number of investigators at each field office;

    b) the total number of active cases (disaggregated by type of claim);

    c) the number of active cases per investigator;

    d) the number of monitoring cases per field office;

    e) average number of active cases per investigator at each field office;

    f) the number of cases closed at each field office; and

    g) the percentage of cases that were closed by day 180 in a field office.

8. I last refreshed the dashboards on March 11, 2025.

9. Additionally, I and others throughout OCR were provided with a report generated by headquarters containing various metrics on a monthly and fiscal year basis. This report is known as the CMS Report. The CMS Report include metrics around investigative staff, complaints, resolutions, and Government Performance and Results Act ("GPRA") standards, both in total for OCR and by regional office. I received the FY 2024 CMS Report. A true copy is attached to this Declaration as Exhibit A.

10. I am providing this declaration in connection with the announcement by the Department of Education on March 11, 2025 that it would be reducing its staff by 50% and that this was a "significant step" towards the Department's "final mission." *U.S. Department of Education Initiates Reduction in Force*, Press Release, Department of Education (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force ("March 11 Press Release"). The Department initiated these mass terminations

and office closures, which it referred to as a "reduction in force," impacting nearly 50% of the Department's workforce. Those workers were placed on administrative leave beginning Friday, March 21, 2025 and told that their employment would end on June 9, 2025.

11. On March 11, 2025, I received an email stating that my position was eliminated and that I had until March 21, 2025 to close out my job. I will be employed by the Department through June 9, 2025.

12. I am providing this declaration to explain certain immediate and irreparable harms resulting from the arbitrary mass terminations and office closures.

13. I have received emails from colleagues informing me that the Department closed the Boston, Chicago, Cleveland, Dallas, New York, Philadelphia, and San Francisco OCR regional offices (collectively, the "Closed Offices"), and left open the Atlanta, Denver, Kansas City, DC Metro, and Seattle OCR regional offices (collectively, the "Open Offices").

14. I have heard that the Trump Administration explained that the administration chose to close the lowest performing offices, and that the Open Offices can and will absorb the additional work. This is blatantly false.

15. First, I know that my hardworking colleagues in all the regional offices did their very best with the resources that OCR gave them. But caseloads were too high even prior to March 11, 2025, and for fiscal year ("FY") 2024, ten of the twelve regional offices failed to meet the GRPA goal of resolving 80% of cases within 180 days. 74% of cases were closed within 180 days at the Chicago regional office (Closed Office); 73% of cases were closed within 180 days at the Cleveland regional office (Closed Office); 71% of cases were closed within 180 days at the Dallas regional office (Closed Office); 66% of cases were closed within 180 days at the New York regional office (Closed Office); 55% of the cases at the Atlanta field office (Open Office) were closed within 180 days; 70% of cases were closed within 180 days at the Boston regional office (Closed Office); 71% of cases were closed within 180 days at the Metro regional office (Open Office); 81% of cases were closed within 180 days at the Kansas City regional office (Open Office); 83% of cases were closed within 180 days at the Denver

3

regional office (Open Office); 63% of cases were closed within 180 days at the Philadelphia regional office (Closed Office); 65% of cases were closed within 180 days at the San Francisco regional office (Closed Office); and 64% of cases were closed within 180 days at the Seattle regional office (Open Office).

16. The CMS Report also details the number of cases resolved and number of investigators in each office. Chicago resolved 1,176 cases with 33 investigative staff; Cleveland resolved 1,104 with 25 investigative staff; Dallas resolved 1,526 with 40 investigative staff; New York resolved 916 complaints with 32 investigative staff; Atlanta resolved 880 complaints with 42 investigative staff; Boston resolved 868 with 20 investigative staff; Metro resolved 1,167 with 29.5 investigative staff; Kansas City resolved 815 cases with 26 investigative staff; Denver resolved 1,154 cases with 22.5 FT investigative staff; Philadelphia resolved 713 cases with 24.5 FT investigative staff; San Francisco resolved 1,419 with 35 investigative staff; and Seattle resolved 626 with 24 investigative staff.[1]

17. By some metrics, some of the most effective, efficient offices were closed. For instance, Cleveland (Closed Office) and Chicago (Closed Office) resolved approximately forty-four and thirty-six cases per investigator, respectively during FY 2024, while Kansas City (Open Office) resolved only 31.35 cases per investigator during that time period. Similarly, Dallas (Closed Office) resolved 38.15 cases per investigator, while Atlanta (Open Office) resolved only 20.95 cases per investigator. And San Francisco (Closed Office) resolved 40.54 cases per investigator, while Seattle (Open Office) resolved only 26.08 cases per investigator.

18. Second, it is impossible for the remaining investigative staff to absorb the additional cases in a way that will continue to meaningfully enforce civil rights laws in the education systems of this country. In January 2025, there were an estimated 375.5 total investigators at OCR across the country. However, this number does not reflect the many investigators that I

---

[1] Several of the regional offices have part-time investigative staff during FY 2024: Chicago had 2, Metro had 1, Denver had 1, and Philadelphia had 1. For purposes of this Declaration, I have considered each part-time investigator to be the equivalent of half (.5) of a full-time investigator.

4

personally know who have left OCR since January as a result of the Trump Administration's various efforts to reduce the size of the Department. As of March 11, 2025, the investigators at the Closed Offices were investigating a total of 9,181 active cases, 57% of the total number of active OCR cases (16,022). At least 7,037 of the active cases that were being investigated by staff at a Closed Office as of March 11, 2025 included an allegation or claim of noncompliance with Section 504 of the Rehabilitation Act of 1973 or Title II of the Americans with Disabilities Act of 1990.

19. The Closed Offices had an aggregate of 224.5 investigators, approximately 60% of the total number of OCR investigators (375.5).

20. After the mass terminations and office closures, OCR will have no more than 151 investigators assigned to 16,022 cases, an approximate average of 106 cases per investigator. However, the true estimate is likely higher, given the number of OCR investigators that I personally knew who had left the office since January.

21. This is a completely untenable caseload and will likely decrease the efficiency and quality of OCR investigations. The data supports this conclusion. According to the FY 2024 CMS Report, Denver, the office with the highest percentage of cases resolved within 180 days (83%), also had one of the lowest caseloads per investigator (30 cases per investigator). Atlanta, the office with the highest caseload per investigator (47 cases per investigator), also had the lowest number of cases resolved within 180 days (55%).

22. The 16,022 cases does not even include the number of cases in monitoring. Cases in monitoring are cases where OCR found a violation or had a cause for concern, and the school signed a resolution agreement requiring it to take action to come back into compliance with the civil rights laws. As of March 11, 2025, there were 2,765 cases in monitoring.

23. As a senior attorney with 18 years of experience at OCR, if I were assigned 106 active cases, I would either be forced to conduct cursory investigations that are investigations in name only in order to resolve the cases in a timely fashion or allow cases to languish for an

unreasonably long time. And it would be impossible for me to do comprehensive monitoring on additional cases.

24. The more time passes, the more difficult it is to investigate a complaint. Witness memories fade. Documents are lost or destroyed. Complaining victims move on with their lives and do not want to be retraumatized. As a result, meritorious complaints may be denied justice due to the prolonged delay caused by the mass terminations and office closures.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed April 24, 2025, at Cleveland, Ohio.

*Doe Declarant 3*
Doe Declarant 3