**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NIKKI S. CARTER, et. al., <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION, et. al, <br><br> *Defendants*. | ) <br> ) <br> ) <br> ) <br> ) Case No. 1:25-cv-744-PLF <br> ) <br> ) <br> ) <br> ) <br> ) |

**DECLARATION OF DOE DECLARANT 4**

Pursuant to 28 U.S.C. § 1746, I, Doe Declarant 4, declare as follows:

1. I am providing this declaration pursuant to 5 U.S.C. § 2302(b)(8) and (b)(9).

2. This declaration is submitted in support of the Plaintiffs' Request for a Preliminary Injunction.

3. I am a member of the investigative staff in one of the now-closed regional offices for the U.S. Department of Education's Office for Civil Rights ("OCR").

4. Through my personal knowledge and experience, as well as through documents and information I have reviewed, I have knowledge about OCR in general and the now-closed regional office where I worked in particular.

5. OCR is charged with enforcing and investigating alleged violations of various federal civil rights laws that protect students and other individuals against discrimination, including Title VI of the Civil Rights Act of 1964 (Title VI), Title IX of the Education Amendments of 1972 (Title IX), Section 504 of the Rehabilitation Act of 1973 (Section 504), the Age Discrimination Act of 1975 (Age Act), Title II of the Americans with Disabilities Act

of 1990 (Title II), and the Boy Scouts of American Equal Access Act of 2002. OCR has a responsibility to act in a reasonably prompt manner in response to alleged violations of these laws.

6. In addition to its enforcement and investigative work, OCR also provides trainings and technical assistance on civil rights laws to state and local educational agencies. And it gives educational presentations to advocacy groups and parents.

7. The Assistant Secretary for Civil Rights leads OCR. OCR's headquarters are in Washington, D.C. Prior to March 11, 2025, OCR had 12 regional offices in Atlanta, Boston, Chicago, Cleveland, Dallas, Denver, Kansas City, New York, Philadelphia, San Francisco, Seattle, and Metro Washington D.C. The Deputy Assistant Secretary for Enforcement oversaw four Enforcement Divisions, each consisting of three regional locations. Each Enforcement Division was managed by an Enforcement Director, who was responsible for coordinating the program operations and resource management of three regional offices.

8. Investigative staff in the regional offices carry out OCR's mission by enforcing civil rights statutes and regulations. Staff use a variety of approaches to resolve complaint investigations and compliance reviews in order to ensure equal access to education for all students.

9. Like other regional offices, my regional office received complaints alleging civil rights violations, from parents, students, advocates, or any other community member who believed that discrimination occurred or was occurring. Investigative staff evaluated those complaints and determined whether they met the case processing guidelines warranting a full investigation. While investigating a complaint, staff interviewed witnesses, requested and reviewed documents, conducted on-site visits if necessary, and communicated with the

complainant to understand the extent of the alleged discrimination. Staff also conducted technical assistance activities for state and local educational agencies to provide guidance on how to comply with antidiscrimination laws, and provided guidance and information to members of the public on OCR's processes and laws it enforces.

10. As a member of OCR's investigative staff, I reviewed complaints to determine if they had merit and warranted a full investigation. I investigated the complaints, negotiated resolutions, and monitored compliance with resolutions. I worked on complaints involving violations of federal law, including Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and Title II of the Americans with Disabilities Act of 1990. I also initiated compliance reviews to determine whether or not the recipient was in compliance with the federal laws that OCR enforces, which usually led to monitoring.

11. Shortly after President Trump's inauguration in January 2025, all OCR investigations were paused. During the pause, we could not engage in any external communications. We could not even let external parties know that we had received documents or communications. During the pause, I worked to get letters of findings and other external communications ready to be sent out as soon as the pause was lifted. In late February, the pause was lifted as to some complaints regarding disability discrimination only, so I was finally able to send out communications for my investigations where the only claims were related to certain types of disability discrimination. On or around March 6, 2025, the pause was lifted as to other types of cases. I worked to send out as many communications as I could to get everything back on track.

