UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| NIKKI S. CARTER, et. al., | ) |
| *Plaintiffs,* | ) |
| v. | ) Case No. 1:25-cv-744-PLF |
| UNITED STATES DEPARTMENT OF EDUCATION, et. al, | ) |
| *Defendants.* | ) |

**DECLARATION OF DOE DECLARANT 6**

Pursuant to 28 U.S.C. § 1746, I, Doe Declarant 6, declare as follows:

1.    I am providing this declaration pursuant to 5 U.S.C. § 2302(b)(8) and (b)(9).

2.    This declaration is submitted in support of the Plaintiffs' Request for a Preliminary Injunction.

3.    I am a member of the investigative staff in one of the now-closed regional offices for the U.S. Department of Education's Office for Civil Rights ("OCR"). I have worked for OCR for nearly three years.

4.    Through my personal knowledge and experience, as well as through documents and information I have reviewed, I have knowledge about OCR in general and the now-closed regional office where I worked in particular.

5.    OCR is charged with enforcing and investigating alleged violations of various federal civil rights laws that protect students and other individuals against discrimination, including Title VI of the Civil Rights Act of 1964 (Title VI), Title IX of the Education Amendments of 1972 (Title IX), Section 504 of the Rehabilitation Act of 1973 (Section 504),

the Age Discrimination Act of 1975 (Age Act), Title II of the Americans with Disabilities Act of 1990 (Title II), and the Boy Scouts of American Equal Access Act of 2002. OCR has a responsibility to act in a reasonably prompt manner in response to alleged violations of these laws.

6.    In addition to its enforcement and investigative work, OCR also provides trainings and technical assistance on civil rights laws to state and local educational agencies. And it gives educational presentations to advocacy groups and parents.

7.    The Assistant Secretary for Civil Rights leads OCR. OCR's headquarters are in Washington, D.C. Prior to March 11, 2025, OCR had 12 regional offices in Atlanta, Boston, Chicago, Cleveland, Dallas, Denver, Kansas City, New York, Philadelphia, San Francisco, Seattle, and Metro Washington D.C. The Deputy Assistant Secretary for Enforcement oversaw four Enforcement Divisions, each consisting of three regional locations. Each Enforcement Division was managed by an Enforcement Director, who was responsible for coordinating the program operations and resource management of three regional offices.

8.    Investigative staff in the regional offices carry out OCR's mission by enforcing civil rights statutes and regulations. Staff use a variety of approaches to resolve complaint investigations and compliance reviews in order to ensure equal access to education for all students.

9.    Like other regional offices, my regional office received complaints alleging civil rights violations from parents, students, advocates, or any other community member who believed that discrimination occurred or was occurring. Investigative staff evaluated those complaints and determined whether they met the case processing guidelines warranting a full investigation. While investigating a complaint, staff interviewed witnesses, requested and

reviewed documents, conducted on-site visits if necessary, and communicated with the complainant to understand the extent of the alleged discrimination. Staff also conducted technical assistance activities for state and local educational agencies and other community members to provide guidance on how to comply with antidiscrimination laws.

10.     As a member of OCR's investigative staff, I reviewed complaints to determine if they had merit and warranted a full investigation. I investigated the complaints, negotiated resolutions, and monitored compliance with resolutions. All of the complaints I worked on involved violations of federal law, including Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, Title II of the Americans with Disabilities Act of 1990.

11.     Shortly after President Trump's 2025 inauguration, all OCR investigations were paused for about a month. During the period of the pause, we could not engage in any external communications related to our investigations. We could not request documents, conduct interviews, participate in meetings, facilitate mediations, negotiate resolutions, issue letters of findings, or take other necessary steps to review and resolve complaints. We could not even send out consent requests. I did as much as I could to prepare for when the pause was lifted, but my work was stalled.

12.     On February 20, 2025, the pause was lifted as to complaints alleging disability discrimination, and nothing else. A few weeks later, it was lifted for other cases. Because our work had been paused for so long, I was eager to resume reviewing complaints, conducting investigations, and engaging in resolution activities. I immediately sent out a number of external communications to try to get my cases back on track.

13.    On March 11, 2025, I (along with the rest of my office) received notice that I would be subject to what the notice referred to as a reduction in force ("RIF") and placed on administrative leave starting on March 21, 2025. On March 21, 2025, my office was effectively closed.

14.    As of March 11, 2025, I had several matters that had reached critical stages in the investigation process. I had close to 90 cases on my docket in total. About 65 of those were in the evaluation or investigation stages. About 5 of them were in active mediation. I was also monitoring resolution for about 10 or 15 cases.

15.    Although I technically had ten days between receiving notice and going on leave, between March 11 and March 21, 2025, I was not allowed to access our case and document management systems. I also could not make outgoing phone calls or send any external emails. As a result, I could not do any work on my ongoing cases or take any steps to make sure that they were transitioned appropriately. I could not inform anyone involved with the complaints for which I was responsible that I would no longer be working on their cases. I was not even informed as to whether a remaining office would be taking my cases, or which office it would be. Although I eventually learned that another regional office would be inheriting our cases, it was too late for me to meaningfully transition them. And I was not given any guidance on how to do so.

16.    Between March 11 and March 21, 2025, I was getting lots of phone calls and messages from complainants and educational agencies with whom I had been working, but I could not respond to any of them. And at that time, there was no automated message set up for my accounts, so anyone who was calling or messaging would have had no way of knowing that I was not able to respond to their emails. On March 21, 2025, I lost access to my email

4

and voicemail completely.

