**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

NIKKI S. CARTER, et al.,

     Plaintiffs,

        v.

U.S. DEPARTMENT OF EDUCATION, et al.,

     Defendants.

Case No. 1:25-cv-744-PLF

---

**<u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 3

   I.    Purpose and History of OCR ..................................................................................... 3

   II.   The Decimation of OCR ............................................................................................ 8

   III.    Profound Impact of Defendants' Actions .............................................................. 11

ARGUMENT ...................................................................................................................... 19

   I.    Standard of Review/Legal Standard ....................................................................... 20

   II.   Plaintiffs Are Likely To Succeed On Their APA And Ultra Vires Claims. ..................... 21

      A.   Defendants' actions are "final agency action" subject to judicial review under the APA. ...................................................................................................................... 21

      B.   Defendants' actions are arbitrary and capricious under the APA................................. 22

      C.   Defendants' actions violate the APA because they are not in accordance with law. ... 29

      D.   Defendants' actions violate the APA because they have unlawfully withheld or unreasonably delayed agency action. ................................................................... 32

      E.   Defendants' challenged conduct constitutes ultra vires agency action......................... 34

   III.    Plaintiffs Have Demonstrated A Likelihood Of Irreparable Harm............................. 35

   IV.    The Balance Of Equities And Public Interest Weigh Heavily In Favor Of Granting A Preliminary Injunction. ........................................................................................ 42

CONCLUSION................................................................................................................... 44

## TABLE OF AUTHORITIES

**Cases**

*Abbott Lab'ys v. Gardner*,
  387 U.S. 136 (1967)............................................................................. 22

*Aids Vaccine Advoc. Coal. v. United States Dep't of State*,
  No. CV 25-00400 (AHA), 2025 WL 752378 (D.D.C. Mar. 10, 2025) ................... 36

*Al-Eryani v. Immigrant Investor Program Office*,
  2024 WL 4285895 (D.D.C. Sept. 25, 2024) ........................................... 24

*\*Am. Fed'n of Lab.& Cong. of Indus. Organizations v. Dep't of Lab.*,
  No. CV 25-339 (JDB), 2025 WL 1129227 (D.D.C. Apr. 16, 2025) ..................... 35

*American Bar Ass'n v. United States Dep't of Educ.*,
  370 F. Supp. 3d 1 (D.D.C. 2019)........................................................ 28

*American Trucking Associations, Inc. v. Federal Motor Carrier Safety Admin.*,
  724 F.3d 243 (D.C. Cir. 2013) .......................................................... 24

*Appalachian Power Co. v. EPA*,
  208 F.3d 1015 (D.C. Cir. 2000) ........................................................ 21

*Arabzada v. Donis*,
  725 F. Supp. 3d 1 (D.D.C. 2024) ...................................................... 32

*Batterton v. Marshall*,
  648 F.2d 694 (1980).................................................................... 26

*Battle v. FAA*,
  393 F.3d 1330 (D.C. Cir. 2005) ....................................................... 31

*\*Bennett v. Spear*,
  520 U.S. 154 (1997).................................................................... 21

*Bonnette v. District of Columbia Court of Appeals*,
  796 F. Supp. 2d 164 (D.D.C. 2011) ................................................... 41

*Bowman Transp. Inc. v. Arkansas-Best Freight System*,
  419 U.S. 281 (1974).................................................................... 24

*Brock v. Cathedral Bluffs Shale Oil Co.*,
  796 F.2d 533 (D.C. Cir. 1986) ........................................................ 31

*Burlington Truck Lines, Inc., v. United States*,
  371 U.S. 156 (1962).................................................................... 23

*C.G.B. v. Wolf*,
  464 F. Supp. 3d 174  (D.D.C. 2020) .................................................. 43

*Camp v. Pitts*,
  411 U.S. 138 (1973).................................................................... 24

*Cayuga Nation v. United States*,
  594 F. Supp. 3d 64 (D.D.C. 2022) .................................................... 30

*Certain Named & Unnamed Non-Citizen Child. & Their Parents v. Texas*,
 448 U.S. 1327, 1332 (1980) ................................................................ 39
*Chaplaincy of Full Gospel Churches v. England*,
 454 F.3d 290, 297 (D.C. Cir. 2006) .................................................... 36
*City of Arlington v. FCC*,
 569 U.S. 290 (2013) ........................................................................... 34
*Cox v. Brown*,
 498 F. Supp. 823 (D.D.C. 1980) .................................................... 40, 41
*CSL Plasma Inc. v. U.S. Customs & Border Prot.*,
 628 F. Supp. 3d 243 (D.D.C. 2022) .................................................... 29
*Damus v. Nielsen*,
 313 F. Supp. 3d 317 (D.D.C. 2018) ................................................ 31, 32
*Department of Commerce v. New York*,
 588 U.S. 752 (2019) ........................................................................... 23
*\*Dept. of Homeland Security v. Regents of the Univ. of California*,
 591 U.S. 1 (2020) ................................................................. 24, 27, 28
*Drs. for Am. v. Off. of Pers. Mgmt.*,
 __ F. Supp. 3d __, 2025 WL 452707(D.D.C. Feb. 11, 2025) ................... 21, 22
*Encino Motorcars, LLC v. Navarro*,
 579 U.S. 211 (2016) ........................................................................... 27
*F.C.C. v. NextWave Pers. Commc'ns Inc.*,
 537 U.S. 293 (2003) ........................................................................... 29
*\*FCC v. Fox Television Stations, Inc.*,
 556 U.S. 502 (2009) ...................................................................... 27, 28
*Franklin v. Massachusetts*,
 505 U.S. 788 (1992) ...................................................................... 21, 23
*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
 460 F.3d 13 (D.C. Cir. 2006) ............................................................. 21
*Giri v. National Board of Medical Examiners*,
 718 F. Supp. 3d 30 (D.D.C. 2024) ...................................................... 41
*Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*,
 319 F. Supp. 3d 491 (D.D.C. 2018) .................................................... 20
*Jackson v. Mabus*,
 919 F. Supp. 2d (D.D.C. 2013) ...................................................... 24, 26
*Judulang v. Holder*,
 565 U.S. 42 (2011) ............................................................................. 26
*La. Pub. Serv. Comm'n v. FCC*,
 476 U.S. 355 (1986) ........................................................................... 34
*\*League of Women Voters of the United States v. Newby*,
 838 F.3d 1 (D.C. Cir. 2016) ........................................... 20, 36, 41, 44

*Lofton v. D.C.*,
  7 F. Supp. 3d 117 (D.D.C. 2013) .................................................................................. 40
*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369  (2024) ..................................................................................................... 29
*M.G.U. v. Nielsen*,
  325 F. Supp. 3d 111 (D.D.C. 2018) ............................................................................. 43
*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
  336 F.3d 1094 (D.C. Cir. 2003) ................................................................................... 32
*Massey v. D.C.*,
  400 F. Supp. 2d 66 (D.D.C. 2005) ............................................................................... 39
*Mathis v. United States Parole Commission*,
  749 F. Supp. 3d 8 (D.D.C. 2024) ........................................................................... 37, 38
*Michigan v. EPA*,
  576 U.S. 743 (2015) ...................................................................................................... 24
*Morton v. Ruiz*,
  415 U.S. 199 (1974) ................................................................................................. 31, 32
*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ........................................................................................... 24, 26, 30
*NAACP v. U.S. Postal Serv.*,
  496 F. Supp. 3d 1 (D.D.C. 2020) ............................................................................ 21, 43
*Nat'l Telephone Co-Op Ass'n v. FCC*,
  563 F.3d 536, 540 (D.C. Cir. 2009) ............................................................................. 24
*Nat'l Treasury Emps. Union v. Vought* ("*NTEU*"),
  No. CV 25-0381 (ABJ), 2025 WL 942772 (D.D.C. Mar. 28, 2025) ....................... 30, 35
*Nken v. Holder*,
  556 U.S. 418 (2009) ...................................................................................................... 43
*Petties v. D.C.*,
  881 F. Supp. 63 (D.D.C. 1995) ..................................................................................... 38
*Pursuing America's Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016) ...................................................................................... 44
*Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*,
  324 F.3d 726 (D.C. Cir. 2003) ...................................................................................... 22
*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947) ...................................................................................................... 25
*Telecomms. Rsch. and Action Ctr. v. F.C.C. ("TRAC")*,
  750 F.2d 70 (D.C. Cir. 1984) ........................................................................................ 33
*U.S. Lines, Inc. v. Fed. Mar. Comm'n*,
  584 F.2d 519 (D.C. Cir. 1978) ...................................................................................... 31
*U.S. v. Morton Salt Co.*,
  338 U.S. 632 (1950) ...................................................................................................... 29

*In re United Mine Workers of Am. Int'l Union,*
    190 F.3d 545, 549 (D.C. Cir. 1999) ................................................................ 33

*United States ex rel. Accardi v. Shaughnessy,*
    347 U.S. 260, 268 (1954) ................................................................ 31, 32

*United States v. Nixon,*
    418 U.S. 683 (1974) ................................................................ 31

*Washington v. Reno,*
    35 F. 3d 1093 (6th Cir. 1994) ................................................................ 44

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health and Human Services,*
    485 F. Supp. 3d 1 (D.D.C. 2020). ................................................................ 42

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008) ................................................................ 20, 36, 43

## Statutes

20 U.S.C. § 1682 ................................................................ 4, 31, 35

20 U.S.C. § 3413 ................................................................ 3

20 U.S.C. §§ 1681 *et seq.* ................................................................ 3

29 U.S.C. § 794 ................................................................ 4

42 U.S.C. § 2000d-1 ................................................................ 4, 31, 35

42 U.S.C. §§ 12131 *et seq.* ................................................................ 4

42 U.S.C. §§ 2000d *et seq.* ................................................................ 3

5 U.S.C. § 701, *et seq.* ................................................................ 3

5 U.S.C. § 704 ................................................................ 21

5 U.S.C. § 706(2)(A) ................................................................ 23, 29

## Other Authorities

28 C.F.R § 35.171 ................................................................ 4,5,33

34 C.F.R § 104.61 ................................................................ 33

34 C.F.R. § 100.7(c) ................................................................ 4, 33

34 C.F.R. § 100.7(d)(1) ................................................................ 4

34 C.F.R. § 100.7(d)(2) ................................................................ 4

34 C.F.R. § 106.81 ................................................................ 4, 33

34 C.F.R. Part 100 ................................................................ 4

34 C.F.R. Part 106 ................................................................ 4

## INTRODUCTION

Every day, students attend schools and colleges across the nation, seeking a great education that will help lay a foundation for good citizenship and pave the way to a productive career and prosperous life. Unfortunately, many students and families encounter terrible acts of discrimination, impeding their access to equal educational opportunities. Decades ago, Congress recognized these same barriers and passed several laws protecting students against discrimination based on race, national origin, sex, and disability. Recognizing that the laws themselves were not stopping federal funding recipient institutions from discriminating against students, Congress created the Office for Civil Rights in the Department of Education ("OCR") to enforce them.

Throughout the years and across administrations, Congress has continued to fund OCR and the Department of Education has continued to implement and support the laws it is mandated to follow—until now. In direct conflict with civil rights laws, Defendant Secretary McMahon has shared her own vision: a "final mission" to dismantle the Department of Education and OCR. And she has begun to put that plan into action by placing on leave nearly half of the OCR career staff (who will soon lose their positions permanently on June 9, 2025) and closing seven of twelve regional offices, all without any rhyme or reason.

