### Safeguarding Access and Protection
### A Blueprint for Restoring the Office for Civil Rights
### U.S. Department of Education

### Executive Summary

This paper reflects the institutional knowledge and expertise of a group of former career staff of the Office for Civil Rights (OCR) of the U.S. Department of Education (ED).  It outlines the mission and history of the Office for Civil Rights (OCR) at the U.S. Department of Education.  It explains how OCR enforces laws like Title VI of the Civil Rights Act, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act, and Title II of the Americans with Disabilities Act.  It expresses grave concern about recent actions taken by the current administration in 2025 that have severely reduced OCR's capacity to fulfill its historic statutory mission of enforcing civil rights laws in education.

Specifically, the paper details how the Administration has closed 7 of twelve regional OCR offices, terminated approximately 40% of OCR staff (240 employees), and reoriented priorities away from OCR's traditional broad civil rights enforcement.  The authors authoritatively explain how these changes make it impossible for OCR to properly investigate and resolve complaints of discrimination in educational institutions receiving federal funding.

The paper details why OCR's technical assistance and training functions are indispensable to accomplishing its mission and why these essential functions will not survive the recent cuts.  It takes a comprehensive look at all ED programs and, for synergistic reasons, why it is imperative that they remain together within one department.

The authors assert that the staffing cuts and office closures constitute an unlawful attempt to dismantle a congressionally created agency without congressional approval, and they call for immediate intervention by the courts to restore OCR's capacity to fulfill its statutory obligations.  The authors offer their support to those challenging the Administration's actions through public statements, declarations, serving as expert witnesses, and possibly developing an amicus brief.

In appendices, the paper suggests possible legal remedies, including writs of mandamus and challenges to the administration's actions as unconstitutional bills of attainder.  The appendices include information about the authors (former OCR officials), a letter to the current administration regarding DEI policies, and detailed legal analyses of potential remedial strategies.

**Safeguarding Access and Protection**
**A Blueprint for Restoring the Office for Civil Rights**
**U.S. Department of Education**

## <u>Introduction</u>

This paper reflects the institutional knowledge and expertise of a group of former career staff of the Office for Civil Rights (OCR) of the U.S. Department of Education (ED or Department).[1] We are an inter-generational community, yet there are many commonalities among us:

- We all believe in public service.
- We believe that every person in America is entitled to an equal educational opportunity and that wherever discriminatory practices, standards, and barriers exist to that opportunity they must be removed for the benefit and security of the nation as a whole.
- We all have first-hand, direct knowledge and insight into how OCR functions as well as what it accomplishes for our nation.
- We continue to be actively engaged and informed on the current civil rights landscape through teaching, publishing, conducting continuing legal education classes for professional organizations, *pro bono* work, serving as an expert witness, etc.
- We would like to use our expertise and institutional knowledge to address the current decimation of the enforcement of civil rights and misinterpretation of the civil rights laws and regulations.

Many students in America's schools still, today, suffer the injuries of race, sex, national origin, and disability discrimination, contrary to the civil rights statutes entrusted to OCR for enforcement.  When we state OCR cannot possibly fulfill its statutory mission in its current, decimated staff levels, we are not making an "assertion," we are stating, with complete certainty, a matter of fact based on our experience with the agency.  With similar deep direct experience, we also state that there is no short cut, clever administrative device or digital intervention that can change this conclusion.

The paper is intended to be used for public statements on behalf of the group, to provide information about the agency to parties in litigation against ED for the current Administration's recent actions towards OCR and ED as a whole and to offer our services as expert witnesses and/or declarants, and to possibly serve as the basis for an *amicus* brief on behalf of the group. Our group is deeply grateful to the advocates who seek to defend and restore ED and OCR. We wish to be their allies and supporters.

The paper discusses the mission of OCR; its formation; its responsibilities for investigating, redressing, and monitoring compliance with the  laws it enforces; how it coordinates with and supports other offices that are part of ED to accomplish this work; and the impacts of its cuts. In addition, because our group believes that the strongest and most immediate possible intervention by the courts is necessary to protect and restore OCR, the paper and its appendices suggest several possible remedial strategies to ensure that the actions of the current Administration do

---

[1] The individuals contributing to this paper and their former positions with OCR and ED are listed in Appendix A.

not undermine OCR's mission – seeking a writ of mandamus and challenging the actions as bills of attainder.

Again, based on our many years of experience with OCR, it is evident and certain that there is no rational interpretation of the current circumstances under which OCR can operate at its current reduced staffing level and fulfill the duties assigned to it by law. This will result in significant harm to students, parents, teachers, school districts, and post-secondary institutions.  Immediate redress is necessary.

## Mission of OCR

As set forth in its *2024 Annual Report to the President and the Secretary of Education*:[2]

> [OCR] safeguards the rights of students through the investigation of possible violations of civil rights laws, including Title VI of the Civil Rights Act of 1964 (Title VI), Title IX of the Education Amendments of 1972 (Title IX), Section 504 of the Rehabilitation Act of 1973 (Section 504), Title II of the Americans with Disabilities Act of 1990 (Title II), the Age Discrimination Act of 1975, and the Boy Scouts of America Equal Access Act of 2001. In addition, OCR safeguards students' rights by developing policy guidance to assist schools and other educational institutions receiving federal financial assistance in understanding how OCR interprets and enforces federal civil rights laws, by disseminating information and technical assistance about students' rights and schools' responsibilities, and by collecting and reporting data on key education and civil rights issues in our nation's public schools.

OCR has established a positive reputation for enforcing these civil rights statutes. The Section 504 enforcement has furthered the rights to a free appropriate public education for K-12 students with disabilities and reasonable accommodations (in OCR-speak, "academic adjustments and auxiliary aids and services") to postsecondary students with disabilities.  Under Title IX, education free of harassment for girls and women and fair and equal athletic opportunities including scholarships has become an expectation due to the policies, regulations, and investigative outcomes of OCR.  Under Title VI, OCR investigations have provided equal access to curriculum options and academic challenges, including advanced academic classes and treatment without biased discipline for African American students.  Opportunities for pregnant and LGBTQ+ students have been furthered by OCR.  Meaningful and effective education instruction for English language learners is a well-known success story for the agency. Students at K-12 and postsecondary education levels have filed complaints with OCR as a known avenue for acquiring their rights to an education free from discrimination and harassment.  These achievements have provided OCR experience with complex and sensitive issues leading to the development of clarifying policy and regulations to further civil rights. OCR's investigators, lawyers, and managers have developed case processing steps that lead to thorough and fair investigations resulting in numerous settlements of fair education policies in programs and activities in schools and colleges that are recipients of federal financial assistance.

---

[2] https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf, last accessed April 15, 2025.

**Background**

The current Administration has acted unlawfully and contrary to the requirements of the US Constitution by taking actions to dissolve the Department of Education without congressional approval.  Under the foundational principles of separation of powers, no Executive Order, by fiat, can close an agency created by Congress.  The President's long-time hostility to the Department is well known.  The President cannot rely on fictitious findings by the Department of Government Efficiency to bolster an illegal attempt to close the Department.  The Secretary cannot simply fire people without cause and move statutorily created offices to other agencies outside of ED.  In effect, the Secretary is attempting to close and cripple an agency without the approval of Congress.

As former OCR attorneys and managers, we are focusing our concerns on what has happened to OCR and the people and institutions it serves.  OCR was included in the Department of Education Organization Act in 1979 and made a Cabinet-level agency in 1980.  Prior to this time, it was a part of the Department of Health, Education, and Welfare, with an early role in desegregating public schools and other federal civil rights tasks. OCR, unlike most other offices in the Department, is not a source of funding.  Its breadth is much broader.  Its mission is to ensure that educational agencies that receive federal financial assistance ("FFA") do not discriminate on the basis of sex, race, color, national origin, language minority status, age, or disability.  It has its own budget to ensure that these goals can be met.

OCR has established, through regulations that have been in existence for almost 50 years, an investigative and enforcement approach to its work. OCR receives complaints that, once accepted as meeting the appropriate standards for jurisdiction and timeliness, must be investigated.  OCR does not charge for investigation or resolution of complaints.  Consequently, for many parents and students, OCR is the sole route to protecting their civil rights while attending school.  Moreover, OCR cannot merely close out complaints by issuing a "right to sue letter" to complainants, as is permissible under Title VII of the Civil Rights Act of 1964, enforced by the U.S. Equal Employment Opportunity Commission.

OCR's investigative work is carried out by regional offices with trained investigators and attorneys.  The complaint caseload has increased and the staffing has decreased over the past 40 years.  In the last decade, the number of discrimination complaints has more than doubled, while the number of investigators has been cut in half.  In FY 2024, OCR had a staff of 588 people and received more than 22,687 complaints, up from 19,201 in FY 2023, an all-time high,[3] and had a backlog of 12,000 investigations.[4]  Despite this, Education Secretary McMahon fired more than 240 OCR employees, almost 40 percent of the staff -- with just 348 staff members remaining, the number of cases per investigator could increase from the current 42-50 per employee to 86[5] to

---

[3] OCR 2024 Fiscal Year Annual Report, https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf, last accessed April 15, 2025.

[4] https://www.insidehighered.com/news/students/safety/2025/04/15/students-and-institutions-limbo-after-mass-layoffs-ocr?utm_source=Inside+Higher+Ed&utm_campaign=af0a9e0e99-DNU_2021_COPY_03&utm_medium=email&utm_term=0_1fcbc04421-af0a9e0e99-237303025&mc_cid=af0a9e0e99&mc_eid=c13f133d9e, last accessed April 15, 2025.

[5] *Id; see* Collin Binkley, *Education Department Layoffs Gut Its Civil Rights Office, Leaving Discrimination Cases in Limbo*, Associated Press (Mar. 12, 2025), https://bit.ly/3DZHl4k, last accessed April 15, 2025.

200 per employee.[6]  Last year, President Biden requested an additional $22.4 million for OCR to deal with the volume of complaints, a 14-percent increase from the previous year. A portion of the money would have gone toward hiring more than 75 additional OCR investigators. Congress rejected the president's request.  In short, OCR has been charged over the years to do more with less.  More complaints, less staff.

On March 11, 2025, the Secretary of Education issued a mass termination notice that closed seven of the 12 OCR regional offices and informed all staff in the soon-to-be-closed offices that they were to be RIFed (government parlance for reduction in force; in other words, terminated).[7]  As a result of this arbitrary and capricious decision to close more than half of the regional offices, complainants and recipients[8] have been in the dark as to what is happening with their already filed complaints, including the investigations, mediations, remedial negotiations in progress, and  those  agreements that were actively being monitored.  Moreover, there is no information provided to the public in those 25 states and 2 territories that no longer are served by a regional office as to how and where to file complaints.  Indeed, for weeks after the seven regional offices were closed – to at least April 16, 2025 -- OCR's webpage still stated that complaints could be filed with them.[9]

OCR was already short staffed and the Secretary's decision affecting 40% of its staff will have devastating consequences for students, teachers, and educational institutions.  OCR will simply not be able to meet its statutory obligations.  Particularly hard hit will be students asserting discrimination on the basis of disability – historically, more than half of new complaints filed annually.  Many students with disabilities could effectively be barred from education because of the reduction in OCR investigative staff.  Timeframes will be extended when resources are so diminished.  Students may lose a year or more of education.

To fulfill its duties, the primary regulations enforced by OCR require that it "make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply."[10] OCR has long had performance standards under the Government Performance and Results Act (GPRA), including as to timeliness. The Act holds "Federal agencies … accountable for establishing organizational routines and management processes for setting performance goals and objectives that deliver results for the American taxpayer."[11]  For OCR, the "results" are the timely and accurate resolution of complaints in order to determine whether discrimination has occurred and, if so, remedy it.  Thus, the performance standards for the regional offices and their staff are based in part on the timeliness of completion of investigations, with the benchmark for satisfactory performance

---

[6] https://www.chronicle.com/article/ed-department-wants-to-end-dei-does-it-have-the-staff, last accessed April 15, 2025.

[7] The employees were placed on administrative leave and notified in mid-April that they would be removed from the payroll on June 10, 2025.

[8] School districts, higher education institutions, and other institutions that receive FFA from ED.

