# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF COLUMBIA

| | |
|---|---|
| NIKKI S. CARTER, et. al., | ) |
| *Plaintiffs*, | ) |
| v. | ) Case No. 1:25-cv-744-PLF |
| UNITED STATES DEPARTMENT OF EDUCATION, et. al, | ) |
| *Defendants*. | ) |

## DECLARATION OF DOE DECLARANT 2

Pursuant to 28 U.S.C. § 1746, I, Doe Declarant 2, declare as follows:

1. I am a resident of New Jersey. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am a Senior Attorney with the U.S. Department of Education (the "Department"), Office for Civil Rights ("OCR") in New York (the "New York office"). I have worked for the New York office since September of 2015. I have worked under multiple administrations, both Democratic and Republican.

3. Through my personal knowledge and experience, as well as through documents and information I have reviewed, I have knowledge about OCR in general and the New York office in particular.

4. OCR is charged with enforcing and investigating alleged violations of various federal civil rights laws that protect students against discrimination, including Title VI of the

Civil Rights Act of 1964 (Title VI), Title IX of the Education Amendments of 1972, Section 504of the Rehabilitation Act of 1973 (Section 504), the Age Discrimination Act of 1975, Title II of the Americans with Disabilities Act of 1990, and the Boy Scouts of American Equal Access Act of 2002. OCR has a responsibility to act in a reasonably prompt manner in response to alleged violations of these laws.

5. In addition to its enforcement and investigative work, OCR also provides trainings and technical assistance such as educational presentations on civil rights laws to state and local educational agencies and other stakeholders such as advocacy groups and parents.

6. The Assistant Secretary for Civil Rights leads OCR. OCR's headquarters are in Washington, D.C. It previously had 12 regional offices in Atlanta, Boston, Chicago, Cleveland, Dallas, Denver, Kansas City, New York, Philadelphia, San Francisco, Seattle, and Metro Washington D.C. Investigative staff in the regional offices carry out OCR's mission by enforcing civil rights statutes and regulations. Staff use a variety of approaches to resolve complaint investigations and compliance reviews in order to ensure equal access to education for all students.

7. On March 21, 2025, the New York office was closed, along with offices in Boston, Chicago, Cleveland, Dallas, Philadelphia, and San Francisco.

8. Prior to its closure, the New York office was led by a regional director with 23 years of experience with OCR and was supported by a chief civil rights attorney and program manager. The New York office was divided into 5 investigative teams. Each team was led by a manager and made up of 5-7 staff members who were primarily attorneys but also included four equal opportunity specialists. The office also had two administrative staff members who provide administrative support, and one paralegal who provided both investigative and

administrative support.

9. The New York office handled complaints against education institutions and libraries in New York, New Jersey, Puerto Rico, and the U.S. Virgin Islands. The New York office received complaints alleging civil rights violations, mostly from parents, advocates, and students, but also from any member of the public who believed that discrimination occurred or was occurring. Investigative staff evaluated those complaints and determined whether they met the case processing guidelines warranting a full investigation. While investigating a complaint, staff interviewed witnesses, requested and reviewed documents, conducted on-site visits if necessary, and communicated with the complainant to understand the extent of the alleged discrimination. Staff also conducted outreach to educational institutions to provide guidance on how to comply with antidiscrimination laws.

10. As a senior attorney, I led investigations alleging violations of federal law, including Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, Title II of the Americans with Disabilities Act of 1990, and the Boy Scouts of American Equal Access Act of 2002.

11. I assisted team leaders and New York office managers by providing expert legal and policy advice relating to all stages of the case resolution process for extremely complex, difficult and/or novel cases, as well as for non-complex cases. This included evaluation, legal theory development, investigative strategy, collection and analysis of evidence, findings of fact, analysis and conclusions of law, resolution, negotiation, and monitoring. I also provided expert legal advice to team leaders and senior managers on recent legislative and judicial developments in civil rights and conducted the evaluation and investigation of cases.

Additionally, I prepared and presented training to regional staff on legal issues and statutory and regulatory standards, changes in case law, new policy decisions, investigatory techniques, negotiation skills, and other case development issues. I further assisted in the formulation of responses to inquiries from the Secretary, members of Congress, and other individuals or organizations; led and coordinated special projects groups, and collaborated with senior members from other regional offices and with Headquarters staff to discuss program objectives and to exchange information on all relevant matters. My work also involved serving as a mediator and mentoring junior attorneys.

12.     Following the October 7, 2023, attacks on Israel, when the New York office received a tremendous increase in shared ancestry discrimination cases, I served as a national leader in OCR's response to antisemitic and other shared ancestry harassment in schools. I provided trainings on how to respond to shared ancestry harassment in compliance with Title VI to national stakeholders, including community organizations and colleges and universities. I advised staff in other regional offices regarding conducting these trainings and provided similar trainings to elementary and secondary school districts within our region.

13.     I was put on administrative leave on January 31, 2025, pursuant to the President's Executive Orders on "DEI." I believe that I was put on leave because I was a member of OCR's DEIA subcommittee of its Employee Engagement, Diversity, Inclusion, and Accessibility Council created under the first Trump administration. Everyone on that DEIA subcommittee was put on administrative leave on January 31. Since I was put on administrative leave, I have not had access to the Department's network, including case and document management systems, email, or my personnel records. I managed dozens of cases on my own and have not been able to communicate with complainants, recipients, or their

counsel, regarding their complaints, or conduct any work since January 31, 2025.

