UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NIKKI S. CARTER, et. al., | ) |
| *Plaintiffs*, | ) |
| v. | ) Case No. 1:25-cv-744-PLF |
| UNITED STATES DEPARTMENT OF EDUCATION, et. al, | ) |
| *Defendants*. | ) |

**DECLARATION OF DOE DECLARANT 5**

Pursuant to 28 U.S.C. § 1746, I, Doe Declarant 5, declare as follows:

1. I am providing this declaration pursuant to 5 U.S.C. § 2302(b)(8) and (b)(9).

2. This declaration is submitted in support of the Plaintiffs' Request for a Preliminary Injunction.

3. I am a member of the investigative staff in one of the now-closed regional offices for the U.S. Department of Education's Office for Civil Rights ("OCR"). I have worked for OCR for around nine years.

4. Through my personal knowledge and experience, as well as through documents and information I have reviewed, I have knowledge about OCR in general and the now-closed regional office where I worked in particular.

5. OCR is charged with enforcing and investigating alleged violations of various federal civil rights laws that protect students and other individuals against discrimination, including Title VI of the Civil Rights Act of 1964 (Title VI), Title IX of the Education Amendments of 1972 (Title IX), Section 504 of the Rehabilitation Act of 1973 (Section 504),

the Age Discrimination Act of 1975 (Age Act), Title II of the Americans with Disabilities Act of 1990 (Title II), and the Boy Scouts of American Equal Access Act of 2002. OCR has a responsibility to act in a reasonably prompt manner in response to alleged violations of these laws.

6. In addition to its enforcement and investigative work, OCR also provides trainings and technical assistance on civil rights laws to state and local educational agencies. And it gives educational presentations to advocacy groups, parents, and students.

7. The Assistant Secretary for Civil Rights leads OCR. OCR's headquarters are in Washington, D.C. Prior to March 11, 2025, OCR had 12 regional offices in Atlanta, Boston, Chicago, Cleveland, Dallas, Denver, Kansas City, New York, Philadelphia, San Francisco, Seattle, and Metro Washington D.C. The Deputy Assistant Secretary for Enforcement oversaw four Enforcement Divisions, each consisting of three regional locations. Each Enforcement Division was managed by an Enforcement Director, who was responsible for coordinating the program operations and resource management of three regional offices.

8. Investigative staff in the regional offices carry out OCR's mission by enforcing civil rights statutes and regulations. Staff uses a variety of approaches to resolve complaint investigations and compliance reviews in order to ensure equal access to education for all students.

9. Like other regional offices, my regional office received complaints alleging civil rights violations from parents, students, advocates, or any other community member who believed that discrimination occurred or was occurring. Investigative staff evaluated those complaints to determine whether they were appropriate for a full investigation. While investigating a complaint, staff interviewed witnesses, requested and reviewed documents,

conducted on-site visits if necessary, and communicated with complainants and recipients to understand the extent of the alleged discrimination. Staff also conducted technical assistance activities for state and local educational agencies to provide guidance on how to comply with antidiscrimination laws.

10. As a member of OCR's investigative staff, I reviewed complaints to determine whether they were appropriate for a full investigation under the laws that OCR enforces. I investigated the complaints, negotiated resolutions, and monitored compliance with those resolutions. I worked on complaints involving violations of federal law, including Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and Title II of the Americans with Disabilities Act of 1990.

11. Shortly after President Trump's inauguration in January 2025, all OCR investigations were paused. During the pause, we could not engage in any external communications. In late February, the pause was lifted as to certain types of complaints some time later.

12. However, on March 11, 2025 – just a few days after the pause was lifted as to non-disability cases – I received notice that I would be placed on administrative leave starting on March 21, 2025, that my position would be terminated, and that my office would be closed. By the following day, I no longer had access to OCR's document or case management systems, and although I was still receiving emails, I no longer had the ability to respond to them. I could not respond to phone calls, either.

13. Because I could not update my cases in OCR's document or case management systems, send emails, or make calls, I was not able to do any work after receiving the notice

on March 11, 2025. As a result, I was not able to take steps to meaningfully advance or transition my cases before being put on leave. On March 21, 2025, I lost all access to my OCR email, laptop, and phone entirely.

14. As of March 11, 2025, I had around 65 cases on my docket, which were in various different stages ranging from evaluation to monitoring. These cases involved disability discrimination claims, race/disability-based harassment and sexual harassment claims, as well as shared ancestry claims.

