## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NIKKI S. CARTER, et. al., | ) |
| *Plaintiffs*, | ) |
| v. | ) Case No. 1:25-cv-744-PLF |
| UNITED STATES DEPARTMENT OF EDUCATION, et. al, | ) **DECLARATION OF DOE DECLARANT 7** |
| *Defendants*. | ) |

## <u>DECLARATION OF DOE DECLARANT 7</u>

Pursuant to 28 U.S.C. § 1746, I, Doe Declarant 7, declare as follows:

1.      I am providing this declaration pursuant to 5 U.S.C. § 2302(b)(8) and (b)(9).

2.      This declaration is submitted in support of Plaintiffs' Request for a Preliminary Injunction.

3.      I am a member of the investigative staff in one of the currently open OCR regional offices.  I have worked at OCR over four presidential administrations, both Democratic and Republican.

1

4.      Through my personal knowledge and experience, as well as through documents and information I have reviewed, I have knowledge about OCR in general and the enforcement in the still-open regional office where I work in particular.

5.      OCR is charged with enforcing and investigating alleged violations of various federal civil rights laws that protect students and other individuals against discrimination, including Title VI of the Civil Rights Act of 1964 (Title VI), Title IX of the Education Amendments of 1972 (Title IX), Section 504 of the Rehabilitation Act of 1973 (Section 504), the Age Discrimination Act of 1975 (Age Act), Title II of the Americans with Disabilities Act of 1990 (Title II), and the Boy Scouts of America Equal Access Act of 2002. OCR has a responsibility to act in a reasonably prompt manner in response to alleged violations of these laws.

6.      In addition to its enforcement and investigative work, OCR also provides trainings and technical assistance on civil rights laws to state and local educational agencies and other stakeholders.

7.      The Assistant Secretary for Civil Rights leads OCR. OCR's headquarters are in Washington, D.C. It previously had 12 regional offices in Atlanta, Boston, Chicago, Cleveland, Dallas, Denver, Kansas City, New York, Philadelphia, San Francisco, Seattle, and Metro Washington, D.C. Previously, the Deputy Assistant Secretary for Enforcement oversaw four Enforcement Directors, who typically each had three regional offices for which they were responsible for coordinating program operations and resource management.

8.      My regional office receives complaints alleging civil rights violations, mostly from parents, students, and advocates across several states. Investigative staff review those complaints

and decide if they have merit and should be fully investigated, mediated, or otherwise resolved. While investigating a complaint, staff interview witnesses, request and review documents, and work with the complainant to understand the alleged discrimination. In addition to investigating complaints received from members of the public, OCR also initiates proactive cases. There are two types of proactive cases: directed investigations and compliance reviews.

9.      OCR has developed performance targets for obtaining results through efficient case management, in response to the Government Performance and Results Act (GPRA). To satisfy its GRPA targets, OCR must resolve 80% of complaints received within 180 days.

10.     Shortly after President Trump's inauguration in January 2025, OCR investigations were frozen completely. We were instructed that although we could review documents that we already had, we could not engage in any external communications related to our investigations. We could not request documents, conduct interviews, participate in meetings, facilitate mediations, negotiate resolutions, issue letters of findings, or take other necessary steps to review and resolve complaints, or issue monitoring audits for existing agreements.

11.     As a result of the freeze, our backlogs continued to grow.

12.     On February 20, 2025, the freeze on investigations of some types of disability discrimination claims was officially lifted. The freeze on other investigations, including complaints based on race, national origin, and sex, continued for two weeks until March 6, 2025, when Craig Trainor sent an email attaching a memo from Secretary McMahon lifting the pause.

13.     Prior to March 11, 2025, my caseload was about 45-50. Many others in the office had a lower caseload, around 25-35 cases.

3

14.    Under that prior caseload, we were generally able to meet GRPA targets, but we sometimes struggled. Even then, some cases would get stuck in the administrative bottleneck and would not be resolved in 180 days. Some other cases were just more complicated and systemic in nature and took a long time to resolve.

15.    On March 11, 2025, there were mass firings and office closures at OCR. The Boston, Chicago, Cleveland, Dallas, New York, Philadelphia, and San Francisco offices were eliminated. My office inherited the caseloads from closed regional offices. We now cover more than twice as many states as we used to.

16.    Between the mass terminations, voluntary early retirement, Voluntary Separation Incentive Payment, administrative leave for employees alleged to have engaged DEI, and an increasingly hostile work environment, our workforce has been gutted. Some of the people we lost had specialized positions that will not be backfilled. Because there was no plan for those employees to transition out, their departure has resulted in the loss of career expertise that cannot be replaced.

17.    As of today, we now have only one Enforcement Director for all of OCR, whereas we used to have four.

18.    As of last week, OCR has over 24,000 cases, with a fraction of the staff that we had at the start of the year.

19.    Since March 11, 2025, the caseloads for me and the other investigative staff in my office has increased significantly and become untenable.  Most staff in my office now have caseloads ranging from 200 to over 300 cases. The staff that are not up to 200 cases yet likely will

4

be soon. Even now, it is difficult to know exactly what final caseloads will look like because the regional offices shut down so quickly. We anticipate more staff departures in the near future because of the hostile work environment, which is created by a variety of factors, including overwhelming caseloads, job instability and the threats of further mass terminations, limitations on the types and scope of work that we do, and other working conditions such as draconian return to office policies.

