## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NIKKI S. CARTER, et al.,

      Plaintiffs,

          v.

U.S. DEPARTMENT OF EDUCATION, et al.,

      Defendants.

Case No. 1:25-cv-744-PLF

## **PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

I.    Introduction .........................................................................................................................1

II.   Argument..............................................................................................................................2

A.   Plaintiffs satisfy standing requirements and this court has jurisdiction. ............................2

1.   Plaintiffs have standing because they face actual, ongoing harm connected to the challenged agency actions. ...................................................................................................2

2.   COPAA has organizational and associational standing. .................................................3

3.   Plaintiffs' claims are not precluded by federal civil-service laws...................................6

B.   Plaintiffs challenge discrete, final agency actions subject to judicial review under the APA. .....................................................................................................................................10

C.   The Department's decision to abdicate its statutory responsibilities is beyond the scope of the agency's discretion and arbitrary and capricious under the APA.........................................14

D.   The only evidence before the Court shows Defendants' actions are not in accordance with law. 17

E.   Defendants' delays are unreasonable. ...............................................................................19

F.   Plaintiffs have demonstrated a clear departure from Defendants' statutory mandate to investigate and enforce civil rights violations, warranting ultra vires review...........................19

G.   Defendants fail to rebut Plaintiffs' evidence demonstrating irreparable harm.................20

H.   The balance of equities and the public interest weigh in favor of an injunction. ..............23

I.   The requested preliminary injunction appropriately addresses the harm at issue. ...........23

J.   The Court should dispense with the requirement for a bond and the injunction should not be stayed. ...............................................................................................................................24

III.   Conclusion..........................................................................................................................25

# I.      Introduction

Caught making significant, arbitrary cuts to the Office for Civil Rights ("OCR") that imperil OCR's ability to meet its statutory and regulatory responsibilities, Defendants resort to a final gasp to defend their pursuit of a "Final Mission" to dismantle OCR and the Department of Education altogether. They go to great lengths to suggest that they have no duty to enforce any civil rights laws, even though OCR was established for that very purpose. Defendants proffer that even if they had such obligations, there is nothing the Court can do about it, because it is wholly within their discretion to decide whether to investigate any complaints. They aver that while their own regulations require OCR to address complaints in a "prompt" manner, "prompt" has no meaning and is unenforceable.

Defendants brush aside the declarations of Plaintiff families and the Council of Parent Attorneys and Advocates, Inc. ("COPAA"), refusing to acknowledge the perilous harms Plaintiffs continue to experience as a result of Defendants' refusal to do their job and investigate and resolve complaints of racial, sexual, and disability discrimination. Defendants also fail to present any evidence substantiating the reason for the catastrophic discrete and final agency actions that cut an already-burdened OCR staff by nearly one-half and closed seven of twelve offices. Indeed, Defendants fail to rebut sworn testimony by several current and former OCR employees demonstrating how the cuts have prevented OCR from carrying out its statutory and regulatory duties to enforce civil rights.

Certainly, Defendants have discretion in weighing the merits of complaints, but they do not have discretion to act in ways that render OCR incapable of meeting their legal obligations. Plaintiffs have carried their burden demonstrating the need for a preliminary injunction tailored to address the legal wrongs—the type of relief courts routinely order when federal governmental entities stray from the law and cause irreparable harm to children and families.

## II.       Argument

**A. Plaintiffs satisfy standing requirements and this court has jurisdiction.**

**1.  Plaintiffs have standing because they face actual, ongoing harm connected to the challenged agency actions.**

Defendants contend that Plaintiffs lack standing because they fail to identify an actual or imminent injury and fail to "connect [their injuries] to a statutory violation." Both arguments fail.

*First*, Plaintiffs are experiencing ongoing, actual injury, including the denial of equal educational opportunities. Plaintiffs have pending complaints with OCR detailing violations of federal anti-discrimination statutes, which OCR has accepted for investigation. Decl. of A.M. ("A.M. Decl.") ¶¶ 22, 34-35, Dkt. No. 52-13; Decl. of Amy Cupp ("Cupp Decl.") ¶¶ 7, 26, 30, Dkt. No. 52-12; Decl. of K.D. ("K.D. Decl.") ¶¶ 33-34, Dkt. No. 52-10; Decl. of Melissa Combs ("Combs Decl.") ¶¶ 10, 15, Dkt. No. 52-11. They brought these complaints relying on OCR's existing enforcement functions. *See* A.M. Decl. ¶¶ 23, 29, 31; Cupp Decl. ¶ 18; K.D. Decl. ¶ 31; Combs Decl. ¶¶ 12-13. But with the significant cuts to OCR, investigations and resolutions of their complaints and others across the country have halted as evidenced by the unrebutted sworn testimony of Plaintiffs and current and former OCR investigators and attorneys. *See e.g.*, Declaration of Doe 2 ("Doe 2 Decl."), ¶¶ 21-22, Dkt. No. 52-17; Declaration of Doe 3 ("Doe 3 Decl."), ¶¶ 21, 23-24, Dkt. No. 52-18; Declaration of Doe 5 ("Doe 5 Decl."), ¶¶ 14-20, Dkt. No. 52-20; Declaration of Doe 6 ("Doe 6 Decl.") ¶¶ 18-30, Dkt. No. 52-21; Declaration of Doe 8 ("Doe 8 Decl.") ¶¶ 22-23, Dkt. No. 52-23; A.M. Decl. ¶ 40; Cupp. Decl. ¶¶ 30-32, 46; K.D. Decl. ¶¶ 38-39; Combs Decl. ¶¶ 17-18. Plaintiffs are harmed by OCR's inability to investigate and resolve their complaints. For example, without a resolution, Plaintiff G.C., a student with disabilities, is afraid to go to school because the district continues to seclude and restrain her. Cupp Decl. ¶¶ 19; 41-42. Plaintiff M.W. continues to experience racial harassment at school.

K.D. Decl. ¶¶ 25-28, 46. Plaintiffs A.M. and D.P. have been forced out of their local public schools entirely because of ongoing discriminatory harassment. Combs Decl. ¶¶ 19-20; A.M. Decl. ¶ 45. And these student-Plaintiffs are experiencing emotional challenges and disruptions to their education as a result. K.D. Decl. ¶¶ 41-45, 51-52; Cupp. Decl. ¶¶ 39-42; A.M. Decl. ¶¶ 44-47.