12. On March 11, 2025, I was still working to catch up, when my OCR laptop

rebooted around 6 p.m. When it came back on, I no longer had the ability to communicate externally via email. I also could no longer update cases or edit documents in OCR's case management systems. On the same day, about two hours later, I received notice that I would be subject to mass terminations and placed on administrative leave beginning on March 21, 2025, and that my office would be closed.

13. Although I technically had ten days between receiving notice and going on leave, between March 11 and March 21, 2025, I was not able to meaningfully advance my ongoing cases or take steps to make sure they were transitioned appropriately. During that time, I could not make changes or updates in OCR's case or document management systems, make outgoing phone calls, or send any external emails. I was also instructed not to work on anything after March 11, 2025. I was asked to provide a list of cases that needed immediate attention, so I did that. But I was never given any further instruction for transitioning my cases or told what would happen to them.

14. As of March 11, 2025, I had several matters that had reached critical stages in the investigation process. I had between 40 and 50 active cases on my docket in total. I also had a handful new cases in the evaluation stage. This was less than my usual caseload, because I had been able to close a number of cases immediately prior to the pause. Most of my cases were in the investigation stage. Around 8-10 were in the monitoring stage. One was very close to resolution – the parties had agreed to mediate, I was just waiting for approval to set a date for mediation. And I had at least six letters of findings that were ready to go out or almost ready to go out. Because I was unable to meaningfully transition these cases, their resolution will be unnecessarily delayed – if they are resolved at all.

15. On the day that I received notice of the mass terminations, I was actively

4

working on a case involving a recipient that had been found in violation of Title VI based on a complaint alleging antisemitism. That case was in monitoring. I had reviewed some information provided by the recipient regarding their resolution activities and was ready to provide a substantive response noting some areas of noncompliance, but I was not able to send that. Without continued monitoring, the recipient might cut corners when it comes to implementing the resolution agreement. Even if OCR eventually resumes monitoring in this case, whenever there is a lull in monitoring, there is a risk that documents will not be appropriately retained, and the recipient will not be able to tell OCR how they complied with the resolution agreement.

16. As of March 11, 2025, I was also monitoring a second case after finding that students with disabilities lacked meaningful access to the same types of courses in their school district as their nondisabled peers. The district was complying with the resolution agreement, but it needed continued guidance on how to substantively comply with the law. Because of the disruption in my monitoring activities, the district will go without that guidance.

17. I was also investigating a complaint alleging that nonverbal students with disabilities had been severely physically abused at school. I had recently received information from the school district related to the complaint, and I was reviewing it. But that stopped when my office was closed and I was placed on administrative leave. On top of that, I was investigating the state educational agency for allegedly failing to respond adequately to reports of the abuse. That investigation was paused, too.

18. In another of my cases, I was in the process of responding to a complaint alleging that a school district failed to address bullying on the basis of race and disability for nearly two years. The bullying had escalated after the parent's initial complaint to the district,

5

and it was severely impacting the student's mental health. A delay in that investigation could seriously impact the student's access to a safe school environment.

19. I had also drafted several letters of findings when I received notice of the mass terminations. Two of the letters involved Title IX sexual harassment cases where we had completed the investigation and found violations. These letters were drafted and waiting for internal review, but nobody was able to meaningfully move them forward because they were instructed not to during the pause. And then after the pause, nobody had time to review them before the terminations. I was also working on a letter of findings in a third case involving disability and sex discrimination. In that case, I was also waiting for a final review of the letter. But that was also stalled.

20. Between the mass terminations and our inability to meaningfully transition our cases, all of these matters and more have been or will be adversely affected. And the complainants, along with other students at the recipients schools, will be left without timely relief, because their complaints will not get resolved or the resolution will be unreasonably delayed. The longer the delay, the greater the likelihood that they will suffer harm that cannot be resolved.

21. In addition to the adverse effects on my casework, I also had a backlog of technical assistance calls when I received notice of the mass terminations, because I had not been able to respond to any calls during the pause. Those will likely go unanswered, now.

22. Based on my knowledge and experience, I do not think that the Department of Education can meet its statutory obligations to investigate and ensure compliance with federal civil rights given the downsizing.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct. Executed on April 30, 2025.

Signature:

*Doe Declarant 4*
_____

Doe Declarant 4