17.     On April 4, 2025, I noticed that an automated message was set up for my email account, and for the email accounts of others in my office who were placed on leave. The message was in first person and stated that I was working to transition my cases. But that was not true. By that time, I had completely lost access to my email and the office network and was not able to take any steps to transition my cases. Now, the automated message connected to my email says that my employment status has changed, and people should reach out to a "transitions" email address.

18.     Immediately after receiving notice about the RIF, I received a response to a proposed resolution agreement from a school district, which had been participating in negotiations with me. The case was related to a physical accessibility complaint. The district had extremely minor edits to the agreement. Had I had an opportunity to seek approval, the agreement would have been approved immediately, and the district would have begun to implement it. But I could not respond, so I was not able to finalize that resolution. Even if someone eventually follows up on that agreement, its implementation will be unreasonably and unnecessarily delayed.

19.     I do not know what happened to that case. I suspect that it will never be resolved, because for us to close resolution monitoring, we often have to make an in-person site visit to the school district engaged in the resolution. Even if the case was assigned to another regional office, someone would have to travel from that office to close the monitoring. That is not likely going to happen, especially considering the current caseload of the open offices. And I do not think that the school district will make the school accessible for the complainant student absent OCR enforcement, so that student will likely go without any relief.

20.     Shortly after receiving the notice on March 11, 2025, I also received an email from a school district stating that the district was interested in moving forward with mediation of a complaint involving disability discrimination. Again, I could not respond.

21.     When I received the notice on March 11, 2025, I had also been in conversations with parents about mediating a complaint involving a student who was excluded from school on the basis of disability. The parents had recently expressed via email that they wanted to mediate. I forwarded the email internally, but I do not know if that led to any follow up.

22.     I also had a case in resolution monitoring – the resolution addressed a school district's practice of segregating students with disabilities in a remote school. Monitoring reports were due shortly after I received notice of the RIF. The school district would have sent the monitoring reports to my email, but I could not and cannot check. And as far as I know, my email was not set up with automated messages at the time that the reports were due, so I do not know how the district would know where to send the reports.

23.     In another case that I was monitoring as of March 11, 2025, I found that a school district was not complying with the resolution agreement – which sought to address the district's unlawful practice of secluding and restraining students with disabilities. The investigation had resulted in violations and causes for concerns. There were many components to the resolution agreement, and the district had a number of outstanding reports due to OCR, but with my office closed, the district would not have known where to send those. I was working with the district to completely rebuild trainings and policies and procedures around tracking and monitoring of restraint and seclusion in the district. The ongoing back and forth with OCR was critical to this process – the district needs guidance on how to comply. Now though, I do not know what will happen with the monitoring of that case. Without active

monitoring, I worry that students in that district will continue to suffer harm.

24.    Before the terminations, I had requested data from two school districts in connection with disability discrimination complaints that the districts were working to provide me. I do not know if they sent it to me, but if they did, no one would have seen it. I do not know if they would have been informed about where to send the data, instead.

25.    Just hours before receiving the notice, on the morning of March 11, 2025, I had an intake interview with a parent alleging that her child's school refused to respond to students using racial slurs against her child. I had a letter drafted to send to the school the next morning, but it never went out.

26.    Also on March 11, 2025, I drafted letters notifying a complainant and a university that her case would be opened for investigation. The complainant was alleging that she had been terminated after requesting accommodations for her disability. Those letters never went out, either.

27.    On March 12, 2025, I had an intake interview scheduled with a complainant alleging discrimination based on sex and parental status. But I never got to speak with her or even let her know that I would miss the interview. After the notice of terminations, I continued to get calls and emails from her asking about the status of her complaint, but I could not respond.

28.    Also on March 12, 2025, I was scheduled to begin negotiations in a case involving a school district that had excluded and segregated an individual who used a service animal. I had already drafted a resolution agreement, which had been approved, but I was not able to present it to the district.

29.    I had also drafted three monitoring audits for physical accessibility complaints

to be sent out that week. But now they are probably just sitting in the system. I doubt that anyone will get to them.

30.     Between the terminations at OCR and our inability to meaningfully transition our cases, all of these matters and more have been or will be adversely affected. And the above-mentioned students and complainants will suffer immediate harm, as their complaints – all which had merit – will not be resolved, or their resolution will be unreasonably delayed. Many of the cases that I was working on also would have allowed for more systemic change within school districts – for example, complaints involving physical access issues or the segregation of students with disabilities. The longer the delay, the greater the likelihood that they will suffer harm that cannot be resolved.

31.     Our other work will suffer, too. When the terminations and closures happened, there was a backlog of hundreds of technical assistance requests that we had been trying to work through since the pause lifted. Now, it is not likely that anyone will provide technical assistance to those individuals.

32.     Based on my knowledge and experience, I do not think that the Department of Education can meet its statutory obligations to investigate and ensure compliance with federal civil rights given the downsizing.

33.     The long-term impact of significantly downsizing OCR will be that students will not have access to education free from discrimination and harassment. This will lead to worse educational outcomes and more students leaving school. For those students, this will cause irreparable harm. And no one will benefit.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct. Executed on April 29, 2025.

Signature:

*Doe Declarant 6*
Doe Declarant 6 (Apr 29, 2025 19:59 EDT)

Doe Declarant 6

.