The results have been catastrophic. Plaintiff students and parents are among thousands across the nation who filed complaints of race, sex, and disability discrimination with OCR, hoping for some relief, but are now without recourse. Their schools continue to receive federal funds without any repercussions while children face continual bullying and harassment, are denied basic, essential accommodations, and are forced to encounter daily the students and school officials who committed and supported the discriminatory acts. One plaintiff child with

disabilities was frequently secluded in a "blue room" and once was held down by four school officials, including a football and wrestling coach. She now attends school only two hours a day out of fear for her safety. Another plaintiff child, one of the only Black students at her school, was falsely accused of fighting while trying to break up a fight and suspended, even after a video proved she was innocent. Classmates harassed her, hurling racial epithets like the "n-word" and "black monkey" at her; sadly, the harassment continues to this day. Another plaintiff child, who identifies as LGBTQ+, experienced severe bullying and harassment. A faculty member analogized identifying as LGBTQ+ to a "mental illness" and punished students for taking part in an annual day of action to spread awareness about the effects of bullying and harassment on LGBTQ+ students. Classmates subjected the plaintiff child and other LGBTQ+ students to a hostile environment, including using constant homophobic and transphobic slurs during class and telling LGBTQ+ students to "go die" and "go kill" themselves multiple times.

These harms are just a sampling of the severe, imminent, and ongoing harm plaintiff students and others experience today in schools. The students relive the trauma each day and some have even been forced to leave their schools. After filing their complaints with OCR, some families were beginning to see some action prior to the new administration taking office in 2025. However, Defendants' recent evisceration of OCR's capacity to address and fully investigate students' and families' complaints by gutting OCR's workforce and closing several regional offices has effectively halted OCR's statutorily mandated investigations of Plaintiffs' complaints. The remaining staff are handling two to three times the number of cases, when their caseloads were already unmanageable.

Faced with imminent and irreparable harm, Plaintiffs respectfully urge the Court to enter a preliminary injunction under Federal Rule of Civil Procedure 65 ordering Defendants to restore

the investigation and enforcement capacity of OCR that would enable OCR to process

complaints promptly and equitably, as required by law.

As demonstrated further below, Plaintiffs are likely to succeed on their claims that

Defendants' actions are final agency actions that run afoul of the Administrative Procedure Act

("APA"), 5 U.S.C. § 701, *et seq.*, and exceed Defendants' lawful authority. Granting the

preliminary injunction to require Defendants to comply with the laws and regulations governing

the investigative process by restoring the capacity of OCR would both address the continuing

harm at stake and serve the public interest, tipping the balance of equities in favor of Plaintiffs.

## STATEMENT OF FACTS

### I.    Purpose and History of OCR

The mission of OCR is "to ensure equal access to education and to promote educational

excellence through vigorous enforcement of civil rights in the nation's schools."[1] Congress

created OCR at the same time it created the Department of Education, to "assume responsibility

for [] carrying out the nation's civil rights laws in education."[2] Accordingly, OCR and its

Assistant Secretary have specific authority and duties set out by statute, 20 U.S.C. § 3413,

including the authority "to select, appoint, and employ such officers and employees, including

staff attorneys, as may be necessary to carry out the functions of such Office," *id.* § 3413(c)(2).

The Department is charged with enforcing various civil rights laws prohibiting

discrimination in all programs and activities that receive federal financial assistance, including

Title VI of the Civil Rights Acts of 1964 ("Title VI"), 42 U.S.C. §§ 2000d *et seq.*; Title IX of the

Education Amendments of 1972, as amended ("Title IX"), 20 U.S.C. §§ 1681 *et seq.*; Section

---

[1] U.S. Dep't of Educ., Office for Civil Rights (OCR),
https://www.ed.gov/about/ed-offices/ocr (last reviewed April 11, 2025).
[2] S. Rep. No. 96-49, at 35-36 (Mar. 27, 1979).

504 of the Rehabilitation Act of 1973, as amended ("Section 504"), 29 U.S.C. § 794; and Title II

of the Americans with Disabilities Act ("Title II"), 42 U.S.C. §§ 12131 *et seq.*[3] With respect to

Title VI and Title IX, Congress expressly requires that the Department effectuate those statutes.

*See* 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682 (directing "[e]ach Federal department and agency

which is empowered to extend Federal financial assistance to" educational programs and

activities "to effectuate the provisions of" Title VI and Title IX, respectively).

Federal regulations require OCR to enforce Title VI (34 C.F.R. Part 100), Title IX (34

C.F.R. Part 106), and Title II (28 C.F.R. § 35.171). Under 34 C.F.R. § 100.7(c), OCR must

"make a prompt investigation whenever a compliance review, report, complaint, or any other

information indicates a possible failure to comply with" Title VI. 34 C.F.R. § 100.7(c). The

investigation must include, as appropriate, review of relevant policies and practices, the

circumstances at issue, and other relevant factors. *Id.* If an investigation identifies

noncompliance, OCR must "inform the recipient [of federal funding]" and, when possible,

resolve the matter "by informal means." 34 C.F.R. § 100.7(d)(1). If there is no finding of

noncompliance, OCR must "inform the recipient and the complainant, if any, in writing." 34

C.F.R. § 100.7(d)(2). Either way, OCR must actually complete investigations to determine

whether there has been noncompliance with Title VI.

Similarly, 34 C.F.R. Part 106 requires OCR to enforce Title IX, adopting the same

investigative procedures and obligations that apply under Title VI. *See* 34 C.F.R. § 106.81

("[T]he procedural provisions applicable to Title VI of the Civil Rights Act of 1964 are hereby

adopted and incorporated herein."). For complaints filed under Title II, OCR must "promptly

---

[3] *See also* 34 C.F.R. Part 100, 34 C.F.R. Part 106, 34 C.F.R. Part 104, and 28 C.F.R. Part 35
(implementing Title VI, Title IX, Section 504, and Title II, respectively).

review the complaint to determine whether it has jurisdiction . . . under section 504" and, if so, "promptly notify" complainants and public entities of its receipt and acceptance, and "process the complaint according to its procedures for enforcing section 504." 28 C.F.R. § 35.171.

OCR has a long-established structure for complying with its statutory duty to enforce the nation's civil rights laws. Traditionally, "[m]ost of OCR's critical activities take place in its enforcement offices,"[4] which "are responsible for investigating and resolving complaints of discrimination, conducting compliance reviews, monitoring corrective action agreements, and providing technical assistance."[5] OCR has had at least ten regional offices since at least 1990.[6] From 1996 until March 11, 2025, OCR had twelve regional offices: Washington D.C., Atlanta, Boston, Chicago, Cleveland, Dallas, Denver, Kansas City, New York, Philadelphia, San Francisco, and Seattle.[7] Until March 11, 2025, OCR had four Enforcement Directors who each oversaw three regional offices and served as a conduit between the regional offices and OCR headquarters. Doe 8 Decl. ¶ 6; Doe 5 Decl. ¶ 7.

OCR has developed well-established policies and procedures for the receipt, processing, investigation, and prompt resolution of civil rights complaints, as described in its Case Processing Manual.[8] For instance, OCR's Early Mediation Process ("EMP") allows for

---

[4] U.S. Dep't of Educ., OCR *Annual Report, Fiscal Year 1995* at 4 (1995), *available at* https://files.eric.ed.gov/fulltext/ED422669.pdf (last visited May 2, 2025).

[5] U.S. Dep't of Educ., "Ensuring Access to High-Quality Education" at 3 (Jan. 2011), *available at* https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ensure03.pdf (last visited May 2, 2025).

[6] U.S. Dep't of Educ., *OCR Annual Report, Fiscal Year 1990* at 10 (1990), *available at* https://files.eric.ed.gov/fulltext/ED396451.pdf (last visited May 2, 2025).

[7] U.S. Dep't of Educ., *OCR Annual Report, Fiscal Year 1996* at 13 (1996), *available at* https://files.eric.ed.gov/fulltext/ED422670.pdf (last visited May 1, 2025).

[8] *See* U.S. Dep't of Educ., *OCR Case Processing Manual* (Feb. 19, 2025), *available at* https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf; *see also* U.S. Dep't of Educ., *Questions and Answers on OCR's Complaint Process*, *available at*

facilitated settlement discussion between parties soon after a complaint is filed.[9] Like other

federal agencies, the Department sets performance targets pursuant to the Government

Performance and Results Act ("GPRA"). OCR's GPRA performance targets include that OCR

will resolve 80% of complaints within 180 days of receipt, and make "significant progress

toward having no more than 25% of all pending complaints over 180 days old."[10]

OCR also has a well-established practice of identifying manageable caseload numbers for

OCR investigators and seeking federal funding to meet that goal. As of the beginning of January

2025, OCR had around 600 staff members. Of those, around 375 were investigative staff,

handling complaints alleging discrimination.[11] Doe 3 Decl. ¶ 18. While the number of full-time

employees, and thus caseloads, has fluctuated somewhat in accordance with federal budget

appropriations over the years, it has never before dropped below 540.[12] As Assistant Secretary

---

https://www.ed.gov/laws-and-policy/civil-rights-laws/civil-rights-faqs/questions-and-answers-on-ocrs-complaint-process ("OCR's role is to . . . promptly resolve complaints."). This is not a new requirement. *See* U.S. Dep't. of Educ., *OCR Case Processing Manual* (Aug. 26, 2020), *available at* https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm-20202608.pdf.
[9] U.S. Dep't of Educ., *Discrimination Complaint Form* (2023), *available at* https://www.ed.gov/sites/ed/files/about/offices/list/ocr/complaintform.pdf.
[10] U.S. Dep't of Educ., *Office For Civil Rights Fiscal Year 2025 Budget Request* at 26 (2025), *available at* https://www.ed.gov/media/document/ocr-fiscal-year-2025-budget-request-39373.pdf; OCR Alumni Report, *Safeguarding Access and Protection: A Blueprint for Restoring the Office for Civil Rights* (on file), at 5, Ex. 6.
[11] Tyler Kingkade & Adam Edelman, *What the Education Department Layoffs Could Mean for Students with Disabilities, NBC News* (Mar. 12, 2025), https://www.nbcnews.com/news/usnews/education-department-layoffs-students-disabilities-rcna196114.
[12] *U.S. Dep't of Educ., OCR Annual Report, Fiscal Year 2016* at 8 (2016), *available at* https://www.ed.gov/sites/ed/files/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2016.pdf; *see* U.S. Dep't of Educ., *OCR Annual Report, Fiscal Year 2021* at 8 (2021), *available at* https://www.ed.gov/sites/ed/files/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2021.pdf; U.S. Dep't of Educ., *OCR Annual Report, Fiscal Year 2022* at 8 (2022), *available at* https://www.ed.gov/sites/ed/files/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2022.pdf; U.S. Dep't of Educ., *OCR Annual Report, Fiscal Year 2023* at 9 (2023), *available at* https://www.ed.gov/sites/ed/files/about/reports/annual/ocr/report-to-president-and-secretary-of-

for Civil Rights Norma V. Cantu testified in 1998: "There is a direct relationship between the level of funding" and attendant levels of staffing "and [OCR's] ability to serve customers and resolve real civil rights problems."[13]

In contrast, the number of complaints filed with OCR has increased dramatically over recent years, tripling since 2009.[14] In Fiscal Year 2024, OCR received 22,687 complaints.[15] That year, ten of the twelve regional offices failed to meet GPRA targets. Doe 3 Decl., Ex A, FY 2024 CMS Report. The offices that met GPRA targets had the lowest caseloads per investigator. *Id.* That year, Secretary of Education Miguel Cardona requested additional funding to hire more investigators to prevent caseloads from rising from forty-one cases—which was already "untenable"—to seventy-one cases per investigator.[16]

As of the beginning of January 2025, OCR investigators had caseloads averaging fifty or more.[17] *See* Doe 3 Decl. ¶ 18. As of March 11, 2025, OCR had 16,022 open cases and an additional 2,765 cases in monitoring. Doe 3 Decl. ¶¶ 18, 22.