[9] https://ocrcas.ed.gov/contactfor weeksfeb-ocr?field_state_value=.  The webpage had been updated by April 25, 2025, but the weeks with the incorrect information contributed to uncertainty and anxiety for many complainants and potential complainants.

[10] 34 C.F.R. § 100.7(c) (Title VI); see also 34 CFR §§ 104.61 (Section 504), 106.81 (Title IX), 110.30–33 (Age Discrimination Act), and 28 C.F.R. § 35.171 (Americans with Disabilities Act).

[11] https://www.performance.gov/about/performance-framework/, last accessed April 15, 2025.

being resolution of 80% of complaints within 180 days of receipt and making significant progress toward having no more than 25% of all pending complaints that are over 180 days old – all to ensure that complainants and respondents are provided with timely resolution of complaints.

Career OCR staff have always been mindful that, with changes in administration, policy initiatives will change. However, the reorientation of OCR's priorities and resources away from the types of complaints that OCR has historically addressed will prevent OCR from fulfilling its statutory mandate to address all forms of discrimination prohibited by the statutes it is charged with enforcing.

The termination of hundreds of career attorneys, investigators, and managers who have knowledge and experience is also a tremendous loss to OCR. Even if there is a decision to hire more staff, the talented and experienced staff who were wrongfully fired by the Secretary are irreplaceable. As a result of this "brain drain," the agency, students, and recipients will suffer.

Indeed, they already have. A report by National Public Radio[12] describes in detail an OCR complaint alleging that a school district has unlawfully secluded a 12-year-old student with fetal alcohol syndrome, autism, ADHD, and a mild intellectual disability. Because the investigation of the complaint has stalled -- the attorney looking into the case was laid off in March and the parent hasn't received any updates since -- the student remains subject to continuing seclusion. Moreover, because the parent can no longer expect prompt action by OCR on the complaint, the parent has joined a lawsuit that aims to force OCR to act on complaints like hers. The lawsuit explains that the layoffs have undermined OCR's "ability to fulfill its statutory and regulatory mandate to enforce civil rights laws in schools." In the meantime, as the parent waits for the federal government to step in, she  has cut the amount of time the student spends at school to just two hours a day. The student is the one to suffer.

Laid off employees (some of whom are unwilling to share their names because of fear of retribution) have described the impact of the cuts on the agency's ability to meet its statutory responsibilities. In many cases, this will exacerbate the harm to students, parents, and employees from the discrimination leading them to file their complaints. In one complaint, a school district would only allow a student with Down's Syndrome and autism to go on a field trip if the parent came along; the OCR attorney assigned to the case had scheduled a mediation that, if successful, would have authorized the student to participate. However, when OCR managers instructed staff to cease communications with complainants and recipients, the mediation didn't take place and the student lost the opportunity to participate. In another complaint in which OCR had determined that a student had been subjected to egregious racial harassment, the district signed a resolution agreement. The district's attorney subsequently contacted OCR with questions about implementation of the agreement, but the staff assigned to the case could not respond at the time – indeed, it is not clear if the district's attorney has ever received a response or if the agreement has in fact been implemented. In yet another complaint, OCR and a school district were close to resolving a complaint involving transportation of students with disabilities but, because of the cuts to the agency, there has been no agreement. In another matter, a sexual violence compliance

---

[12] https://www.npr.org/2025/04/16/nx-s1-5338830/trump-federal-cuts-civil-rights-education-investigations, last accessed April 16, 2025.

review initiated during the first Trump administration has been fully investigated. Yet, due to the recent cuts, there is no one at OCR sufficiently familiar with the case to write up a determination letter and resolution agreement.

The combination of a steep reduction in staffing and the redirection of OCR to a narrow set of political priorities (e.g., a narrow view of antisemitism, alleged discrimination against Whites, and transgender issues) must not be permitted to operate as a nearly complete preemption of the core objectives of Congress when it passed the laws enforced by OCR – laws that remain unchanged.

## Reduction in Complaint Processing

Until now, OCR has always followed the regulations articulating the standards for resolutions of complaints and compliance reviews.[13]  However, the recent actions by the Secretary of Education have exceeded her authority, thereby violating both statutory and Constitutional law.

There have been statements by the current Administration that the reduced staff will be able to deal with the complaint load more efficiently through approaches such as the Rapid Resolution Process (RRP) set out in OCR's Case Processing Manual (CPM).[14]  However, RRP will not be appropriate for many complaints.  OCR is not a claims adjustment agency, simply seeking an outcome that is acceptable to the parties.  According to the CPM, the "outcomes in all RRP cases must meet OCR's standards for legal sufficiency and be consistent with applicable statutory and regulatory authority." Often, it is only through an investigation that OCR will be able to determine the nature and extent of any discrimination and what measures will be necessary to remedy it.  Further, according to the CPM, "[a]ny resolution agreement reached through RRP must be aligned with the allegations in the complaint deemed appropriate for resolution pursuant to RRP."  The CPM provides that RRP will only be used where the recipient is interested in immediately resolving the matter or has already taken action to do so.  Since this option has long been offered to recipients, there is no reason to believe that recipients will suddenly find it more attractive now than in the past.  Indeed, in FY 2024, only 638 complaints were resolved through this process.[15]  For similar reasons, mediation (to reach a resolution acceptable to the parties, without necessarily meeting OCR's standards and to which OCR is not a party)[16] cannot be expected to be an effective method of keeping up with the complaint load – in FY 2024, only 778 complaints were resolved in this way.[17]  Thus, it is abundantly clear that resolution of most complaints will continue to require at least some investigation.

During the course of an investigation, a recipient may express an interest in resolving the allegations.  This can be an effective way to resolve a complaint, but only if "OCR's investigation has identified issues that can be addressed through a resolution agreement. The

---

[13] 34 C.F.R Part 100 (Title VI); 34 C.F.R. Part 104 (Section 504); 34 C.F.R. Part 106 (Title IX); and 34 CFR Part 108 (Age Discrimination Act).
[14] Section 110 of the CPM, https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf, last accessed April 16, 2025.
[15] OCR 2024 Fiscal Year Annual Report, https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf, last accessed April 15, 2025.
[16] Article III of the CPM.
[17] *Id.*

provisions of the resolution agreement must be tied to the allegations and the evidence obtained during the investigation, and will be consistent with applicable regulations."[18]  In other cases, it may only be possible to resolve a case after a full investigation.

If there is a finding that the recipient has failed to comply with the civil rights statutes, the recipient and OCR then may enter into an agreement to address the violation.[19]  Article V of the Case Processing Manual provides specific steps to be taken to monitor resolution agreements.  It has been our experience that monitoring can take considerable time and resources – resources that the agency will no longer have as a result of the Administration's actions.  Without effective monitoring, there is no assurance that the violations identified will actually be remedied.

If an agreement cannot be reached, the are several additional steps that OCR – or civil rights offices at other federal agencies -- must take to ensure compliance. These steps are set out by statute at 42 USC § 2000d-1 (Title VI) and 20 U.SC. § 1682 (Title IX) and elaborated on by the procedures in the Title VI regulations.[20]

Before ED or another federal agency can suspend, terminate, refuse to grant, or refuse to continue FFA, the agency must:

- notify the recipient of the failure to comply and attempt compliance by voluntary means,
- have a hearing with procedural and substantive due process requirements that results in an express finding on the record of a failure to comply,
- get approval of the agency's Secretary, and
- wait 30 days after the Secretary provides a written report to the appropriate House and Senate committees.

These steps require considerable resources, with no available shortcuts or "efficiencies."

Moreover, any fund termination is subject to the statutory requirement of "pinpointing":

> Any action to suspend or terminate or to refuse to grant or to continue Federal financial assistance shall be limited to the particular political entity, or part thereof, or other applicant or recipient as to whom such a finding has been made and *shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found*.  [Emphasis added.]

As an alternative to fund termination, ED or another federal agency can refer the matter to the Department of Justice for suit in Federal court after the Secretary has determined that voluntary compliance cannot be reached, the recipient has been notified of the failure to comply and of the coming referral, and then wait at least 10 days after the notification.

---

[18] Section 302 of the CPM.
[19] Section 303 of the CPM.
[20] *See, e.g.,* the procedures for OCR and the Department are at 34 CFR § 100.8, https://www.law.cornell.edu/cfr/text/34/100.8; Agriculture at 7 CFR § 15.8, https://ecfr.io/Title-7/Section-15.8; and Health and Human Services at 45 CFR § 80.8, https://www.ecfr.gov/current/title-45/subtitle-A/subchapter-A/part-80. *See also* Article VI of OCR's Case Processing Manual.

And it's one or the other; e.g., 34 CFR § 100.8 provides:

> If there appears to be a failure or threatened failure to comply with this regulation, and if the noncompliance or threatened noncompliance cannot be corrected by informal means, compliance with this part may be effected by the suspension or termination of or refusal to grant or to continue Federal financial assistance *or* by any other means authorized by law. [Emphasis added.]

The current Administration did not follow these steps in several recent cases where FFA was summarily cut off.  In the recently reported case against Columbia University, there was no finding, no attempt to resolve the case voluntarily, and no administrative hearing.  Rather than pinpoint which FFA was to be terminated, all funds were.  These actions are unlawful and certainly do not comport with the law or the rationale supporting these remedies.  Other recipients have been subjected to similar actions; e.g., Maine and Harvard,[21] with the action against Maine resulting in an Emergency Temporary Restraining Order against the freezing of federal funds under the Administrative Procedures Act.[22]  Moreover, in the Maine case, FFA was cut off (without pinpointing[23]) *and* the matter was referred to the Department of Justice: "If no such Resolution Agreement has been executed by close of business April 11, 2025, OCR will issue a Letter of Impending Enforcement Action to [the Maine Department of Education] and concurrently refer this matter to the Department of Justice for enforcement."[24] Other recipients have been threatened with similar actions.  Since OCR was created, no recipients have been treated like this.[25]

---

[21] While the Administration's letter to Harvard notifying it of the funding freeze did not specifically refer to Title VI, the multiagency Joint Task Force to Combat Anti-Semitism  wrote: "Harvard's statement today reinforces the troubling entitlement mindset that is endemic in our nation's most prestigious universities and colleges — that federal investment does not come with the responsibility to uphold civil rights laws.  Moreover, a spokesperson for the White House stated: " "President Trump is working to Make Higher Education Great Again by ending unchecked anti-Semitism and ensuring federal taxpayer dollars do not fund Harvard's support of dangerous racial discrimination or racially motivated violence. Harvard or any institution that wishes to violate Title VI is, by law, not eligible for federal funding." "https://www.washingtonpost.com/education/2025/04/14/harvard-rejects-trump-administration-demands/?utm_campaign=wp_todays_headlines&utm_medium=email&utm_source=newsletter&carta-url=https%3A%2F%2Fs2.washingtonpost.com%2Fcar-ln-tr%2F421a47f%2F67fe2e2c1c02d2281d8a207f%2F5981e5e39bbc0f6826da5c2d%2F14%2F63%2F67fe2e2c1c02d2281d8a207f, last accessed April 14, 2025.
[22] *State of Maine v. U.S. Department of Agriculture, et al.*, Case 1:25-cv-00131-NSW (D. Maine, April 11, 2025), https://storage.courtlistener.com/recap/gov.uscourts.med.67828/gov.uscourts.med.67828.12.0.pdf.  On April 21, 2025, Harvard also sued the Administration for (among other things) bypassing the procedures required by Title VI for fund termination.  https://www.harvard.edu/research-funding/wp-content/uploads/sites/16/2025/04/Harvard-Funding-Freeze-Order-Complaint.pdf, last accessed April 21, 2025; https://www.thecrimson.com/article/2025/4/22/harvard-sues-trump-admin/, last accessed April 21, 2025.
[23] In *State of Maine v. U.S. Department of Agriculture, Id.,* the court granted the Emergency TRO in part because USDA imposed restrictions on FFA for food assistance programs rather than on any FFA for athletics programs.
[24] https://www.ed.gov/media/document/mdoe-letter-of-impasse-109687.pdf.
[25] Curiously, while running roughshod over the required procedures in these matters, the certification form the Department recently sent to school districts and state educational agencies acknowledged that they are required before funds can be terminated or the matter can be referred to the Department of Justice. https://www.ed.gov/media/document/reminder-of-legal-obligations-undertaken-exchange-receiving-federal-

Note that there is one other alternative for enforcement of the civil rights laws. In 1979, the Supreme Court established a private right to sue under Title IX, which also applies to Title VI, Section 504, and the Age Discrimination Act.[26]

In an April 10, 2025, cabinet meeting, the President and the Secretary of Education asserted that funding was being or would be cut off for a number of universities because they had diversity, equity, and inclusion (DEI) programs. The Secretary further asserted that the investigations are ongoing. There have been no completed investigations, no findings of a violation of any civil rights statute, no attempts to reach a voluntary agreement, no administrative hearings prior to her decision to terminate FFA.