14. On March 12, 2025, I received an email informing me that my unit and my position within the unit was being abolished. My colleagues in the New York office received a similar notice. Around the same time, all of my colleagues in the New York office lost access to OCR's case and document management systems and were only able to send emails internally. They were then completely cut off from the network after March 21, 2025. Since March 11, 2025 (the day they received this notice), my colleagues received emails from parties asking for updates on their cases or providing information. But without access to the network, they could not respond to the parties or save any of this information internally, and were therefore unable to meaningfully transfer their cases. Because I have also been without access to any of these systems since January 31, 2025, I have also been denied the opportunity to ensure a proper transition of my cases.

15. On April 10, 2025, I received an email notifying me that my position had been abolished and I would be subject to a "reduction in force" effective June 10, 2025.

16. Around that time, I noticed that an automated message had been set up for my OCR email account. It said that I was actively working to transition my cases. But this was not and is not true – I have never had any opportunity to transition my cases.

17. Based on my knowledge and experience, I do not think that the Department can meet its statutory obligations to investigate and ensure compliance with federal civil rights law now that the entire New York office of OCR is abolished, particularly given that 6 other regional offices were also closed.

18. I understand that the Metro D.C. office will be handling all complaints formerly handled by the Boston and New York offices. The Seattle office will be handling all complaints

formerly handled by the San Francisco office. The Atlanta office will be handling all complaints formerly handled by the Philadelphia office. The Kansas City office will be handling complaints formerly handled by the Dallas office. And the Denver office will be handling all complaints formerly handled by the Chicago and Cleveland offices.

19. Prior to the closures, the New York office was operating without full staff for some time and we still could not manage cases as well as we would have liked to. It will be impossible for the D.C. Metro office to absorb all of the complaints from the New York and Boston offices and effectively address them.

20. A lot of complaints require a significant amount of work and constant undivided attention. They may require many interviews, multiple document requests, on-site inspections, and ongoing work with the complainant to fully understand the alleged violation. There are also many complaints that can be dismissed as not having merit under the new guidelines. However, even these more administrative tasks require manpower to complete. People whose complaint may not have merit still deserve acknowledgment and a response from OCR, which they will no longer be able to receive.

21. The immediate impact of closing 7 of the 12 regional OCR offices has been and will continue to be significant, particularly for students with disabilities. Prior to the closure of the New York office, we had many cases where a student had been out of school because of a disability related behavior or a dispute between the family and the school about the proper placement for the student. These cases will no longer be resolved promptly, and students will continue to suffer and fall behind. We also had cases where OCR had been trying to work with a school district to secure the accommodations that a student needs, but all of that work has now been put on pause. Finally, there are students who have been out of school because of

harassment or a hostile environment at school, and their complaints will no longer be addressed in a timely manner.

22. Prior to the transition in administration, the New York office was working on a complaint involving a student who wanted to attend their senior school trip, but because of their disability, needed an aide to accompany them, which the school would not provide. Because of the transition in administration, this administration deprioritizing disability cases, and the mass termination that closed 7 of the 12 regional offices, our office was not able to ensure that the school provides the student with the required accommodation. The student was not able to attend the senior trip unless a parent attended at the family's expense, effectively imposing a surcharge for the student's disability. The New York office was also trying to resolve a complaint about systemic discriminatory discipline within a school district where there was evidence showing a pattern of treating African American students differently than White and Latino students. Resolution of this important complaint has also been put on pause.

23. While New York has strong anti-discrimination laws, the New York office regularly investigates complaints filed against the New York City Department of Education, including compliance concerns impacting students with disabilities and allegations that resources are allocated more favorably to schools where White and Asian students are overrepresented compared to schools where African American and Latino students are overrepresented. Even in my own child's former New York City public school, a kindergarten teacher separated students by race and limited the activities of one group to teach a lesson on Ruby Bridges. This resulted in at least one OCR complaint when parents felt that the principal had not responded promptly or effectively to their complaints about this lesson and how it created a hostile environment based on race for their children. Without OCR's oversight,

concerns like these will go unresolved.

24. Even in states with strong anti-discrimination laws, OCR plays an important role in vindicating students' rights and ensuring compliance with federal civil rights laws. For example, impartial hearing officers who handle "due process" petitions often do not fully understand schools' obligations under Section 504 compared to those under the Individuals with Disabilities Education Act of 1975 and its amendments. This lack of understanding leads to a tremendous disparity in how the Section 504 regulations are interpreted and applied within and across the states and territories the New York office serves. OCR is needed to fill in the gaps in knowledge and ensure that Section 504 is being applied uniformly and accurately throughout the country. In states with less robust anti-discrimination laws, this is even more important. OCR offices that serve these states are still addressing complaints related to desegregation, but will be far less equipped to do so now.

25. The long-term impact of significantly downsizing OCR will be that students will not have access to education free from discrimination and harassment. This will lead to worse educational outcomes and more students leaving school, which leads to increased societal ills, including increased crime. Access to education improves conditions for everyone and for society as a whole.

26. I was a high school teacher before going to law school and left teaching specifically to do this work. I taught in a town that was the subject of court-ordered integration. I saw firsthand the effects of segregation on my students and their confidence in themselves to achieve in life when the systems that served them treated them unequally. I saw students with disabilities not having mandated accommodations implemented faithfully. And I saw a system that had limited resources and was bending over backwards to comply with the No Child Left

Behind mandates in ways that violated students' individualized education programs (IEPs) and Section 504 plans. I knew that there were laws in place to protect these students and open more opportunities for them, and I felt that I needed to do more to help them. This is just a snapshot of what any dedicated teacher can tell you about the necessity of protecting students' civil rights. Ultimately, students will be the most detrimentally impacted by the incapacitation of OCR.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct. Executed on April 29, 2025.

Signature:

*[signature]*

Doe Declarant 2