15. I had a meeting scheduled in one of my cases to talk about resolution – the meeting was to take place shortly after March 11, 2025. But I could not attend. On the day of the meeting, I was receiving emails from the parties involved letting me know that they were on the Zoom and asking where I was. I could not even respond to let them know that I would not be able to join the meeting.

16. Between March 11 and March 21, 2025, I also received emails and other communications from recipients and complainants, including an email from a complainant about a pending language access investigation. I could not respond to any of them.

17. In another example, as of March 11, 2025, I had case that was very close to resolution. In that case, students with disabilities and English Language Learner students had been denied meaningful access to school. At least half of the students involved are refugees, and the facts were egregious. The case was in monitoring, meaning that we had identified compliance issues, and the recipient had already taken steps to resolve the violations. But because of the mass terminations and office closures, the students and the district were left without final resolution. I do not know what will happen to that case. Even if it is picked up by another office, resolution will be unreasonably delayed.

18. I also had several cases in monitoring, involving school districts that failed to adequately respond to sexual harassment claims. In two of those cases, I had calls scheduled with the involved school districts to talk about the expectations for compliance and review the districts' progress. I had to cancel those calls with no follow up. Prior to the notice of terminations, I was in frequent contact with these districts – they needed guidance to comply with Title IX. Without continued, consistent guidance, I worry that the district will struggle to comply, and students in those districts will face continued harm. In another monitoring case, the school district was not complying with the entered resolution agreement, and pervasive sexual harassment was occurring. Because the district was reluctant to come into compliance, I do not believe that it will comply without continued OCR oversight and students may continue to be subject to sexual harassment without an appropriate Title IX compliance response from the district.

19. Monitoring is where some of OCR's most important and labor-intensive work happens. It presents an opportunity for OCR to meaningfully engage with recipients to build out systemic, sustainable change for students and school districts. Unfortunately, with the downsizing of OCR, I do not believe that cases in monitoring can or will be a priority for the remaining OCR offices. And many school districts will not comply with resolution agreements without pressure from OCR – so students in those districts will likely go without relief. Even school districts that want to comply often need ongoing guidance and support from OCR, but that will likely not be available to them. The point of federal oversight is to ensure compliance, but without consistent monitoring activities, ensuring compliance will no longer be possible. And without monitoring, the work that OCR has done to bring those cases to resolution will not be nearly as impactful. Also, once cases are in monitoring, relationships have been built

between OCR investigators and the recipients with whom we are working. I struggle to see how another office could meaningfully pick up those cases without the benefit of those previous relationships.

20. It is not at all tenable that any other regional office could absorb all of my office's cases – not only because caseloads will be unmanageable, but also because other offices lack the local relationships that we have spent years building within our jurisdiction. For every major case that OCR resolves, there are many other cases that are resolved very quickly and without fanfare because there is a past relationship with the involved recipients. Other offices will not be able to replicate these quick resolutions for cases outside of their traditional jurisdictions. As a result, I believe that many, many cases will not be resolved, and the parties involved in those cases will be left without relief. This will cause immediate harm to the students and families involved. And those students and families who are left without relief will be less likely to come forward again in the future. It takes a lot of courage for parents and students to come forward with a complaint, and when those complaints are left unresolved, it chills their continued ability to speak up to protect and advance their rights.

21. On top of the negative impact on OCR's casework, the downsizing will impact our other work, too. My office has historically engaged in technical assistance activities, which included responding to communications from students and parents to give them information or help them file a complaint or to assist recipients with understanding their legal obligations. This work will not be sustainable, now.

22. People come to OCR because our complaint process is accessible to families even if they do not have an attorney, and we are experts in our field and have relationships with state and local educational agencies in our jurisdictions. OCR's downsizing will severely

impair its ability to provide this unique service for communities, and students and families will be left with far fewer avenues for relief – they already are. As a result, English Language Learner students will be left without meaningful access to their education. Students being harassed on the basis of race or shared ancestry will be left without a remedy. And school districts and universities will not receive clear guidance about their responsibilities under federal law.

23. Based on my knowledge and experience, I do not think that the Department of Education can meet its statutory obligations to investigate and ensure compliance with federal civil rights laws given the downsizing.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct. Executed on April 30, 2025.

Signature: *[signature]*

Doe Declarant 5