20.    My caseload is completely unmanageable at this point. I cannot thoroughly investigate all of my cases within a reasonable timeframe. We cannot meet our GRPA targets under these circumstances.

21.    On top of attempting to manage increasingly high caseloads, we have been forced to spend a significant amount of time trying to get a grasp on the cases that we inherited from other offices. Because other offices were closed so suddenly, most of the staff that was terminated or placed on leave could not transfer their cases or prepare for an orderly transition. There were no transition plans in place. For weeks, we were not able to access all the necessary information and other files within closed offices' case and document management systems. As I understand it, staff at some remaining offices still cannot access or make changes to all the necessary information and records in these systems, including for the cases that have allegedly been transferred to them.

22.    On top of this, the Department has lost almost all OCR information technology staff responsible for maintaining and updating those systems.  We effectively have no one to help us troubleshoot these issues.

23.     Even if we had reliable access to all the necessary information and records in the case and document management systems, not everything is stored there. OCR employees often maintained work product on their Government-furnished drives and networks. However, because staff had no opportunity to upload these documents to the system or otherwise transition them, many of those notes and documents were lost. As a result, we have not been able to access necessary information to efficiently transition cases from the closed offices and continue reviewing and investigating them. In some cases, we have not had access to the work product we would need to efficiently and timely resolve cases.

24.     We still cannot access investigative staffs' email and voicemail inboxes at other offices, and as far as I know, there is no plan in place for giving us access to those. Not only can we not see new complaints in those inboxes, we also cannot see any correspondence related to existing complaints and investigations. We have had to ask educational institutions and complainants to resend information that they already sent so that we could try to continue investigations. For cases that were in mediation or other resolution stages, no progress is being made to continue the resolution for many or most cases. Even near-final resolution agreements have been stalled since we cannot see the email communications related to those cases.

25.     On top of this, we do not have established relationships with students, parents, and recipients in the new regions we now cover.  These relationships are essential to our ability to resolve cases, and we are having to start at square one for the new regions for which we are responsible.  Geographic distance makes trying to build these relationships even more challenging.

26.    All funding for travel has also been cut off. Sometimes travel is essential for an investigation – for example, to meet witnesses in person, interview people with interpretation needs, or assess physical accessibility barriers. Being restricted from engaging in these activities impedes our ability to conduct effective investigations. We have been told that we can travel for "mission critical work," but nobody has told us what that is.

27.    Due to unreasonable demands on senior regional leadership and the fact that there is only one Enforcement Director, cases are also getting stalled during the approval process. For "cases of interest"—many if not most Title VI and Title IX cases, and disability harassment, restraint, and seclusion cases – we need approval from headquarters at almost every stage of the case.  That includes opening the investigation, dismissing the complaint, and resolving the complaint, among other potential actions. Enforcement Directors are critical to the approval process, but we do not have enough to manage the case approval process and get cases approved in a timely manner. For instances, in cases of interest, findings of insufficient evidence or findings of non-compliance need to be approved by the Enforcement Director.  To my knowledge, no such findings in cases of interest from a regional office have been approved.

28.    This has resulted in an effective freeze of those cases, even if there is no official freeze. Especially in light of our unmanageable caseloads, the fact that cases of interest will not be approved or otherwise moved towards resolution has created a deterrent among staff from working on them, even though those cases are legitimate complaints under the laws we are required to enforce.  Instead, my colleagues and I are choosing to focus on cases that do not require approval from headquarters. For example, my colleagues and I are choosing to work on disability

7

accommodations cases, which are not cases of interest and do not need to be approved, rather than racial harassment cases, which are cases of interest.

29.    While most Title VI and Title IX cases and disability harassment, restraint, and seclusion cases that we receive from the public are effectively frozen, headquarters has continued to direct us to engage in targeted investigations under Title VI and Title IX that are aligned with the administration's political priorities. These investigations have not followed typical procedures or protocols. In some cases, headquarters demands that we initiate certain investigations. In others, we learn that headquarters intends to or already has opened an investigation from other sources – press releases, for example – and then we learn later that we may be involved.

30.    This is very different from how previous administrations, including the first Trump administration, exercised their discretionary powers to focus on certain types of discrimination. For instance, under the first Trump administration, in September 2019, headquarters told regional leaders that it were interested in compliance review nominations relating to sexual harassment. Unlike now, headquarters sought our input.  And in previous administrations, headquarters never ordered us to open or investigate cases that were contrary to established precedent or injunctions. Now, headquarters is issuing letters and press releases regarding cases that have been initiated without our input or involvement. And we are left having to investigate cases opened under questionable legal bases, such as cases investigating diversity and equity training for educators.

31.    We are also unable to do non-investigation work that we are supposed to do, like technical assistance. Technical assistance involves activities like community education and training for students, parents, and recipients. And historically, we try to return every call and email

we get to provide the caller or emailer with guidance or information, but it's not feasible for us to do that anymore.  This harms existing relationships we have with students, parents, and recipients, and makes it more challenging for us to build such relationships in the new geographic areas we now cover.

      32.    My substantive work has been minimized and limited to certain types of disability cases at this point, given my caseload, the mechanics of trying to recover from the sudden office closures, and the other impediments to our work. The messaging we've received in my office is to just try to survive each day.

      33.    OCR is not and cannot fulfill its statutorily and regulatorily mandated duties to investigate complaints and enforce civil rights laws in schools under these circumstances.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 29 , 2025.

Signature:

Doe Declarant 7

Doe Declarant 7