*Second*, Defendants' argument that Plaintiffs need to link their injuries to a "statutory violation rather than an exercise of proper discretion," merely restates their merits theory. Defs.' Mem. In Opp. To Pls.' Mot. For Prelim. Inj. ("Opp.") at 6, Dkt. No. 58. For standing, Plaintiffs need only show that their injuries are "fairly traceable" to the challenged conduct of the defendant—in this case, Defendants' office closures and cuts to OCR staff. *See Lujan*, 504 U.S. at 560. Defendants wrongly contend that "Plaintiffs identify no individual whose complaint OCR failed to timely investigate due to the reorganization of OCR." Opp. at 6. After the mass terminations and other changes at OCR, K.D. was expressly informed that it could be up to a year before she received an update on her case which, prior to the terminations, had been close to resolution. K.D. Decl. ¶¶ 35-38. She has heard nothing since. *Id.* ¶ 39. Other Plaintiffs have also been left in the dark. Combs Decl. ¶ 17; A.M. Decl. ¶ 39-40. These undisputed facts are more than sufficient to connect Plaintiffs' injuries to Defendants' conduct, regardless of whether that conduct is the sole cause of their injuries.

**2. COPAA has organizational and associational standing.**

A plaintiff organization may establish Article III standing in two ways: "the organization can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'" *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College,* 600 U.S. 181, 199 (2023) (citation omitted).

a.   **COPAA satisfies the requirements for organizational standing.**

Defendants rely on *Coalition for Humane Immigrant Rights v. United States Department of Homeland Security*, No. 1:25-cv-00943 (TNM), 2025 WL 1078776 (D.D.C. Apr. 10, 2025), as dispositive that COPAA lacks organizational standing. *See* Opp. at 7. Their reliance is misplaced. For organizational standing in APA actions, courts must first ask "whether the agency's action or omission to act injured the [organization's] interest and, second, whether the organization used its resources to counteract the harm." *People for the Ethical Treatment of Animals v. U.S. Dept. of Agriculture* ("*PETA*"), 797 F.3d 1087, 1094 (D.C. Cir. 2015); *see also Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler ("Action Alliance"),* 789 F.2d 931, 936-39 (D.C. Cir. 1986).

Under the first prong, courts have frequently found a "denial of access to an avenue for redress"—including a denial of access to agency investigations—to be a sufficient injury. *Food & Water Watch, Inc. v. Vilsack,* 808 F.3d 905, 920 (D.C. Cir. 2015); *see also PETA*, 797 F.3d. at 1095. In *Action Alliance,* the Circuit Court found that plaintiff organizations had organizational standing because "the challenged regulations den[ied] [plaintiff] organizations access to information and avenues of redress they wish[ed] to use in their routine information-dispensing, counseling, and referral activities." 789 F.2d 931 at 937-38. Similarly, in *PETA,* PETA demonstrated requisite injury for standing in part because the challenged action "'precluded PETA from preventing cruelty to and inhumane treatment of these animals through its normal process of submitting USDA complaints,'" and required PETA "to divert and redirect its limited resources to counteract and offset Defendant's unlawful conduct and omissions." 797 F.3d. at 1094-95 (internal quotations omitted).

COPAA's mission is to protect and enforce the legal and civil rights of students with disabilities and their families. Decl. of D. Marshall ("Marshall Decl.") ¶ 4, Dkt. No. 52-15. To do

so, COPAA, among other activities, provides resources, training, and information to members to assist them in obtaining a free appropriate public education and equal educational opportunity for children with disabilities, including helping parents and advocates file administrative complaints; OCR complaints, in particular, have been an important option for many parents, advocates and attorneys. Marshall Decl. ¶¶ 6, 9. Defendants' actions have denied COPAA and its members an avenue to redress violations of established federal law. *See Action Alliance,* 789 F.2d at 937-38. With the decimation of OCR, members are now left with inadequate options: resort to state complaint processes that often do not address Section 504 violations, bear the time and expense of litigation, or forgo *bona fide* administrative complaints altogether. *See* Marshall Decl. ¶¶ 11-14, 23.

As a result of Defendants' actions COPAA has had to divert significant resources to rewriting and updating its training materials, retraining members on alternative complaint processes, and altering its recommendations and advice on the likely efficacy of an OCR complaint. Marshall Decl. ¶¶ 11, 16. Those efforts "take a great deal of time, money and effort—time, money, and effort that could instead be spent working to ensure access to education for children with disabilities." Marshall Decl. ¶¶ 11, 15, 25. Already, COPAA has had to update training materials for its twelve-week online training course for new attorneys, its materials for the two-day in-person skills training for new attorneys, and its member webinars on Section 504. Marshall Decl. ¶ 21. COPAA also had to add information regarding closed OCR offices and information on filing state complaints in lieu of OCR complaints to its Special Education Advocacy Training curriculum. *Id.*

**b. COPAA satisfies the requirements for associational standing.**

Associational standing exists when (1) at least one of the organization's members "would otherwise have standing to sue in their own right;" (2) "the interests [the organization] seeks to

protect are germane to [its] purposes;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members…." *See Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 53 (D.C. Cir. 1988) (quoting *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977)).

Defendants only challenge the first requirement, contending that COPAA members' injuries are too speculative to confer standing. *See* Opp. at 7-8. As detailed above, the injuries to parents and students in this case are actual and ongoing. *See* Section II(A)(1). COPAA has over 3,600 members nationally; many are parents with pending OCR complaints concerning discrimination on the basis of disability, including complaints alleging both disability-based and race- and/or sex-based discrimination in schools. Marshall Decl. ¶¶ 5, 8, 19. In fact, several named Plaintiffs are COPAA members. Cupp Decl. ¶ 5; Marshall Decl. ¶ 26.

Though unchallenged by Defendants, COPAA also meets the second and third requirements. As an entity whose sole mission is protecting the legal and civil rights of students with disabilities and their families, COPAA's interests are plainly germane to this lawsuit. *See Humane Soc. of the U.S.* at 56 (requiring "only that an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together"). And this lawsuit does not require individual COPAA members to participate in this litigation for declaratory and injunctive relief. *See id.* at 53 & n.8 ("the declaratory and injunctive relief requested by [plaintiff organization] is clearly not of a type that requires the participation of any individual member"). Accordingly, COPAA meets the requirements for associational standing.