---

education-2023.pdf; U.S. Dep't of Educ., *OCR Annual Report to Congress, Fiscal Year 2024* at 8 (2024), *available at* https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf.

[13] *Hearing on Appropriations for Dep'ts of Labor, Health and Human Servs., Educ., and Related Agencies Appropriations for 1999 before the H. Subcomm. on Appropriations for the Dept's of Labor, Health and Human Servs., and Related Agencies*, 105 Cong. 648 (Apr. 1, 1998) (testimony of Norma V. Cantu, Assistant Sec'y for C.R.).

[14] U.S. Dep't of Educ., *OCR Annual Report to Congress, Fiscal Year 2024* at 8, *see supra* n. 12.

[15] *Id*. at 5.

[16] Naaz Modan, *Cardona pushes for more OCR funding given increased caseload*, K-12 Dive (May 8, 2024), https://www.k12dive.com/news/ocr-increase-funding-fy-2025-budget-request-education-department/715516/.

[17] Kingkade & Edelman, *What the Education Department Layoffs Could Mean for Students with Disabilities, see supra* n. 11.

## II.    The Decimation of OCR

On March 11, 2025, Secretary McMahon eliminated seven of the twelve regional enforcement offices and gutted OCR's workforce through mass terminations, leaving skeleton staffing at the remaining offices. Doe 7 Decl. ¶¶ 15-17. Defendants shuttered the Boston, Chicago, Cleveland, Dallas, New York, Philadelphia, and San Francisco offices. Doe 3 Decl. ¶ 13. Around half of OCR employees—at least 243 union-eligible staff members and an unknown number of supervisors—were told they would be laid off and placed on administrative leave as of March 21, 2025, and that their employment would be terminated around June 9, 2025.[18] Currently, there are no more than 151 OCR investigators. Doe 3 Decl. ¶ 20.

Terminated OCR employees immediately lost access to the case management and document management systems and were unable to send or reply to external emails. Doe 2 Decl. ¶ 14; Doe 4 Decl. ¶ 13; Doe 5 Decl. ¶ 12; Doe 6 Decl. ¶ 15. Allegedly, OCR planned for staff at the remaining five offices to absorb their peers' cases. Doe 2 Decl. ¶ 18. But Defendants created no standard mechanism for employees from closed offices to transfer their cases, and accordingly, most were not transferred. Doe 4 Decl.¶ 13; Doe 6 Decl.¶¶ 15, 17; Doe 7 Decl. ¶ 21. For instance, OCR employees typically store draft documents and informal notes on their Department computers, rather than storing all case-related documents on the case and document management systems. Doe 7 Decl. ¶ 23. Many such files were lost as a result of the March 11, 2025 mass terminations, because affected employees could not add them to the system to make them available to staff receiving transferred cases. Doe 7 Decl. ¶ 23. As of today, staff in open offices do not have access to email and voicemail inboxes for terminated staff whose cases they

---

[18] *See* Jodi S. Cohen & Jennifer Smith Richards, *Massive Layoffs at the Department of Education Erode Its Civil Rights Division*, ProPublica (Mar. 12, 2025), https://www.propublica.org/article/education-department-civil-rights-division-eroded-by-massive-layoffs.

are expected to cover. Doe 7 Decl. ¶ 24. OCR staff at some open offices have been unable to access and/or make changes to necessary information and records for transferred cases in the document management and case management systems. Doe 7 Decl. ¶ 21; Doe 8 Decl. ¶ 15.

The agency has also left in the dark, and even misled, OCR complainants and other members of the public who rely on OCR for civil rights enforcement. By early April, the Department set up out of office email responses for eliminated staff, but those emails are inaccurate and misleading, stating that the employee from the closed office "is currently engaged in closing out their work activities and responsibilities as part of a planned transition. They are working to ensure a smooth handover of key matters." Doe 1 Decl. ¶ 17; Doe 6 Decl. ¶ 17. That statement is false, because the employees from closed offices are on forced administrative leave and unable to work. *Id; see also* Ex. 4. Moreover, to date, OCR's website has not been updated to reflect office closures.[19]

Even if cases had been properly transitioned, Defendants have knowingly decimated OCR's staffing to a point where the caseload exceeds any approximation of reasonableness.  Doe 3 Decl. ¶¶ 20-21; Doe 4 Decl. ¶¶ 20, 22; Doe 8 Decl. ¶ 18; Decl. of Catherine E. Lhamon, Exhibit 5 ¶¶ 28, 30, 43. Currently, the average caseload is 106 open cases per investigator, not counting cases in monitoring. Doe 3 Decl. ¶ 20. In one open office, caseloads for most staff currently range from 200-300 per investigator. Doe 7 Decl. ¶ 19. These are impossible and unmanageable caseloads for even the most experienced and dedicated civil rights investigators. Doe 7 Decl. ¶ 20; Doe 3 Decl. ¶ 23. Furthermore, staff in the open offices are less able to effectively investigate cases transferred from the now-closed regions. For instance, in-person

---

[19] *See e.g.*, U.S. Dep't of Educ., *Office for Civil Rights Complaint Assessment System,* https://ocrcas.ed.gov/contact-ocr?field_state_value=657 (last visited May 2, 2025).

investigation is sometimes necessary to meet witnesses, interview people with interpretation needs, or assess physical accessibility barriers. Doe 7 Decl. ¶ 26; Doe 8 Decl. ¶ 19. Although OCR investigators are now geographically much further from some of the places they investigate, all funding for travel has effectively been cut off. Doe 7 Decl. ¶ 26; Doe 8 Decl. ¶¶ 18-19. And investigators need to start from square one in building the kind of relationships with parents, students, and recipients that allow them to effectively and efficiently resolve cases. Doe 7 Decl. ¶ 31; Doe 5 Decl. ¶ 20.

Defendants also gutted the infrastructure that formerly allowed the regional offices to carry out their statutorily and regulatorily mandated duties. For instance, they have eliminated all but one of the Enforcement Directors. Doe 7 Decl. ¶ 17; Doe 8 Decl. ¶ 20. For "cases of interest"—many if not most Title VI and Title IX cases, and disability harassment, restraint, and seclusion cases—investigative staff need approval from headquarters at almost every stage of the case. Doe 7 Decl. ¶ 27. Enforcement Directors are critical to that approval process and must, for instance, approve findings of insufficient evidence or findings of non-compliance for cases of interest. Doe 7 Decl. ¶ 27. One Director is woefully insufficient to get cases approved in a timely manner *Id.* In fact, one current investigator reports that they are unaware of any approvals for such findings in cases of interest from a regional office since March 11, 2025. Doe 7 Decl. ¶ 27. Additionally, OCR's case management and document management systems were developed in-house, and Defendants laid off all OCR information technology staff responsible for maintaining and updating those systems, leaving staff without anyone to help with the complicated transition of cases from closed to open offices. Doe 7 Decl. ¶ 22; Doe 8 Decl. ¶ 20.

Ultimately, the closing of seven regional offices and the gutting of OCR's staff will undoubtedly imperil investigations moving forward and prevent OCR from carrying out its

mission and statutory duties. Ex. 5 ¶¶ 28, 30, 43; Doe 2 Decl. ¶ 25; Doe 3 Decl. ¶ 23; Doe 5

Decl. ¶ 23; Doe 6 Decl. ¶¶ 32-33; Doe 8 Decl. ¶¶ 22-23. While Secretary McMahon stated that

the office closures and mass termination were part of the Department's commitment to

"efficiency, accountability, and ensuring that resources are directed where they matter most: to

students, parents, and teachers," she provided no data or analysis supporting this.[20] Secretary

McMahon boasted of impacting "nearly 50% of the Department's workforce," stating that the

office closures and mass terminations are part of the Department's "final mission" of eliminating

itself.[21] Defendants have actively obstructed OCR's ability to meet its obligation to make prompt

investigations and functionally halted investigations.

Defendants have made no effort to determine which agency staff are necessary to conduct

its statutorily mandated mission. In fact, Defendants targeted some of the most effective OCR

regional offices for closure. Doe 7 Decl. ¶ 17, *see also Id.* And there is no evidence that the

Department considered the interest of students, parents, and others alleging discrimination in

their schools when changing its policy on investigations and undermining its enforcement

responsibilities. In neither her final mission memo nor in her announcement of the mass

terminations and office closures does Secretary McMahon mention how her actions to decimate

OCR comport with her obligations to comply with Congressional directives.

## III. Profound Impact of Defendants' Actions

Defendants' March 11, 2025 actions have had a direct and immediate effect on Plaintiffs

and other students and families who rely on OCR to perform its statutorily and regulatorily

---

[20] U.S. Dep't of Education, Press Release, *U.S. Department of Education Initiates Reduction in Force* (Mar. 11, 2025), Ex. 2, https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force.
[21] *Id.*

mandated duties. Many families who have filed complaints with the reasonable expectation that OCR will follow its legal mandates and longstanding practice of investigating and processing their cases have been left without any information about the status of their complaints or the prospect of obtaining relief. Because of the decimation of OCR, students with pending complaints are losing out on their right to access an education free from discrimination. Others are losing significant instructional time. Some families have been forced to send their children to school far from their home communities. Plaintiffs in this case have suffered and will continue to suffer these types of irreparable harm in the absence of a preliminary injunction.

First, the failure to resolve Plaintiffs' complaints has resulted in and continues to result in the interruption of Plaintiff children's education. Plaintiff M.W. continues to experience racial harassment in school because OCR has failed to resolve a complaint filed on her behalf by her mother, Plaintiff K.D. Decl. of K.D. ("K.D. Decl.") ¶¶ 40-56. Earlier this year, before OCR laid off staff and closed offices, the OCR complaint was close to resolution. OCR had proposed a voluntary resolution agreement to the school board, and though the school board did not initially accept the agreement, it had requested more information about M.W.'s experiences of discrimination. K.D. Decl. ¶¶ 35-37. Plaintiff K.D. provided this information to OCR and was waiting to hear back about further progress as the San Francisco office was shutting down. K.D. Decl. ¶ 37. K.D. was told that her complaint would be moved to the Seattle office, and though her case had been flagged as important and close to resolution, it could be six months to a year before she received an update; she has not heard anything since. K.D. Decl. ¶¶ 38-39.