Again, career OCR staff have always been mindful that, with changes in administration, policy initiatives will change. However, any policy must comport with the law. In order to advance their policy objectives, a DEI portal has been created at OCR suggesting that DEI programs are a *per se* violation of Title VI. There is no legal authority for such an assertion. Institutions and school districts have been informed that they need to disband DEI programs that violate Title VI or risk losing federal grants. However, there is no clear definition of which DEI programs may violate Title VI.[27] On April 3, 2025, the Department raised the stakes. It sent a revised Certificate of Assurance to all state and local educational agencies (including school districts).[28] New language was added to the Certificate without the required OMB approval. The Department informed recipients that they had to ensure not only compliance with Title VI but also that they had to eliminate any DEI programs that violate Title VI. Once again, the Department has provided no clear guidance as to which programs might constitute a violation.[29] The Department has informed recipients that refusal to sign these certificates makes them ineligible to receive new Federal funds. If they do sign the certificates, they have been

---

financial-assistance-and-request-certification-under-title-vi-and-sffa-v-harvard-april-3, nn. 3 & 4. Last accessed April 16, 2025.

[26] *Cannon v. U. of Chicago*, 441 U.S. 677 (1979). When Geraldine Cannon was denied admission to the University of Chicago Medical School, she filed a complaint at OCR's Chicago Regional Office alleging discrimination based on her sex (female) and age (39) years. The Medical School asserted that their policy against admitting applicants who are more than 30 years old was based upon the premise that older students were not likely to practice medicine long enough to justify providing resources needed to them. Ms. Cannon provided actuarial tables showing that women had longer life expectations than men, thus rebutting the claim of a shorter length of time for practicing medicine. Furthermore, this policy had a disparate impact on women, who more frequently take child rearing breaks before continuing advance degree education. The Supreme Court recognized her right to bring suit against the School and required her admission to the Medical School.

[27] OCR initially announced its interpretation of Title VI as prohibiting DEI programs in a February 14, 2025, Dear Colleague Letter, https://www.ed.gov/media/document/dear-colleague-letter-sffa-v-harvard-109506.pdf. It provided some guidance on what programs it considered to be prohibited in a March 1, 2025, FAQ document, https://www.ed.gov/media/document/frequently-asked-questions-about-racial-preferences-and-stereotypes-under-title-vi-of-civil-rights-act-109530.pdf. Taken together, the documents provide a confused, skewed, and inaccurate picture of what programs are and are not acceptable. *See, e.g.,* February 27, 2025, letter from former OCR employees to Trainor on the February 14, 2025, Dear Colleague Letter on DEI at Appendix B; *NEA, et al. v. United States Department of Education, et al,* Civil No. 25-cv-091-LM (D.N.H. April 24, 2025), granting plaintiff's motion for preliminary injunction, https://storage.courtlistener.com/recap/gov.uscourts.nhd.65138/gov.uscourts.nhd.65138.74.0.pdf, last accessed April 26, 2025.

[28] *Id.*

[29] *Id.*; *see, e.g.,* criticisms of the FAQ document in https://www.naacpldf.org/wp-content/uploads/Civil-Rights-Organizations-Letter-to-SEAs-and-LEAs-Re-ED-Certification-Request-1.pdf, last accessed April 16, 2025.

threatened with possible Federal False Claim[30] actions if they later have been found to have continued DEI programs that are deemed to violate Title VI. This is a draconian threat that could lead to triple damages. This is a new and threatening mode of enforcement that would have devastating consequences for elementary and secondary schools and their students.

As former career civil rights attorneys, investigators, and managers, we have served under both Republican and Democratic administrations. We know that new administrations have different policy initiatives. But we have never seen a complete failure to follow the laws and regulations, nor the arbitrary dismantling of an agency as we do now. OCR's interactions with recipients have always had the end goal of working together to achieve a resolution to a civil rights concern, not to starve them of necessary resources. This attack on recipients will have devastating consequences for students, teachers, and parents. OCR has always been an agency that investigated and enforced the law without bias. The Trump-envisioned new OCR has been given quite a different charge.

## The Destruction of Human Capital Assets

To accurately understand the resources that are essential for OCR to fulfill its statutorily mandated responsibilities, one must take into account the quality of the human capital necessary for OCR to develop and retain its institutional expertise and skills. The body of knowledge each OCR employee must gain is vast. No one can arrive at OCR immediately ready to engage in complaint investigation, much less develop an effective remedy or provide technical assistance.

OCR develops the skills needed to support its required functions by engaging in multiple forms of expert development, including structured training, experiential training, mentoring, and facilitating "learning communities." By itself, structured training is not nearly sufficient to enable OCR employees to implement the mission of OCR. Experiential training, years of it, is crucial for OCR to develop its human capital.

OCR's core function is the investigation and resolution of complaints. Each OCR attorney and investigator must gain comprehensive familiarity with the regulations, policies, and precedents that establish the scope and limits of OCR's mission. These authorities detail what is lawful and what is not. To name just a few of the types of discrimination within the span of OCR's responsibilities: segregation, disparate treatment, disparate impact, and hostile environment. Each of these forms of discrimination may occur with regard to race, color, sex, national, national origin, or disability. Moreover, each of these protected categories has certain specialized issues; e.g., for disability, denial of reasonable accommodation; for sex, denial of equal athletic opportunity; for race, discrimination in discipline; for national origin, failure to address the needs of non- or limited English speakers.

Each OCR employee must also gain an understanding of the application to their work of the First Amendment and the privacy rights of students. For example, both of these issues apply to OCR's current assignments with regard to antisemitism and Islamophobia.

---

[30] 31 U.S.C. §§ 3729-3733.

With any given set of allegations, the investigator and attorney must be able to know which analytical elements to apply -- disparate treatment, disparate impact, FAPE, hostile environment, accommodations, etc.  In turn, they must identify the data to collect and the questions to ask. Much like a judge, once the data has been collected, the investigator and attorney must make determinations as to relevance and reliability, applying the pertinent standards to the facts that are before them.  Finally, along with their supervisors, they will have to reach sound, legally supportable conclusions.

For most investigators and attorneys, skillfully engaging in the above process is their core responsibility, but there is a great deal more to be learned.  Each instance of noncompliance requires a remedy.  Unlike in litigation, it is not the plaintiff or their experts who must develop the remedial proposal, it is OCR.  This responsibility may require even more substantial skill development than learning how to investigate a complaint.  Without understanding the way recipients operate, it will be difficult to craft a practical, workable, and effective remedy. Without understanding the harms that arise from harassment, there is little point to investigating harassment claims in the first place. For example, some employees at OCR will need to know:

- What are the most effective ways to help non-English speaking children acquire fluency in English?
- What procedures does a school district need to adopt to ensure that allegations of racial or sexual harassment are promptly and thoroughly investigated?
- What is necessary to assess whether a student has a learning disability, AD/HD, or any other disability?
- How do blind or deaf students attain effective access to on-line or digital course content?

This list could go on forever.  For this reason, over time and through an organic process of specialization, each investigator and attorney will have to engage in deep-learning about a number of subject areas. This step may require returning to school, attending professional development conferences, reading educational or medical journals, and/or participating in an OCR learning community – over the years, OCR has had internal networks and discussion groups on disability, discipline, English language learners, gifted and talented, minorities and special education, racial harassment, Title IX athletics, Title IX sexual harassment and violence, and web accessibility. But most often, this knowledge is acquired through on-the-job assignments with more experienced peer mentors who have already faced these challenges.

Out of necessity and good public policy, and as already discussed, OCR seeks to resolve appropriate complaints through rapid resolution or mediation.  Both processes require a vision for solutions to the problems that generated the complaint.  Such insights do not arrive overnight. They come from experience.  Mediation requires a command of the applicable ethical standards, advanced listening skills and, once again, a command of solutions.  Here too, training, mentoring, and on-the-job experience are all necessary to skill development.

As exemplified by the National Disability Accessibility Team (discussed in the next section), delivering technical assistance may require the highest possible level of expertise.  This knowledge can be acquired, in part, through training, attending higher education classes, and so

on.  But, at bottom, there is no equal to peer-based training by OCR employees who have experience with implementable solutions to recurring problems.

Clear regulations are critically important to OCR's mission. As explained below, many OCR regulations need updating.  To develop a new regulation, one must understand the reasoning behind the existing regulation.  What was the original regulation attempting to address?  Was there a compromise behind its wording?  Who were the stakeholders?  The reduction in OCR staffing likely has greatly reduced the number of employees with this kind of historical and institutional knowledge. Whatever is necessary to bring them back must be accomplished or indispensable knowledge will be permanently lost.

Thousands of students and their parents depend on OCR to do its job well.  For most, OCR is the only viable path to justice in the classroom.  Nonetheless, the skills and knowledge necessary to progress through the OCR investigative/case resolution processes cannot be conveyed quickly or simply through explicit training.  Each hire must receive extensive practice and mentoring opportunities, usually spanning years.  Many of the people who do have the necessary experience are now sitting at home, as a wasted asset.  OCR cannot accomplish its mission without returning to work as many of them as possible.  Consequently, it is all the more urgent that the recently RIFed employees of OCR, as well as those coerced into retirement, be given a legitimate, prompt opportunity to return to their employment at OCR.

## Curtailing Helpful Technical Assistance

To understand the resources necessary for OCR to fulfill its statutory responsibilities, it is important to take into account the amount of human capital necessary for OCR to develop and provide technical assistance.

Investigation, negotiation, monitoring, or even litigation and termination are the most disruptive, least efficient ways to obtain compliance with the laws enforced by OCR.  By far, the more constructive approach is to gain compliance through the adoption and promulgation of technical assistance to ED recipients.  Even this approach to achieving compliance requires considerable resources.  Moreover, given that the statutes and regulations enforced by OCR require the investigation of complaints but not technical assistance, when OCR human resources are in short supply, technical assistance services are all too often the first to be cut.

In the experience of the members of our group, we have learned that some students and recipients appreciate the work of OCR, while others, perhaps not so much.  Regardless, we have learned that what both sides of the table want most is ***clarity***. In a given set of circumstances, what would OCR require, and what would it not?  There is no downside to clarity! High quality technical assistance empowers students, parents, and advocates to stand up on their own to assert their civil rights.  Clarity enables recipients to avoid noncompliance by benign neglect, ignorance, or accident.  Clarity provides institutions that simply believe OCR's interpretation of the law is wrong with an explicit, established policy or guidance to challenge or appeal to the courts or Congress.

No law can anticipate every possibility, nor can any regulation. Some of the laws enforced by OCR are extremely succinct. Section 504 is approximately 70 words. Its implementing regulations are somewhat more detailed but they are 48 years old. They pre-date dramatic cultural changes, expectations, and concepts of equality of educational opportunity. They pre-date children surviving certain disabilities that used to be fatal, the Internet, digital remote instruction, online academic courseware, real time captioning, etc. The prohibition of sex discrimination in Title IX is less than 40 words, yet extensive regulations have proven necessary to effectuate that prohibition – with those regulations revised over time to deal with single sex classes, sexual harassment, and other developments in the educational context. Under all of these circumstances, ***there can be no clarity without technical assistance.***

Technical assistance can be provided through a number of routes, all essential. Regional OCR staff provide an "officer of the day" service, responding to calls from parents, students, recipient personnel, independent counsel, and advocates. Over time, this has led to constructive relationships with recipients at all levels that have saved both them and OCR a great deal of time and other resources. Sometimes, a technical assistance conversation can resolve an open complaint in just a few minutes. At other times, major decisions by recipients, capable of creating great liability, could be guided into the direction of compliance. On other occasions, the conversation could facilitate effective communication between recipients and OCR Headquarters over complex and sensitive matters, such as allegations of discrimination pertaining to alleged antisemitism and Islamophobia, that can inform the agency's development of policy guidance (discussed further below). It will be impossible for the reduced number of regional staff to maintain this technical assistance function.