**3. Plaintiffs' claims are not precluded by federal civil-service laws.**

Plaintiffs, who are parents, students, and a nonprofit organization, could not have brought their claims before the Merit Systems Protection Board ("MSPB") or Fair Labor Standards Authority ("FLSA"). *See* 5 U.S.C. § 7511; 5 U.S.C. § 7105(2). Nonetheless, Defendants contend

this Court lacks jurisdiction over Plaintiffs' claims because some remedies they seek might implicate federal employment relationships. Such a ruling would upend APA jurisprudence, exempting from the APA an entire category of agency actions that involve agencies eliminating staff needed to carry out statutorily-mandated functions. Defendants' theory would also leave Plaintiffs without any way to secure the rights that federal civil rights statutes and regulations guarantee them. But "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001).

Defendants fail to cite a single case holding that a party not covered by the MSPB or FLRA is nonetheless prohibited by the Civil Service Reform Act ("CSRA") or Federal Service Labor-Management Relations Statute ("FSL-MRS") from seeking any remedies in federal court. The overbreadth of Defendants' theory is perhaps best illustrated by their treatment of *Elgin v. Department of Treasury*, 567 U.S. 1, 5 (2012), which they cite for the proposition that "the CSRA provides the exclusive means of redressing employment disputes involving federal employees," Opp. at 10. But *Elgin* actually held that "the CSRA provides the exclusive avenue to judicial review *when a qualifying employee challenges an adverse employment action* by arguing that a federal statute is unconstitutional." *Id.* at 5 (emphasis added).[1]

Moreover, Plaintiffs do not challenge the legality of an adverse employment action, as Defendants suggest. Plaintiffs challenge OCR's unlawful failure to carry out its statutorily-mandated functions. If, instead of terminating OCR employees, the government had ordered

---

[1] Defendants also cite *United States v. Fausto*, 484 U.S. 439 (1988). But *Fausto* held that the CSRA was intended to replace "patchwork" statutes for judicial review of federal employment actions, including the plaintiff's claim for back pay. *Id*. at 444-55. That holding is irrelevant here.

them to go to work but process no complaints, Plaintiffs' claims would be unchanged. Defendants had the opportunity to present evidence that their cuts to OCR would not have the effects Plaintiffs' declarants assert. They failed to do so.

Nor do Plaintiffs identify the terminations as the sole cause of OCR's failures: the preliminary injunction and supporting declarations identify a host of related factors which have prevented OCR from carrying out its statutory responsibilities. Most importantly, OCR shut down seven of its twelve offices. Doe 3 Decl. ¶ 13. No effort was made to preserve documents for cases when they were transferred from closed offices, meaning that new attorneys taking them on lost the benefit of already-completed work. Declaration of Doe 1 ("Doe 1 Decl.") ¶ 16, Dkt. No. 52-18; Doe 2 Decl. ¶ 14; Doe 4 Decl. ¶ 13, Doe 5 Decl. ¶ 13, Doe 6 Decl. ¶ 16; Declaration of Doe 7 ("Doe 7 Decl.") ¶ 21, Dkt. No. 52-22; Doe 8 Decl. ¶ 15. Travel is often required to effectively investigate complaints, yet Defendants have cut off all travel funding. Doe 7 Decl. ¶ 26; Doe 8 Decl. ¶ 19. OCR staff rely on information technology systems to manage the complaint process, but staff who remain are unable to access information about cases transferred to them due to inadequate IT support. Doe 7 Decl. ¶¶ 21-22.

Defendants cite only one case holding that a party who may not bring an administrative claim before an administrative body can nonetheless be barred from bringing an APA claim: *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984). Opp. at 11. In *Block*, consumers argued that the Secretary of Agriculture was misapplying the Agricultural Marketing Agreement Act of 1937, which created an administrative review scheme for milk marketing orders that only producers and handlers could use. *Id.* at 344-45. The Court held that consumers could not bring APA claims under the Act because Congress did not "intend that [consumers] . . . be relied upon to challenge agency disregard of the law." *Id.* at 347. The analogous "law" in this case to that in

*Block* is the CSRA and FSL-MRS. But Plaintiffs do not seek to enforce those laws through the APA. Their claims are based on civil rights statutes and regulations. Defendants' reliance on *Thunder Basin Coal Company v. Reich*, 510 U.S. 200 (1994), is even further afield. Opp. at 10. It addressed whether a coal company had to follow the procedures under the Federal Mine Safety and Health Amendments Act when challenging a decision by the Mine Safety and Health Administration. *Id.* at 202. As in *Block*, the plaintiffs argued under the APA that the defendants violated a law with a regulatory scheme that plainly outlined the applicable administrative review process for that law. But no applicable administrative review process exists here.

Moreover, *Thunder Basin* identified three factors courts should consider when determining whether an administrative process precludes judicial review, all of which favor Plaintiffs: 1) "could precluding district court jurisdiction 'foreclose all meaningful judicial review' of the claim[;] [2)] . . . is the claim 'wholly collateral to [the] statute's review provisions'[;] [a]nd last, is the claim 'outside the agency's expertise?'" *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023) (*citing Thunder Basin*, 510 U.S. at 212-13). Defendants' position would preclude judicial review of Plaintiffs' claims, because it would bar Plaintiffs from pursuing relief in federal court and Plaintiffs cannot bring claims before the MSPB or FLRA.[2] Plaintiffs' claims under federal civil rights laws are also "wholly collateral" to the civil service protections that the CSRA and FSL-MRS were intended to protect. Plaintiffs do

---

[2] Defendants imply in a footnote, Opp. at 9 n.2, that Plaintiffs could intervene in a hypothetical FLRA case over the discharge of OCR employees, citing regulations concerning proceedings over unfair labor practices. But it is doubtful if those employees could even challenge their terminations under this procedure. *See* 5 U.S.C.A. § 7116(a) (defining unfair labor practices by agencies without any reference to terminations that interfere with an agency's statutory duties). Moreover, even if Plaintiffs could intervene, the FLRA could, at most, only halt termination of OCR employees, not offer Plaintiffs the relief they seek—enforcement of civil rights laws. And there is no evidence of such a case existing for Plaintiffs to intervene.

not seek to vitiate any employee's rights under those statutes and as already explained, protecting employees' rights under those statutes is not sufficient to provide Plaintiffs with relief. Finally, the enforcement of civil rights laws is "entirely outside" the MSPB and FLRA's expertise.[3]