M.W. has continued to experience racial harassment. Since K.D. filed the complaint, other students have called M.W. the "n-word," made jokes about the Ku Klux Klan and slavery, and called her a "black monkey." K.D. Decl. ¶¶ 26-28. M.W. faces obvious interruptions in her

schooling. She steps out of class to cry when other students are harassing her, and has taken a period of independent study instead of attending school out of fear for her safety. K.D. Decl. ¶¶ 18, 50. M.W. has a class with one of the students who has harassed her, and next year she will have to share an office with a teacher who made fun of her for being suspended. K.D. Decl. ¶¶ 42, 44. In addition, as M.W.'s high school will be merging with the middle school where the original incident happened, M.W. will have to see and interact with the same staff members referenced in K.D.'s OCR complaint, including the middle school principal who lied to the police about M.W. kicking a white student. K.D. Decl. ¶ 41. Unsurprisingly, M.W.'s school performance has worsened. K.D. Decl. ¶ 49. She has had to attend therapy because of her treatment at school, and "now feels hopeless and like nothing will change" and "doesn't think that anyone cares about what happened to her." K.D. Decl. ¶¶ 24, 52. K.D. experiences constant anxiety about her daughter's safety and well-being at school. K.D. Decl. ¶¶ 53-54. The school has not implemented M.W.'s safety plan, and the problems that caused K.D. to file her OCR complaint have still not been addressed. K.D. Decl. ¶¶ 44, 46. As K.D. shares: "I understand why my daughter feels hopeless. When I heard that the San Francisco OCR office was closed, I started to lose hope. OCR was my last hope that something would be done to help my daughter. And now we are just left in the dark and waiting." K.D. Decl. ¶ 56.

Similarly, Plaintiff G.C., who is currently in the sixth grade and has several identified disabilities for which she receives services at school, continues to experience disruption of her education due to OCR's failures. She has been subjected to frequent incidents of restraint and seclusion for various behaviors—many of which are manifestations of her disabilities—since starting sixth grade, including approximately fifteen incidents of restraint and fourteen incidents of seclusion this year, totaling over twenty-three hours. Cupp Decl. ¶¶ 4, 6, 8-9, 19. As a

necessary protective measure, Ms. Cupp has G.C. attend school for only two hours a day. Cupp Decl. ¶ 40. G.C. used to love school, but is now scared of going in case she is again put in the "blue room"—the room used for seclusion. Cupp Decl. ¶¶ 41-42. Ms. Cupp filed an OCR complaint on December 6, 2024. Cupp Decl. ¶ 7. On January 14, 2025, OCR notified her via email that they would open her complaint for investigation and that she would receive the opening letter soon. Cupp Decl. ¶ 26. On March 11, 2025, OCR once again told Ms. Cupp that it was opening her complaint for investigation and she would receive the opening letter in a week. Cupp Decl. ¶ 30. Ms. Cupp did not receive the opening letter until April 23, 2025, about two weeks after she joined this lawsuit and resulting news coverage of her complaint. Cupp Decl. ¶¶ 33-35. If Ms. Cupp and G.C. received the relief requested in their OCR complaint, Ms. Cupp would be able to return G.C. to full school days. Cupp Decl. ¶ 46. But with the OCR closures and mass terminations, resolution of G.C.'s case is likely to be significantly delayed. As Ms. Cupp stated: "OCR gave me hope when I had nowhere else to turn in my state. That sense of hope diminished when I heard about the OCR investigation pause and subsequent mass termination and office closures." Cupp Decl. ¶ 44.

Other plaintiffs are forced to attend school outside of their home communities because of ongoing harassment due to OCR's failures. Plaintiff Melissa Combs was forced to take her child, D.P., out of their local public school due to the school's failure to address the bullying D.P. faced based on their gender identity. Decl. of Melissa Combs ("Combs Decl.") ¶¶ 4, 7, 20. Because of the school's failure, D.P.'s mental well-being and academic achievement plummeted. Combs Decl. ¶¶ 19, 23. D.P. has also lost out on a number of extracurricular opportunities because they have had to change schools as a result of the district's failure to remedy the discrimination and harassment they experienced. Combs Decl. ¶ 22. D.P.'s current school has significantly fewer

clubs and extracurricular programs than the public school in their home community, which had, for instance, a theater club that D.P would like to join. Combs Decl. ¶ 22. If D.P.'s case was favorably resolved, D.P. would be able to safely return to their local school and participate in extracurricular academic and social opportunities like other children in their district. Combs Decl. ¶ 25. Combs and D.P. must currently drive twenty to forty minutes each way, depending on traffic, to D.P.'s new school outside their home district. Combs Decl. ¶ 21.

Similarly, Plaintiff A.M. currently drives about half an hour each way to take her daughter to a school outside of their home district, even though their local public high school is less than two blocks away from their home. Decl. of A.M. ("A.M. Decl.") ¶ 45. Because of the school district's failure to appropriately investigate her daughter's sexual assault and subsequent harassment, her daughter experienced trauma, which led to a decline in her daughter's mental health and hospitalizations, including for self- harm. A.M. Decl. ¶¶ 1, 3, 15-17, 21, 46. A.M. pulled her daughter out of the school district because it is unsafe. A.M. Decl. ¶ 12. Since then, A.M.'s daughter has switched schools multiple times. A.M. Decl. ¶ 45. Even enrolling A.M.'s daughter in her new school was difficult because it required changing school districts. A.M. Decl. ¶ 45. A.M.'s daughter continues to experience trauma and continues to require therapy and medication. A.M. Decl. ¶¶ 44, 46-47. If A.M. obtained the relief she requested from OCR, she and her daughter would be able to hold the district accountable. A.M. Decl. ¶ 48.

Plaintiff Nikki S. Carter is a Black community activist and advocate in Demopolis, Alabama. Decl. of Nikki S. Carter ("Carter Decl.") ¶ 5. Because of Ms. Carter's race and advocacy, the Demopolis City School District issued two trespass orders against Ms. Carter, first banning her from the high school two of her children now attend, then from all district events and premises. Carter Decl. ¶¶ 30, 32. The trespass orders prevented Ms. Carter from dropping off

or picking up her children at school, going to school-related events, attending school board meetings, or advocating on behalf of children with disabilities in the district. Carter Decl. ¶¶ 37, 38. In September 2022, Ms. Carter filed an OCR complaint, and in December 2022, OCR opened an investigation into the complaint, specifically with respect to her allegations of Title VI and Section 504 violations. Carter Decl. ¶¶ 40, 49-50. After that complaint, the school superintendent notified the police that Ms. Carter's trespass order had expired and she was allowed back on school property. Carter Decl. ¶ 54. Ms. Carter is worried that with OCR's mass elimination of almost half of its workforce, "there is nothing stopping Demopolis City School District from issuing additional trespass orders" in response to her advocacy. Carter Decl. ¶¶ 58-59. Ms. Carter has been put in a position where her "job as an advocate threatens [her] ability to participate as a parent in [her] children's education" as a result of the district's failure to remedy its discriminatory and retaliatory practices. Carter Decl. ¶ 67.

Finally, Plaintiff COPAA is suffering irreparable harm because Defendants' conduct is causing it to divert and expend its resources to address concerns and inquiries and update its training materials. COPAA's primary mission is to protect and enforce the legal and civil rights of students with disabilities and their families, and to secure appropriate educational services for children with disabilities in accordance with federal laws. Decl. of Denise Marshall ("Marshall Decl.") ¶ 4. As part of this mission, COPAA also seeks to protect the rights of children with disabilities to be free from discrimination based on their disability, race, sex, sexual orientation, and gender identity. Marshall Decl. ¶ 4. COPAA accomplishes its mission by providing resources, training, and information to members; helping parents and advocates file administrative complaints; helping parents and advocates find attorneys and legal resources;

educating the public and policymakers; and educating COPAA members about developments in federal laws and policies affecting the education of children with disabilities. Marshall Decl. ¶ 6.

As COPAA's Chief Executive Officer detailed in her declaration, COPAA has had to divert significant resources as a result of OCR's actions, resulting in various financial and operational burdens on the organization. As a result of the OCR office closures and mass terminations, COPAA "must rewrite many of [its] manuals, update [its] trainings, and retrain many of [its] members," all of which will "take a great deal of time, money and effort—time, money, and effort that could instead be spent working to ensure access to education for children with disabilities." Marshall Decl. ¶ 11. Because the impact of the closures will be to "severely limit, if not entirely eliminate, OCR complaints as a viable means to resolve violations of established federal law," COPAA staff will need to update materials and advise members on non-OCR paths for enforcing student's rights, which will necessarily involve litigation if the OCR complaint process is foreclosed, as well as state complaint processes. Marshall Decl. ¶¶ 12-13, 16. COPAA has already had to update its training materials and webinars, which primarily focus on filing OCR complaints, for new attorneys and advocates. Marshall Decl. ¶ 21. COPAA also had to add information regarding closed OCR offices and information on filing state complaints in lieu of OCR complaints to its Special Education Advocacy training (SEAT) curriculum. Marshall Decl. ¶ 21. But for the Department's actions, "COPAA would not need to undertake such extensive efforts." Marshall Decl. ¶ 24.

COPAA members, which include some Plaintiff parents, are also suffering irreparable harm. It has 3,600 members across the United States advocating for children with disabilities. Marshall Decl. ¶ 5. COPAA members file OCR complaints regularly. Marshall Decl. ¶ 8. Removing the OCR complaint process means those members will need to hire more attorneys or

be left without a remedy for violations of children's rights. Marshall Decl. ¶ 13. The absence of meaningful scrutiny from OCR will also remove a deterrent to Districts' infringing on students' rights. Marshall Decl. ¶ 14. COPAA members with active pending cases before OCR will suffer harm directly analogous to the individual Plaintiffs' harm. Marshall Decl. ¶¶ 26-27.

The harms that Plaintiff families face are representative of ones faced by students and families across the country who have filed complaints with OCR. Declarants in this case cite to several critical investigations that were nearing resolution or that involved dire circumstances that have now been shelved. *See, e.g.*, Doe 1 Decl. ¶¶ 19-20 (San Francisco OCR office); Doe 2 Decl. ¶¶ 21-22 (New York OCR office); Doe 5 Decl. ¶¶ 15, 17-18 (unnamed closed OCR office); Doe 6 Decl. ¶¶ 14, 18, 19-28 (unnamed closed OCR office); Decl. of Andrew R. Hairston ("Hairston Decl.") ¶¶ 6-14. For example, Texas Appleseed, a civil rights organization located in Texas, filed a Title VI complaint with OCR in October 2024 on behalf of a Black teenager in Beaumont, Texas who was beaten up on her high school campus by a Beaumont Independent School District (ISD) police officer. Hairston Decl. ¶¶ 3, 6. Texas Appleseed's OCR complaint alleged that the Beaumont ISD Police Department engaged in illegal racial discrimination against Black students; the complaint also provided data from the Civil Rights Data Collection showing that all of the students referred to law enforcement in Beaumont ISD in a previous academic year were Black. Hairston Decl. ¶¶ 6-7. An OCR attorney from the Dallas Office emailed Texas Appleseed a set of questions to get a better understanding of the discrimination alleged. Hairston Decl. ¶¶ 8-9. On February 25, 2025, the OCR attorney reached out notifying Texas Appleseed that their complaint was pending. Hairston Decl. ¶ 11. When attempting to respond to that email, Texas Appleseed received an automated bounce-back message. Hairston Decl. ¶ 11. That was the last status update Texas Appleseed received from OCR. Hairston Decl. ¶ 11.