Another major form of technical assistance is through public presentations at gatherings of relevant officials, parent or student advocates, recipient organizations, and attorney advocacy and civil rights organizations. Such presentations are often requested by state educational agencies, recipient organizations, student and advocacy groups, and national interest groups. OCR has long made presentations at annual meetings of such groups as the Association of Higher Education and Disability (a professional organization composed of thousands of disabled student service directors and a number of their house counsel) and its state affiliates, the National Association of College and University Attorneys, the National Association of ADA Coordinators, the Association of Title IX Administrators, the Stetson University Higher Education Law Conference, the education sections of state bar organizations, conferences of state-owned higher education institutions, and other national, regional, and local groups. These technical assistance presentations have a most vital goal, to amplify the work of OCR. Important OCR cases, often with innovative remedial agreements, rather than serving as a lesson or solution for the benefit of a single recipient, can be shared with a broad audience of responsible individuals. In this manner, OCR can achieve the maximum, constructive impact from its compliance efforts.

Through both the "office of the day" service and public presentations, OCR's regional offices were able to develop good working relationships with a great many recipients that proved useful when it came time to negotiate settlement agreements. According to quadrennial ***Highlights of Activity*** report to Congress, in 2021, OCR provided 164 such presentations; in 2022, 186

presentations; in 2023, 197 presentations; and, in 2024, 211 such presentations.[31] Each presentation requires an intense amount of preparation time; for example, reviewing a hundred OCR determination/resolution letters to find the dozen that would provide the greatest amount of insight to the pertinent OCR recipients, developing a PowerPoint deck, and, gaining approval of the content of the presentation from OCR headquarters. Obtaining such clearance might seem like a bureaucratic inefficiency, but, in fact, such review is essential to ensuring national uniformity and quality control. Further, this review process creates an opportunity for collaboration between headquarters and the regional offices on emerging issues. It will be impossible for OCR to continue to make anywhere near the same number of such presentations after the recent staff reductions.

In 2018, OCR started its Open Center program. It was originally established to address another resource-intensive OCR responsibility, responding to Freedom of Information Act requests. Subsequently, the Open Center became a hub for many technical assistance referrals and activities. The Center coordinated with other ED components, such as the Federal Student Aid office, and provided direct assistance with regard to the most sensitive technical assistance requests from recipients -- such as those pertaining to allegations of sexual violence, antisemitism, and Islamophobia. To our knowledge, there are no remaining employees staffing the Open Center.

It is our understanding that the single most common form of postsecondary disability complaint filed with OCR alleges digital inequality in the treatment of persons with visual or auditory impairments. These complaints allege that recipients are failing to ensure that all websites, electronic communication systems, and digital courseware are accessible to and useable by such persons/students. In addition, the Department of Justice has published a final rule updating its regulations for Title II of the Americans with Disabilities Act (ADA) to ensure that public entities do not discriminate with regard to digital sites and services.[32] The DOJ rule has specific requirements about how to ensure that web content and mobile applications are accessible to people with disabilities. Under this rule, most public postsecondary recipients now have just a little more than one year remaining to come into compliance with this highly-technical regulation. Under the authority of Section 504, it is likely that private recipients will be required to meet the same standards, though more clarity on this point would be highly beneficial.

In response to the high number of complaints to OCR alleging digital inequality, OCR formed the National Digital Accessibility Team (NDAT) in June of 2019. The purpose of NDAT was to provide the expert-level technical assistance necessary for recipients to provide digital access to their students and other program participants. According to a former member of the team, at its height, the team was composed of 15 staff members (attorneys and investigators), two digital technology experts, and two managers. Faced with other backlogs, the team was dismantled in October of 2024 but it was almost immediately reconstituted by the current Administration. Unfortunately, due to the OCR "brain drain," there is now a critical shortage of qualified personnel necessary to staff the NDAT. Both of the former digital technology experts are gone and only two experienced staff members and one manager remain on the team. The expertise necessary to develop and staff this team is in very short supply. Moreover, there are few private

---

[31] https://www.ed.gov/media/document/protecting-civil-rights-109409.pdf, last accessed April 16, 2025.
[32] 28 CFR Part 35, as amended, 89 F.R. 88 (April 24, 2024).

entities providing guidance in this area.  Clearly, support from OCR is critical to recipients trying to achieve compliance with digital equality requirements but the necessary resources have been terminated.

Another valuable form of technical assistance is published guidance.  In the quadrennial *Highlights of Activity* report to Congress, this form of assistance is collectively referred to as Policy Resources.  These resources are largely conveyed in the forms of a "dear colleague letter," an FAQ, or a Fact Sheet.  In addition, the NDAT published a comprehensive set of video lessons concerning digital access.  According to the report, OCR produced 64 such resources during the four years 2021 through 2024:

> The policies OCR shared during these four years address complex and timely issues such as civil rights related to the use of artificial intelligence in schools, the rights of students against sex discrimination in equal athletic opportunities, the rights of students against discrimination based on stereotypes about their national origin including shared religious or other ancestral identities, and civil rights guardrails when considering and imposing discipline related to students with disabilities.

Report at page 51.[33]  As with the other forms of technical assistance, OCR will not be able to maintain the previous level of service with its reduced staffing.

Though not usually labelled as a technical assistance activity, the most powerful tool for achieving clarity is the issuance of up-to-date regulations.  On May 6, 2022, ED announced its Intent to Strengthen and Protect Rights for Students with Disabilities by Amending Regulations Implementing Section 504.[34]  There was wide consensus both in the education and advocacy communities that this update was critically necessary.  In response to an Advanced Notice of Proposed Rule Makings, OCR received over 400 comments.[35]  Yet, to date, ED has not even published a first draft of a proposed update.  The reason is evident -- even before the recent decimation of its staff, OCR lacked the personnel necessary to reach this essential goal.

## Collaboration with Other ED Offices

Synergism is defined as follows: combined action of operation; a mutually advantageous conjunction or compatibility of distinct business participants or elements (such as resources or efforts).[36]  "The whole is greater than the sum of its parts" expresses the basic meaning of synergy.  OCR relies on its synergistic relationships with other offices and programs in the Department to carry out its charge to protect and further the right to an education free from discrimination and harassment. It is important that these offices and programs be maintained as

---

[33] https://www.ed.gov/media/document/protecting-civil-rights-109409.pdf, last accessed April 16, 2025.
[34] https://spedlawspotlight.com/u-s-department-of-education-announces-plans-to-strengthen-section-504-in-upcoming-months/; https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202304&RIN=1870-AA18, last accessed April 16, 2025.
[35]
https://www.ralaw.com/media/insights/Education%20Law%20Alert/section_504_notice_of_proposed_rulemaking_expected_august_2023, last accessed April 16, 2025.
[36] Merriam Webster Dictionary.

part of the Department to facilitate OCR's work and to improve educational outcomes throughout the nation.

Congress created the Department in 1979 in order to consolidate functions that affected students, agencies, and educational offices and programs. Congress recognized that the Department was necessary to ensure that there was no duplication (i.e., waste, fraud, and abuse) when a number of agencies, offices, and programs had competing relationships with educational institutions. The U.S. Constitution does not require the federal government to provide public education to U.S. citizens. Providing public education is the responsibility of the States and local governments. Nevertheless, the federal contribution to elementary, secondary, and postsecondary education is significant. Regarding funding for K-12 education, the federal contribution is about 8 percent, including the Department of Agriculture's School Lunch program[37] and the Department of Health and Human Services' Head Start program.[38] The largest proportion of the 8 percent is from ED.

The Elementary and Secondary Education Act (ESEA)[39] was passed by Congress and signed by President Johnson in 1965. The President urged its passage, believing that furthering children's education would lift them out of poverty. The ESEA has been reauthorized over the years to meet the changing needs of school districts under various titles and goals such as "Every Student Succeeds Act" and "No Child Left Behind." Title I of the ESEA provides awards to school districts and state educational agencies with high percentages of low-income students in poverty (and often, as a result, with high minority enrollments). The purposes of Title I are to provide all children significant opportunity to receive a fair, equitable, and high-quality education, and to close educational achievement gaps. These purposes are consistent with the goals of OCR. Indeed, where grants alone cannot achieve the purposes of Title I, OCR can often motivate districts to do so.

The purpose of Title III of the ESEA is to help ensure that English learners attain English language proficiency and meet state academic standards. Formula grants under Title III are provided to states for supplemental services for English language learners. The landmark Supreme Court decision in *Lau v. Nichols, et al*,[40] required services to English learners and affirmed their rights to participate meaningfully in the educational programs offered in public schools. The decision led OCR to establish a requirement under Title VI for public schools to take affirmative steps towards meeting the language needs of their students, starting with OCR's May 25, 1970, memo identifying the responsibility of school districts to identify and provide equal education opportunity to those national origin minority group children who are deficient in English language skills. As a result of the combined requirements of Title III and Title VI, the services provided to limited-English-speaking children in many instances are provided under the terms of an OCR remedial agreement. Again, the work of two ED offices, working in tandem, can be the most efficient way to achieve the goal of equal educational opportunity.

---

[37] P.L. 396, 79th Congress, June 4, 1946, 60 Stat. 231.
[38] 42 USC 9801 *et seq*.
[39] Title VII, 20 U.S.C. §7701-7714, 34 C.F.R. §222).
[40] 415 U.S. 563 (1974).

Impact Aid (Title VII of ESEA) is a federal education program that reimburses school districts that have lost local property tax revenue due to the presence of nontaxable federal property. ED is the primary agency with responsibility for administering Impact Aid. The amount of Impact Aid received by local school districts is based on the number of affected students who live on federal property or whose parents work in federal facilities. These situations are exempt from local property taxes, typically resources for local public education.

The Migrant Education Program[41] provides funds to support high quality education programs for migratory children, as they move among the states. The purpose of the Migrant Education Program is to ensure that migratory children are not penalized in any manner by disparities among states in curriculum, graduation requirements, or academic content and achievement standards. Supportive programs and services include: academic instruction, remedial and compensatory instruction, bilingual and multicultural instruction, vocational instruction, career education, special guidance, counseling and testing services, health services, and preschool services. These purposes support OCR goals of education equity, particularly for migratory children in poverty.

The Individuals with Disabilities Act (IDEA) provides grants to K-12 schools for the education of eligible children with disabilities, including health services, salaries for service providers, assistive technology equipment, hearing assistance, professional development and instructional supplies, materials, and software. Unlike other federal funds provided to state and local governments, IDEA funds contribute a more significant and higher proportional amount in funding for special education of students with disabilities. In return for these grants, the schools must meet a variety of requirements for providing the students with a free appropriate public education (FAPE). Applying the principles of *Lau v. Nichols*, OCR brought the requirements of the IDEA to provide disabled students a meaningful education program into Section 504. By establishing this requirement, OCR furthered the understanding of the meaning of FAPE as also a requirement under Section 504. OCR has always worked closely with the Office of Special Education and Rehabilitative Services in developing policies to ensure FAPE and crafting remedies when districts fail to provide it, including for such issues as restraint and seclusion, discipline, supplemental services, services for students with visual and hearing-related disabilities, etc.

Over many of the 53 years since the passage of Title IX, the law was best known for advancing athletic opportunities. In 1979, the Department of Health, Education, and Welfare published "*A Policy Interpretation: Title IX and Intercollegiate Athletics.*"[42] Before Title IX was enacted in 1972, 15% of college athletes were women. In 2023, 43% of sports opportunities go to women. Since Title IX was passed, 3 million more high school girls and 200,000 more college women have opportunities to play sports each year.[43] One in five girls plays sports, according to the Women's Sports Foundation Report.[44] In 1972 it was one in 27.