This administration has advanced the same unprecedented and sweeping interpretation of the CSRA and FLS-MRS in other cases, but to no avail. Plaintiffs are unaware of any court adopting the defense. *See, e.g.*, *Wiley v. Dep't of Health and Human Servs.*, No. 2:25-00227, 2025 WL 1384768, at *11 (S.D.W. Va. May 13, 2025) (coal miners receiving treatment for black lung from federally-funded medical service could challenge termination of employees providing that service under the APA); *Rhode Island v. Trump*, No. 1:25-128-JJM-LDA, 2025 WL 1303868, at *7 (D.R.I. May 6, 2025) (states could challenge closure of congressionally-mandated agencies under the APA).[4] Some courts have allowed unions to challenge mass terminations directly, despite the CSRA. *See, e.g., AFGE v. U.S. Off. of Pers. Mgmt.*, No. 25-01780; 2025 WL 900057, at *3 (N.D. Cal. Mar. 24, 2025).

**B. Plaintiffs challenge discrete, final agency actions subject to judicial review under the APA.**

Plaintiffs challenge Defendants' office closure and staff termination decisions, which decimated OCR's ability to carry out its enforcement mandates. Defendants assert that no APA challenge is available because (1) the challenged actions are insufficiently discrete and Plaintiffs'

---

[3] Defendants' remaining citations to cases about the scope of judicial review under the CSRA and FLS-MRS are likewise unpersuasive, because they concern the claims of employees and unions.
[4] In one abbreviated, nonprecedential order, the Fourth Circuit stayed a district court order prohibiting layoffs on the grounds that the government was likely to succeed on its argument that the CSRA deprived the district court of jurisdiction. *Maryland v. United States Dep't of Agric.*, No. 25-1248, 2025 WL 1073657 (4th Cir. Apr. 9, 2025). But there, the state plaintiffs argued that the layoffs violated federal laws governing termination of employment, not that they prevented the agencies from carrying out statutory duties. *Maryland v. United States Dep't of Agric.*, No. CV JKB-25-0748, 2025 WL 973159, at *18 (D. Md. Apr. 1, 2025).

claims therefore amount to an inappropriately broad programmatic challenge; and (2) the challenged actions are not final and therefore not reviewable. Opp. at 13-17. Both arguments fail.

As a threshold matter, the challenged actions fall within the broad scope of agency actions subject to APA challenge, which "is expansive," and "meant to cover comprehensively every manner in which an agency may exercise its power." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006) (*quoting Whitman,* 531 U.S. at 478)). Congress intended to provide for "the complete coverage of every form of agency power, proceeding, action, or inaction." *Jud. Watch, Inc. v. Nat'l Energy Pol'y Dev. Grp.*, 219 F. Supp. 2d 20, 38 (D.D.C. 2002) (quoting S. Doc. No. 248, 79th Cong., 2d Sess., 255 (1946)). Indeed, Congress "rarely allows claims involving agency action to escape effective judicial review." *Axon Enterprise, Inc. v. Fed. Trade Comm.*, 598 U.S. 175, 186 (2023).

***Discrete Action.*** Defendants mischaracterize Plaintiffs' APA claims as a "broad, programmatic attack" seeking "wholesale reform of an agency program." Opp. at 13 (*citing Greater Bos. Legal Servs. v. U.S. Dep't of Homeland Sec.*, No. 21-cv-10083-DJC, 2022 WL 138629, at *6 (D. Mass. Jan. 13, 2022); *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006)). Plaintiffs have not launched a "generalized" challenge to the functioning and administration of OCR, *Cobell*, 455 F.3d at 307, and do not seek review of day-to-day staffing decisions or the processing or resolution of individual cases. Instead, Plaintiffs challenge the discrete decisions on March 11, 2025, to eliminate specific offices and staff positions, thereby rendering OCR incapable of fulfilling its statutory functions.[5] This case is unlike *Lujan v.*

---

[5] Although Defendants confusingly object that the civil rights statutes Plaintiffs invoke "have nothing to do with OCR investigation or enforcement" of civil rights violations, Opp. at 14, they do not contest that the Department must comply with Title VI and Title IX, or that the statutory purpose of OCR is to investigate and enforce civil rights law. 20 U.S.C. § 3413; *see also* S. Rep. No. 96-49, at 35-36 (Mar. 27, 1979).

*National Wildlife Federation*, where the Court faulted plaintiffs for packaging their request for "*wholesale* improvement" of a Bureau of Land Management program—folding in complaints about a variety of decisions such as failure to properly revise land use plans, provide public notice, and correctly consider and weigh certain factors—as an APA challenge to an unlawful agency action. 497 U.S. 871, 891 (1990). Here, Plaintiffs challenge a specific decision and its ramifications. *See Lujan*, 497 U.S. at 890 n.2 ("If there is in fact some specific order or regulation, applying some particular measure across the board to all individual [determinations], and if that order or regulation is final, . . . it can of course be challenged under the APA . . . ."). That the discrete actions challenged precipitated devastating, widespread consequences for OCR and Plaintiffs does not convert the case into a "broad programmatic attack."

Defendants also argue that it would not be feasible for the Court to entertain Plaintiffs' challenge because the agency could not compile an administrative record supporting OCR's general program. Opp. at 15 (citing, *inter alia*, *Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989)). Only the record supporting the office closures and reduction in force would be germane here. Defendants have not refuted Plaintiffs' claim that the agency has proffered no reasoned explanation or factual or data-based support for this decision, so such a record promises to be easily reviewable.

Furthermore, as to remedy, Plaintiffs have not invited the Court to micromanage the day-to-day administration of OCR or individual enforcement decisions made by OCR staff, much less subject OCR to a "conservatorship." Opp. at 15. Plaintiffs seek only the restoration of OCR's ability to function as required by law and its own regulations, with sufficient reporting for the Court to ensure that the agency is operating within the boundaries of its legal mandates, *see* 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682; 34 C.F.R. §§ 100.7(c), 106.81; 28 C.F.R. § 35.171. The

requested relief neither "prescribe[s] specific tasks for [the Department] to complete," *Cobell*, 455 F.3d at 307,S nor constitutes "undue judicial interference with [the Department's] lawful discretion." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004). Rather, it requests precisely what the APA empowers the Court to do: "compel [the Department] to perform a . . . non-discretionary act . . . without directing *how* it shall act." *Id.* at 64 (internal quotation marks omitted).