Following Defendants' actions challenged here, Texas Appleseed is doubtful that OCR will "meaningfully address the harmful practices of the Beaumont ISD Police Department through its resolution of the complaint." Hairston Decl. ¶ 13. All the while, Black students in Beaumont ISD continue to be subjected to discriminatory practices by the district and police department. Hairston Decl. ¶¶ 13-14. Further, the student on behalf of whom Texas Appleseed's complaint was initially filed "is still anxious that the same police department is patrolling the halls of her current campus" and "is fearful that she could be subjected to . . . abuse again." Hairston Decl. ¶ 14.

## ARGUMENT

Plaintiffs have satisfied their burden demonstrating the need for a preliminary injunction that requires Defendants to restore OCR's capacity and fulfill its statutory and regulatory duties and enforce civil rights laws. As evidenced below, Plaintiffs are likely to succeed on their APA claims. First, Defendants' final agency action to decimate the OCR workforce in furtherance of their ultimate goal to eliminate the Department of Education is a textbook example of arbitrary and capricious action. Defendants failed to offer any reasoned explanation for their decision and any proffered basis for the decision was untethered to their statutory duties to enforce civil rights laws. In making their decision, Defendants also failed to consider the substantial reliance interests of students, parents, and others alleging discrimination at schools receiving federal funding, let alone provide the more detailed justification required given the serious reliance interests at stake.

Second, Defendants' actions were not in accordance with law, and in fact, contradicted the very laws and regulations requiring them to investigate civil rights complaints and enforce civil rights laws. Third, Defendants' actions violate the APA because they unlawfully withheld

and unreasonably delayed agency action by failing to make "prompt investigation" in response to civil rights complaints filed by Plaintiffs.

Finally, Defendants' decisions to undermine their obligation to enforce laws also constitute unlawful ultra vires actions. Congress prescribed Defendants' duties to carry out civil rights laws, but Defendants have functionally ended the processing of scores of complaints.

Defendants' unlawful actions have caused irreparable harm to Plaintiff students and parents. As further described above and below, this harm is imminent and ongoing and will continue unless the Court enters a preliminary injunction. Clearly, the balance of equities and the public interest weigh heavily in favor of Plaintiffs' motion for preliminary injunction.

## I. Standard of Review/Legal Standard

A party seeking a preliminary injunction "bears the burden of persuasion and must demonstrate, by a clear showing, that the requested relief is warranted." *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 497 (D.D.C. 2018) (cleaned up). In determining whether a preliminary injunction is warranted, the courts examine four factors: (1) the likelihood of success on the merits; (2) the likelihood of irreparable injury to the movant if the injunction is not granted; (3) whether the irreparable injury is greater than the potential harm to the nonmovant if the injunction is granted (also called "the balance of equities"); and (4) the effect of the decision on the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)*; see also League of Women Voters of the United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016). When the federal government is the opposing party, courts frequently combine the balance of equities and public interest factors. *NAACP v. U.S. Postal Serv.*, 496 F. Supp. 3d 1, 8 (D.D.C. 2020).

## II.    Plaintiffs Are Likely To Succeed On Their APA And Ultra Vires Claims.

### A.    Defendants' actions are "final agency action" subject to judicial review under the APA.

Defendants' actions challenged here are final agency actions subject to review under the APA. "[F]inal agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. The APA's definition of agency action "is expansive ... [and] is meant to cover comprehensively every manner in which an agency may exercise its power." *Drs. for Am. v. Off. of Pers. Mgmt.*, --- F. Supp. 3d ---, 2025 WL 452707 at *5 (D.D.C. Feb. 11, 2025) (alteration in original) (quoting *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006)). The Supreme Court established a two-prong test to determine whether an agency action is final: (1) "The action must mark the consummation of the agency's decisionmaking process," and (2) "[T]he action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).

Under the first prong, final agency actions are not "merely tentative or interlocutory [in] nature." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). Clearly, the Department has completed its decision-making process. The elimination of several OCR offices and nearly half of its staff can hardly be considered a temporary or interim measure. *Cf. Appalachian Power Co.*, 208 F.3d at 1022. These are not informal actions or "ruling[s] of a subordinate official." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 151 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Rather, Defendants have, throughout this process, openly and expressly intended to obstruct OCR's

ability to process and investigate civil rights complaints in their haste to permanently eliminate the Department.

The second prong is a pragmatic inquiry. "An agency action is deemed final if it is definitive and has a direct and immediate effect on the day-to-day business of the party challenging the agency action." *Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) (cleaned up).

Plaintiffs and thousands of other families with pending OCR complaints experienced "direct and immediate" consequences from Defendants' actions. *Id*. These families are unable to avail themselves of OCR's statutorily and regulatorily required complaint investigation process. "[A]n agency determines rights and obligations when the statute creates a right . . . and . . . fails to provide Plaintiffs with access to" that right. *Drs. for Am.*, 2025 WL 452707 at *6 (cleaned up). Defendants' actions "commanding" staff placed on leave and in the closed offices to discontinue their work and render the meager remaining staff incapable of fulfilling their statutory duties to review, investigate, and enforce the applicable civil rights laws, has greatly undermined people's right to file OCR complaints. *See, e.g.*, Ex. 5 ¶ 28, 30, 43; Doe 6 Decl. ¶ 32; Doe 7 Decl. ¶¶ 19-21, 31; Doe 8 Decl. ¶¶ 17-18, 22-23.

Clearly, Defendants' dismissal of OCR staff and their closure of seven OCR offices is final agency action that is foreclosing the statutory and regulatory responsibilities of OCR to investigate Plaintiffs' complaints in a prompt manner.

## B. Defendants' actions are arbitrary and capricious under the APA.

The APA "sets forth procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). Under section 706(2)(A) of the APA, reviewing courts are to "hold unlawful and set

aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

In general, an agency action is considered arbitrary and capricious if the agency (1) "has relied on factors which Congress has not intended it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before the agency," or (4) "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

As discussed below, Defendants' actions are arbitrary and capricious because of: (i) the Department's failure to offer a reasoned basis for its decision when firing half the staff of OCR and closing seven of twelve regional offices, which has largely stopped the investigation of thousands of complaints, including those of Plaintiffs, undermining the core statutory functions of the division and (ii) the Department's lack of consideration of the serious reliance interests implicated by its decisions.

**i.    The Department failed to proffer any explanation for its decision to decimate OCR.**

The Department's failure to offer a reasoned explanation for its decision to obliterate the already under-resourced OCR likely constitutes a violation of the APA. The APA requires an agency to proffer a basis or explanation for its decisions and actions; failure to do so renders that decision or action arbitrary and capricious. *See Department of Commerce v. New York,* 588 U.S. 752, 780 (2019) (quoting *Burlington Truck Lines, Inc., v. United States,* 371 U.S. 156, 167-169 (1962) ("in order to permit meaningful judicial review" under the APA, "an agency must 'disclose the basis' of its action.")); *see also Jackson v. Mabus*, 919 F. Supp. 2d 117, 120 (D.D.C. 2013) (finding agency's action arbitrary and capricious because agency "failed to provide even the barest explanation for its decision"). Generally, agencies must offer explanations for their actions contemporaneously with executing those actions. *See Dep't of*

*Homeland Security v. Regents of the Univ. of California,* 591 U.S. 1, 20 (2020) (quoting

*Michigan v. EPA*, 576 U.S. 743, 758 (2015) (judicial review of agency action is "limited to 'the

grounds that the agency invoked when it took action'"); *American Trucking Associations, Inc. v.

Federal Motor Carrier Safety Admin.,* 724 F.3d 243, 253 (D.C. Cir. 2013) ("conclusory, post-

hoc rationalization falls far short of what is required under *State Farm*")*.* When "an agency's

initial explanation 'indicate[s] the determinative reason for the final action taken,' the agency

may elaborate on that reason (or reasons);" however, the agency "may not provide new ones."

*Regents of the Univ. of California*, 591 U.S. at 21 (quoting *Camp v. Pitts,* 411 U.S. 138, 143

(1973) (*per curiam*)).

    The core question "is whether the agency's decision was 'the product of reasoned

decisionmaking.'" *Al-Eryani v. Immigrant Investor Program Office,* 2024 WL 4285895 (D.D.C.

Sept. 25, 2024) (quoting *State Farm,* 463 U.S. at 52 (1983)); *see also Nat'l Telephone Co-Op

Ass'n v. FCC,* 563 F.3d 536, 540 (D.C. Cir. 2009) ("The APA's arbitrary-and-capricious

standard requires that agency rules be reasonable and reasonably explained."). A court reviewing

an agency decision under this standard "must 'consider whether the decision was based on a

consideration of the relevant factors and whether there has been a clear error of judgment.'"

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)

(quoting *Bowman Transp. Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 285 (1974)).

Furthermore, a reviewing court "may not supply a reasoned basis for the agency's action that the

agency itself has not given." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

    Here, the Department failed to proffer any reasoned basis for any of its actions when

gutting OCR and its regional offices, imperiling investigations from moving forward. Shortly

after her Senate confirmation, on March 3, 2025, Secretary McMahon issued a memorandum

instructing the entire Department of Education that her "historic final mission" would be the "elimination" and "transfer of educational oversight" out of the Department.[22] Although she acknowledged that she would need to partner with Congress and other federal agencies in the coming months to see that final mission through, she stressed in her memo that her actions follow the will of President Trump, not Congress.

Thereafter, on March 11, 2025, she unilaterally took action to undermine the critical work of OCR by displacing half of its workers and closing seven of the twelve regional offices. Doe 8 Decl. ¶¶ 14, 22. In Secretary McMahon's reduction in force ("RIF") announcement, she boasted of impacting "nearly 50% of the Department's workforce," and that the RIF was part of the Department's "final mission."[23] She asserted that the RIF was a commitment to "efficiency, accountability, and ensuring that resources are directed where they matter most: to students, parents, and teachers."[24] However, she failed to provide the data or analysis supporting the reduction in force needed to ensure efficiency and accountability. Any explanation offered by an agency must be based on "relevant data" and must demonstrate a "rational connection between the facts found and the choice made" to be considered "satisfactory," or not arbitrary or capricious. *State Farm,* 463 U.S. at 43 (1983) (internal citations omitted); *see also Jackson v. Mabus*, 919 F. Supp. 2d 117, 121 (D.D.C. 2013) (finding agency action arbitrary and capricious because agency "failed to address any facts found, let alone, provide an adequate explanation connecting those facts to its decision").

---

[22] Linda McMahon, *Secretary McMahon: Our Department's Final Mission,* U.S. Dep't of Educ. (Mar. 3, 2025), Ex. 1, https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission.

[23] U.S. Dep't. of Education, *U.S. Department of Education Initiates Reduction in Force* (Mar. 11, 2025), Ex. 2, https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force.