---

[41] Title I, Part C of the ESEA.
[42] 44 F.R. No.239, Dec. 11, 1979.
[43] NCAA Sports Sponsorship and Participation Report, 2023.
[44] "Play to Lead: The Generational Impact of Sports on Women's Leadership."

The Equity in Athletics Disclosure Act was enacted in 1994. Administered by the Office of Postsecondary Education, it requires co-educational postsecondary institutions that participate in federal student financial assistance programs under Title IV and have an intercollegiate athletic program to prepare an annual report to the Department on athletic participation, staffing, and revenues and expenses for men's and women's teams. These reports are invaluable to OCR in identifying issues in need of policy clarification and for identifying possible targets for OCR-initiated compliance reviews. The success of U.S. women Olympians has been attributed to the increase in the number of women and girls participating in sports because of Title IX.

The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (Clery Act), enforced by the Office of Student Financial Aid, requires colleges receiving federal financial aid to disclose campus crime statistics and security policies, including as to sexual violence and related misconduct. This information ensures that students, employees, and parents are adequately  informed about campus safety and crime.  An annual security report and fire safety report must be published by October 1st and made available to the campus community. Alerts and timely warnings must be issued for Clery Act crimes that pose serious threat. Notifications must be issued for significant emergencies.  In particular, the Clery Act requires colleges and universities to have policies and procedures for responding to sexual violence and related misconduct – significantly overlapping with OCR's Title IX responsibilities and requirements.  OCR first developed the guidance which led to establishing the requirements and standards for providing an education free of harassment under Title IX.[45]  The information, warnings, and alerts of the Clery Act provide support for OCR's goals of providing an education environment free from sexual harassment on college campuses. Given this overlap, it is only logical that OCR continue to coordinate and collaborate with the Office of Student Financial Aid in its expectations and requirements regarding sexual violence and related misconduct and in targeting recipients for investigation. Coordination between these two offices is essential to the success of both programs.

The Safe and Drug Free Schools and Communities Act (SDFSCA) is the Federal Government's primary vehicle to support student academic achievement through the reduction of violence, alcohol and other drug use through education, prevention, and intervention activities in U.S. schools.

The Comprehensive Centers Network is comprised of 19 Region Comprehensive Centers (RCCs) and one National Center providing capacity-building services to state education agencies, regional education agencies, local education agencies, and individual schools to improve educational outcomes, close achievement gaps, and improve the quality of instruction for all students. This program provides important technical assistance that further goals consistent with the goals of OCR.

ED has several offices and programs that conduct research on the effects of education programs and on demonstration projects to help improve education.  The Institute for Education Sciences[46]

---

[45] 62 F.R. 12034 (1997).

[46] The Administration has cancelled many of the IES contracts carrying out intensive studies and supporting data collection and dissemination and terminated nearly 90% of IES staff.  These actions are being challenged in *AERA*

consists of the National Center for Education Statistics, charged with data collection and analysis; The National Center for Education Research and the National Center for Special Education Research, which fund and manage rigorous education research projects; and the National Center for Education Evaluation and Regional Assistance, which funds and operates critical dissemination functions for education research findings, including the What Works Clearinghouse, Regional Education Laboratories, and the Education Resource Information Center. These offices collect statistics on the status and progress of schools, school districts, and state educational agencies and throughout the nation and distribute data and information to further improvement. They provide technical assistance to school districts and state agencies on how to use these statistics to improve education. The longitudinal and comparative data they collect is indispensable to OCR in targeting subject areas and specific school districts for OCR's self-initiated investigations (compliance reviews.) *When the necessary resources are available*, such compliance reviews can be the single most effective investigative tool at OCR's disposal. Clearly, here, the total is greater than the sum of its parts.

In carrying out its charge to protect and further the right to an education free from discrimination and harassment, OCR has worked with offices and programs throughout ED. The many accomplishments of all these offices could not have been achieved separately. Indeed, these offices have also lost personnel, creating an information and expertise shortage that places an even greater burden on the remaining OCR employees. The goals of OCR and purposes of ED's other programs and offices share a positive synergistic working relationship. As described above, there is coordination and important relationships amongst OCR and the many ED offices that provide funding for programs that support and further the goals of OCR. There is no logic or administrative experience to support proposals to split apart the funding, statistical collection and analysis, technical assistance, and enforcement programs of ED, as the current Administration, with no authorization from Congress, has announced it intends to do. If nothing else, such a split would be wasteful, at times duplicative, and at other times leading to inconsistent but overlapping requirements. Only through one agency -- pulling in the same direction, knowledgeable and supportive of each other's priorities, actions, and guidance -- can the full measure of benefit be derived for our nation's children.

## <u>Possible Remedies to Ensure that OCR Meets its Statutory Requirements</u>

This is not the first time that OCR has failed in its statutory duties. In 1972, the NAACP brought a suit against Department of Health, Education, & Welfare Secretary Eliot Richardson, alleging a failure to timely and effectively enforce Title VI.[47] Over the next 15 years, the NAACP expanded its claims and requests for relief. Additional advocacy organizations, including the Women's Equity Action League (WEAL), raised analogous claims of delayed or insufficient action by OCR. As a consequence, during this period of time, D.C. District Court Judge John Pratt ordered extensive relief (commonly-known as the *Adams Order*). In the multiple iterations of the *Order*, OCR's productivity was under intense, on-going scrutiny. For example, the Court required detailed new complaint handling procedures and tight timelines for investigation and resolution.

---

*and SREE v. U.S. Department of Education, et al.*, Case 8:25-cv-01230-SAG (S.D. MD, filed April 14, 2025), https://democracyforward.org/wp-content/uploads/2025/04/1-Complaint-IES.pdf, last accessed April 16, 2025.
[47] *Adams v. Richardson*, 351 F. Supp. 636 (D.D.C. 1972).

For example, one iteration of the *Adams Order* provided:

> Pursuant to this Court's November 16, 1972 Opinion finding that defendants had failed to enforce Title VI of the 1964 Civil Rights Act with respect to public higher education systems in ten states, on February 16, 1973 this Court ordered defendants within 120 days to commence Title VI enforcement proceedings against states which failed to undertake higher education desegregation.

In 1975 the court stated in a Supplemental Order:

> This Court has ruled in this case that HEW has a duty to commence prompt enforcement activity upon all complaints or other information of racial discrimination in violation of Title VI, and that where it appears that a school district is in violation or presumptive violation of Title VI the agency has a duty under Title VI to commence enforcement proceedings by administrative notice of hearing or any other means authorized by law where efforts to obtain voluntary compliance do not succeed within a reasonable period.

> HEW has often delayed too long in ascertaining whether a complaint or other information of racial discrimination constitutes a violation of Title VI. HEW has also frequently failed to commence enforcement proceedings by administrative notice of hearing or any other means authorized by law although the efforts to obtain voluntary compliance have not succeeded during a substantial period of time.

In compliance with the *Adams Order*, long-term OCR employees, including members of this group, had to report their productivity each week. Their evaluations, the allocation of new resources, nearly every discretionary resource, was tied to making the most efficient use of resources possible.

Those in our group who worked under the *Adams Order* found it to be an effective strategy for ensuring that OCR resolved complaints in a timely fashion and suggest that it might be an appropriate way to address the current Administration's decimation of the agency. More information about writs of mandamus can be found in Appendix C. Another possible remedial strategy is to challenge the actions by the current administration as bills of attainder, discussed in Appendix D.

## Conclusion

Education remains the most promising path to achievement, excellence, and equality in America. The civil rights laws entrusted to OCR were enacted to see to it that ***all*** of America's students have the opportunity to meaningful benefit from their education. The leadership of OCR has long known how to operate efficiently in the service of its civil rights mission and it has done so, achieving much along the way. At the same time, due to budgetary and staffing constraints, it has fallen short of what it is mandated by law to accomplish. There is simply no way that OCR can survive a 40% or greater cut to its human capital and, going forward, come even close to effectively implementing these laws. At a minimum, OCR must be restored to its 2024 levels of

funding and personnel, preferably within the context and synergy of the U.S. Department of Education, and must be held accountable for complying with its own regulations and case processing procedures.  It should be restrained from taking arbitrary and capricious actions under the Administrative Procedures Act, required to meet due process requirements under the Constitution, and required to fulfill the Constitutional right to redress of grievances.

Appendix A
OCR Alumni: Senior Leadership Group

Amy Berman, Enforcement Director, Headquarters, 2011-2012
- Also, Acting Section Chief and Principal Deputy at the U.S. Department of Justice, Civil Rights Division, Educational Opportunities Section

Susan Bowers, 1980-1986, 1992-2005
- Enforcement Director, Headquarters
- Deputy Director, PES (policy office)
- Also, Senior Trial Attorney DOJ Civil Rights Division Special Litigation Section

Marc Brenman, 1973-1995
- San Francisco Enforcement Office, PRMS Director and Branch Chief
- Boston Enforcement Office, Division Director
- Headquarters, Branch Chief, Program Legal Division (policy office)
- Also, Senior Policy Advisor for Civil Rights, Office of the Secretary, U.S. Department of Transportation
- Also, Executive Director, Washington State Human Rights Commission

Wendella Fox, 1997-2021
- Director, Philadelphia Regional Office

Paul Grossman, 1972-2013
- Chief Regional Attorney, San Francisco Office
- Attorney, Headquarters
- Also, Executive Counsel, AHEAD

Howard Kallem, 1993-2007, 2008-2013
- Chief Regional Attorney, DC Enforcement Office
- Supervisory Attorney, Program Legal Group
- Also, Director of Title Compliance/Title IX Coordinator, Duke University and UNC Chapel Hill

Elizabeth Keenan, Supervisory Investigator, San Francisco Enforcement Office, 1973-1985
- Previously, Investigator, Denver Enforcement Office
- Also, Deputy Section Chief, Civil Rights Division/Coordination and Review Section, U.S. Department of Justice.

Jeanette Lim Esbrook, 1979-2002
- Director, Program Legal Group (policy office), Headquarters
  - Acting Assistant Secretary, 1992-1993 and 2000-2001
- Also, Deputy Assistant Secretary, Office of Elementary and Secondary Education
- Also, Senior Advisor to Director Risk Management Service, Office of the Deputy Secretary, ED

- Also, Attorney, DOJ Civil Rights Division, Equal Opportunities Section

Alice Wender, 1979-2021
- Director, Washington, DC Enforcement Office
- Supervisor/Branch Chief, PES and Program Legal Group

Appendix B
February 27 Letter from Former OCR Staff to OCR re DEI

February 27, 2025

Dear Craig Trainor, Acting Assistant Secretary for Civil Rights, United States Department of Education,

RE: February 14, 2025 Dear Colleague Letter

The undersigned, former civil rights employees in the Department of Education, Office for Civil Rights (OCR), write in response to the request in the February 14, 2025, Dear Colleague Letter (DCL) for comments. As non-political, career civil servants serving under both Democratic and Republican administrations, we always supported the lawful policy goals of those administrations. We appreciate the DCL's emphasis on the importance of addressing unlawful discrimination in all its forms, but we believe that the DCL takes too expansive a view of the types of programs and decisions that could be unlawful under the Equal Protection Clause and Title VI. At the very least, we suggest further guidance from OCR clarifying the many common school practices that are permissible and often necessary to ensure equal access to educational opportunities for all students.

***First***, the Department's interpretation of *Students for Fair Admissions v. Harvard* (SFFA) is overly broad in its application and interpretation. The decision is explicitly limited to decisions about "whether a university may make admissions decisions that turn on an applicant's race." Thus, by its terms, it doesn't apply to a host of other school practices, such as:

- Affirmative recruitment for admissions and hiring designed to increase the pool of qualified candidates.
- Affinity groups or themed residence halls that are open to all students and have a focus on a particular group or identity.
- Academic support and other retention programs or policies that focus on the experience and barriers most often faced by students from specific groups but are available to all.
- Classes and courses examining the role of discrimination in American history.

***Second***, the Department relies only on SFFA to say that no consideration of race is permissible when that is not the holding of the court. To the contrary, Justice Roberts lauded the values of diversity as "worthy" and commendable." The DCL correctly states that use of personal essays as a means of determining a student's race and then making an admission decision based on race is impermissible. However, it is important for universities to understand that, as explained by Justice Roberts, it is permissible to consider the extent to which race impacts an individual student's lived experiences, writing: "nothing in this opinion should be construed as prohibiting universities from

considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise."