 ***Final Action.*** Defendants cannot alter the final nature of the challenged action by recasting it as one step along a path to reorganizing and ultimately dismantling the Department. Opp. at 16-17. Plaintiffs have not challenged the Executive Order or the government's plan to fully dismantle the Department of Education. Instead, Plaintiffs challenge the finalized office closure and reduction-in-force decisions, which are already precipitating real-world consequences. This challenged action meets both prongs of the test articulated in *Bennett v. Spear*: it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." 520 U.S. 154, 177-78 (1997) (internal quotation marks and citations omitted); *see also Pub. Citizen Health Rsch. Grp. v. Comm'r, Food & Drug Admin.*, 740 F.2d 21, 30 (D.C. Cir. 1984) (courts should "apply the finality requirement in a 'flexible' and 'pragmatic' way") (*citing Abbott Labs. v. Gardner*, 387 U.S. 136, 149-50 (1967)).

 Defendants do not assert, and there is no indication in their public statements, that the Department views its decisions to close the offices or terminate the employees as a tentative, equivocal, or preliminary step. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) (final agency actions are not "merely tentative or interlocutory"); 5 U.S.C. § 704. Nor do Plaintiffs challenge "decisions made by low level agency actors" whose actions are now

subject to supervisory review. *Jud. Watch, Inc.*, 219 F. Supp. 2d at 40. Instead "Plaintiffs are

challenging decisions allegedly made on behalf of an agency by the head of that agency." *Id.*

That more steps are contemplated along the path to Secretary McMahon's "Final Mission" does

not mean that this challenged step is not complete. The undisputed facts demonstrate that these

actions have already devastated OCR's ability to fulfill its statutory functions, *see, e.g.*, Dkt. No

52-8 ¶ 28, 30 ("Lhamon Decl."), 43; Doe 6 Decl. ¶ 32; Doe 7 Decl. ¶¶ 19-21, 33; Doe 8 Decl. ¶¶

17-18, 22-23, and Plaintiffs are experiencing "direct and immediate" effects. *See infra* at Section

II(A)(1). *Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Cmm'n*, 324 F.3d 726,

731 (D.C. Cir. 2003) (internal quotation marks omitted); *see also Wiley,* 2025 WL 1384768, at

*9-10 (assessing allegations that, due to a reduction in force, HHS had ceased to fulfill its

statutory duties, and concluding that "[s]hutting down programs without conducting rulemaking

or otherwise engaging in a process that results in an official written statement announcing the

shutdown is no less final"). These actions are final, and APA review is appropriate.

**C. The Department's decision to abdicate its statutory responsibilities is beyond the scope of the agency's discretion and arbitrary and capricious under the APA.**

Defendants' decision to close seven offices and terminate approximately half of OCR's

workforce has, as Plaintiffs have demonstrated and Defendants have not contested with any

evidence, rendered OCR incapable of fulfilling its statutory functions. Defendants argue that they

enjoy agency discretion, but that discretion does not allow them to avoid their statutory

obligations. Further, as Defendants fail to meaningfully contest, the decision is arbitrary and

capricious because it is unsupported by any reasoned decision-making and the agency did not

consider significant reliance interests.

Defendants argue that the challenged action falls within the sphere of actions "committed

to agency discretion by law." 5 U.S.C. § 701(a)(2). In light of the "strong presumption" of

judicial review of agency action, the agency "bears a heavy burden . . . to show that Congress prohibited all judicial review of the agency's compliance with a legislative mandate." *Mach. Mining LLC v. E.E.O.C.*, 575 U.S. 480, 486 (2015) (internal quotation marks omitted); *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (reading the § 701(a)(2) exception "quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion'") (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,* 586 U.S. 9, 23 (2018)). There is no such evidence it did so here.

Plaintiffs do not challenge any individual enforcement decision or case outcome; rather, they challenge the Department's decision to so completely compromise OCR's capacity that it cannot perform its statutorily required functions. For this reason, Defendants' reliance on *Heckler v. Chaney* for the proposition that an agency has unfettered discretion not to prosecute or enforce is inapposite. Opp at 17; 470 U.S. 821, 831 (1985). In *Heckler*, the Court foreclosed a challenge to the FDA's decision not to take various enforcement actions concerning the use of specific drugs for executions. It did not greenlight the FDA abdicating an entire agency function, for example, by eliminating its capacity to review the use of any drug for any application. *See Id.* at 833 n.4 (distinguishing a case where an agency's policy "is so extreme as to amount to an abdication of its statutory responsibilities") (*citing Adams v. Richardson*, 480 F.2d 1159 (1973) (*en banc*) (allowing challenge to OCR predecessor agency's alleged abdication of its statutory duty to enforce Title VI)). And *Heckler* does not block Plaintiffs' challenge to the Department's action destroying its own ability to process civil rights complaints submitted by the public.[6]

---

[6] Defendants' hunt for statutory guidelines to structure the Court's review of OCR's enforcement decisions, Opp. at 17-18, also misses the point. First, applicable guidelines in the substantive statute and an effective abdication of statutory responsibilities are two distinct exceptions to

Similarly, Defendants' argument that Plaintiffs' APA challenge runs afoul of the government's discretion to reallocate resources, adapt to changing circumstances, and meet statutory responsibilities, *see* Opp. at 19-20, misses the mark. The government does enjoy wide discretion in determining *how* to meet its statutory responsibilities, but not *whether* to meet them. Here, as a result of the challenged action, OCR no longer has the staffing or resources necessary to meet its statutory responsibilities. Moreover, the fact that the agency made no attempt to meaningfully transfer cases from shuttered offices suggests it has no feasible plan to comply with its statutory mandates. Defendants do not contest these facts.

Defendants also misleadingly aver that neither Plaintiffs nor the Court can substitute their judgment for the agency's in how to conduct civil rights enforcement. Opp. at 19-20. However, clearly, the Court has a role to ensure that Defendants do not substitute their judgment for Congress's in electing not to enforce civil rights laws. Courts need not "turn a blind eye when government officials fail to discharge their duties." *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001). And an assurance that the Secretary will act only "to the maximum extent appropriate and permitted by law," Exec. Order No. 14,242 § 2(a), 90 Fed. Reg. at 13,679, does not win her a free pass to avoid judicial review. A "savings clause . . . cannot . . . override [an executive order's] meaning." *City and Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018).