[24] *Id.*

Even if an agency has "legitimate reasons" for making a decision, those reasons must be related to the purposes of the statutes enabling the agency. *Judulang v. Holder*, 565 U.S. 42, 55 (2011) (finding the Board of Immigration Appeal's decision arbitrary and capricious because even if the agency had "legitimate reasons" for its decision, the reasons the agency relied on "must [have] be[en] tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system"). Here, the Department offered no contemporaneous reasoned explanation or analysis justifying its actions, much less one based on relevant facts and guided by reasons or rationale that are tied to the statutes and regulations the Department is tasked with implementing and enforcing. *See Batterton v. Marshall*, 648 F.2d 694, 708 (1980) ("The critical question is whether the agency action jeopardizes the rights and interest of parties, for if it does, it must be subject to public comment prior to taking effect."). Indeed, Secretary McMahon's actions contradict the Department's own statutory duties and the very mission of OCR: "[T]o ensure equal access to education and to promote educational excellence through vigorous enforcement of civil rights in the nation's schools."[25] *See, e.g.*, Ex. 5 ¶ 29-30, 43; Doe 8 Decl. ¶ 22-23.

### ii.    The Department failed to consider serious reliance interests.

Defendants' actions are also arbitrary and capricious because Defendants failed to consider serious reliance interests in deciding to close most OCR offices and to eliminate a significant proportion of OCR's workforce. "When an agency changes course, . . . it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.' It would be arbitrary and capricious to ignore such matters." *Regents of the Univ. of California*, 591 U.S. at 30 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211,

---

[25] U.S. Dep't of Educ., *Office for Civil Rights (OCR)* (Jan. 19, 2025), https://www.ed.gov/about/ed-offices/ocr.

222 (2016)). Agencies that modify pre-existing policies, rather than starting from a blank slate, must "assess whether there [a]re reliance interests, determine whether they [a]re significant, and weigh any such interests against competing policy concerns." *Id*. at 33. When an agency implements a "new policy [that] rests upon factual findings that contradict those which underlay its prior policy[,] or when its prior policy has engendered serious reliance interests," the agency must provide a "more detailed justification" for the change. *FCC v. Fox Television Stations*, *Inc.*, 556 U.S. 502, 515 (2009).

Defendants' decision to decimate OCR implicates serious reliance interests, affecting not only Plaintiffs and thousands of complainants with pending cases, but also members of the public who rely on OCR to enforce civil rights laws. OCR has an established history of responding to the public's civil rights complaints, *see* Ex. 5 ¶¶ 7-13, and currently has over 20,000 open cases and 12,000 pending investigations.[26] Defendants' recent actions have resulted in unmanageable caseloads for the staff members who remain. Ex. 5 ¶¶ 28, 30, 43; Doe 7 Decl. ¶ 20; Doe 3 Decl. ¶ 23. Their effectiveness is further compromised by the difficulties of picking up reassigned investigations midstream, such as the need to rebuild relationships with stakeholders and the physical distance between the offices that remain open and the school sites previously investigated by staff at the closed offices. Doe 7 Decl. ¶¶ 25-26. Students and families who filed their complaints with the reasonable expectation that OCR would promptly and diligently evaluate and investigate their cases and hold school districts accountable for

---

[26] Collin Binkley, *Education Department Layoffs Gut Its Civil Rights Office, Leaving Discrimination Cases In Limbo*, Associated Press (Mar. 12, 2025), Ex. 4, https://apnews.com/article/trump-education-department-layoffs-civil-rights-8cbf463cce765f497c10d688ab4d51e1; U.S. Dep't of Educ., *Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools* (accessed Mar. 13, 2025), https://ocrcas.ed.gov/open-investigations.

discrimination on the basis of race, sex, and disability now face the prospect that their cases will stall, unresolved, with OCR too understaffed and under-resourced to move them forward.

There is no evidence that the Department considered the reliance interests of students, parents, and others alleging discrimination at school when eliminating OCR offices and staff positions, let alone evidence of the "more detailed justification" required given the serious reliance interests at stake. *Fox Television Stations*, 556 U.S. at 515. As in *Regents*, where the Department of Homeland Security wholly failed to consider the reliance interests of Deferred Action for Childhood Arrivals ("DACA") program recipients and their families and communities when rescinding the program, here too, there is no indication that the Department of Education balanced the interests of students and their families in ordering the office closures and OCR reduction in force – "[m]aking that difficult decision was the agency's job, but the agency failed to do it." *Regents*, 591 U.S. at 30-33; *see also American Bar Ass'n v. United States Dep't of Educ.*, 370 F. Supp. 3d 1, 33 (D.D.C. 2019) (finding agency's action in adopting new standards affecting student borrowers seeking loan forgiveness arbitrary and capricious in part because "there [wa]s no indication in the record" that the Department "had considered the substantial reliance interests at stake"); *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 628 F. Supp. 3d 243, 261 (D.D.C. 2022) (rejecting "a one-sentence acknowledgement" of "the role of the plasma donation business" as insufficient consideration of reliance interests implicated by change in temporary visa policy).

In undertaking an agency action that critically undermines the Department's own enforcement capabilities and abdicates the agency's statutory responsibilities to students and their communities, Defendants failed to acknowledge, let alone meaningfully consider, balance, and justify their rejection of, the significant reliance interests at stake. Plaintiffs are therefore

likely to succeed on the merits of their claim that Defendants' actions were arbitrary and
capricious under the APA.

**C. Defendants' actions violate the APA because they are not in accordance with law.**

Under the APA, courts must "hold unlawful and set aside" agency actions that are "not in
accordance with law." 5 U.S.C. § 706(2)(A); *see also F.C.C. v. NextWave Pers. Commc'ns Inc.*,
537 U.S. 293, 300 (2003) (emphasis in original) (contrary to law "means, of course, *any* law, and
not merely those laws that the agency itself is charged with administering"). Congress enacted
the APA "as a check upon administrators whose zeal might otherwise have carried them to
excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v.
Raimondo*, 603 U.S. 369, 391 (2024) (quoting *U.S. v. Morton Salt Co.*, 338 U.S. 632, 644
(1950)). Defendants' actions violate the law in two ways: they directly contradict relevant
statutes and regulations and they violate the Department's own rules.

**i. OCR's failure to effectuate civil rights laws is "Not In Accordance with the Law"
and thus violates Section 706(2) of the APA.**

Defendants' gutting of OCR is only one of this administration's many efforts to
dismantle statutorily-mandated agency functions. Those efforts are all unlawful. Where a
congressional statute requires an agency to take certain actions, the government may not
terminate staff necessary to carry out that action. *See Nat'l Treasury Emps. Union v. Vought*
("*NTEU*"), No. CV 25-0381 (ABJ), 2025 WL 942772, at *40 (D.D.C. Mar. 28, 2025) (plaintiffs
likely to succeed on the merits of their claim that shut down of the Consumer Financial
Protection Bureau (CFPB) was contrary to law where Defendants presented no evidence of an
effort to ensure that the agency continued to perform statutorily-mandated duties). The D.C.
Circuit allowed that order to go into effect, ruling that the agency could not lay off any
employees without a "particularized assessment" of whether the agency would "be able to

perform any statutorily required duties of that division or office without the employees subject to the [reduction in force]." Order 2113309, *NTEU v. Vought*, Case No. 25-5091 (D.C. Cir. Apr. 28, 2025) (per curiam); *cf. State Farm,* 463 U.S. at 43 (an agency action is considered arbitrary and capricious when the "the agency has relied on factors which Congress has not intended it to consider"); *Cayuga Nation v. United States,* 594 F. Supp. 3d 64, 74 (D.D.C. 2022) (decisions that are "inconsistent with Congress's delegation of authority" are generally considered arbitrary and capricious).

Here, just as in *NTEU*, Defendants have made no effort to determine which agency staff are necessary to conduct its statutorily mandated mission. Instead, as explained in section II(B) above, they have arbitrarily eliminated entire offices and laid off staff necessary to ensure all complaints are addressed. These actions directly violate Congress' express mandate that the Department effectuate Title VI and Title IX. OCR's decimation of the OCR workforce has, as laid out above, resulted in valid complaints of violations of these statutes not being investigated or addressed by the Department. Defendants' actions thus ensure that the objectives of these statutes—to prevent discrimination by federal funding recipients by creating a mechanism for investigation and remedy of violations of them—will not be "effectuate[d]." 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682.

### ii. OCR's failure to enforce its own regulations constitutes agency action "Not in Accordance with the Law," per the *Accardi* Doctrine.

Federal agencies and their officials are required to follow their own "existing valid regulations." *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). As long as a "regulation remains in force[,] the Executive Branch is bound by it." *United States v. Nixon*, 418 U.S. 683, 696 (1974). Though "it is within the power of [an] agency to amend or repeal its own regulations, [an] agency is not free to ignore or violate its regulations while they

remain in effect." *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 526 n. 20 (D.C. Cir. 1978). In the D.C. Circuit, "*Accardi* has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others." *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005); *see also Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536 (D.C. Cir. 1986) (citing *Accardi*, 347 U.S. at 265–67 ("It is axiomatic that an agency must adhere to its own regulations.")). *Accardi* claims can be brought through the APA.  *See Damus v. Nielsen*, 313 F. Supp. 3d 317, 337 (D.D.C. 2018) (collecting authority).

This proposition "appl[ies] with particular force in those cases in which 'the rights of individuals are affected.'" *Id.* at 335 (quoting *Morton v. Ruiz*, 415 U.S. 199, 235 (1974)). In such cases, "it is incumbent upon agencies to follow their own procedures . . . even where [they] are possibly more rigorous than otherwise would be required." *Morton v. Ruiz*, 415 U.S. at 235. An agency's failure to follow its own rules, regulations, or binding policy constitutes "agency action . . . not in accordance with law" under Section 706(2)(A) of the APA. *See Damus,* 313 F.Supp.3d at 337 (internal citations omitted) ("A fundamental principle of federal law is that a federal agency must follow its own procedures. For an agency to violate this government maxim . . . would amount to an 'unlawful' action under the APA.").

As explained above (SOF at 3-5), Federal regulations require OCR to enforce Title VI, Title IX, Title II, and Section 504. Because the Department's actions prevent it from doing so, they are unlawful under *Accardi*. Moreover, *Accardi* applies with "particular force" here because OCR's failure to investigate allegations of discrimination greatly affects "the rights of individuals." *Damus,* 313 F. Supp. 3d at 335 (internal citations omitted). Defendants' efforts to eviscerate OCR violate the regulations delineated in 34 C.F.R. Part 100, 34 C.F.R. Part 106, and 28 C.F.R. Part 35. OCR's non-compliance with its own regulations violates the *Accardi* principle

and constitutes agency action "not in accordance with the law." *See Accardi,* 347 U.S. at 268;

*Morton v. Ruiz*, 415 U.S. at 235 (1974).

### D.  Defendants' actions violate the APA because they have unlawfully withheld or unreasonably delayed agency action.

Under the APA, a reviewing court shall "compel agency action unlawfully withheld or

unreasonably delayed." 5 U.S.C. § 706(1). "Even where an agency's statutory mandate does not

impose a specific, non-discretionary duty, the 'general' duty of the APA is sufficient grounds" to

compel agency action. *Arabzada v. Donis*, 725 F. Supp. 3d 1, 12 (D.D.C. 2024) (quoting

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1099 (D.C. Cir. 2003)).

The D.C. Circuit has identified six relevant considerations for determining when a delay is

unreasonable:

> (1) the time agencies take to make decisions must be governed by a "rule of reason";
> (2) where Congress has provided a timetable or other indication of the speed with
> which it expects the agency to proceed in the enabling statute, that statutory scheme
> may supply content for this rule of reason; (3) delays that might be reasonable in
> the sphere of economic regulation are less tolerable when human health and welfare
> are at stake; (4) the court should consider the effect of expediting delayed action on
> agency activities of a higher or competing priority; (5) the court should also take
> into account the nature and extent of the interests prejudiced by delay; and (6) the
> court need not find any impropriety lurking behind agency lassitude in order to hold
> that agency action is unreasonably delayed.