Similarly, the DCL states: "If an educational institution treats a person of one race differently than it treats another person because of that person's race, the educational institution violates the law." However, this statement is not entirely correct. The SFFA decision is premised on the principle "that an individual's race may never be used against him." Thus, so long as schools do not limit opportunities to students from a particular racial group or apply different standards to individual students or applicants, there is no unlawful discrimination, even if the policy is designed to promote overtly racial goals like diversity, equity, or inclusion. This is an important distinction that would be helpful for schools to understand.

***Third***, the Department's assertion that race-neutral means may be unlawful is inconsistent with well-established policies and law interpreting constitutional principles permitting diversity-related goals through race-neutral means under which no student is treated differently based on race. As recently as 2013, in *Fisher v. University of Texas* a seven-Justice majority of the U.S. Supreme Court set forth rigorous race-neutral procedures and protocols to guide college and university efforts advancing their mission-related diversity goals. The Supreme Court's decision in SFFA did not affect this ruling. Further guidance that takes into account the holdings of recent decisions addressing the use of race-neutral practices, racial balance, and racial diversity would be helpful to schools in understanding their obligations and responsibilities. *See, e.g., Boston Parent Coalition for Academic Excellence v. School Committee of the City of Boston,* 89 F. 4th 46 (1st Cir. 2023), *cert. denied* 604 U.S. ___ (U.S. 2024) (holding that an intent to reduce racial disparities is not by itself enough to show an Equal Protection violation without there also being a disproportionate racial result, with the latter requiring more than awareness of consequences); *Coalition for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864 (4th Cir. 2023), *cert. denied*, 218 L. Ed. 2d 71 (U.S. 2024) ("To the extent the Board may have adopted the challenged admissions policy out of a desire to increase the rates of Black and Hispanic student enrollment at TJ — that is, to improve racial diversity and inclusion by way of race-neutral measures — it was utilizing a practice that the Supreme Court has consistently declined to find constitutionally suspect").

Again, the Dear Colleague Letter states that OCR intends to provide further legal guidance. We respectfully request that our concerns be considered in the drafting of that guidance.

[Signed by over 60 former OCR employees.]

Appendix C[48]
Writs of Mandamus

Background

The problem presented by the current situation  how to get a federal agency to carry out its statutorily required duties. These duties have their origin in the public good and in the legal requirements brought into existence through acts of Congress and signed by the President. The United States has a fraught history, and has not always had protected rights for all people in the U.S. To effectuate rights that have developed over time, Congress creates duties and agencies in the Executive Branch. Congress is a co-equal branch of the government and its laws are not to be taken lightly.

As discussed elsewhere, OCR has such duties and the current Administration is not carrying them out. There are various means of effecting public policy in a democracy, including electoral, public pressure, media coverage, and lawsuits. The method discussed here is a subset of the last, called the writ of mandamus. It has its origins in English common law, which is the foundation of much American law. Mandamus means "we command."

As with most statutes, regulations were issued to effectuate the laws enforced by OCR. Administrative agencies create rules to help them achieve the statute's goals, and conduct investigations to monitor compliance and identify and correct violations. These regulations are developed under the strict rules under the Administrative Procedure Act.[49] These regulations have the force and effect of law.  While federal court decisions may modify the effective meaning and implementation of agency regulations, there have been no decisions that diminish the plain language of the laws enforced by OCR or the federal requirements to enforce them. A law that is not enforced becomes a mere suggestion, losing its power to shape behavior and maintain order, rendering it essentially meaningless. Laws are designed to establish rules and standards of conduct, to protect citizens and maintain social order. The effectiveness of any law hinges on its ability to be enforced, meaning that there must be mechanisms and consequences for violations. Unenforced laws can lead to widespread disregard for the legal system, eroding public trust and undermining the rule of law. If some laws are enforced while others are not, it can create an impression of unfairness and selective justice.

As discussed earlier, the current Administration in its first three months has cut the staffing and regional presence of OCR approximately in half, and by executive order has reoriented its priorities away from the usual types of complaints that OCR has historically received. Traditionally, OCR had no discretion in what complaints it investigated, as long as they met a relatively low threshold of timeliness, were against a recipient of federal financial assistance, and concerned an allegation which if true would constitute a violation of one or more of the laws it enforces. The current Administration has focused its remaining staff on specific issues (e.g., antisemitism, DEI, transgender issues), making it impossible for OCR to fulfill its statutorily required duties regarding all the many other types of prohibited discrimination. This lack of

---

[48] Prepared by Marc Brenman.
[49] 5 U.S.C. §§ 551-559.

ability based on lack of staff is covered in the body of this paper. The combination of a steep reduction in staffing and the direction of OCR by executive order to a narrow set of political priorities must not be permitted to operate as a nearly complete preemption against addressing the core objectives of Congress when it passed the laws enforced by OCR.  OCR's enforcement of the law is not and should not be based on executive orders without legal support. The laws enforced by OCR remain unchanged.[50]

Sometimes federal agencies do not fulfill their duties under their "organic" and program statutes. There are various reasons why this happens. These can include lack of resources, national emergencies, policy decisions, lack of interest, lack of knowledge, and differing priorities of political administrations. As explained in the body of this paper, the drastic reduction in staffing will make it impossible for the current Administration to fulfill its duty to conduct prompt investigations of complaints from the persons protected from discrimination under the laws entrusted to OCR.  As set out in the Title VI regulations[51]:

> The responsible Department official or his designee will make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with this part. The investigation should include, where appropriate, a review of the pertinent practices and policies of the recipient, the circumstances under which the possible noncompliance with this part occurred, and other factors relevant to a determination as to whether the recipient has failed to comply with this part."

When a federal agency refuses or ceases to carry out its statutory duties, private individuals can request from an appropriate federal court a writ of mandamus. As Black's Law Dictionary states[52]:

> The common law writ of mandamus issues from a court of superior jurisdiction, and is directed to a private or municipal corporation, or any of its officers, or to an executive, administrative or judicial officer, or to an inferior court, commanding the performance of a particular act therein specified, and belonging to his or their public, official, or ministerial duty, directing the restoration of the complainant to rights or privileges of which they have been illegally deprived. A writ of mandamus is a judicial remedy in the form of an order from a court to a government official, public agency, or lower court that commands the performance of a specific duty that the body is legally obligated to complete.

A writ of mandamus is considered an extraordinary remedy, used only when other remedies are inadequate. In the situation under discussion, no other remedy than OCR investigating, analyzing, and resolving complaints under its jurisdiction in a timely manner would be adequate. There are no administrative remedies available.

<u>Alternatives to Mandamus</u>

---

[50] *See, e.g.,* February 27, 2025, letter from former OCR employees to Trainor on the February 14, 2025, Dear Colleague Letter on DEI at Appendix B.
[51] 34 CFR § 100.7(c).
[52] Black's Law Dictionary 1113 (4th ed. rev. 1968).

Other judicial remedies might be possible in order to ensure that OCR fulfills its statutory duties and should be considered before seeking a writ of mandamus or in addition to it. These include declaratory relief, seeking a judicial declaration of rights without the coercive element of mandamus; injunctive relief; requesting a court order prohibiting agency inaction or requiring specific performance; and Administrative Procedure Act (APA) claims; and filing suit under 5 U.S.C. § 706(1) to "compel agency action unlawfully withheld or unreasonably delayed." There is much overlap between mandamus and APA approaches. Many federal complaints include both mandamus claims (under 28 U.S.C. § 1361) and Administrative Procedure Act claims (under 5 U.S.C. § 706(1)) in the same filing. Courts often analyze these claims together as they involve similar standards for compelling agency action. Common concurrent approaches include the following: declaratory and mandamus relief; seeking both a declaration of plaintiff's rights and a mandamus order in the same action, giving courts flexibility in the type of relief granted; preliminary and permanent injunctive relief; and requesting preliminary injunctions alongside mandamus, particularly in time-sensitive matters.

Some less formal, but not required, approaches include the following: pre-litigation demand letters; formally notifying the agency of intent to seek mandamus if action isn't taken; public pressure, including using media coverage or advocacy campaigns to highlight agency inaction; class action organizing; and joining with similarly situated individuals to increase leverage.

<u>Pursuing a Writ of Mandamus</u>

In the U.S. federal system, the authority for courts to issue writs of mandamus comes from the All Writs Act[53] and Article III of the Constitution (as interpreted by the federal courts). The All Writs Act grants district courts:

> [J]urisdiction of any action in the nature of mandamus to compel an officer or employee of the United States…to perform a duty owed to the plaintiff. The relevant part of Article III states, "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States…

The Department of Justice Civil Resource Manual[54] states:

> Mandamus is an extraordinary remedy, which should only be used in exceptional circumstances of peculiar emergency or public importance. … The All Writs Act, 28 U.S.C. § 1651(a), confers the power of mandamus on federal appellate courts. ... The power of a district court to compel official action by mandatory order is limited to the enforcement of nondiscretionary, plainly defined, and purely ministerial duties. … An official action is not ministerial unless "the duty in a particular situation is so plainly prescribed as to be free from doubt and equivalent to a positive command." … (Citations omitted.)

---

[53] 28 U.S.C. § 1651.
[54] https://www.justice.gov/archives/usam/civil-resource-manual.

Civil rights enforcement is a matter of public importance, and can even be considered an emergency, since justice delayed is justice denied. The importance of public education on equal terms was emphasized by the Supreme Court in its landmark decision in *Brown v. Board of Education*:

> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

Mandamus is an important but sparingly used tool in the American legal system, serving as a check on government inaction when legal duties are neglected. As we discuss elsewhere, not investigating the complaints of allegedly discriminated against people, including children, is neglect. The harm to the injured person can grow if the issue is not resolved in a neutral, objective, professional, and timely way.

A number of the current suits against the current Administration regarding its actions toward other agencies have asked for a writ of mandamus. For example, the suit in regard to funding for Radio Free Asia[55] states:

> It is necessary and appropriate for this Court to issue a writ of mandamus pursuant to 28 U.S.C. §§ 1361 and 1651 and under this Court's equitable authority to compel Defendants to grant, disburse, and otherwise make accessible RFA's appropriated funds…The Mandamus Act, 28 U.S.C. § 1361, vests this Court with original jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." The All Writs Act, 28 U.S.C. 1651, authorizes this Court to issue all writs "necessary or appropriate" in aid of its jurisdiction."

In *Center for Biological Diversity v. U.S. Department of Interior,*[56] the plaintiffs are seeking:

> [D]eclaratory judgement that DOGE and its sub-teams are subject to the [Federal Advisory Committee Act] and have violated the APA and FACA, an injunction stopping Department of Interior employees from meeting with or relying on work by DOGE employees, and an order of mandamus requiring compliance with FACA.

---

[55] *Radio Free Asia v. USA et al*, Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandamus, Civil Action No. 1:2025cv00907 (D.D.C., filed 3/27/2025).
[56] Civil Action No. 1:25-cv-00612, (D.D.C., filed 3/3/2025).

In *Brehm v. Marocco*,[57] regarding the dismantling of the U.S. African Development Foundation by the current Administration, the plaintiffs have sought "a declaratory judgment that [Brehm] is the President of USADF and Marocco's appointment was unlawful; preliminary and permanent injunctive relief; and, in the alternative, a writ of mandamus prohibiting his removal by any entity other than the Board."

In *Storch et al. v. Hegseth et al.*,[58] regarding termination of several inspectors general from several federal departments and agencies, the plaintiffs have sought a writ of mandamus compelling defendants not to obstruct them in the exercise of their duties.

In *Federal Bureau of Investigation Agents Association v. Department of Justice*,[59] regarding firing of FBI agents who had participated in the investigation into the January 6, 2021, insurrection at the U.S. Capitol, the plaintiffs sought injunctive relief against "any further collection or dissemination" of personally identifiable information and a writ of mandamus as necessary to compel rescission of any unlawful termination orders.