---

*Heckler's* nonreviewability presumption. *Baltimore Gas & Elect. Co. v. FERC*, 252 F.3d 456, 460 (D.C. Cir. 2001). Further, "[i]n determining whether a matter has been committed solely to agency discretion, [courts] consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing *that action*." *Drake v. FAA*, 291 F.3d 59, 70-71 (D.C. Cir. 2002) (emphasis added). The question is not whether statutory standards generally constrain OCR's discretion in enforcement decisions, because Plaintiffs are not asking the Court to review any individual determinations; it is whether statutory standards constrain OCR's decision whether to perform its statutory functions and "effectuate" Title VI and Title IX at all. Clearly, such constraints exist here.

As a final matter, Defendants do not meaningfully engage with Plaintiffs' arguments that the agency actions challenged are arbitrary and capricious. 5 U.S.C. § 706(2)(A). As more fully explained in Plaintiffs' memorandum in support of their motion, ("Pls. Br") at 22-29, Dkt. No. 52-1, the challenged actions are not only discrete, final, and reviewable, Plaintiffs are also likely to succeed on their claims that they are arbitrary and capricious, both because the agency offered no reasoned basis for its decision, *see Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019); and because Defendants failed to consider the serious reliance interests implicated. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020).

**D. The only evidence before the Court shows Defendants' actions are not in accordance with law.**

Defendants' argument that their actions comply with the law is circular. They argue that President Trump ordered the shutdown of the Department of Education only "to the maximum extent appropriate and permitted by law." Opp. at 20. Hence, they argue, the executive order cannot be unlawful. But Plaintiffs do not challenge that executive order, instead bringing their APA challenge to the Department's actions that preceded the executive order. Defendants similarly argue that "the notion that the agency has eliminated OCR's ability to enforce civil rights violations is inconsistent with Secretary McMahon's statement that the Department 'will continue to deliver on all statutory programs that fall under the agency's purview.'" *Id* at 21. But just because she says so does not make it true. Plaintiffs have provided declarations from OCR employees and others demonstrating that OCR is not carrying out its duties. *See* Doe 7 Decl. ¶¶ 19-21, 27-28; Doe 8 Decl. ¶ 18.

Defendants then retreat further, claiming that OCR is not required to enforce Title IX and Title VI at all, fixating on the word "prompt." Opp. at 21. Because that word's definition is unclear, they argue, any length of time for processing complaints is fine. Following Defendant's

logic, these delays would be permissible even if the result was not adjudicating *any* complaints. But this makes a mockery of the statutory language, which directs the agency to "effectuate the provisions" of Title VI and Title IX. *See* 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682. The Department understood that command to require it to "make a prompt investigation" into complaints. 34 C.F.R. § 100.7(c). It is extraordinary for the Department to pretend not to understand a word that it itself used to define its own statutory obligations. Nor is it a difficult word to interpret. In interpreting a different statute which used the word "prompt," another court in this district explained that "[i]n the absence of statutory definitions, the Court 'must presume that Congress intended to give the term[s] [their] ordinary meaning'" and gave a dictionary definition for "prompt" of "'being ready and quick to act as occasion demands' or 'performed readily or immediately.'" *New York v. Biden*, 636 F. Supp. 3d 1, 26 (D.D.C. 2022) (alterations in original) (internal citations omitted).

OCR has also set benchmarks of resolving 80 percent of complaints within 180 days.[7] This Court can readily apply these benchmarks and require Defendants to issue a restoration plan that ensures OCR is capable of meeting its statutory and regulatory requirements. Indeed, Plaintiffs have provided overwhelming, uncontradicted evidence that OCR's cuts have rendered it unable to resolve the typical complaint in a prompt manner. Defendants assert that whether the cuts to OCR "are too significant to allow OCR to continue to function" is "a judgment call for the Department, and not Plaintiffs or this Court, to make." Opp. at 21. But they do not support that claim with citation and, as Plaintiffs pointed out in their opening brief, courts can review

---

[7] U.S. Dep't of Educ., *Office for Civil Rights Fiscal Year 2025 Budget Request* at 26 (2025), *available at* https://www.ed.gov/media/document/ocr-fiscal-year-2025-budget-request-39373.pdf; OCR Alumni Report, *Safeguarding Access and Protection: A Blueprint for Restoring the Office for Civil Rights*, Ex. 6, at 5.

agencies' determinations about whether changes to their staffing and other decisions prevent them from complying with statutory mandates. *See Nat'l Treasury Emps. Union v. Vought* ("*NTEU*"), No. CV 25-0381 (ABJ), 2025 WL 942772, at *40 (D.D.C. Mar. 28, 2025); *Cayuga Nation v. United States,* 594 F. Supp. 3d 64, 74 (D.D.C. 2022). Moreover, even setting the statute aside, Defendants have an obligation to comply with their own regulations. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *see also* Pls. Br. at 30-32. Finally, Defendants never made a "judgment call"—that is, they did not engage in reasoned decision-making—about whether OCR could comply with its obligations despite the cuts. Opp at 21.

### E. Defendants' delays are unreasonable.

Defendants' unreasonable delay argument merely restates their central "prosecutorial discretion" theory that they are under no obligation to ever investigate any complaints made to OCR. Opp. at 22-23. Defendants do not present any evidence disputing that, to the extent such a duty does exist, their cuts to OCR have caused an unreasonable delay. They do assert in a section header that "[a] delay of mere months is not unlawfully withholding or unreasonably delaying agency action." Opp. at 22. But they do not defend that proposition in the text with caselaw or argument. Nor do they provide any facts or argument supporting the idea that the delays Plaintiffs will experience are for "mere months." To the contrary, Plaintiffs' unrebutted evidence is that the gutting of OCR prevents any effective response to their complaints. *See* Lhamon Decl. ¶¶ 28, 30, 43; Doe 2 Decl. ¶ 25; Doe 3 Decl. ¶ 23; Doe 5 Decl. ¶ 23; Doe 6 Decl. ¶¶ 32-33; Doe 8 Decl. ¶¶ 22-23.

### F. Plaintiffs have demonstrated a clear departure from Defendants' statutory mandate to investigate and enforce civil rights violations, warranting ultra vires review.