*In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999) (internal

quotation marks omitted) (*citing Telecomms. Rsch. and Action Ctr. v. F.C.C. ("TRAC")*, 750

F.2d 70, 80 (D.C. Cir. 1984)).

Defendants' decimation of OCR's ability to process and investigate complaints by

eliminating OCR regional offices and substantially reducing staff is grounds for compelling the

agency to reverse course and meet its statutory obligations. As noted above, OCR is required to

"make a prompt investigation" in response to indications of possible failures to comply with

Title VI, Title IX, and Section 504. *See, e.g.*, 34 C.F.R § 100.7(c); 34 C.F.R. § 106.81; 34 C.F.R § 104.61. For Title II complaints, OCR is required to "promptly review the complaint to determine whether it has jurisdiction over the complaint under section 504," accept all completed complaints over which it has jurisdiction, and "promptly notify the complainant and the public entity of the receipt and acceptance of the complaint." 28 C.F.R § 35.171.

Doe Declarants and Plaintiffs have made clear that delays caused by Defendants' actions are unreasonably long. *See supra* SOF at 12-18; Doe 7 Decl. ¶¶ 19-21, 27-28; Doe 8 Decl. ¶ 18. Most Plaintiffs still have not heard from OCR for months, even those whose that cases were very close to resolution. K.D. Decl. ¶¶ 35-39, 55; Combs Decl. ¶¶ 15-18; Carter Decl. ¶¶ 50-56. As to factor two, while Congress has not set a specific timetable for complaint-processing, it is reasonable to assume that it should be fast enough to not interfere with students' education. A complaint delayed for years may end up moot before it is resolved when the child leaves the school. The delays are particularly egregious under factor three because OCR exists to prevent discrimination against children, and thus to prevent harm to their welfare. Factor four also strongly favors Plaintiffs—Defendants have simply laid off staff and shut down activities and replaced them with nothing at all, so no other priority would be affected by reversing that decision. As to factor five, Defendants' delay will ensure discrimination of many forms goes unaddressed, a very serious prejudice to the children affected. Finally, while courts need not find impropriety lurking behind a delay to address it, there is certainly impropriety here. Defendants are shutting down congressionally-mandated programs for no apparent reason other than they disagree with Congress's decision to mandate them and they do not believe the Department of Education and OCR should exist.

By decimating OCR's ability to process and investigate complaints through the elimination of OCR regional offices and staff, Defendants have actively obstructed OCR's ability to meet its obligation to make prompt investigations and, in fact, functionally halted investigations. Defendants thus cannot promptly investigate complaints and have unlawfully withheld and/or unreasonably delayed investigations of complaints within OCR's jurisdiction. The courts should compel the Department to act under Section 706(1) of the APA.

### E. Defendants' challenged conduct constitutes ultra vires agency action.

In the alternative, if the APA does not provide a remedy for Plaintiffs' claims, Plaintiffs are nonetheless likely to succeed on the merits of their claim that Defendants have engaged in unlawful ultra vires agency action. An executive agency's power to act under a federal statute is "authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Consequently, "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Federal courts may set aside agency action or inaction that exceeds an agency's powers, including action or inaction that violates a clear and mandatory statutory command or that lacks a contemporaneous, reasoned justification. *NTEU*, 2025 WL 942772 at *20-23.

The decimation of OCR's ability to process and investigate complaints violates the clear mandates of Title VI, 42 U.S.C. § 2000d-1, and Title IX, 20 U.S.C. § 1682, to effectuate the provisions of those statutes. Nothing in those statutes permits the Department to functionally end the processing of large volumes of complaints. To the contrary, they require the Department to "effectuate" Titles VI and IX "by issuing rules, regulations, or orders of general applicability." *See* 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682. OCR and its Assistant Secretary have specific authorities set out by statute. 20 U.S.C. § 3413. These include "to select, appoint, and employ

such officers and employees, including staff attorneys, as may be necessary to carry out the functions of such Office." *Id.* § 3413(c)(2). The Department's gutting of OCR prevents it from "carry[ing] out [its] functions" and from effectuating the purposes of Title IX and Title VI. It is therefore ultra vires and unlawful. *See NTEU*, 2025 WL 942772, at *20-22 (mass layoffs at CFPB were ultra vires where they violated separation of powers by interfering with statutory scheme of financial regulation).

This is just one of many cases where courts have recognized that many actions of this administration have gone far beyond its statutory authority. *See, e.g.*, *Am. Fed'n of Lab.& Cong. of Indus. Organizations v. Dep't of Lab.*, No. CV 25-339 (JDB), 2025 WL 1129227, at *22 (D.D.C. Apr. 16, 2025) (allowing claim that US DOGE service acted ultra vires by exercising authority over other agencies without any statutory basis). Courts have specifically held that attempts to shut down entire agencies and thereby prevent them from carrying out statutorily-mandated functions are ultra vires and hence unlawful. *NTEU,* 2025 WL 942772 at *20-23 (shutting down most functions of CFPB was ultra vires); *Aids Vaccine Advoc. Coal. v. United States Dep't of State,* No. CV 25-00400 (AHA), 2025 WL 752378, at *18 n.18 (D.D.C. Mar. 10, 2025) (plaintiffs likely to succeed on the merits of ultra vires claims where defendants refused to carry out congressionally-mandated spending on foreign aid). Here, too, Defendants' efforts to carry out the will of President Trump, as opposed to Congress, by beginning to eliminate the Department of Education and OCR are unlawful ultra vires actions.

## III.    Plaintiffs Have Demonstrated A Likelihood Of Irreparable Harm.

As a result of Defendants' unlawful actions, Plaintiffs are presently suffering and, absent preliminary injunctive relief, will continue to suffer from the deprivation of their right to have their discrimination complaints addressed by OCR and the attending denial of equal educational

opportunities. A preliminary injunction requires movants to establish a likelihood of irreparable harm. *See League of Women Voters of United States,* 838 F.3d at 8–9 (citing *Winter*, 555 U.S. at 22, (2008)). While the harm must be "imminent," that means only that there must be a "clear and present need for equitable relief to prevent irreparable harm." *Id.* at 8 (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). The harm also "must be beyond remediation." *Id.* (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297).

Plaintiffs clearly satisfy this factor. As detailed in the Statement of Facts (*see supra* pp. 12-18) and explained further below, OCR's abdication of its statutory duties causes irreparable harm to Plaintiffs in several ways. These harms have already begun to manifest, and will persist until OCR is ordered to comply with its statutorily mandated duties to timely and equitably process, investigate, and resolve complaints.

***First,*** even where youth still physically attend school, they suffer irreparable harm when they are unable to engage on the same basis as other students because of unremediated discrimination. Plaintiff M.W. continues to experience racial harassment in school, including the use of racial slurs, because of OCR's failure to resolve her family's complaint, even though it was close to resolution before the closure of the San Francisco office. K.D. Decl. ¶¶ 26-28, 35-39. Other students across the country with pending OCR complaints confront the same reality. *See, e.g.*, Hairston Decl. ¶ 14 (describing continued discrimination against Black students while OCR complaint challenging racial disparities in law enforcement referrals is stalled, as well as the individual complainant's fear of additional abuse); Doe 6 Decl. ¶¶ 15-23; Doe 7 Decl. ¶¶ 19-21, 27-28; Doe 8 Decl. ¶ 18. This "'denial of equal treatment' *itself* counts as" the "kind of harm [that] is irreparable." *Mathis v. United States Parole Commission,* 749 F. Supp. 3d 8, 25 (D.D.C. 2024) (emphasis in original).

Youth who are experiencing discrimination, threats, harassment, and other types of mistreatment, like M.W., are likely to perform worse in school, which can have lifelong consequences for access to higher education and employment. K.D. Decl. ¶¶ 24, 49, 52 (describing M.W.'s declining performance at school and need for therapy); Combs Decl. ¶¶ 19, 23 (describing D.P.'s plummeting mental well-being and academic achievement, including serious self-harm and refusal to attend school out of fear of continued discrimination and harassment); A.M. Decl. ¶¶ 1, 3, 15-17, 21, 46 (describing daughter's trauma following school district's failure to appropriately investigate sexual assault and harassment, leading to a decline in her mental health and hospitalizations, including for serious self-harm).

When students are forced to change schools due to unaddressed discrimination or the school's inability to provide a safe education, like Plaintiff D.P. and the daughter of Plaintiff A.M., youth lose instructional time, credits, and progress. Combs Decl. ¶¶ 4, 7, 20 (explaining decision to remove D.P. from local public school due to school's failure to address bullying based on D.P.'s gender identity); A.M. Decl. ¶¶ 12, 45 (describing decision to pull her daughter out of school for her safety when the school district failed to appropriately investigate and respond to sexual harassment and assault, as well as the educational instability caused by multiple school and school district changes); *see also, e.g.*, Janette E. Herbers, et al., *School Mobility and Developmental Outcomes in Youth Adulthood*, 25 Developmental Psychopathology at 501 (2021) ("School mobility has been shown to increase the risk of poor achievement, behavior problems, grade retention, and high school drop-out."). Students like D.P. and the daughter of A.M. who are forced to attend schools outside of their home districts also lose time and access to extracurricular and social activities due to long commutes. Combs Decl. ¶¶ 21-22, 25 (D.P. has lost out on a number of extracurricular opportunities, both because the new school

has significantly fewer clubs and programs and because of the commute; a favorable resolution of their family's OCR complaint would mean a safe return to school and equal access to these programs); A.M. Decl. ¶¶ 12, 45 (describing her thirty-minute commute to school, even though the local high school is less than two blocks away). The failure of OCR to fulfill its duties to these youth and their families contributes to these harms.

The risk of continued discrimination and denial of equal educational opportunity are harms which can only be remedied via "forward-looking equitable remedies." *Mathis*, 749 F.Supp. 3d at 25 (D.D.C. 2024). Because the "[c]ourt cannot undo the discrimination" Plaintiffs have already and will continue to face as result of OCR's inability to timely and equitably resolve their complaints, Plaintiffs have a high likelihood of suffering irreparable harm. *Id.*

**Second**, the psychological toll of educational instability on students causes irreparable harm. *Petties v. D.C.*, 881 F. Supp. 63, 70 (D.D.C. 1995) (uncertainty over whether students could maintain their educational placement "exact[ed] a psychological, emotional and physical toll on many of the students" that constituted irreparable harm). While not every OCR complaint will result in the resolution sought by the student and their family, the end of the OCR process would bring closure. Whether the complaint brings the desired relief or not, students and their families could make decisions about schooling moving forward knowing that a complaint is no longer pending, that their case has been fairly and impartially reviewed, and that OCR has obtained any possible relief. But due to OCR's cuts, students and families are left in limbo indefinitely without knowing whether or when OCR will process, investigate, and resolve their complaints. Plaintiff M.W., for example, "now feels hopeless and like nothing will change. She doesn't think that anyone cares about what happened to her." K.D. Decl. ¶¶ 24, 52; *see also*

A.M. Decl. ¶ 52 (explaining that with her OCR case resolved, she and her daughter would be able to move on with their lives and find peace).