In *Project on Government Oversight, Inc. v. Trump*,[60] concerning records under the Presidential Records Act, the plaintiffs seek declaratory judgment that DOGE's actions are arbitrary, capricious, and illegal, and injunctive and mandamus relief ordering DOGE to treat its records as subject to the Federal Records and Freedom of Information Acts.

To issue a writ of mandamus, courts typically require:

1. A clear legal right to the requested relief
2. A clear duty by the defendant to perform the act
3. No other adequate remedy is available.

In addition, in bringing an action for a writ a mandamus in regard to OCR's dereliction of duty, those interested would have to show that they have standing -- that their injury is separate and distinct from that of the public at large, and that the harm in question is traceable to some wrongful action of the defendant. Individuals who have filed complaints with OCR would likely have standing to seek a writ of mandamus based on the agency's inaction on their complaints. Similarly, an organization representing such individuals would likely have associational or organizational standing.

The question of whether federal agencies must provide sufficient resources to fulfill statutory duties is nuanced and has been addressed in various court decisions. In general, Federal agencies are not absolutely required to allocate sufficient resources to fulfill every statutory duty completely. Courts generally recognize that agencies have significant discretion in allocating limited resources among competing priorities. Agencies frequently and often successfully cite budgetary constraints as a defense when sued for failing to meet statutory obligations. However, courts typically consider whether the agency's duty is mandatory or discretionary, and whether the agency's resource

---

[57] Civil Action No. 1:25-cv-00660 (D.D.C., filed 3/5/2025).
[58] Civil Action No. 1:25-cv-00415 (D.D.C., filed 2/12/2025).
[59] Civil Action No. 1:25-cv-00328 (D.D.C., filed 2/4/2025).
[60] Civil Action No. 1:25-cv-00527 (D.D.C., filed 2/21/2025).

allocation decisions were arbitrary and capricious. For example, in *Massachusetts v. EPA,*[61] the Court held that, while resource constraints may influence how an agency carries out its obligations, they cannot justify a complete failure to fulfill mandatory duties.

Where an agency is challenged for delays in fulfilling its statutorily required duties, courts often apply an "unreasonable delay" standard considering he extent of delay, the reasonableness of the agency's explanation for the delay, the consequences of the delay, and whether human health and welfare are at stake. As explained in the body of this document, we do not believe that OCR will be able to meet its enforcement duties in a timely manner.  The Secretary has provided no rational explanation for the decimation of OCR's staff and OCR's singular focus on specific issues (and the impact that will have on the other issues raised in complaints), despite Administrative Procedure Act requirements that a rational explanation be shown. This suggests that the agency has no adequate explanation. Human health and welfare are at stake because civil rights are an essential part of such health and welfare. OCR's duty to conduct prompt resolutions is non-discretionary and clearly defined by statute. The courts look askance at procedural manipulation, such as deliberately putting certain types of cases at the "bottom of the pile" despite chronological processing requirements. Section 301 of the Case Processing Manual states, "Case planning will begin as early as possible, will be thorough, and will be conducted throughout the life of *every* case to ensure high quality decisions, prompt investigations and efficient use of OCR resources." [Emphasis added.]

In evaluating bad faith, courts look for the following:

- Deviation from established procedures
- Substantial departures from past practice without explanation
- Evidence of political interference in technical decisions
- Inconsistent explanations for agency action
- Destruction or concealment of relevant documents
- Unusual timing of decisions coinciding with external political events

The Administration's actions toward OCR involve such deviation, departures, and political interference in technical decisions.

Mandamus has been used in other civil rights cases, especially fair housing ones. For example, in *Gautreaux v. Chicago Housing Authority,*[62] the court issued orders compelling the housing authority to implement non-discriminatory site selection and tenant assignment policies. In *NAACP v. HUD*, a series of cases in the 1980s-90s, multiple courts issued mandamus-type remedies ordering HUD to enforce Fair Housing Act requirements in various cities.

---

[61] 549 U.S. 497 (2007).
[62] 296 F. Supp. 907 (1969).

Appendix D[63]
Bills of Attainder

A possible legal basis that has appeared in extremely few of the cases filed against the current Administration and its elements is bills of attainder. However, there may be more pertinence, especially in regard to the situation of the Office for Civil Rights of the U.S. Department of Education.

A bill of attainder is a legislative act that declares a person or group of people guilty of a crime and punishes them without a trial. It is prohibited by the U.S. Constitution, as it infringes upon the principles of separation of powers and due process. The Constitution prohibits both the federal government (Article I, Section 9) and state governments (Article I, Section 10) from passing bills of attainder. Article 1, Section 9, Clause 3 states: "*No Bill of Attainder or ex post facto Law shall be passed.*"

In the history of England, the word "attainder" refers to people who were declared "attainted," meaning that their civil rights were nullified. In his work on the Blackstone Commentaries, St. George Tucker, in 1803, defined "Bills of Attainder" as follows:

"They are state-engines of oppression in the last resort, and of the most powerful and extensive operation, reaching to the absent and the dead, as well as to the present and the living. They supply the want of legal forms, legal evidence, and of every other barrier which the laws provide against tyranny and injustice in ordinary cases: being a legislative declaration of the guilt of the party, without trial, without a hearing, and often without the examination of witnesses, and subjecting his person to condign punishment, and his estate to confiscation and forfeiture."

Everything old is new again, and this sounds very familiar. In *U.S. v. Brown*,[64] the Supreme Court opined that "the Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature… It was…looked to as a bulwark against tyranny."

Bills of attainder are best understood as a summary form of legal process, rather than a legislative act.

American dissatisfaction with British attainder laws resulted in their being prohibited in the U.S. Constitution in 1789. The fact that they were banned even under state law reflects the importance that the Framers attached to this issue. Within the Constitution, the clauses forbidding attainder laws serve two purposes. First, they reinforce the separation of powers by forbidding the legislature to perform judicial or executive functions, as a bill of attainder necessarily does. Second, they embody the concept of due process, which is reinforced by the Fifth Amendment.

---

[63] Prepared by Marc Brenman.
[64] 381 U.S. 437 (1965).

In *U.S. v. Brown*, Chief Justice Warren's majority opinion emphasized that the Bill of Attainder Clause was intended to reinforce separation of powers.[65]

Every state constitution also expressly forbids bills of attainder.

Here's a more detailed explanation:

- **Definition:**
  A bill of attainder is essentially a law that singles out specific individuals or groups and inflicts punishment on them without the right to a fair trial.
- **Historical Context:**
  In England, bills of attainder were used to punish individuals deemed to be traitors or rebels without the need for a trial.
- **Constitutional Prohibition:**
  The U.S. Constitution prohibits bills of attainder because they bypass the judicial process and allow the legislature to act as a court, which would violate the separation of powers.
- **Examples:**
  A law that declares a specific person guilty of a crime and imposes a death sentence, or a law that automatically strips citizenship from all members of a particular group, would be considered bills of attainder.
- **Supreme Court Interpretation:**
  The Supreme Court has interpreted the bill of attainder clause to prohibit legislation that targets specific individuals or groups and inflicts punishment without a judicial trial, even if the punishment is not as severe as death

"[W]ithin just the last couple of years, litigants have more aggressively utilized the Constitution's Bill of Attainder Clause in an increasing variety of cases involving the following issues: petitions of habeas corpus, the invalidation of regulatory schemes, housing ordinances, the constitutionality of a DNA database, and the Elizabeth Morgan Act. Perhaps the most controversial case involving bill of attainder analysis in our country's history was decided in the U.S. District Court for the District of Nebraska. In that case, the court decided to invalidate a state constitutional amendment' on the basis that it was "an unconstitutional bill of attainder" because it singled out gays, lesbians, bisexuals, and transsexuals for legislative punishment." Jacob Reynolds; *The Rule of Law and the Origins of the Bill of Attainder Clause*.[66]

Note that the current Administration has also singled out gays, lesbians, bisexuals, and transsexuals for punishment. One prominent example is the punishment of the Maine school system for permitting transgender (male to female) students to participate in women's athletic teams and contests. The Administration has even proposed taking away titles previously awarded to individuals and teams that had transgender athletes on them. This would be implementation of an ex post facto rule as well as an example of a bill of attainder.

---

[65] *Id.*
[66] St. Thomas Law Review; Vol. 18, Iss. 1 (2005),
https://scholarship.stu.edu/cgi/viewcontent.cgi?article=1337&context=stlr) (last accessed April 20, 2025).

The connection between bills of attainder and civil rights laws lies primarily in the Constitutional protections of due process and equal protection. Civil rights laws aim to protect individuals from discrimination and ensure equal treatment under the law, principles that would be violated by bills of attainder.

Several Supreme Court cases have addressed bills of attainder and their relationship to civil rights:

In *United States v. Brown* (1965), the Court struck down a law barring Communist Party members from serving as labor union leaders, ruling it was an unconstitutional bill of attainder.

In *Nixon v. Administrator of General Services* (1977), the Court established a three-part test to determine if legislation constitutes a bill of attainder:

- The law inflicts punishment, viewed historically.
- Whether the statute, viewed in terms of burdens and severity, can reasonably be said to further non-punitive purposes.
- The law targets specific named or identifiable individuals or groups.

The Supreme Court's test examines whether the challenged law has the following elements:

1. **Specification of the affected persons**: Does the law single out a specific individual or easily identifiable group? The Court looks at whether the legislation targets a person or group by name or by readily ascertainable characteristics.
2. **Punishment**: Does the law impose punishment? The Court considers whether the law imposes burdens traditionally associated with punishment, such as imprisonment, banishment, confiscation of property, or barring individuals from certain professions. The Court also examines whether the restriction serves legitimate non-punitive governmental purposes.
3. **Lack of judicial trial**: Does the law impose punishment without a judicial trial? This element focuses on whether the legislature has usurped the judiciary's role by determining guilt and imposing punishment without proper judicial proceedings.

This test has since been applied in numerous cases involving challenges to laws alleged to be bills of attainder, helping courts strike a balance between legislative authority and protecting individuals' rights to due process.

Here are several significant cases where the bill of attainder test from Nixon v. Administrator of General Services has been applied or developed further:

1. **Selective Service System v. Minnesota Public Interest Research Group (1984)** - The Supreme Court upheld a law denying federal financial aid to male students who failed to register for the draft. The Court ruled it wasn't a bill of attainder because it gave students the opportunity to register late and receive aid, and therefore didn't permanently designate a fixed class of persons for punishment.
2. **BellSouth Corp. v. FCC (1998)** - The D.C. Circuit Court applied the three-part test to evaluate restrictions on Baby Bell companies entering the long-distance market. The

court found these weren't bills of attainder because the restrictions served legitimate regulatory purposes rather than punishment.

3. **Foretich v. United States (2004)** - The D.C. Circuit Court struck down a law (the "Elizabeth Morgan Act") that specifically prevented Dr. Eric Foretich from having unsupervised visitation with his daughter. This rare successful bill of attainder challenge showed how legislation targeting a specific individual by name could fail the test.

4. **ACORN v. United States (2010)** - After Congress passed legislation specifically prohibiting federal funding to ACORN following controversy, the Second Circuit applied the Nixon test but ultimately vacated the case as moot when ACORN dissolved. This case raised important questions about legislation targeting specific organizations. After the U.S. House of Representatives passed a resolution in late 2009 barring the community organizing group Association of Community Organizations for Reform Now (ACORN) from receiving federal funding, the group sued the U.S. government. Another, broader bill, the Defund ACORN Act, was enacted by Congress later that year. In March 2010, a federal district court declared the funding ban an unconstitutional bill of attainder.[63] On 13 August 2010, the Court of Appeals for the Second Circuit reversed and remanded on the grounds that only 10% of ACORN's funding was federal and that did not constitute "punishment".

5. **Kaspersky Lab v. Department of Homeland Security (2018)** - The D.C. District Court rejected Kaspersky's bill of attainder challenge to legislation banning its software from government computers. The court found the law served the legitimate non-punitive purpose of protecting national security.

These cases demonstrate how courts have refined the application of the bill of attainder prohibition over time. The courts generally show significant deference to Congress, making successful bill of attainder challenges relatively rare. Most legislation passes the test if courts can identify any legitimate non-punitive purpose, even if the law specifically names individuals or organizations.