Defendants' argument that their actions are not *ultra vires* largely repeats their APA arguments and fails for the same reason. Defendants assert they have "exclusive authority and

absolute discretion to decide whether to prosecute a case" and therefore their decisions about whether to investigate complaints cannot be ultra vires. Opp. at 22-23 (*citing United States v. Nixon,* 418 U.S. 683, 693 (1974); *Heckler*, 470 U.S. at 832). While *Heckler* holds that an agency's decision not to pursue enforcement actions is generally unreviewable, 470 U.S. at 837-38, here, Plaintiffs challenge Defendants' wholesale departure from their statutory mandate to enforce federal civil rights laws. *See* 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682. A more analogous situation would be if the FDA ceased investigating and approving all drug use, not one drug's use in one highly specific situation. Such a challenge would fall squarely within the bounds of *ultra vires* review. *See Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 971-72 (D.C. Cir. 2022) (contravening clear and specific statutory mandates warrants *ultra vires* review). Unrefuted testimony from recent and current OCR employees shows that office closures and mass terminations have critically compromised OCR's ability to comply with its mandate. *See* Lhamon Decl. ¶¶ 28, 30, 43; Doe 1 Decl. ¶ 26; Doe 2 Decl. ¶ 25; Doe 3 Decl. ¶ 23; Doe 5 Decl. ¶ 23; Doe 6 Decl. ¶¶ 32-33; Doe 8 Decl. ¶¶ 22-23. No more is needed.

### G. Defendants fail to rebut Plaintiffs' evidence demonstrating irreparable harm.

Defendants do not contest that the harms Plaintiffs have alleged—unremedied discrimination and harassment, risk of continued discrimination, and denial of equal educational opportunity—are irreparable. *See* Pls. Br. at 36-38. Instead, Defendants aver that the injunction Plaintiffs seek would not resolve those harms unless Plaintiffs' underlying complaints were resolved in their favor. Opp. at 24. But Defendants' conclusory statement that Plaintiffs' harm "does not satisfy the D.C. Circuit's requirement that the harm be both certain and great," Opp. at 23, ignores unrefuted evidence that Plaintiffs indeed experienced illegal discrimination and harassment and that harm is certain and great. Absent a preliminary injunction ordering OCR to promptly investigate Plaintiffs' meritorious complaints, they will continue to suffer irreparable

harm. *See, e.g.*, Combs Decl. ¶¶ 4, 7, 19-20, 23; A.M. Decl. ¶¶ 1, 3, 12, 15-17, 21, 45-46. For

instance, K.D.'s declaration asserts that her case was near resolution and that OCR had *already*

proposed and started negotiating a voluntary resolution with the school district that would have

remedied the underlying violation. Pls. Br. at 37-38 (citing K.D. Decl. ¶¶ 26-28, 35-39).

Defendants' actions halted this resolution. Accordingly, K.D. has shown that absent a

preliminary injunction she and M.W. will suffer irreparable harm that is "both certain and great"

and "of such imminence that there is a 'clear and present' need for equitable relief." *Chaplaincy*

*of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  Defendants have

presented no countervailing facts.

Further, Defendants do not contest that the psychological toll of educational instability

causes irreparable harm to students. *Petties v. D.C.*, 881 F. Supp. 63, 70 (D.D.C. 1995). Rather,

Defendants make conclusory statements that the "majority of harms alleged by Plaintiffs are

harms brought by the alleged discrimination they faced in school" and are "only tenuously

connected to the relief sought." Opp. at 24. But the psychological toll of educational instability

that Plaintiffs face because their OCR cases are in limbo would certainly be addressed by the

injunction Plaintiffs seek. Defendants fail to rebut Plaintiffs' declarations, including K.D.'s and

A.M.'s, which show that the uncertainty over whether their claims will ever be processed has

exacted a psychological, physical, and emotional toll that constitutes irreparable harm. *See* Pls.

Br. at 37-38 (*citing* K.D. Decl. ¶¶ 24, 52; A.M. Decl. ¶ 52). And Defendants do not contest that

Plaintiffs have no other accessible means to address their discrimination claims. *See* Combs

Decl. ¶ 26; A.C. Decl. ¶ 47; and A.M. Decl. ¶ 54.

Defendants also argue that COPAA's injury does not meet the standard for irreparable

harm because Plaintiffs fail to provide any evidence placing diverted resources in the context of

COPAA's overall finances. Opp. at 24-25. But that requirement applies only when the alleged injury is an economic injury. *See Nat'l Council of Agric. Emps. v. U.S. Dep't of Lab.*, No. 22-3569, 2023 WL 2043149, at *6 (D.D.C. Feb. 16, 2023) (internal citations omitted) ("[T]he 'general rule' in this Circuit is that 'economic harm does not constitute irreparable injury.' . . . [To] depart from this general rule[,] . . . economic loss . . . must be 'great, certain and imminent.'").

COPAA's injuries go beyond simply economic injuries. OCR's decimation of its workforce and closure of regional offices have significantly reduced its processing capacity, creating "obstacles" that "unquestionably make it more difficult" for COPAA to "accomplish [its] primary mission." Pls. Br. at 41 (citing *League of Women Voters,* 838 F.3d 1, 9). Defendants contest neither that "[t]he Department's actions have made achieving COPAA's mission to ensure equal access to education more difficult, time-consuming, and resource-intensive," Marshall Decl. ¶ 15, nor that OCR's actions have "perceptibly impaired [COPAA's] programs," Pls. Br. at 41 (*citing League of Women Voters,* 838 F.3d at 8). Courts have found that diversion of "scarce resources away from previously planned projects to address" a defendant's actions constitute irreparable harm. *Open Communities Alliance v. Carson,* 286 F. Supp. 3d 148, 178 (D.D.C. 2017). That is what happened to COPAA. Marshall Decl. ¶ 20 ("As a result of the freeze in investigations and now decimation of OCR's workforce, COPAA's mission . . . has been significantly frustrated."); *id.* ¶¶ 11-12, 16, 21 (describing how COPAA must rewrite training manuals and materials, update courses, and retrain members as a result of OCR's actions).

Moreover, Defendants mischaracterize COPAA's injuries associated with assisting families as "litigation expenses" that do not constitute irreparable harm. Opp. at 25. Defendants

offer nothing to support their conclusory assertion and, as explained above, assisting families is vital for COPAA to accomplish its primary mission.