**Third,** the failure to resolve Plaintiffs' complaints has resulted in and continues to result in educational disruption. For example, student Plaintiff G.C., a child with several identified disabilities, currently attends school for only two hours per day, because her mother fears that her school will again subject her to repeated episodes of restraint and seclusion. Cupp Decl. ¶¶ 4, 6, 8-9, 40. It is undisputed being unable to attend school harms children. *Massey v. D.C.*, 400 F. Supp. 2d 66, 75 (D.D.C. 2005). As the Supreme Court has noted, "[t]he harm caused . . . children by lack of education needs little elucidation." *Certain Named & Unnamed Non-Citizen Child. & Their Parents v. Texas*, 448 U.S. 1327, 1332 (1980). This harm rises to an even higher level when youth have disabilities: "A child without disabilities would suffer harm from being unable to attend school; such harm is heightened for a disabled child with much greater need for daily structure and consistency." *Massey*, 400 F. Supp at 75; *see also Cox v. Brown*, 498 F. Supp. 823, 829 (D.D.C. 1980) (children experience irreparable harm when they "lack[] each day of their young lives an appropriate education, one that is sensitive to their particular disabilities, commensurate to their levels of understanding, and fulfilling of their immediate needs").

Interruption of education is uniquely irreparable because a student "has a finite amount of time to receive educational services." *Lofton v. D.C.*, 7 F. Supp. 3d 117, 124 (D.D.C. 2013); *see also Massey*, 400 F. Supp at 75 (lack of assurances that school would follow procedural timeline contributed to finding of irreparable harm). Every week that a youth is not in school is a lost week that cannot be regained. *Lofton*, 7 F. Supp 3d at 124. With staffing suddenly cut by at least forty percent, regional offices eliminated, and complaints continuing to rise, OCR is likely to fall

further and further behind, unable to meet its basic statutory obligations,[27] with students losing "a year or more of education."[28] Plaintiffs and other complainants risk waiting for a resolution until they have graduated, aged out of entitlement to public education, or given up and left the school district.

**Fourth**, the irreparable harms described above are suffered not only by the students themselves, but also by their parents. Parent Plaintiff K.D. experiences constant anxiety about her daughter's safety and well-being at school; "OCR was [her] last hope that something would be done to help [her] daughter." K.D. Decl. ¶¶ 46, 53-55. Similarly, parent Plaintiff Amy Cupp's "sense of hope [that her daughter would be able to return to school full time] diminished when [she] heard about the OCR investigation pause and subsequent mass termination and office closures." Cupp Decl. ¶ 44. Interference with a child's "free educational rights" harms parents "as guardians of their children and protectors of their emotional, physical, and educational well-being" who have the "duty, responsibility, and right" to demand that their children's educational needs are met. *Cox v. Brown*, 498 F. Supp. 823, 828-29 (D.D.C. 1980).

Plaintiff Nikki S. Carter, whose OCR complaint concerns discrimination against herself as a parent advocate, faces a continued risk of discrimination and retaliation, which has chilled and continues to chill her ability to advocate on behalf of children with disabilities in her community. Carter Decl. ¶¶ 40, 49-50, 54-59. As a result of her children's school district's failure to remedy its discriminatory and retaliatory practices—a failure OCR could push the district to correct if it moved her case forward—Ms. Carter faces a situation where her "job as an

---

[27] *See* OCR Alumni Report, Ex. 6. ("When we state OCR cannot possibly fulfill its statutory mission in its current decimated staff levels, we are not making an 'assertion,' we are stating, with complete certainty, a matter of fact based on our experience with the agency."). *See also* Doe 7 Decl. ¶ 20; Doe 3 Decl. ¶ 23.

[28] Ex. 6 at 4 (OCR Alumni Report).

advocate threatens [her] ability to participate as a parent in [her] children's education." Carter Decl. ¶ 67. This harm is irreparable. *Giri v. National Board of Medical Examiners,* 718 F. Supp. 3d 30, 44 (D.D.C. 2024) ("The loss of opportunity to pursue one's chosen profession due to alleged discrimination is widely recognized as constituting an irreparable injury . . . even when the barrier to plaintiffs' pursuit is only temporary."); *see also Bonnette v. District of Columbia Court of Appeals*, 796 F. Supp. 2d 164, 186 (D.D.C. 2011) ("The lost opportunity to engage in one's preferred occupation goes beyond monetary deprivation.").

Finally, Plaintiff COPAA is suffering irreparable harm because Defendants' conduct is causing it to divert and expend its resources to address concerns and inquiries and update its training materials. For organizational plaintiffs, "obstacles" that "unquestionably make it more difficult for [an organization] to accomplish [its] primary mission . . . provide injury for purposes both of standing and irreparable harm." *League of Women Voters,* 838 F.3d 1, 9. Irreparable harm may be found when an organization's "ability to provide services" is "perceptibly impair[ed]," and the organization has demonstrated that it "will likely experience an array of financial and operational burdens." *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health and Human Services*, 485 F. Supp. 3d 1, 56 (D.D.C. 2020).

COPAA accomplishes its mission—to protect and enforce the legal and civil rights of students with disabilities and their families, and to secure appropriate educational services for children with disabilities in accordance with federal laws—by providing resources, training, and information to members; helping parents and advocates file administrative complaints; helping parents and advocates find attorneys and legal resources; educating the public and policymakers; and educating COPAA members about developments in federal laws and policies affecting the education of children with disabilities. Marshall Decl. ¶¶ 4, 6.

COPAA has had to divert significant resources as a result of OCR's actions, resulting in various financial and operational burdens. Because of the OCR office closures and mass terminations, COPAA must now "rewrite many of [its] manuals, update [its] trainings, and retrain many of [its] members," all of which will "take a great deal of time, money and effort— time, money, and effort that could instead be spent working to ensure access to education for children with disabilities." Marshall Decl. ¶ 11. With the OCR pathway blocked, COPAA staff must update materials, such as training materials and webinars, and advise members on other paths to enforce students' rights, such as litigation and state complaint processes. Marshall Decl. ¶¶ 12-13, 16, 21. But for the Department's actions, "COPAA would not need to undertake such extensive efforts." Marshall Decl. ¶ 24. In addition, several of COPAA's individual attorney, parent, and advocate members, including Plaintiffs Carter, Combs and Cupp, have suffered harms as a result of OCR failing to investigate and resolve their claims. Marshall Decl. ¶¶ 1, 26.

All of the aforementioned harms to Plaintiffs are irreparable and will continue absent a preliminary injunction.

## IV.    The Balance Of Equities And Public Interest Weigh Heavily In Favor Of Granting A Preliminary Injunction.

In considering a motion for a preliminary injunction, a court must evaluate the parties' "competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter,* 555 U.S. at 24 (2008). In "balanc[ing] the equities as the litigation moves forward," a court may issue a preliminary injunction that serves to "preserve the relative positions of the parties until a trial on the merits can be held." *NAACP v. U.S. Postal Serv.*, 496 F. Supp. 3d 1, 20 (D.D.C. 2020) (citations omitted). A court must also consider "the overall public interest." *Winter*, 555 U.S. at 26. The balance of equities and public

interest factors typically merge in cases against the federal government. *NAACP v. Postal Serv.*, 496 F. Supp. 3d at 8 (*citing Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Here, absent a preliminary injunction, the individual Plaintiffs, organizational Plaintiff COPAA and its members, and students and families nationwide who rely on OCR to fulfill its statutory and regulatory obligations to investigate and resolve their civil rights complaints will suffer serious, immediate harms that could not be adequately remedied at the conclusion of the litigation. *See supra* Section III. Students' educational, academic, and emotional development cannot wait pending the resolution of this case; these harms should be avoided now.

On the other side of the ledger, "[i]t is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quotation marks and citations omitted); *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111 (123) (D.D.C. 2018). Defendants will not be harmed by an order that compels them to comply with their statutory and regulatory obligations, and that maintains an established agency performing routine functions while the Court has an opportunity to decide the merits of the case.

Indeed, "there is a substantial public interest in 'having governmental agencies abide by the federal laws that govern their existence and operations,'" *League of Women Voters,* 838 F.3d 1, 12 (*quoting Washington v. Reno*, 35 F. 3d 1093, 1103 (6th Cir. 1994)), and, conversely, "generally no public interest in the perpetuation of unlawful agency action." *Id.* (*citing Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511-12 (D.C. Cir. 2016)). The public has a strong interest in ensuring that federal agencies, like the Department of Education, fulfill their statutory and regulatory mandates, and that OCR investigates recipients of federal funding that perpetuate discrimination against students and other members of the public.  A grant of preliminary injunctive relief before OCR staff currently on administrative leave are permanently terminated,

on June 9, 2025, and before Defendants further dismantle the Department, as contemplated by the March 20, 2025, Executive Order, will preserve the functionality of OCR and maintain this key lifeline for students and families seeking protection from and accountability for civil rights violations.

These final factors weigh sharply in favor of Plaintiffs' requested relief.

## CONCLUSION

Accordingly, Plaintiffs respectfully urge the Court to grant Plaintiffs' Motion for Preliminary Injunction and order Defendants to restore the investigation and enforcement capacity of OCR that would enable OCR to process complaints promptly and equitably, as required by law. Plaintiffs ask the Court to require Defendants to submit a restoration plan and expeditious timetable to carry out the Court's preliminary injunction within seven calendar days of the order, to explain the basis of the restoration plan with relevant and accurate data and supporting credible facts that provide a reasoned basis for the proposed plan, and to provide Plaintiffs an opportunity to review and comment on the plan. Once the plan is approved by the Court, Plaintiffs request that the Court order Defendants to submit periodic status reports on their compliance and implementation and allow for Plaintiffs the opportunity to conduct discovery related to Defendants' status reports. Plaintiffs request all other relief so entitled.

Dated: May 2, 2025

Respectfully submitted,

/s/ David G. Hinojosa
Johnathan Smith (D.C. Bar No. 1029373)
David G. Hinojosa (D.C. Bar No. 1722329)
Nina Monfredo**

Freya Pitts (admitted *pro hac vice*)
Hong Le (admitted *pro hac vice*)
Pallavi Bugga (admitted *pro hac vice*)
National Center for Youth Law
1212 Broadway, Suite 600
Oakland, CA 94610
(510) 835-8098

National Center for Youth Law
818 Connecticut Ave NW, Suite 425
Washington, D.C. 20006
(202) 868-4782
jsmith@youthlaw.org
dhinojosa@youthlaw.org

Selene Almazan-Altobelli
(admitted *pro hac vice*)
Council of Parent Attorneys and
Advocates, Inc.
PO Box 6767
Towson, MD 21285
(844) 426-7224, ext. 702
Selene@copaa.org

Michael Tafelski*
Claire Sherburne*
Southern Poverty Law Center
150 E. Ponce de Leon Ave., Ste. 340
Decatur, GA 30030
(334) 430-9104
michael.tafelski@splcenter.org
claire.sherburne@splcenter.org

Sam Boyd*
Southern Poverty Law Center
2 Biscayne Blvd., Ste. 3750
Miami, FL 33131
(786) 560-0737
sam.boyd@splcenter.org

*Application for* pro hac vice *admission pending*
**Application for* pro hac vice *admission forthcoming*

Counsel for Plaintiffs