In the instant cases of federal civil rights laws ostensibly being used to cut off funds from recipients of federal financial assistance such as Harvard and Columbia Universities and the University of Maine system and other colleges and universities, these recipients would normally have judicial and administrative procedures available to them and which must be implemented by executive branch agencies before funds could be cut off. These procedures are discussed in detail elsewhere in this paper.

The current Administration is essentially creating a law that it is not authorized under the Constitution to create.

These tests are (1) historical, (2) functional, and (3) motivational. The historical test looks to the infamous history of bills of attainder to determine whether the law was one of a limited set of legislative actions that were deemed to be bills of attainder before the Founding and in prior Supreme Court cases. Those historical punishments included pre-Founding legislation imposing death sentences, imprisonment, and banishment, as well as the employment bans that were struck down in *Cummings*, *Lovett*, and *Brown*. The functional test considers whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said

to further nonpunitive legislative purposes. The motivational test looks to legislative history to determine whether the legislative record evinces a congressional intent to punish.[34] Finding that none of the three tests were satisfied in *Nixon*, the Supreme Court concluded that the law requiring the transfer and preservation of the presidential records did not qualify as a punishment under any of these three tests. The Nixon decision limited the Bill of Attainder Clause's prohibition to laws not rationally advancing legitimate (i.e. nonpunitive) legislative purposes.

As noted elsewhere in this paper, Title VI of the Civil Rights Act of 1964 is a nondiscrimination statute. To use it for discriminatory purposes does not rationally advance its purpose. The Congressional Research Service has stated, "[I]t is a defense to a bill of attainder challenge to establish that a statute is not intended to punish, but rather to implement a legitimate regulatory scheme."[67] Clearly, that proffered defense does not apply here.

Another key feature of a bill of attainder is that it applies retroactively: the Supreme Court has held that the Bill of Attainder Clause does not apply to legislation that is intended to prevent future action rather than to punish past action.[68].

The Supreme Court applied the constitutional prohibitions on bills of attainder in a pair of Reconstruction-era cases, *Ex parte Garland*[69] and *Cummings v. Missouri*.[70] *Garland* concerned a federal statute, while *Cummings* involved a post-Civil War amendment to the Missouri constitution, but both of the challenged provisions required persons engaged in certain professions to swear an oath that they had never been disloyal to the United States. In both cases, the Court held that the effect of the challenged provisions was to punish a group of individuals who had been disloyal to the United States, and the punishment they faced was effective exclusion from the covered professions.  One can note the similarity between the oath required here and the requirement imposed on all public school districts in the U.S. that they do not discriminate under the laws enforced by OCR.  Based on that holding, the Supreme Court invalidated the provisions as unconstitutional bills of attainder.

In *Cummings*, the Court noted that the challenged state constitutional provisions did not expressly define any crimes, or declare that any punishment shall be inflicted, but they produced the same result upon the parties, against whom they are directed, as though the crimes were defined and the punishment was declared. The provisions aimed at past acts, and not future acts, and were intended to operate by depriving such persons of the right to hold certain offices and trusts, and to pursue their ordinary and regular avocations. The Court held that this deprivation constituted a punishment, and that the purported option to avoid the restriction by swearing a loyalty oath did not make it less so.

The framers of the constitution of Missouri knew at the time that whole classes of individuals would be unable to take the oath prescribed. To them . . . the deprivation was intended to be, and

---

[67] Bills of Attainder: The Constitutional Implications of Congress Legislating Narrowly; August 24, 2014, https://sgp.fas.org/crs/misc/R40826.pdf (last accessed April 20, 2025).
[68] *American Communications Ass'n, C.I.O., v. Douds*, 339 U.S. 382, 414 (1950); *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994)
[69] 71 U.S. 333 (1866).
[70] 71 U.S. 277 (1867).

is, absolute and perpetual. To make the enjoyment of a right dependent upon an impossible condition is equivalent to an absolute denial of the right under any condition, and such denial, enforced for a past act, is nothing less than punishment imposed for that act.

In *Garland*, the Court applied its reasoning in *Cummings* to strike down the similar federal law. The Court struck down a federal statute requiring attorneys practicing in federal courts to take an oath that they had never sympathized with the Rebel cause in the Civil War. The Court based its decision on *Cummings* and emphasized that "exclusion from any of the professions or any ordinary avocations of life for past conduct can be regarded as punishment for such conduct." The exclusion was based on alleged ideology, similar to the punishments meted out to law firms by the current Administration. Demanding and requiring ideological purity is unamerican.

A factor that may be relevant to a bill of attainder analysis is the duration of the burden imposed. In the case of the recissions of federal aid to educational institutions under discussion here, the Administration has posited no end date, other than the institutions "coming into line" with Administration policy. The burden on educational institutions would be extreme, especially in that it would require them to change their essential function of academic freedom and inquiry. In other civil rights issues such as religious and disability discrimination, a change to essential functions is sufficient defense to avoid making the change requested or demanded.

In the 1946 case *United States v. Lovett*,[71] the Supreme Court struck down as a bill of attainder an appropriations bill cutting off the pay of certain named federal employees accused of being subversives. The Court explained that the challenged legislation effectively declared specific persons guilty of the crime of subversive activities without the safeguards of a judicial trial. The legislation further permanently barred those persons from government service, which qualified as punishment . . . of a most severe type. Similarly, in the 1965 case *United States v. Brown*, the Court held that a federal statute making it a crime for a member of the Communist Party to serve as an officer of a labor union was a bill of attainder. The *Brown* Court eschewed a rigid historical view of the Bill of Attainder Clause, explaining that the clause was intended not as a narrow, technical prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply- trial by legislature.

The current Administration has cut off the pay of employees of the Office for Civil Rights of the U.S. Department of Education in part because they are implementing its rules about race and gender based efforts in education. The Civil Rights Act of 1964 and subsequent legislation reinforced the principle that individuals should be judged on their actions rather than through blanket legislative judgments against groups.

The intersection is fundamentally about protecting individuals from arbitrary punishment by the legislature and ensuring that everyone receives due process and equal protection under the law. Both prohibitions against bills of attainder and civil rights laws share the common goal of preventing government overreach and protecting individual rights.

---

[71] 328 U.S. 303 (1946).

Cases which invoked the bill of attainder principle without being fully adjudicated include the following:

In 2009, the city of Portland, Oregon's attempt to prosecute more severely those on a "secret list" of 350 individuals deemed by police to have committed "livability crimes" in certain neighborhoods was challenged as an unconstitutional bill of attainder.

In 2011, the House voted to defund Planned Parenthood. Democratic Representative Jerry Nadler called that vote a bill of attainder, saying it was unconstitutional as such because the legislation was targeting a specific group.

In January 2017, the House reinstated the Holman Rule, a procedural rule that enables lawmakers to reduce the pay of an individual federal worker down to $1. It was once again removed at the beginning of the 116th U.S. Congress in January 2019, after Democrats had taken control of the chamber.

On November 5, 2019, the Supreme Court heard oral arguments in *Allen v. Cooper*. On March 23, 2020, the Court ruled in favor of North Carolina and struck down the Copyright Remedy Clarification Act, which Congress passed in 1989 to attempt to curb such infringements of copyright by states, in Allen v. Cooper. After the ruling, Nautilus Productions (the plaintiff in *Allen v. Cooper*) filed a motion for reconsideration in the U.S. District Court for the Eastern District of North Carolina. On August 18, 2021, Judge Terrence Boyle granted the motion for reconsideration which North Carolina promptly appealed to the Court of Appeals for the Fourth Circuit. The 4th Circuit denied the state's motion on October 14, 2022. Nautilus then filed their second amended complaint on February 8, 2023, alleging 5th and 14th Amendment violations of Nautilus' constitutional rights, additional copyright violations, and claiming that North Carolina's "Blackbeard's Law", N.C. Gen Stat §121-25(b), represents a Bill of Attainder. Eight years after the passage of the law, on June 30, 2023, North Carolina Gov. Roy Cooper signed a bill repealing the law.

President Trump's executive orders targeting specific law firms, such as the executive order on March 6, 2025, entitled "Addressing Risks from Perkins Coie, LLP, have been criticized as being essentially bills of attainder.[72] Perkins Coie's suit against the Department of Justice argues that the order "shares all the essential features of a bill of attainder."[73]

> Starting in late February, President Donald Trump began signing a series of unprecedented executive orders that imposed significant sanctions on prominent American law firms and lawyers: including Perkins Coie, WilmerHale, Paul Weiss, Covington & Burling, and Jenner & Block. The moves were in retaliation for the firms' or lawyers' prior legal work that the president characterized as personally harmful to him. The sweeping sanctions include suspension of security clearances, termination of

---

[72] https://www.wsj.com/opinion/trump-bills-of-attainder-target-law-firms-a15bf632, last accessed April 20, 2025.
[73] https://cdn.prod.website-files.com/67cf71f1f27ef68a8f5c5c70/67d098cae5905f455b133083_PerkinsCoieFiling1.pdf#page=43.12; https://www.courtlistener.com/docket/69725919/perkins-coie-llp-v-us-department-of-justice/, last accessed April 20, 2025.

government contracts, and restrictions preventing firm employees from accessing federal buildings.[74]

In an *amicus* brief filed on Apr. 8, 2025, in *Perkins Coie LLP v. U.S. Department of Justice*, 27 former senior government officials of both political parties, who served in the last seven presidential administrations, confirmed that they "have never before seen or condoned an *ad hominem* punitive, and retaliatory order of this kind, attacking and intimidating lawyers and a law firm on the basis of their lawful activities." As the amici say in closing their brief:

> When [we] served in the United States government, executive orders of this nature would have been viewed as unthinkable violations of [our] constitutional oath. Yet the repeated issuance in recent weeks of punitive executive orders against specific lawyers and law firms, with perhaps more to come, makes clear that this Administration will continue to levy such sanctions unless enjoined by the courts.

Similarly, punishments imposed on educational institutional under color of law without due process are analogous.

At the initial temporary restraining order (TRO) hearing for the Perkins Coie case, Judge Beryl Howell seized on this separation of powers challenge by asking whether "executive orders that ... stand in for law ... could be subject to a bill of attainder constitutional bar."

According to several commentators:

> The Bill of Attainder clauses in the Constitution do not just protect against governmental abuse; they safeguard the separation of powers. America's constitutional order reserves to the judicial branch alone the power to determine guilt and impose punishment following due process. Executive orders that bypass this structure threaten not just the legal profession, but the very separation of powers that shields every citizen from the arbitrary exercise of authority the Framers so deeply feared. As the Supreme Court recently noted in *SEC v. Jarkesy*, the Framers took pains not to concentrate "the roles of prosecutor, judge, and jury in the hands of the Executive Branch." But the recent Trump executive orders unconstitutionally install the president in all three roles, levying retaliatory punishment against individuals and institutions who have been neither charged with nor found guilty of any crime… As the Supreme Court emphasized in Cummings v. Missouri, the "inhibition [on bills of attainder is] levelled at the *thing*, not the name"— "what cannot be done directly cannot be done indirectly.[75]

A common theme in these cases is the tension between legislative authority to address specific problems and the constitutional prohibition against legislative punishment without trial - a tension that remains relevant in civil rights contexts today. The bill of attainder prohibition also resonates with Ex post facto law, which prohibits retroactively changing the legal consequences of actions committed prior to a law's enactment. As discussed elsewhere in this paper, there are important considerations of the need for clarity for a recipient of federal financial assistance.

---

[74] Koh, Halbhuber, and Pe'er; "No, the President Cannot Issue Bills of Attainder," Just Security, April 9, 2025).
[75] *Id.*

As one commentator wrote:

> The founders were attempting to preserve the Rule of Law by eliminating the arbitrariness often associated with supreme sovereigns that believed they were above the law. The founders protected against three distinct things in their framing of the Constitution: (1) "punishment without a previously existing law providing for it," (2) statutes with retrospective operation, and (3) magistrates that were unchecked by laws. The Constitution as a whole undoubtedly aims at accomplishing these goals and the Bill of Attainder Clause protects against all three."[76]

---

[76] Reynolds; *The Rule of Law and the Origins of the Bill of Attainder Clause.*