**H.  The balance of equities and the public interest weigh in favor of an injunction.**

Defendants do not seriously contend that the balance of equities and the public interest weigh in their favor. Defendants assert that an injunction would disrupt the Department of Education's efforts to comply with the President's executive order that the agency "take all steps necessary to facilitate the closure of the Department of Education. . . . ." However, the final agency actions challenged here *preceded* the executive order, so the order is not relevant.

Regardless, the public has an interest to ensure that neither the President nor the Secretary attempt to sidestep their statutory and constitutional obligations as they have done here. Issuing the injunction will place Defendants back in line with the law without unduly burdening them and such injunctions are always in the public interest. *See M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 123 (D.D.C. 2018) ("Defendants 'cannot suffer harm from an injunction that merely ends an unlawful practice.'") (citation omitted).

**I.  The requested preliminary injunction appropriately addresses the harm at issue.**

Defendants contest the scope of Plaintiffs' requested relief, arguing that any preliminary injunction should be limited to the harm specific to any individual plaintiff. Opp. at 26-27. But that argument runs counter to the rule in this and other circuits that the appropriate remedy in APA litigation is to set aside unlawful agency action in its entirety. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see also Nat'l Mining Ass'n v. U.S. Army Corps of Engineers,* 145 F.3d 1399, 1409 (D.C. Cir. 1998) (rejecting challenge to a nationwide injunction given *Harmon* and other authority). And contrary to Defendants' arguments relying

on *Gill v. Whitford*, such relief does not violate Article III principles of standing. *Compare* Opp.
at 26 *with District of Columbia v. U.S. Department of Agriculture,* 444 F.Supp.3d 1, 54 (D.D.C.
2020) (noting that the agency's reliance on *Gill* to argue that "plaintiffs do not have standing to
seek a remedy that benefits non-plaintiffs" is "not just wrong but almost comically so" because
"[f]ashioning equitable relief is not and has never been an exercise in . . . formulaically ordering
relief scoped precisely to the injury the plaintiff has asserted and proven").

      Defendants' reliance on a single concurring opinion in *Department of Homeland Security
v. New York* to cast doubt on the equitability of nationwide injunctions is equally unpersuasive.
"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as
much on the equities of a given case as the substance of the legal issues it presents." *Trump v.
Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) (citations omitted). And federal
district courts have "wide discretion to fashion appropriate injunctive relief." *Richardson v.
Trump*, 496 F. Supp. 3d 165, 189 (D.D.C. 2020) (quoting *Richmond Tenants Org. v. Kemp*, 956
F.2d 1300, 1308 (4th Cir. 1992)); *see also Nat'l Mining Ass'n,* 145 F.3d at 1408 ("district courts
enjoy broad discretion in awarding injunctive relief"). Moreover, the relief Plaintiffs seek here is
already tailored; the preliminary injunction seeks to restore OCR's investigation and
enforcement capacity to enable OCR to process complaints promptly as required by law.

### J.  The Court should dispense with the requirement for a bond and the injunction should not be stayed.

      Defendants suggest that if the Court issues a preliminary injunction, it should require
Plaintiffs to post security under Federal Rule of Civil Procedure 65(c). Opp. at 27. "Courts in this
Circuit have found [that] the Rule 'vests broad discretion in the district court to determine the
appropriate amount of an injunction bond,' including the discretion to require no bond at all."
*Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (cleaned up). In this case,

Defendants have not explained the "costs and damages" they would sustain in carrying out their statutory mandates, for which Congress has appropriated funds. Moreover, Plaintiffs in this case—students, parents, and a not-for-profit organization—have limited financial resources. *See* K.D. Decl. ¶ 24; Combs Decl. ¶ 26; Marshall Decl. ¶ 2, 13. "Courts regularly take both of these factors into account when exercising their discretion to require a bond." *Id.*; *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, Civil Action No. 25-0239 (LLA), 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (quoting *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases)) ("A bond 'is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action.'"). Accordingly, the Court should waive bond.

Similarly, Defendants' bare, unreasoned request for a stay of any injunction pending any appeal should be denied. Plaintiffs have shown that they are likely to succeed on the merits and would be irreparably harmed without the Court's intervention, and that the balance of equities and public interest heavily favor keeping any injunctive relief in place.

### III.    Conclusion

For all these reasons and those in Plaintiffs' memorandum in support of their motion, the Court should enter a preliminary injunction, without a bond and without a stay.

Dated: May 16, 2025                                   Respectfully submitted,

                                                       /s/ David G. Hinojosa

Freya Pitts (admitted *pro hac vice*)          David G. Hinojosa (D.C. Bar No. 1722329)
Hong Le (admitted *pro hac vice*)              Johnathan Smith (D.C. Bar No. 1029373)
Pallavi Bugga (admitted *pro hac vice*)        Nina Monfredo (admitted *pro hac vice*)
National Center for Youth Law                  National Center for Youth Law
1212 Broadway, Suite 600                        818 Connecticut Ave NW, Suite 425
Oakland, CA 94610                               Washington, D.C. 20006
(510) 835-8098                                  (202) 868-4782
fpitts@youthlaw.org                             dhinojosa@youthlaw.org
hle@youthlaw.org                                jsmith@youthlaw.org
pbugga@youthlaw.org                             nmonfredo@youthlaw.org

Selene Almazan-Altobelli
(admitted *pro hac vice*)
Council of Parent Attorneys and
Advocates, Inc.
PO Box 6767
Towson, MD 21285
(844) 426-7224, ext. 702
Selene@copaa.org

Michael Tafelski (admitted *pro hac vice*)
Claire Sherburne (admitted *pro hac vice*)
Southern Poverty Law Center
150 E. Ponce de Leon Ave., Ste. 340
Decatur, GA 30030
(334) 430-9104
michael.tafelski@splcenter.org
claire.sherburne@splcenter.org

Sam Boyd (admitted *pro hac vice*)
Southern Poverty Law Center
2 Biscayne Blvd., Ste. 3750
Miami, FL 33131
(786) 560-0737
sam.boyd@splcenter.org

Counsel for Plaintiffs

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on this 16th day of May, 2025, this document was filed with the Clerk of the Court through the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

Dated: May 16, 2025

Respectfully submitted,

<u>/s/ David Hinojosa</u>
David Hinojosa (D.C. Bar No. 1722329)
National Center for Youth Law
818 Connecticut Ave NW, Suite 425
Washington, D.C. 20006
(202) 868-4784
dhinojosa@youthlaw.org