## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| A.W., | ) | |
| | ) | |
| K.D., *on behalf of herself and her minor child*, M.W., | ) ) ) | |
| | ) | |
| Melissa Combs., *on behalf of herself and her minor child*, D.P., | ) ) ) | Case No. 1:25-cv-0744-PLF |
| A.M., | ) ) | |
| Elizabeth Stewart-Williams, | ) ) | **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF[1]** |
| A.S., | ) ) | |
| Amy Cupp, *on behalf of herself and her minor child*, G.C., | ) ) ) | |
| Diane Wilson,      address omitted per LCvR 5.1, | ) ) ) | |
| Austin Budd,      address omitted per LCvR 5.1, | ) ) ) | |
| Lisa Youngblood, *on behalf of herself and her minor child,* M.Y.,      address omitted per LCvR 5.1, | ) ) ) ) | |
| and | ) ) | |
| COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, INC., | ) ) ) | |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) | |
| UNITED STATES DEPARTMENT OF EDUCATION, | ) ) ) | |

---

[1] Plaintiffs file this Second Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(2).

LINDA MCMAHON, Secretary of Education, )
)
)
and )
)
)
KIMBERLY RICHEY, Assistant Secretary for Civil Rights, )
)

*Defendants*.

———————————————

## I.    INTRODUCTION

1.    Public education is a foundational building block of our democracy.  Through the educational process, students learn not only about the world around them, but also how to engage and participate as productive members of society.  All students deserve access to safe schools where they can learn free from discrimination.  Unfortunately, for far too many students in the United States, educational institutions are not places of safety, refuge, and support, but rather places of discrimination, harassment, and violence.  For these students and their families, the promise of opportunity and American democracy is too often betrayed by the very institutions entrusted to protect them.  This is especially true for students of color, students with disabilities, female students, and LGBTQ+ students.

2.    Recognizing the central importance of a quality, non-discriminatory education to the well-being and growth of our country's young people, in 1979, Congress created the United States Department of Education (the "Department").  Congress found that education is essential to the development of individuals and the country as a whole—and that no student should be denied access to quality educational opportunities due to their race, creed, color, national origin, or sex. The Department was charged with expanding educational access for all students, supporting state and local education efforts, encouraging community engagement in education programs, and conducting research to improve education quality.

3.    Within the Department, the Office for Civil Rights ("OCR") is charged with "ensur[ing] equal access to education and [] promot[ing] educational excellence through vigorous enforcement of civil rights in our nation's schools."[2]  For decades, as part of this crucial mandate, and in

---

[2] U.S. Dep't of Educ., *Office for Civil Rights (OCR)* (Jan. 19, 2025), https://www.ed.gov/about/ed-offices/ocr; *see also* Kristen A. Graham, Susan Snyder & Maddie Hanna, *What the Department of*

accordance with federal law, including Title VI of the Civil Rights Act of 1964 ("Title VI"), Title

IX of the Education Amendments of 1972, as amended ("Title IX"), Section 504 of the

Rehabilitation Act of 1973, as amended ("Section 504"), and Title II of the Americans with

Disabilities Act ("Title II") and their implementing regulations,[3] OCR has received, investigated,

and resolved complaints submitted by members of the public alleging discrimination on the basis

of race, sex, disability, and other protected characteristics.  This service is available without

financial cost to students and families.  Students and families' ability to have their civil rights

complaints thoroughly reviewed in a prompt, impartial, and non-discriminatory manner is integral

to the mission of OCR.  In 2024 alone, OCR received 22,687 complaints from the public.[4]

4.    The current presidential administration, however, is committed to eliminating the

Department.  President Trump campaigned on abolishing the Department and, over the past eleven

months, his administration has taken steps to effectuate that promise, including multiple mass

firings of Department staff and the termination of dozens of education-related contracts worth

nearly one billion dollars.[5]  These actions harm students and their families, who rely on the

---

*Education Cuts Mean for Local Schools*, Philadelphia Inquirer (Mar. 12, 2025), https://www.inquirer.com/education/us-education-department-cuts-trump-administration-20250312.html.

[3] 34 C.F.R. Part 100, 34 C.F.R. Part 106, 34 C.F.R. Part 104, and 28 C.F.R. Part 35, respectively.

[4] U.S. Dep't of Educ., Office for Civil Rights, *2024 Fiscal Year Annual Report: Report to the President and Secretary of Education* (2024) at 8, https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf.

[5] *See* Collin Binkley, *Education Department workers targeted in layoffs are returning to tackle civil rights backlog*, Associated Press (Dec. 8, 2025), https://apnews.com/article/education-department-closure-layoffs-civil-rights-disability-001478ed94bc6c196f6f9f53a2462083;    Dana Goldstein, *Could Trump Shut Down the Department of Education?*, N.Y. Times (Nov. 13, 2024), https://www.nytimes.com/2024/11/13/us/trump-close-department-of-education.html; Michael C. Bender & Dana Goldstein, *Education Department Fires 1,300 Workers, Gutting Its Staff*, N.Y. Times    (Mar.    11,    2025),    https://www.nytimes.com/2025/03/11/us/politics/trump-education-department-firings.html; Cory Turner, *Trump Is Weighing Big Cuts to the U.S. Department of Education*, NPR (Feb. 4, 2025), https://www.npr.org/2025/02/03/nx-s1-5282233/trump-to-make-

Department to ensure their access to educational opportunities, as required by the federal civil rights laws Congress charges OCR to enforce.

5.      The Office for Civil Rights and its complaint and investigation processing functions have fallen under attack.  Since the start of the new administration, Department leadership has engaged in a series of actions that have obstructed the processing of complaints from the public. Shortly after the inauguration, the Department abruptly froze all OCR investigations, abdicating its responsibility to process and investigate civil rights complaints filed by students and families nationwide seeking equal access to education.  On February 20, 2025, then-Acting Assistant Secretary for Civil Rights Craig Trainor released the freeze on complaints alleging only disability-based discrimination, while continuing to bar OCR staff from advancing the cases of students and families seeking accountability for race- and sex-based claims under Title VI and Title IX, including complaints implicating race- or sex-based discrimination alongside disability-based discrimination.

6.      Even as OCR generally stopped investigating complaints from the public based on race or sex discrimination, it cherry-picked and, on its own initiative, began targeted investigations into purported discrimination against white and cisgender students, including through the establishment of an "End DEI" (short for "End Diversity, Equity, and Inclusion") portal to solicit information for use in potential investigations into programs designed to ensure equal access to education for transgender students and students of color.[6]

---

big-cuts-to-education-department; Michael C. Bender, *Asked if U.S. Needs Education Department, Its Head Says 'No'*, N.Y. Times (Mar. 7, 2025), https://www.nytimes.com/2025/03/07/us/politics/education-department-mcmahon-trump.html.

[6] U.S. Dep't of Educ., *U.S. Department of Education Launches "End DEI" Portal* (Feb. 27, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-launches-end-dei-portal.

7.    While Secretary McMahon did, on March 6, 2025, declare an end to the "pause" on OCR complaint processing that had nullified the OCR complaint process for students and families across the country, within days, she stymied the prompt processing of their complaints in a new way: by decimating OCR's workforce, including by eliminating seven of twelve regional offices and enacting a reduction-in-force ("RIF") of 299 OCR employees that left skeleton staffing at the remaining offices, leaving students and families with little chance of their complaints being processed and investigated and sabotaging OCR's ability to fulfill its statutory and regulatory mandate to enforce civil rights laws in schools.[7]  A federal court preliminarily enjoined this RIF in June 2025, but that injunction was later stayed.[8]

8.    During the government shutdown, in October 2025, the Department reinitiated that RIF, telling the affected employees that they would be terminated effective November 3, 2025.  Also during the shutdown, and in response to a memo from the Office of Management and Budget, directed by the Trump Administration, that called on agencies to issue RIFs to programs that were not a priority of the president, among other conditions,[9] the Department initiated an additional RIF that would have eliminated 137 more OCR employees.  On October 28, 2025, in a case brought

---

[7] *See* Jodi S. Cohen & Jennifer Smith Richards, *Massive Layoffs at the Department of Education Erode Its Civil Rights Division*, ProPublica (Mar. 12, 2025), https://www.propublica.org/article/e ducation-department-civil-rights-division-eroded-by-massive-layoffs;  Cory Turner, *Education Department recalls fired attorneys amid civil rights complaint backlog*, NPR (Dec. 10, 2025), https://www.npr.org/2025/12/10/nx-s1-5637464/education-department-layoffs-civil-rights
[8] Order, *Victim Rights Law Center v. U.S. Department of Education*, No. 25-1787 (1st Cir. Sept. 29, 2025).  Under two other consolidated lawsuits, a broader preliminary injunction also enjoined the OCR RIF but the Supreme Court granted Defendants' application to stay the preliminary injunction. *McMahon v. New York*, 145 S. Ct. 2643, 600 U.S. __ (2025).
[9] The other conditions included discretionary funding lapsing on October 1, 2025 and the unavailability of another source of funding, such as H.R. 1 (Public Law 119-21).

by government employee unions, the U.S. District Court for the Northern District of California

issued a preliminary injunction that blocked both RIFs.[10]

9.      In November, Congress passed a law that invalidated both RIFs.  *See* Continuing

Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and

Extensions Act, 2026, Pub. L. No. 119-37 (2025) (the "Continuing Appropriations Act" or

"CAA").  The CAA cancelled any RIF "proposed, noticed, initiated, executed, implemented, or

otherwise taken" from October 1 to November 12, 2025.  *Id.* § 120(e).  Accordingly, the CAA

provides that both the March RIF and the October 10 RIF "have no force and effect."  *Id.*

10.     Although the Department has rescinded the October 10 RIF, it contends that Section

120(e) of the Continuing Appropriations Act does not apply to the March RIF.  On December 5,

2025, the Department ordered the employees covered by the March RIF to return to work while

litigation continues.  At the same time, the Department noted to the OCR employees that it was

not able to meet its enforcement obligations without those employees, stating in the December 5

notice:

> In order for OCR to pursue its mission with all available resources, *all* those
> individuals currently being compensated by the Department need to meet their
> employee performance expectations and contribute to the enforcement of existing
> civil rights complaints.  Utilizing all OCR employees, including those currently on
> administrative leave, will bolster and refocus efforts on enforcement activities in a
> way that serves and benefits parents, students, and families.

11.     The Department has made clear that it intends to proceed with the March RIF as soon

as it can do so without violating a court order.  In the *American Federation of Government

Employees* litigation concerning the RIFs executed during the funding freeze, the Department

---

[10] Order Granting Pls.' Mot. for Prelim. Inj. And Enjoining Shutdown-Related Reductions in
Force, *Am. Fed. of Gov't Emps. v. U.S. Office of Management and Budget*, No. 3:25-cv-08302-SI
(N.D. Cal. Oct. 28, 2025), Dkt. No. 94.

continued to defend its March RIF, even after the passage of the CAA. Following an evidentiary hearing and further briefing by the parties, the district court issued a second preliminary injunction enjoining the March RIF, finding the RIF violative of the CAA.[11] That preliminary injunction is currently being appealed and is partially stayed pending appeal.[12] The preliminary injunction is set to expire on January 30, 2026, the last day of the CAA, unless the CAA is extended.

12.    Repeated changes in Department staffing and policy and the Department's other cuts have compounded the effects of the March RIF and grievously harmed the Department's ability to carry out its statutorily-mandated civil rights enforcement functions. If the Department proceeds with the March RIF—which it has not rescinded—the mass termination will make the situation even worse and make it impossible for OCR to comply with its statutory and regulatory obligations, denying many families, including Plaintiffs, rightful consideration of their discrimination complaints.[13]

13.    This assault on OCR has taken place against a backdrop of explicit hostility towards students of color and LGBTQ+ students on the part of the Trump administration. Through a series of press releases, policy statements, executive orders, and high-profile OCR investigations into select issues, the administration has made clear its contempt for the civil rights of historically marginalized students. For example, in a February 14, 2025 Dear Colleague Letter regarding the Department's interpretation of civil rights laws, then-Acting Assistant Secretary Trainor alleged

---

[11] Order Granting Pls.' Mot. for Prelim. Inj. and Enjoining Reductions in Force, *Am. Fed. of Gov't Emps.*, No. 3:25-cv-08302-SI (N.D. Cal. Dec. 17, 2025), Dkt. No. 139.

[12] *Am. Fed. of Gov't Emps. v. U.S. Office of Management and Budget*, No. 25-7998 at 2 (9th Cir. Dec. 23, 2025), Dkt. No. 9.1 (granting the defendants' application for a stay as to subsection 3(d) of the preliminary injunction, denying it as to the rest of the preliminary injunction, and setting a briefing schedule for appeal).

[13] *See* Clay Decl., *Am. Fed. of Gov't Emps.*, No. 3:25-cv-08302-SI (N.D. Cal. Nov. 21, 2025), Dkt. No. 117-2.

that, in recent years, U.S. educational institutions have discriminated against white students on the basis of race, and made clear the administration's intent to attack DEI initiatives and other disfavored efforts to achieve "diversity, racial balancing, social justice, or equity."[14]

14.    The Department's actions are causing significant harm.  Without even minimally adequate staffing, OCR cannot fulfill its mandate and move complaint investigation and processing forward.  OCR has abdicated its responsibility to enforce civil rights protections, leaving students who should be able to trust and rely on their government to protect and defend their rights to instead endure discriminatory and unsafe learning environments without recourse.

15.    Students with disabilities feel with force the Department's failure to protect students across the country.    Historically, the majority of complaints OCR receives have raised allegations regarding disability; OCR has played an especially important role in ensuring that students with disabilities are able to enforce their right to a non-discriminatory public education.[15]

16.    In addition, the attack on the Department and OCR is not felt equally across students and their communities.  It disproportionately harms students of color, women and girls, and LGBTQ+ students.

17.    This lawsuit seeks to hold the Department accountable for ensuring that schools are places where all students can learn and thrive.  Plaintiffs A.W.;[16] K.D.,[17] on behalf of herself and

---

[14] U.S. Dep't of Educ., *Dear Colleague Letter: Title VI of the Civil Rights Act in Light of Students for Fair Admissions v. Harvard* (Feb. 14, 2025), https://www.ed.gov/media/document/dear-colleague-letter-sffa-v-harvard-109506.pdf.

[15]  U.S. Dep't of Educ., Office for Civil Rights, *2024 Fiscal Year Annual Report: Report to the President and Secretary of Education* (2024) at 8, https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf.

[16] Plaintiffs have sought permission to use initials for Plaintiff A.W.

[17] Plaintiffs have sought permission to use initials for Plaintiff K.D.

her minor child, M.W.; Melissa Combs, on behalf of herself and her minor child, D.P.;[18] A.M.;[19] Elizabeth Stewart-Williams; A.S.;[20] Amy Cupp, on behalf of herself and her minor child, G.C.; Diane Wilson; Austin Budd; Lisa Youngblood, on behalf of herself and her minor child, M.Y.; and the Council of Parent Attorneys and Advocates, Inc., on behalf of itself and its members, bring this action against Defendants the U.S. Department of Education, Secretary of Education Linda McMahon, and Assistant Secretary for Civil Rights Kimberly Richey.  Plaintiffs challenge the evisceration of students' and families' access to OCR's statutorily and regulatorily mandated complaint investigation process through the gutting of OCR's workforce and closure of regional offices, as well as the particular impact on people of color and LGBTQ+ individuals.  The Department's actions run afoul of the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*, exceed Defendants' lawful authority, and violate the Equal Protection guarantee under the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  Plaintiffs therefore seek declaratory and injunctive relief holding Defendants' actions unlawful and ordering Defendants to restore the investigation and processing capacity of OCR and to process complaints from the public promptly and equitably in accordance with OCR's statutory and regulatory obligations.

## II.    JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law, including the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*, and the United States Constitution.  Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 702, 704.  Plaintiffs' claims for

---

[18] Plaintiffs have sought permission to use pseudonymous initials for Plaintiff D.P.
[19] Plaintiffs have sought permission to use initials for Plaintiff A.M.
[20] Plaintiffs have sought permission to use initials for Plaintiff A.S.

declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201 and 2202, 5 U.S.C. §§ 705 and 706, and Federal Rules of Civil Procedure 57 and 65.

19.    Venue is proper in this District pursuant to 28 U.S.C. 1391(e) because this action seeks relief against federal agencies and officials acting in their official capacities, at least one of the Defendants is headquartered in Washington, D.C., and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## III.    PARTIES

20.    Plaintiff A.W. is the parent of an Alabama student who experienced sexual assault and harassment by a classmate.  When the school failed to address the situation, A.W. withdrew her child from school for their safety.  In October 2023, A.W. filed a complaint with OCR on behalf of her child alleging discrimination on the basis of sex and disability, seeking to hold the school accountable and to ensure that other students do not suffer similar harm.  In June 2024, OCR opened an investigation under Title IX, Section 504, and Title II.  As a result of Defendants' obstruction of OCR's complaint investigation and processing functions, OCR stopped investigating and processing A.W.'s complaint.  A.W. has received no indication that the investigation has resumed.

21.    Plaintiff M.W. is a sixteen-year-old Black student.  Pursuant to Fed. R. Civ. P. 17(c)(2), M.W. appears through her Next Friend and parent, Plaintiff K.D.  In April 2023, as a middle school student in a California public school, M.W. experienced discrimination by a school administrator and harassment by staff and other students based on her race.  M.W. and K.D. reported the harassment to school officials, who failed to adequately respond.  On May 15, 2023, K.D. filed a complaint with OCR on behalf of her child, alleging discrimination on the basis of race.  On July 31, 2023, OCR opened an investigation into the school's disproportionate discipline and response

9

to the harassment under Title VI. As a high school student in the same school district, M.W. now continues to face harassment based on her race. But, as a result of Defendants' obstruction of OCR's complaint investigation and processing functions, including the closure of the San Francisco regional office handling K.D.'s complaint, OCR stopped its investigation. K.D. and M.W. have received no indication that the investigation has resumed.

22.    Plaintiff D.P. is an LGBTQ+ high school student in Connecticut. Pursuant to Fed. R. Civ. P. 17(c)(2), D.P. appears through their Next Friend and parent, Plaintiff Melissa Combs. When they were in middle school, D.P. experienced discrimination and harassment from both school staff and other students targeting their gender/sexual identity. D.P.'s experience is part of a pattern of discrimination and harassment targeting LGBTQ+ students in the school district where they live. On June 10, 2022, after the school district failed to address this discrimination and harassment, Ms. Combs filed a complaint with OCR on behalf of D.P. and other LGTBQ+ students who had experienced discrimination and harassment on the basis of their gender/sexual identity in violation of Title IX. On August 10, 2022, Ms. Combs received a letter stating that OCR was opening an investigation into her complaint. As a result of Defendants' obstruction of OCR's complaint investigation and processing functions, including the closure of the Boston regional office handling Ms. Combs' complaint, OCR stopped its investigation. Ms. Combs and D.P. have received no indication that the investigation has resumed.

23.    Plaintiff A.M. is the parent of a Michigan student who experienced sexual assault and harassment by a classmate while in middle school. When the school failed to address the situation, A.M. withdrew her daughter from school for her daughter's physical safety and mental health. In January 2023, A.M. filed a complaint with OCR on behalf of her child alleging discrimination on the basis of sex as a result of the district's failure to adequately respond to her formal complaint,

as well as the district's failure to appropriately train its personnel on Title IX investigations. OCR opened an investigation in response to A.M.'s complaint in May 2023. As a result of Defendants' obstruction of OCR's complaint and processing functions, including the closure of the Cleveland regional office handling A.M.'s complaint, OCR stopped its investigation. Although A.M.'s case has been transferred to the Denver regional office, she has received no indication that the investigation has resumed.

24.    Plaintiff A.S. is an eighteen-year-old college student who served as the captain on her Texas high school track team. A.S. is Black. She experienced sexual harassment and assault by another student on her team that the school failed to address. Plaintiff Elizabeth Stewart-Williams is A.S.'s mother. She filed an OCR complaint on her daughter's behalf on February 20, 2024, alleging discrimination on the basis of sex and race in violation of Title IX and Title VI. On July 24, 2024, OCR conducted a mediation, which failed, and on July 29, 2024, OCR opened the complaint under a new case number. As a result of Defendants' obstruction of OCR's complaint investigation and processing functions, including the closure of the Dallas regional office handling Ms. Stewart-Williams' complaint, OCR stopped its investigation. Ms. Stewart-Williams and A.S. have received no indication that the investigation has resumed.

25.    Plaintiff G.C. is a thirteen-year-old seventh-grade student diagnosed with multiple disabilities who receives special education services, including academic, social and emotional, and behavioral supports, pursuant to an Individualized Education Program in her Indiana public school. Pursuant to Fed. R. Civ. P. 17(c)(2), G.C. appears through her Next Friend and parent, Plaintiff Amy Cupp. During the 2024-2025 school year, school staff subjected G.C. to multiple incidents of restraint and seclusion, including one incident that resulted in bruising from the restraint used. On December 6, 2024, Ms. Cupp contacted the Chicago OCR office for assistance, and staff

encouraged her to file a complaint via the online portal. Ms. Cupp filed a complaint that day. On January 14, 2025, OCR indicated that it would open an investigation and informed Ms. Cupp that she would receive an official notification letter soon. Ms. Cupp did not hear from OCR again until March 11, 2025, before the office was shuttered, and the investigator again told her OCR would soon be sending her a letter. She did not receive the letter and due to the urgency of the matter and the lack of responsiveness from OCR, Ms. Cupp reached out to her U.S. Senator in April, whose office then contacted OCR. Even with contacting her Senator to intervene, over one year later, G.C. and Ms. Cupp have not had their discrimination complaint resolved and do not have any current contact with OCR, as a result of Defendants' obstruction of OCR's complaint investigation and processing functions, including the closure of the Chicago regional office.

26.    Plaintiff Austin Budd is an eighteen-year-old student from Sandwich, Massachusetts. He has been diagnosed with learning disabilities. When Austin was in the eighth grade at Sandwich Public Schools, he experienced severe harassment from a teacher because of his disabilities. Plaintiff Diane Wilson is Austin's mother. On September 12, 2022, she filed a complaint with OCR. On March 27, 2023, Ms. Wilson received an official letter stating that OCR was opening an investigation. As a result of Defendants' obstruction of OCR's complaint investigation and processing functions, including the closure of the Boston regional office handling Ms. Wilson' complaint, OCR stopped its investigation. Ms. Wilson and Austin have received no indication that the investigation has resumed.

27.    Plaintiff M.Y. is a sixteen-year-old eleventh grade student from Frisco, Texas. Pursuant to Fed. R. Civ. P. 17(c)(2), M.Y. appears through her Next Friend and parent, Plaintiff Lisa Youngblood. M.Y. is Black. When M.Y. was in the eighth grade in Lewisville I.S.D. schools, she was suspended and assigned to a disciplinary alternative program for seventy-three days for

reporting a potential school threat.  Other students validated the threat but administrators failed to disclose that evidence until much later.  The school district's third-party review of the discipline found that it was disproportionately severe.  Plaintiff Lisa Youngblood is M.Y.'s mother.  On July 16, 2023, Ms. Youngblood filed a complaint on behalf of her daughter alleging racial discrimination in discipline with OCR.  In 2024, OCR informed Ms. Youngblood that it would refer the complaint for Rapid Resolution Process.  However, since 2024, OCR has failed to follow up, and Ms. Youngblood has been unable to contact anyone at OCR since the Dallas office closure.  Plaintiff M.Y. experienced severe trauma due to the suspension and surrounding events and suffered academically.  As a result of Defendants' obstruction of OCR's complaint investigation and processing functions, including the closure of the Dallas regional office handling Ms. Youngblood's complaint, OCR stopped its investigation.  Ms. Youngblood and M.Y. have received no indication that the investigation has resumed.

28.    Plaintiff Council of Parent Attorneys and Advocates, Inc. ("COPAA") is a national not-for-profit membership organization whose membership comprises parents of children with disabilities, their attorneys, and their advocates.  COPAA's mission is to protect and enforce the legal and civil rights of students with disabilities and their families.  COPAA's primary goal is to secure appropriate educational services for children with disabilities in accordance with federal laws.  As part of this mission, COPAA seeks to protect the rights of children with disabilities to be free from discrimination based on their disability, race, sex, sexual orientation, and gender identity, and to receive the free and appropriate public education to which they are legally entitled.

29.    COPAA accomplishes its mission by, among other activities, providing resources, training, and information to members to assist them in obtaining a free appropriate public education and equal educational opportunity for children with disabilities; helping parents and

advocates file administrative complaints; helping parents and advocates find attorneys and legal resources as they advocate for their children's legal rights; educating the public and policymakers, including federal agencies, about the experiences of children with disabilities and their families; and educating COPAA members about developments in the federal civil rights laws and policies affecting the education of children with disabilities. COPAA frequently advises, trains, and assists parents, attorneys, and advocates filing complaints with OCR.

30.    COPAA has more than 3,600 members located across the United States.  Membership is open to all persons who are interested in furthering COPAA's purposes and who pay annual dues as required.  COPAA's Board of Directors is composed exclusively of COPAA members.

31.    COPAA has active members nationwide.  As parents, advocates, and attorneys for students with disabilities, COPAA's members rely on the Department to enforce the rights of students with disabilities to receive an education free from discrimination.  COPAA's members have filed pending OCR complaints concerning discrimination on the basis of disability, including complaints alleging both disability-based and race- and/or sex-based discrimination in schools.

32.    Plaintiffs A.W., Melissa Combs, and Diane Wilson are members of COPAA.

33.    As a result of Defendants' obstruction of OCR's complaint investigation and processing functions, OCR stopped processing COPAA members' complaints.

34.    COPAA brings this action as an organizational plaintiff.  The Department's actions have made achieving COPAA's mission to ensure equal access to education more difficult, time-consuming, and resource-intensive.  Because of Defendants' obstruction of OCR's complaint investigation and processing functions, COPAA has expended time and resources it would have devoted to advocating on behalf of students with disabilities to responding to calls and emails

14

about Defendants' actions, as well as addressing inquiries about, tracking, and analyzing the impact of Defendants' actions on its members' pending complaints.

35.    COPAA has also been forced to expend resources updating its training materials, retraining its members on alternative and state complaint processes, and altering its recommendations and advice on the likely efficacy of an OCR complaint, which has required additional expenditures on staff and diverted resources from direct assistance to members. COPAA has expended time and resources that it otherwise could have dedicated to its efforts to secure equal access to education.

36.    COPAA also brings this action on behalf of its active members with pending OCR complaints.  COPAA's membership includes parents, attorneys, and advocates who have pending stalled OCR complaints.  For example, a COPAA member attorney representing a COPAA member parent filed an OCR complaint in September 2024 raising allegations of discrimination under both Section 504 and Title VI on behalf of an English language learner student in Maryland. OCR opened that investigation on December 9, 2024.  As a result of Defendants' obstruction of OCR's complaint investigation and processing functions, including the closure of the Philadelphia regional office handling the COPAA members' complaint, OCR stopped its investigation.  The COPAA members have received no indication that the investigation has resumed.  Another COPAA member in Michigan represents families with more than a dozen complaints assigned to a number of closed offices.  Most of those complaints are frozen with no updates available. Another COPAA member whose child was in school in Massachusetts filed a complaint with the Boston regional office in July 2024.  That complaint is also frozen with no updates available since November 2024.

37.    Defendant United States Department of Education is an agency of the United States government.  The Department of Education is headquartered in Washington, D.C.

38.    Defendant Linda McMahon is the Secretary of the Department of Education.  She is sued in her official capacity only.  Secretary McMahon maintains an office at 400 Maryland Ave SW, Washington, D.C. 20202.

39.    Defendant Kimberly Richey is the Assistant Secretary for Civil Rights.  She is sued in her official capacity only.  Assistant Secretary Richey maintains an office at 400 Maryland Ave SW, Washington, D.C. 20202.

### IV.    FACTUAL ALLEGATIONS

*The Department was Created to Ensure Equal Access to Educational Opportunities and to Remedy Discrimination in Schools through OCR*

40.    Congress established the Department of Education in 1979, finding in part that "there is a continuing need to ensure equal access for all Americans to educational opportunities of a high quality," and that "such educational opportunities should not be denied because of race, creed, color, national origin, or sex."[21]

41.    The functions of the Department had previously been spread across various federal agencies, including the Department of Health, Education, and Welfare, the predecessor agency to the Department of Health and Human Services.  Congress found that there was a need to create the Department because "the dispersion of education programs across a large number of Federal agencies has led to fragmented, duplicative, and often inconsistent Federal policies relating to education."[22]

---

[21] Department of Education Organization Act, Pub. L. No. 96–88, § 101, 93 Stat. 668, 669 (1979).
[22] *Id.* at 670.

42.    At the time Congress created the Department of Education, it also created an Office for Civil Rights within the Department to "assume responsibility for [] carrying out the nation's civil rights laws in education," specifically referencing "such provisions as Title VI of the Civil Rights Act of 1964 (racial and ethnic discrimination) [and] Title IX of the Education Amendments of 1972 (sex discrimination)."[23]

43.    The Department of Education is charged with enforcing various civil rights laws prohibiting discrimination in all programs and activities that receive federal financial assistance, including Title VI, 42 U.S.C. §§ 2000d *et seq.*; Title IX, 20 U.S.C. §§ 1681 *et seq.*; and Section 504, 29 U.S.C. § 794, and Title II, 42 U.S.C. §§ 12131, *et seq.*, which prohibit discrimination based on disability.

44.    With respect to race- and sex-based discrimination in particular, Title VI and Title IX explicitly direct the Department of Education, as an agency that extends federal financial assistance to education programs, to effectuate their anti-discrimination provisions.  42 U.S.C. § 2000d-1 ("Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity by way of grant, loan, or contract . . . is . . . directed to effectuate the provisions of [Title VI]."); 20 U.S.C. § 1682 ("Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract . . . is . . . directed to effectuate the provisions of [Title IX] with respect to such program or activity.").

---

[23] S. Rep. No. 96-49, at 35-36 (1979).

45.    The mission of OCR is "to ensure equal access to education and to promote educational excellence through vigorous enforcement of civil rights in the nation's schools."[24]

46.    Federal regulations require OCR to investigate and resolve potential violations of, *inter alia*, Title VI, Section 504, Title IX, and Title II.  *See* 34 C.F.R. Parts 100, 104, 106, and 28 C.F.R. Part 35.[25]  The implementing regulations for Title VI specify that "[t]he responsible Department official or his designee will make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with this part," and that the investigation must "include, where appropriate, a review of the pertinent practices and policies of the recipient, the circumstances under which the possible noncompliance with this part occurred, and other factors relevant to a determination as to whether the recipient has failed to comply with this part."  34 C.F.R. § 100.7(c).  The regulations require OCR to enforce Section 504 and Title IX using the same procedures.  34 C.F.R. § 104.61; 34 C.F.R. § 106.81.[26]  For complaints under Title II, OCR must "promptly review the complaint to determine whether it has jurisdiction over the complaint under section 504" and, if so, "promptly notify" complainants and public entities of

---

[24]    U.S. Dep't of Educ., *Office for Civil Rights (OCR)* (Jan. 19, 2025), https://www.ed.gov/about/ed-offices/ocr; *see also* Kristen A. Graham, Susan Snyder & Maddie Hanna, *What the Department of Education Cuts Mean for Local Schools*, Philadelphia Inquirer (Mar. 12, 2025), https://www.inquirer.com/education/us-education-department-cuts-trump-administration-20250312.html.

[25]    OCR is additionally required to investigate and resolve potential violations of the Age Discrimination Act and the Boy Scouts of America Equal Access Act under 34 C.F.R. Part 110 and 34 C.F.R Part 108, respectively.

[26]    *See also* U.S. Dep't of Educ., *OCR Case Processing Manual* (Feb. 19, 2025) at 21, https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf (explaining that "the regulations implementing Title VI . . . require OCR to investigate complaints that are filed with the agency," and that this requirement "is incorporated by reference in the regulations implementing other statutes enforced by OCR," including those implementing Title IX and Section 504).

the receipt and acceptance of complaints, and "process the complaint according to its procedures for enforcing section 504." 28 C.F.R. § 35.171.

47.    Like other federal agencies, the Department of Education sets performance targets pursuant to the Government Performance and Results Act ("GPRA").  OCR's GPRA performance targets include that OCR will resolve 80% of complaints within 180 days of receipt.[27]

48.    Pursuant to Section 203(b)(1) of the Department of Education Organization Act, the Assistant Secretary for Civil Rights must "make an annual report . . . identifying significant civil rights or compliance problems as to which such Office has made a recommendation for corrective action."[28]

49.    In line with its mandate, OCR has developed well-established policies and procedures for the receipt, processing, investigation, and prompt resolution of civil rights complaints, as described in its Case Processing Manual.[29]

50.    OCR's Early Mediation Process ("EMP") allows for facilitated settlement discussion between parties soon after a complaint is filed.[30]  If complainants indicate their interest in EMP by checking the appropriate box on the online complaint form when they file their complaint, OCR

---

[27]  U.S. Dep't of Educ., *Office For Civil Rights Fiscal Year 2025 Budget Request* (2025) at 26, https://www.ed.gov/media/document/ocr-fiscal-year-2025-budget-request-39373.pdf.
[28] Department of Education Organization Act, Pub. L. No. 96–88, §101, 93 Stat. 669, 673 (1979).
[29]  *See* U.S. Dep't of Educ., *OCR Case Processing Manual* (Feb. 19, 2025), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf; *see also* U.S. Dep't of Educ., *Questions and Answers on OCR's Complaint Process* (accessed Feb. 20, 2025), available at: https://www.ed.gov/laws-and-policy/civil-rights-laws/civil-rights-faqs/questions-and-answers-on-ocrs-complaint-process ("OCR's role is to . . . promptly resolve complaints.").  This is not a new requirement.  *See* U.S. Dep't. of Educ., *OCR Case Processing Manual* (Aug. 26, 2020), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm-20202608.pdf.
[30] U.S. Dep't of Educ., *Discrimination Complaint Form* (2023), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/complaintform.pdf.

can determine if the complaint is appropriate for resolution through the EMP.[31]  Mediation is a form of complaint resolution that OCR offers as an alternative to its investigation process, where "a staff member from OCR who is trained in mediation assists the parties to reach a negotiated resolution of the complaint" and "helps the parties to find a mutually acceptable resolution" to the complaint.[32]

51.    OCR's Rapid Resolution Process ("RRP") is an expedited case processing approach available to staff working in any of OCR's statutory areas, designed to accelerate resolution of complaints.  Per the Case Processing Manual, "[f]or cases in RRP, the [OCR] Regional Office must ensure expeditious completion in accordance with statute, regulations, and case processing procedures."[33]

52.    For 2024, Congress allocated a $140 million budget to OCR to perform its authorized functions.  OCR's budget requests and justifications make clear that these functions include, in substantial part, OCR's enforcement work.  For example, OCR's 2025 budget request states that "[s]ince fiscal year 2009, the number of [discrimination] complaints has almost tripled," and explains that "[r]equested funds would ensure program support to resolve complaints of discrimination filed by the public and ensure that institutions receiving Federal financial assistance comply with the civil rights laws enforced by OCR."[34]  The budget request further specifies that

---

[31] U.S. Dep't of Educ., *Complaint Processing Procedures* (2022),  https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/complaints-how.pdf.

[32] *Id.*

[33] *See* U.S. Dep't of Educ., *OCR Case Processing Manual* (Feb. 19, 2025) at 12, https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf.

[34] U.S. Dep't of Educ., *Department of Education Fiscal Year 2025 President's Budget* (2025) at 69, https://www.ed.gov/sites/ed/files/about/overview/budget/budget25/summary/25 summary.pdf; U.S. Dep't of Educ., *Office for Civil Rights Fiscal Year 2025 Budget Request* (2025), https://www.ed.gov/sites/ed/files/about/overview/budget/budget25/justifications/dd-ocr.pdf.

the "funds would support a full time equivalent (FTE) level of 643 [staff][35] and provide resources necessary for OCR to deliver on its statutory and regulatory mandates."[36]

53.    Before the current administration's attack on the ability of OCR to fulfill its mandate, most of OCR's statutory and regulatory investigation and enforcement functions were assigned to its twelve regional enforcement offices: Washington D.C., Atlanta, Boston, Chicago, Cleveland, Dallas, Denver, Kansas City, New York, Philadelphia, San Francisco, and Seattle.  "These enforcement offices [were] organized into 4 divisions carrying out OCR's core work—preventing, identifying, ending, and remedying discrimination against American students."[37]

54.    In Fiscal Year 2024, OCR had 588 FTE staff.[38]  Over half were investigative staff, who are responsible for handling complaints alleging discrimination based on race, gender, disability, and sexual orientation, and most had caseloads of fifty or more during Fiscal Year 2024.[39]  Further, prior to the staffing cuts, it was projected that the average case load per investigative staff member

---

[35] The Department of Education's budget requests over the years have consistently included funding for OCR staff to resolve complaints filed by the public.  For example, the Department requested funds for 523 FTE in 2018, 529 FTE in 2019, and 619 FTE in 2020.  *See* U.S. Dep't of Educ., *Office for Civil Rights Fiscal Year 2018 Budget Summary and Background Information* (2018), https://www.ed.gov/sites/ed/files/about/overview/budget/budget18/summary/18summary .pdf; U.S. Dep't of Educ., *Office for Civil Rights Fiscal Year 2019 Budget Summary and Background Information* (2019), https://www.ed.gov/sites/ed/files/about/overview/budget/budget19/summary/19summary.pdf; and U.S. Dep't of Educ., *Office for Civil Rights Fiscal Year 2020 Budget Summary* (2020), https://www.ed.gov/sites/ed/files/about/overview/budget/budget20/summary/20summary.pdf.

[36] U.S. Dep't of Educ., *Office for Civil Rights Fiscal Year 2025 Budget Request* (2025), https://www.ed.gov/sites/ed/files/about/overview/budget/budget25/justifications/dd-ocr.pdf.

[37] U.S. Dep't of Educ., *About the Office for Civil Rights* (2025), https://www.ed.gov/about/ed-offices/ocr/about-ocr.

[38] U.S. Dep't of Educ., Office for Civil Rights, *2024 Fiscal Year Annual Report: Report to the President and Secretary of Education* (2024) at 8, https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf.

[39] *See* U.S. Dep't of Educ., *Office for Civil Rights Fiscal Year 2025 Budget Request* (2025), https://www.ed.gov/sites/ed/files/about/overview/budget/budget25/justifications/dd-ocr.pdf; Lhamon Decl. at 8, *State of New York v. McMahon,* No. 1:25-cv-10601 (D. Mass. Mar. 13, 2025).

in Fiscal Year 2025 "w[ould] become unmanageable at 71 cases."[40]

55.    Under that prior staffing level, OCR investigators struggled to meet the Department of Education's GPRA target, which sets 180 days as a goal for 80% cases to be resolved.[41]  Upon information and belief, in Fiscal Year 2024, ten of the twelve regional offices failed to meet that standard.

56.    In Fiscal Year 2024, OCR received 22,687 complaints.[42]  As of December 2025, there are nearly 24,000 open investigations, double the number of open investigations at the end of the prior administration.[43]

### *Contrary to OCR's Mandate and Purpose, Defendants Systemically Obstructed OCR's Investigation and Enforcement Functions by Imposing a General Freeze on Investigations while Directing Resources to Cases of Political Interest*

57.    Following the inauguration, OCR's investigation of discrimination complaints essentially grounded to a halt.[44]  OCR instructed employees that they could continue reviewing files, but barred staff from communicating with students, families, and schools involved in their cases and instructed them to cancel scheduled meetings and mediations.  This freeze stopped the

---

[40] *See* U.S. Dep't of Educ., *Office for Civil Rights Fiscal Year 2025 Budget Request* (2025) at 16, https://www.ed.gov/sites/ed/files/about/overview/budget/budget25/justifications/dd-ocr.pdf.

[41] U.S. Dep't of Educ., Office for Civil Rights, *GPRA,* https://www.ed.gov/about/ed-offices/ocr/gpra (last visited Apr. 8, 2025); *see also* U.S. Dep't of Educ., *Office For Civil Rights Fiscal Year 2025 Budget Request* (2025) at 26, https://www.ed.gov/media/document/ocr-fiscal-year-2025-budget-request-39373.pdf.

[42] U.S. Dep't of Educ., Office for Civil Rights, *2024 Fiscal Year Annual Report: Report to the President and Secretary of Education* (2024) at 8, https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf.

[43] Jennifer Smith Richards, *Monkey Sounds, "White Power" and the N-Word: Racial Harassment Against Black Students Ignored Under Trump,* (Dec. 19, 2025), https://www.propublica.org/article/trump-education-department-civil-rights-racial-harassment.

[44] Jennifer Smith Richards & Jodi S. Cohen, *"We've Been Essentially Muzzled": Department of Education Halts Thousands of Civil Rights Investigations Under Trump,* ProPublica (Feb. 13, 2025), https://www.propublica.org/article/department-of-education-civil-rights-office-investigations.

investigation and processing of students' and families' complaints in their tracks. Because all external communications with students, families, and schools were frozen, OCR staff could not request documents, conduct interviews, participate in meetings or mediations, negotiate resolution agreements, issue letters of finding, or take other steps to investigate or resolve complaints.

58. At the same time, however, OCR affirmatively opened selected investigations targeting programs and actions designed to combat discrimination against students of color and LGBTQ+ students and provide them with equal access to educational opportunities. Many are "directed investigations," meaning they were initiated by the agency, rather than by individual students and their families and advocates.

59. For example, on January 27, 2025, OCR opened an investigation into the Ithaca City School District for sponsoring the Students of Color United Summit, an event designed to "provide a safe space for" and to "celebrate and uplift students of color" as part of its inclusion and support efforts.[45] OCR agreed to open an investigation based on allegations that this event supporting students of color was "discriminatory" against white students.[46]

60. On January 28, 2025, OCR announced it had opened an investigation into Denver Public Schools for creating a gender-neutral bathroom in an effort to support transgender students.[47]

---

[45] Maddy Vogel, *Trump-Era Education Department Launches Investigation into Ithaca Schools Over Alleged Racial Exclusion*, Ithaca.com (Feb. 4, 2025), https://www.ithaca.com/news/ithaca/trump-era-education-department-launches-investigation-into-ithaca-schools-over-alleged-racial-exclusion/article_b1635a08-e2af-11ef-85e6-7760bf2508d6.html.

[46] Letter from U.S. Dep't of Educ., Office for Civil Rights, to William A. Jacobson, President, Legal Insurrection Foundation (Jan. 27, 2025), https://equalprotect.org/wp-content/uploads/2024/08/EPP-v.-Ithaca-City-School-District-OCR-Letter-Opening-Investigation-1-27-2025.pdf.

[47] U.S. Dep't of Educ., *U.S. Department of Education Launches Investigation into Denver Public Schools for Converting Girl's Restroom to All-Gender Facility* (Jan. 28, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-launches-investigation-denver-public-schools-converting-girls-restroom-all-gender-facility.

61.    On February 6, 2025, OCR announced that it had opened investigations into three universities for allowing transgender students to participate in sports on teams that match their gender identities.  It characterized this support of transgender students as "radical transgender ideology" and intentionally misgendered trans students who participated in sports at the three universities.[48]

62.    On February 12, 2025, OCR announced it had opened investigations into several school districts in Virginia for policies supporting transgender students, including policies allowing transgender students to use restroom and locker room facilities that align with their gender identities.[49]

63.    Also on February 12, 2025, OCR announced it had opened investigations into high school athletic leagues in California and Minnesota for policies allowing transgender students to participate on athletic teams that align with their gender identities.[50]

64.    Other investigations remained frozen.  OCR offered no public explanation for its abandonment of its well-established policy, practice, and procedure of investigating, processing, and resolving discrimination complaints from the public, and instead advancing only selected complaints aligned with the administration's political agenda.

65.    On February 20, 2025, OCR issued a memorandum lifting the freeze as to "complaints that allege only disability-based discrimination (i.e., complaints that do not allege other statutory

---

[48] U.S. Dep't of Educ., *U.S. Department of Education to Investigate Title IX Violations in Athletics* (Feb. 6, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-investigate-title-ix-violations-athletics.

[49] Letter from Dan Greenspahn, Team Leader, Team I, U.S. Dep't of Educ. Office for Civil Rights, to Ian D. Prior, Senior Advisor, Am. First Legal Found. (Feb. 12, 2025), https://media.aflegal.org/wp-content/uploads/2025/02/14102615/C-LON-11-25-1305-1309.pdf.

[50] U.S. Dep't of Educ., *U.S. Department of Education Launches Title IX Investigations into Two Athletic Associations* (Feb. 12, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-launches-title-ix-investigations-two-athletic-associations.

violations)." Complaints filed by members of the public alleging race- and sex-based discrimination, including complaints on behalf of students with disabilities alleging race- and sex-based discrimination in conjunction with disability-related claims, remained stalled. The memorandum did not provide any reason or rationale for this updated policy.

66. On February 21, 2025, OCR announced that it had opened an investigation into the Maine Department of Education and a school district in Maine regarding their policies supporting transgender student athletes.[51]

67. On February 27, 2025—as it continued to freeze investigations into cases from the public alleging race, sex, or intersectional discrimination—the Department of Education launched an "End DEI" (short for "End Diversity, Equity, and Inclusion") portal. The portal purports to collect "reports of discrimination based on race or sex in publicly-funded K-12 schools" from parents, students, teachers, and the broader community.[52]

68. The press release makes clear that the portal solicits information for use in potential investigations targeting programs designed to combat discrimination against LGBTQ+ students and students of color and provide them with equal access to educational opportunities. Tiffany Justice, Co-Founder of Moms for Liberty, explained that the Department was soliciting information about the use of "critical theory"—a reference to the recognition of systemic racism against people of color in society—and "rogue sex education and divisive ideologies"—a reference

---

[51] Letter from Bradley Burke, Reg'l Dir., Office for Civil Rights, U.S. Dep't of Educ., to Pender Makin, Comm'r, Me. Dep't of Educ. (Mar. 19, 2025), https://www.ed.gov/media/document/letter-of-finding-maine-doe-109602.pdf; U.S. Dep't of Educ., *Office for Civil Rights Launches Title IX Violation Investigations into Maine Department of Education and Maine School District* (Feb. 21, 2025), https://www.ed.gov/about/news/press-release/office-civil-rights-launches-title-ix-violation-investigations-maine-department-of-education-and-maine-school-district.

[52] U.S. Dep't of Educ., *U.S. Department of Education Launches "End DEI" Portal* (Feb. 27, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-launches-end-dei-portal.

to recognizing and affirming the identities of LGBTQ+ people—in public schools for the purpose of "identify[ing] potential areas for investigation."  Research demonstrates that culturally responsive curricula and teaching practices can provide effective support for students of color, and that instructional materials, assignments, and texts drawing on students' background knowledge supports student comprehension.[53]

69.    On February 28, 2025, OCR opened an investigation against Tumwater School District for allowing a transgender female student to play on the girls' basketball team.[54]

70.    In pausing thousands of complaints filed by the public while initiating and advancing selected investigations based on the administration's political priorities, OCR abdicated its responsibility to equitably consider complaints filed by students and their families in a nondiscriminatory manner, politicized its work, and undermined its credibility as a neutral fact finder.

71.    According to OCR press releases, during the pause on investigations,[55] OCR opened twenty-one cases.  Of those cases, fourteen targeted policies designed to provide equal educational

---

[53] *See, e.g.*, Thomas Dee & Emily Penner, *The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum*, 54 Am. Educ. Res. J. 127, 127 (2017), https://files.eric.ed.gov/fulltext/EJ1132535.pdf; *Understanding Culturally Responsive Teaching*, New Am., https://www.newamerica.org/education-policy/reports/culturally-responsive-teaching/understanding-culturally-responsive-teaching/ (last visited Apr. 8, 2025) (discussing and citing studies).
[54] U.S. Dep't of Educ., *Office for Civil Rights Launches Title IX Investigation Into Washington State School District* (Mar. 3, 2025), https://www.ed.gov/about/news/press-release/office-civil-rights-launches-title-ix-investigation-washington-state-school-district; *see also* U.S. Dep't of Educ., *Letter to Tumwater School District* (Feb. 28, 2025), https://www.ed.gov/media/document/letter-tumwater-school-district-february-2025-109531.pdf.
[55] All investigations were paused until February 20, 2025.  The pause on disability investigations was lifted on February 20, 2025, while the pause on non-disability investigations was lifted on March 6, 2025.

opportunities for transgender students.  Only one case addressed discrimination against students with disabilities.[56]

72.     Upon information and belief, OCR's directed investigations have not followed typical procedures or protocols.  Unlike in typical investigations, upon information and belief, OCR has issued press releases upon opening certain cases, even before conducting investigations.  These press releases included language that suggests predetermined conclusions and featured statements from individuals and groups that align with the administration's political agenda.[57]  This practice contravenes OCR's policies in its Case Processing Manual ("CPM"), which promise that OCR will serve as a neutral fact finder.[58]  In addition, OCR has begun to resolve its directed investigations with unusual speed and without the support and analysis contemplated by the CPM.  OCR's letter of finding to the Maine Department of Education, for example, does not articulate the legal standard it relied upon to reach the novel determination that the Title IX regulations categorically bar schools from letting transgender students participate on any athletic team consistent with their gender identity, nor does it provide relevant evidence necessary to support such a determination, as required by section 303 of the CPM.[59]  Additionally, the letter does not

---

[56] Brooke Schultz, *See Which Schools Trump's Education Department Is Investigating and Why*, EducationWeek (Mar. 28, 2025), https://www.edweek.org/policy-politics/see-which-schools-trumps-education-department-is-investigating-and-why/2025/03.

[57] *See e.g.*, U.S. Dep't of Educ., *U.S. Department of Education Launches Investigation into Maine Department of Education for Alleged FERPA Violations* (Mar. 28, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-launches-investigation-maine-department-of-education-alleged-ferpa-violations.

[58] U.S. Dep't of Educ., *OCR Case Processing Manual* (Feb. 19, 2025) at 13, https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf.

[59] Letter from Bradley R. Burke, Reg'l Dir., Office for Civil Rights, U.S. Dep't of Educ., to Pender Makin, Comm'r, Me. Dep't of Educ. (Mar. 19, 2025), https://www.ed.gov/media/document/letter-of-finding-maine-doe-109602.pdf.

appear to reflect a review or consideration of evidence submitted by the Maine Department of Education or interviews with its personnel, as generally contemplated by section 702 of the CPM.[60]

73.    On March 6, 2025, Secretary McMahon sent an email to OCR Enforcement staff "lifting the pause on the processing of complaints in all areas of OCR's practice."[61]  Secretary McMahon's email provided no explanation for her message or any justification or rationale for imposing the freeze in the first place.

### *Defendants' Actions Culminated in the Decimation of OCR's Workforce, which Prevents OCR from Performing Its Statutory Duties*

74.    On March 11, 2025, less than a week after her email lifting the freeze on complaint processing that had nullified the OCR complaint process for historically marginalized students and families across the country, Secretary McMahon moved to make it practically impossible for OCR to effectuate its statutory duties.

75.    This time, the change was permanent.  Secretary McMahon eliminated seven of twelve regional offices and decimated OCR's workforce through an unprecedented Reduction in Force (the "March RIF"), leaving skeleton staffing at the remaining offices.  The Boston, Chicago, Cleveland, Dallas, New York, Philadelphia, and San Francisco offices were eliminated.  More than half of OCR employees—299 OCR workers—were told they would be laid off and placed on administrative leave as of March 21, 2025, and that their employment would be terminated around

---

[60] *Id.*
[61] That Secretary McMahon, rather than the Acting Assistant Secretary for Civil Rights, issued the order instructing OCR to unfreeze investigations is highly unusual, as the Secretary does not have the authority to do so.  The Department of Education Organization Act provides that the Secretary shall delegate OCR's enforcement authority to the Assistant Secretary for Civil Rights.  *See* Department of Education Organization Act, Pub. L. No. 96–88 § 203, 93 Stat. 669, 672 (1979).

June 9, 2025.[62] More broadly, Defendants terminated a total of approximately 1,315 Department employees and reduced Department staff to about half of its size at the time President Trump took office.[63]

76.    Upon information and belief, Defendants have also eliminated all but one of the Enforcement Directors.  Previously, there were four Enforcement Directors, each in charge of three Regional Offices.

77.    Upon information and belief, OCR's case management and document management systems were developed in-house, and Defendants laid off all OCR information technology staff responsible for maintaining and updating those systems.

78.    OCR employees that Defendants fired or placed on administrative leave immediately lost access to the case management and document management systems and were unable to send or reply to external emails.  Upon information and belief, Defendants created no standard mechanism for employees from closed offices to transfer their cases.  Upon information and belief, most employees whom Defendants fired or placed on administrative leave were unable to meaningfully transfer their cases.  Upon information and belief, OCR employees typically store draft documents and informal notes on their Department computers, rather than storing all case-related documents on the case and document management systems.  Accordingly, upon information and belief, many such files and information were lost as a result of the March 11, 2025

---

[62] Clay Decl. ¶ 18, *Am. Fed. of Gov't Emps.*, No. 3:25-cv-08302-SI (N.D. Cal. Oct. 28, 2025), Dkt. No. 117-2; *see also* Laura Meckler, et al., *How education department layoffs hit student loans, testing, civil rights*, Washington Post (Mar. 13, 2025), https://https://www.washingtonpost.com/education/2025/03/13/education-department-layoffs-student- loans-fafsa-impacts.

[63] *Id.*; *see also* Press Release: U.S. Dep't of Educ., *U.S. Department of Education Initiates Reduction in Force* (Mar. 11, 2025), https://bit.ly/42fXyf8. Michael C. Bender & Dana Goldstein, *Education Department Fires 1,300 Workers, Gutting Its Staff*, N.Y. Times (Mar. 11, 2025).

Reduction in Force, because affected employees could not add them to the system to make them available to staff receiving transferred cases.

79.    Upon information and belief, OCR staff at some remaining open offices have been unable to access and/or make changes to files in the document management and case management systems for cases that are allegedly being transferred to them from the closed offices.

80.    Defendants targeted some of the most effective OCR regional offices for closure.  For instance, upon information and belief, in the Midwest, the Cleveland and Chicago offices resolved approximately forty-four and thirty-six cases per investigator, respectively, from January through September 2024 and were targeted for closure, while Kansas City resolved 31.35 cases per investigator during that time period and remains open.  In the South, upon information and belief, Dallas resolved 38.15 cases per investigator and was targeted for closure, while Atlanta resolved only 20.95 cases per investigator but remains open.  And on the West Coast, upon information and belief, San Francisco resolved 40.54 cases per investigator and was targeted for closure, while Seattle resolved only 26.08 cases per investigator and remains open.

81.    Defendants knowingly decimated OCR's staffing to a point where the caseload exceeds any approximation of reasonableness.  The gutting of OCR's staff means that no complainant has a fair shot at accessing an OCR investigation.  Anyone who files any claim is unlikely to secure relief from OCR.  Prior to the March RIF and office closures, OCR's investigators handled an average of over sixty cases at a time.[64]  In the experience of Catherine Lhamon, who served as

---

[64] Jodi S. Cohen & Jennifer Smith Richards, *Massive Layoffs at the Department of Education Erode Its Civil Rights Division*, ProPublica (Mar. 12, 2025), https://www.propublica.org/article/education-department-civil-rights-division-eroded-by-massive-layoffs; U.S. Dep't of Educ., *Office for Civil Rights Fiscal Year 2025 Budget Request* (2025) at 16; https://www.ed.gov/media/document/ocr-fiscal-year-2025-budget-request-39373.pdf;    Gonzales Decl. ¶¶ 10–11, *State of New York v. McMahon,* 1:25-cv-10601-MJJ (S.D.N.Y. March 24, 2025),

Assistant Secretary for Civil Rights under both the Obama and Biden administrations, even fifty cases per investigator is an untenable caseload.[65]  Senators reported in October that because of the March RIF, OCR investigators now carry caseloads of 168 cases per investigator.[66]  Upon information and belief, caseloads in at least one open OCR office have reached as high as over 200-300 cases per investigator with the transferred and reassigned cases from closed offices.  Ms. Cupp's investigator from the Denver office, who was handling her investigation because of the Chicago office closure, informed her in late April 2025 that his caseload was 350.

82.     Upon information and belief, the elimination of offices and staff has the purpose and effect that OCR cannot fulfill its statutory and regulatory functions to enforce civil rights in schools.  Former Assistant Secretary Lhamon reported to ProPublica: "What you've got left is a shell that can't function."[67]  Civil rights investigators who remain employed at OCR said it now will be "virtually impossible" to resolve discrimination complaints.[68]

83.     Katie Dullum, a former OCR deputy director, reported to ProPublica that, "This is devastating for American education and our students.  This will strip students of equitable education, place our most vulnerable at great risk and set back educational success that for many will last their lifetimes.  The impact will be felt well beyond this transitional period."[69]

---

Dkt. No. 71-47 (noting that the Dallas office employed about 55 employees, and each team of six to seven OCR staff members effectively handled 250 to 300 cases).

[65] Lhamon Decl. ¶ 26, Dkt. No. 52-08.

[66] Letter from Sens. to Linda McMahon, Sec'y of the Dep't of Educ. at 3 (Oct. 20, 2025), https://perma.cc/3U65- FNAC.

[67] *See* Jodi S. Cohen & Jennifer Smith Richards, *Massive Layoffs at the Department of Education Erode Its Civil Rights Division*, ProPublica (Mar. 12, 2025), https://www.propublica.org/article/education-department-civil-rights-division-eroded-by-massive-layoffs.

[68] *Id.*

[69] *Id.*

84.    Brittany Coleman, an attorney with the Dallas regional office whose position was eliminated, reported to NBC News that with fewer staff members, students with disabilities fighting for accommodations for test-taking, for example, will have to wait longer for help from the Department, and that such help could arrive too late.[70]

85.    Another Department of Education employee said to ABC News, "I don't know how [students with disabilities] will be serviced," and was confident that those students "will not be helped."[71]

86.    One OCR attorney explained to ProPublica: "Part of OCR's work is to physically go to places.  As part of the investigation, we go to schools, we look at the playground, we see if it's accessible . . . .  We show up and look at softball and baseball fields.  We measure the bathroom to make sure it's accessible.  We interview student groups.  It requires in-person work.  That is part of the basis of having regional offices.  Now, California has no regional office."[72]  Another attorney still working at the Department said: "OCR simply will not be investigating violations any more.  It is not going to happen.  They will not have the staff for it."  That attorney also added that investigations were "extremely time and labor intensive."[73]

---

[70] Tyler Kingkade & Adam Edelman, *What the Education Department Layoffs Could Mean for Students with Disabilities*, NBC News (Mar. 12, 2025), https://www.nbcnews.com/news/us-news/education-department-layoffs-students-disabilities-rcna196114.

[71] Arthur Jones II, *'Upsetting': Civil Servants Across the US Part of Department of Education's Mass Layoffs*, ABC News (Mar. 12, 2025), https://abcnews.go.com/Politics/upsetting-civil-servants-us-part-department-educations-mass/story?id=119710915.

[72] *See* Jodi S. Cohen & Jennifer Smith Richards, *Massive Layoffs at the Department of Education Erode Its Civil Rights Division*, ProPublica (Mar. 12, 2025), https://www.propublica.org/article/education-department-civil-rights-division-eroded-by-massive-layoffs.

[73] *Id.*

87.     One senior OCR manager described the RIF as a "gut punch," remarking, "I am seeing the 1964 Civil Rights Act eviscerated right before my eyes."[74]

88.     Predictably, OCR's case resolution numbers have plunged due to the RIF and office closures. According to OCR's public data, OCR resolution agreements have plummeted substantially compared to 2024.

### The Attack on OCR is One Piece of the Administration's Plans to Eliminate the Department of Education

89.     Defendants' abdication of their statutorily mandated obligation to conduct investigations must be understood in the context of the administration's broader goals. President Trump's campaign promised an administration that would dismantle the Department of Education, end Diversity, Equity, and Inclusion efforts, and turn civil rights enforcement on its head, using civil rights laws to target programs that aim to ensure equal educational opportunity for students of color and LGBTQ+ students.[75]

90.     Shutting down the Department of Education has been a central talking point for President Trump. On the campaign trail, Trump emphasized that he would remove "the radical zealots and Marxists" he claimed have "infiltrated" the Department.[76] In a video posted to social media in October 2023, Trump said, "[o]ne . . . thing I'll be doing very early in the administration

---

[74] Eyal Press, *When the Government Stops Defending Civil Rights*, New Yorker (Oct. 29, 2025) https://www.newyorker.com/news/the-lede/when-the-government-stops-defending-civil-rights.
[75] President Donald J. Trump, *Fact Sheet: President Donald J. Trump Empowers Parents, States, and Communities to Improve Education Outcomes*, The White House (Mar. 20, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-empowers-parents-states-and-communities-to-improve-education-outcomes/; *Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI*, The White House (Jan. 22, 2025), https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-protects-civil-rights-and-merit-based-opportunity-by-ending-illegal-dei/.
[76] Meridith McGraw, *Trump Unveils New Education Policy Loaded with Culture War Proposals*, Politico (Jan. 26, 2023), https://www.politico.com/news/2023/01/26/trump-unveils-education-policy-culture-war-00079784.

is closing up the Department of Education in Washington D.C., and sending all education and education work and needs back to the states."[77]  In September 2024, during a rally in Wisconsin, he said, "I say it all the time, I'm dying to get back to do this.  We will ultimately eliminate the federal Department of Education."[78]  In December, in an interview in TIME Magazine, Trump stated that he wanted "to move the schools back to the states" and implement "[a] virtual closure of [the] Department of Education."[79]

91.    Hours after being confirmed, Secretary McMahon sent an email to all Department of Education staff entitled "Our Department's Final Mission."  She wrote in that message:  "Our job is to respect the will of the American people and the President they elected, who has tasked us with accomplishing the elimination of bureaucratic bloat here at the Department of Education—a momentous final mission—quickly and responsibly."[80]  Secretary McMahon made this message available to the public by posting it on the Department of Education's website.

92.    In case there was any ambiguity, Secretary McMahon doubled down on her intention to dismantle the Department of Education during an interview with Fox News several days later, on March 7, 2025.  When asked, during her first interview since being confirmed to her position, whether the United States needs its Department of Education, her response was clear and

---

[77] Steve Inskeep & Taylor Haney, *What Trump's Pledge To Close Dept. of Education Means For Students, GOP-Led States*, NPR (updated Nov. 15, 2024), https://www.npr.org/2024/11/14/nx-s1-5181966/a-look-at-the-potential-impact-of-shutting-down-the-department-of-education.

[78] Katie Lobosco, *Trump Wants to Shut Down the Department of Education. Here's What That Could Mean*, CNN (Dec. 12, 2024), https://www.cnn.com/2024/09/20/politics/department-of-education-shut-down-trump/index.html.

[79] TIME, *Donald Trump's 2024 Person of the Year Interview: Transcript*, TIME (Dec. 12, 2024), https://time.com/7201565/person-of-the-year-2024-donald-trump-transcript/.

[80] U.S. Dep't of Educ., *Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission.

unequivocal: "No, we don't."[81]  Secretary McMahon's unilateral decision to gut OCR and to take actions to shutter the Department of Education are wholly unsupported by any legitimate facts, data, and reasoned basis and run contrary to her obligations under federal civil rights laws.

93.    On March 20, 2025, President Trump issued an Executive Order directing the Secretary of Education to "take all necessary steps to facilitate the closure of the Department of Education."[82] It also directs the Secretary of Education to ensure that any entity receiving federal Department of Education funds terminate their use of DEI and "programs promoting gender ideology."[83]

94.    The March 11, 2025, decision to gut OCR, in contravention of OCR's obligations to promptly investigate all discrimination complaints within its jurisdiction, is part and parcel of Defendants' "Final Mission" to effectuate President Trump's subsequent executive order and end the Department of Education.

95.    On June 18, 2025, the U.S. District Court for the District of Massachusetts issued a preliminary injunction in another case, *Victim Rights Law Center v. United States Department of Education*, Case No. 1:25-cv-11042 (D. Mass) (the "*VLRC* case"), that stayed the March RIF and required Defendants to restore the affected employees to active duty.[84]  Defendants, however, did not return a single OCR employee to work for over two months.  On August 13, 2025, the *VLRC* court denied Defendants' motion to vacate or stay the preliminary injunction and found that

---

[81] Michael C. Bender, *Asked if U.S. Needs Education Department, Its Head Says 'No'*, N.Y. Times (Mar. 7, 2025), https://www.nytimes.com/2025/03/07/us/politics/education-department-mcmahon-trump.html.
[82] Exec. Order No. 14242, 90 Fed. Reg. 13679 (Mar. 20, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/03/improving-education-outcomes-by-empowering-parents-states-and-communities/.
[83] *Id.*
[84] Op. Granting Pls.' Mot. for Preliminary Injunction, *Victim Rights Law Ctr.*, 1:25-cv-11042-MJJ, (D. Mass. Dec. 10, 2025), Dkt. No. 40.

Defendants had failed to substantially comply with it.[85]  After the *VLRC* court issued that order, on August 19, 2025, Defendants committed to return approximately 264 OCR employees (those subject to the March RIF who remained employed by OCR and had not resigned) to active duty on a staggered schedule from September through early November 2025.[86]  On September 29, 2025, however, the First Circuit stayed the preliminary injunction pending appeal.[87]

96.   On October 1, 2025, a government shutdown commenced due to a lapse of congressional appropriations.  After the First Circuit stayed the preliminary injunction in the *VRLC* case, the Department opportunistically used the shutdown to take at least two additional steps designed to dismantle OCR.

97.   First, on October 10, 2025, the Department initiated another RIF (the "October RIF") that would have terminated 137 more OCR employees—in addition to the 299 who were part of the March RIF.[88]  On October 15, Secretary McMahon confirmed that the rationale for the October RIF was the same as the March RIF: to dismantle OCR.  In a post on X, the social media platform, she stated that "the federal Department of Education is unnecessary, and we should return education to the states.  The Department has taken additional steps to . . . root out the education bureaucracy that has burdened states and educators with unnecessary oversight.[89]

---

[85] Order Denying Defs.' Mot. to Vacate or Stay Prelim. Inj., *Victim Rights Law Ctr.,* No. 1:25-cv-11042-MJJ (D. Mass. Aug. 13, 2025), Dkt. No. 60.

[86] Status Report, *Victim Rights Law Ctr.*, No. 1:25-cv-11042-MJJ (D. Mass. Aug. 19, 2025), Dkt. No. 67.

[87] Order for Stay Pending Appeal at 7, *Victim Rights Law Ctr.,* No. 1:25-cv-11042-MJJ (D. Mass. April 21, 2025), Dkt. No., 77.

[88] Clay Decl. ¶ 14, *Am. Fed. of Gov't Emps.*, No. 3:25-cv-08302-SI (N.D. Cal. Oct. 28, 2025), Dkt. No. 117-2.

[89] Sarah Mervosh and Michael C. Bender, *No Education Department? No problem, Trump's Education Secretary Says*, N.Y. Times (Oct. 23, 2025), https://www.nytimes.com/2025/10/21/us/education-department-shutdown-layoffs.html.

98.    Second, on October 14, 2025, the Department restarted the March RIF that was previously paused by the *VRLC* court's now-stayed preliminary injunction.  As of that date, 247 of the 299 employees covered by the March RIF had not resigned and remained employed by OCR.  On October 14, the Department sent those 247 employees an email stating that "[p]ursuant to" the First Circuit's decision "regarding the implementation" of the March RIF, the Department "is continuing with the RIF," and "your separation date has been adjusted to November 3, 2025."[90]

99.    On October 28, 2025, at the request of a group of unions, the U.S. District Court for the Northern District of California issued a preliminary injunction that pauses both the March and October RIFs on the basis that "laying off thousands of public employees . . during a government shutdown is the epitome of hasty, arbitrary, and capricious decisionmaking" and that the plaintiffs were likely to succeed on their claims that directions from the Office of Management and Budget and Office of Personnel Management that agencies consider RIFs during a shutdown rested on illegal grounds.[91]

100.    During the 43 days of the shutdown, both political parties in Congress engaged in negotiations over the terms of an appropriations bill.

101.    Those negotiations culminated in a compromise bill, the CAA, that Congress passed and the President signed on November 12, 2025.  Section 120(e) of the CAA provides in relevant part that "any reduction in force proposed, noticed, initiated, executed, implemented, or otherwise taken by an Executive Agency between October 1, 2025, and the date of enactment, shall have no force or effect."

---

[90] Clay Decl. Ex. A, *Am. Fed. of Gov't Emps.*, No. 3:25-cv-08302-SI (N.D. Cal. Oct. 28, 2025), Dkt. No. 117-2.

[91] *See* Order Granting Pls.' Mot. for Prelim. Inj. And Enjoining Shutdown-Related Reductions in Force at 4, *Am. Fed. of Gov't Emps.*, No. 3:25-cv-08302-SI (N.D. Cal. Oct. 28, 2025), Dkt. No. 94.

102.    Accordingly, Congress invalidated the March and October RIFs.  By its plain terms, Section 120(e) applies not only to RIFs that were "proposed, noticed," or "initiated" during the shutdown, but also to RIFs that were "executed, implemented, or otherwise taken" during that time.  Since OCR executed and implemented the March RIF during the shutdown, the RIF lacks force and effect.

103.    After Congress enacted the CAA, the Department rescinded the RIF notices sent to the 137 OCR employees covered by the October RIF.[92]

104.    On December 5, 2025, the Department ordered the March RIF employees to return to work while litigation over the RIF proceeds.[93]  In the notice, while maintaining that it continues to fight the court orders, the Department informed the employees that their work was needed to help the Department meet its mission and its enforcement obligations.  *Id.*

105.    The Department's statements and actions have made clear that it intends to continue the March RIF as soon as it can do so without violating a court order.  Defendants have indicated that they do not believe that Section 120(e) of the Continuing Appropriations Act applies to the March RIF, and they do not intend to rescind that RIF absent a court order.[94]  Thus, although the CAA

---

[92] Clay Decl. Ex. A, *Am. Fed. of Gov't Emps.*, No. 3:25-cv-08302-SI (N.D. Cal. Oct. 28, 2025), Dkt. No. 117-2.
[93] Collin Binkley, *Education Department workers targeted in layoffs are returning to tackle civil rights backlog*, Associated Press, (Dec. 5, 2025), https://apnews.com/article/education-department-closure-layoffs-civil-rights-disability-001478ed94bc6c196f6f9f53a2462083.
[94] *See* Clay Decl. Ex. A, *Am. Fed. of Gov't Emps.*, No. 3:25-cv-08302-SI (N.D. Cal. Oct. 28, 2025), Dkt. No. 117-2.  Following an evidentiary hearing and further briefing by the parties, the district court issued a second preliminary injunction enjoining the March RIF, finding the RIF violative of the CAA. *Am. Fed. of Gov't Emps.,* No. 3:25-cv-08302-SI (N.D. Cal. Dec. 17, 2025), Dkt. No. 139.  That preliminary injunction is currently being appealed and is partially stayed pending appeal. *Am. Fed. of Gov't Emps. v. U.S. Office of Management and Budget*, No. 25-7998 (9th Cir. Dec. 23, 2025), Dkt. No. 9.1. at 2 (granting the defendants' application for a stay as to subsection 3(d) of the preliminary injunction, denying it as to the rest of the preliminary injunction, and setting an expedited briefing

requires federal agencies to rescind the covered RIFs and to give notice of such recission to "all affected employees" by November 17, 2025, Defendants have not sent any such notice to employees covered by the March RIF.

106.    If either or both the March and October RIFs were to proceed as planned, they would leave OCR decimated and unable to execute its lawful duties under federal law, with as little as only 62 employees—approximately one tenth of the 2024 workforce.  The Department still has not provided any reasoned explanation for either the March or October RIFs or the office closures, nor has it attempted to explain how OCR could deliver on its mandates after the planned terminations and office closures.

### *The Attack on OCR Is Part of the Administration's Plan to Target Programs and Activities that Ensure Equal Educational Opportunities for Students of Color and LGBTQ+ Students*

107.    Similarly, Defendants' obstruction of students' and families' access to OCR's investigation and complaint processing functions while selectively advancing cases on behalf of white and cisgender students and families fits within the administration's demonstrated agenda of targeting programs, activities, and initiatives designed to ensure equal educational opportunities for students of color and LGBTQ+ students.

108.    For example, on the day of his inauguration, President Trump issued the "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" Executive Order, directing the Executive Branch to interpret "sex" as referring to

---

schedule for appeal).  It is set to expire on January 30, 2026, the last day of the CAA, unless the CAA is extended.

"an individual's immutable biological classification as either male or female" under all federal laws and administration policy.[95]

109.   On January 29, 2025, President Trump signed the "Ending Radical Indoctrination in K-12 Schooling" executive order, directing federal agencies to withhold federal funding from institutions that directly or indirectly promote "discriminatory equity ideology"—including through policies that recognize and ameliorate racial discrimination—under the guise of enforcing compliance with Title VI.[96]

110.   On February 5, 2025, President Trump signed the "Keeping Men Out of Women's Sports" executive order, directing federal agencies to rescind all funds from educational programs and institutions that allow transgender students to participate on sports teams aligning with their gender identity.[97]

111.   On February 14, 2025, OCR issued a Dear Colleague letter regarding its interpretation of civil rights law and intended enforcement under Title VI and the Equal Protection Clause."[98] The letter alleges that U.S. educational institutions in recent years have discriminated against white students and contorts civil rights law to command the dismantling of protections for students of color.

---

[95]   Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/.
[96]   Exec. Order No. 14190, 90 Fed. Reg. 8853 (Jan. 29, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-indoctrination-in-k-12-schooling/.
[97]   Exec. Order No. 14201, 90 Fed. Reg. 9279 (Feb. 5, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/02/keeping-men-out-of-womens-sports/.
[98] U.S. Dep't of Educ., *Dear Colleague Letter: Title VI of the Civil Rights Act in Light of Students for Fair Admissions v. Harvard* (Feb. 14, 2025), https://www.ed.gov/media/document/dear-colleague-letter-sffa-v-harvard-109506.pdf.

112.    On February 17, 2025, the Department announced that it had terminated over $600 million in teacher training grants focused on various "divisive ideologies," including "anti-racism," DEI, and instruction on white supremacy.    The materials included training on "[a]cknowledging and responding to systemic forms of oppression and inequity, including racism, ableism, 'gender-based' discrimination, homophobia, and ageism."[99]

113.    On March 1, 2025, OCR published a set of Frequently Asked Questions ("FAQs") intended to clarify elements of the February 14 Dear Colleague Letter.[100]  OCR made clear that it planned to target "social-emotional learning," "culturally responsive teaching," and similar programs that are backed by evidence showing they improve school climates for students of color and LGBTQ+ students.[101]    Despite research demonstrating that such practices benefit all students,[102] the FAQs make clear that OCR considers programs that effectively ensure educational opportunities for students of color to be evidence of discrimination, listing "statistics

---

[99] U.S. Dep't of Educ., *U.S. Department of Education Cuts Over $600 Million in Divisive Teacher Training Grants* (Feb. 17, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-cuts-over-600-million-divisive-teacher-training-grants.

[100] *See* U.S. Dep't of Educ., *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act* (Mar. 1, 2025), https://www.ed.gov/media/document/frequently-asked-questions-about-racial-preferences-and-stereotypes-under-title-vi-of-civil-rights-act-109530.pdf; *see also* U.S Dep't of Educ., *U.S. Department of Education Releases Frequently Asked Questions on Dear Colleague Letter About Racial Preferencing* (Mar. 1, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-releases-frequently-asked-questions-dear-colleague-letter-about-racial-preferencing.

[101] *Id.*

[102] *See, e.g.*, Joseph A. Durlak, et al., *The Impact of Enhancing Students' Social and Emotional Learning: A Meta-Analysis of School-Based Universal Interventions*, 82 Child Dev. 405 (2011), https://srcd.onlinelibrary.wiley.com/doi/10.1111/j.1467-8624.2010.01564.x; Thomas Dee & Emily Penner, *The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum*, 54 Am. Educ. Res. J. 127 (2017), https://files.eric.ed.gov/fulltext/EJ1132535.pdf.

demonstrating a pattern of the policy or decision having a greater impact on members of a particular race" and schools' efforts to further "equity" as evidence of race discrimination.[103]

114.   Throughout the time Defendants froze investigations into other Title IX and Title VI complaints, OCR opened investigations almost exclusively into programs that ensure equal educational opportunities for students of color and LGBTQ+ students.

115.   In Secretary McMahon's "Final Mission" memo, she suggests—without any analysis or evidence—that American education is infiltrated by "political ideologies, special interests, and unjust discrimination."[104]  She then lauds President Trump for his executive orders that supposedly "combat[] critical race theory, DEI, gender ideology, [and] discrimination in admissions, promot[e] school choice for every child, and restor[e] patriotic education and civics."[105]

116.   Upon information and belief, OCR has also issued internal procedures governing the processing of certain complaints required for approval that make it far more difficult and onerous than in years past to investigate and resolve complaints of race and sex discrimination filed by people of color and LGBTQ+ students.

117.   And since the March 11 decimation of OCR's workforce, Defendants have weaponized the skeleton staff that is left at OCR to attack students who share identities that the Administration disfavors, rather than to perform its statutorily required duties.  Despite the drastic gutting of OCR's staff and its failure to investigate and resolve complaints filed with the closed regional offices, OCR has continued to initiate cases targeting programs ensuring equal educational

---

[103] *See* U.S. Dep't of Educ., *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act* (Feb. 28, 2025), https://www.ed.gov/media/document/frequently-asked-questions-about-racial-preferences-and-stereotypes-under-title-vi-of-civil-rights-act-109530.pdf.

[104] U.S. Dep't of Educ., *Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission.

[105] *Id.*

opportunities for transgender students and students of color.   The following are illustrative examples of this policy and practice.

118.   On March 14, 2025, OCR opened investigations into forty-five universities for partnering with a program that encourages students of color to pursue graduate degrees.[106]

119.   On March 20, 2025, OCR opened investigations into the Illinois State Board of Education and Chicago Public Schools regarding their policies supporting transgender students.[107]

120.   On March 25, 2025, OCR opened a similar investigation into Portland Public Schools and the Oregon School Activities Association.[108]

121.   On April 3, the Department of Education announced that it is requiring all state and local educational agencies that receive federal financial assistance to certify that they do not use "certain" DEI practices that it alleges violate federal law.[109]  The Department has not clarified what these "certain" DEI practices are, and to what extent it believes that programs that ensure equal educational opportunity for students of color, such as culturally responsive curricula, fall into this category.

---

[106] U.S. Dep't of Educ., *Office for Civil Rights Initiates Title VI Investigations into Institutions of Higher Education* (Mar. 25, 2025), https://www.ed.gov/about/news/press-release/office-civil-rights-initiates-title-vi-investigations-institutions-of-higher-education-0.

[107] U.S. Dep't of Educ., *OCR Launches Investigations into Illinois DOE, the Chicago Public School District 299, and Deerfield Public Schools District 109 Over Reported Title IX Violations* (Mar. 20, 2025), https://www.ed.gov/about/news/press-release/ocr-launches-investigations-illinois-doe-chicago-public-school-district-299-and-deerfield-public-schools-district-109-over-reported-title-ix.

[108] U.S. Dep't of Educ., *Office of Civil Rights Launches Title IX Investigations into Portland Public Schools and the Oregon School Activities Association* (Mar. 25, 2025), https://www.ed.gov/about/news/press-release/office-civil-rights-launches-title-ix-investigations-portland-public-schools-and-oregon-school-activities-association.

[109] U.S. Dep't of Educ., *Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and SFFA v. Harvard* (Apr. 3, 2025), https://www.ed.gov/media/document/reminder-of-legal-obligations-undertaken-exchange-receiving-federal-financial-assistance-and-request-certification-under-title-vi-and-sffa-v-harvard-april-3.

122.   On April 4, 2025, the U.S. Department of Justice ("DOJ") and Department of Education announced a "Title IX Special Investigations Team" composed of both DOJ and OCR personnel that will "protect students, and especially female athletes, from the pernicious effects of gender ideology in school programs and activities."[110]  It threatens "there's a new sheriff in town" for schools that work to ensure equal educational opportunity for transgender student athletes by allowing them, like cisgender students, to participate on sports teams that align with their gender identity.[111]

123.   On April 29, the Department of Education announced that it was launching a Title VI investigation into Chicago Public Schools for its "Black Students Success Plan," which supports closing pervasive outcome gaps for academically struggling Black students in the district.[112]

124.   On May 22, 2025, OCR launched a Title VI investigation into Fairfax County Public Schools for its use of a holistic, race-neutral admissions process at Thomas Jefferson High School that has helped economically and racially diversify enrollment at the school. The investigation follows federal court decisions holding the school district's admissions practices lawful and the Supreme Court denying review.[113]

---

[110] U.S. Dep't of Just., *U.S. Department of Education and U.S. Department of Justice Announce Title IX Special Investigations Team* (Apr. 4, 2025), https://www.justice.gov/opa/pr/us-department-education-and-us-department-justice-announce-title-ix-special-investigations.
[111] *Id.*
[112] U.S. Dep't of Educ., *U.S. Department of Education's Office for Civil Rights Launches Title VI Investigation into Chicago Public Schools* (Apr. 29, 2025), https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-launches-title-vi-investigation-chicago-public-schools.
[113] U.S. Dep't of Educ., *U.S. Department of Education's Office for Civil Rights Launches Title VI Investigation into Fairfax County Public Schools* (May 22, 2025), https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-launches-title-vi-investigation-fairfax-county-public-schools.

125.    Although OCR has largely failed to fulfill its duty to investigate discrimination complaints, it has continued to selectively investigate certain complaints, especially on high-profile issues targeting equal educational opportunity programs for historically marginalized students, including Plaintiffs M.W., A.S., D.P., and M.Y.

126.    This practice of treating complaints of race and national original discrimination by white people and non-LGBTQ+ students more favorably than those filed by people of color and LGBTQ+ students is a departure from prior policies and practices of OCR that did not previously differentiate between reviews of complaints based on the complainant's race and national origin. The Department of Education's consideration and interpretation of the aforementioned executive orders issued by the President, its decimation of OCR, its anti-DEI measures, its own guidance and prioritizing of investigations targeting the learning and programs serving and benefitting students of color, among other measures, show a sequence of events and history demonstrating the Department's intent to discriminate against people of color and LGBTQ+ students, including M.W., A.S., D.P., and M.Y.  The failure to investigate and resolve their race-based complaints and other complaints by people of color and LGBTQ+ students is a procedural departure from the Department of Education's own procedures and regulations that require the Department to investigate and resolve their valid complaints.  Such policies and practices have directly and disparately impacted plaintiffs M.W., A.S., D.P., and M.Y. and other people of color and LGBTQ+ students experiencing discrimination in schools.

### *OCR's Actions Harm Students and Families Seeking Civil Rights Enforcement*

127.    Defendants' actions—including pausing investigations and closing seven of the twelve OCR regional offices so that there are too few investigators to actually investigate civil rights complaints, and directing any surviving enforcement resources to politicized investigations—

mean that complainants do not have a meaningful shot at OCR investigating their claims in a prompt, fair, consistent, and impartial manner. Defendants have abdicated OCR's statutory responsibility to students and families to enforce the nation's civil rights statutes in American public schools.

128.    Families who have filed complaints with the reasonable expectation that OCR will follow its legal mandates and longstanding practice of investigating and processing their cases have been left without any information about the status of their complaints or the prospect of obtaining relief. This includes families of students who urgently need accommodations so that they may meaningfully participate in the classroom and fully and equitably access educational services, such as one student with a disability in Washington who has been denied supplementary aids and technology since last school year. Upon information and belief, another student with a disability who filed a complaint with OCR in November 2024 regarding the lack of behavioral supports in school has not heard from OCR since the filing of the complaint. The family lives in Tennessee. Upon information and belief, another student with a disability who filed a complaint with OCR has been out of school for more than a year and is owed a significant amount of compensatory education.

129.    When complainants have called or emailed for an update from OCR, many have received no answers. OCR has postponed scheduled meetings and mediations without explanation to students, families, or schools. OCR is depriving students and their families and advocates of access to a critical forum for their discrimination complaints to be heard.

130.    Although as of April 1, 2025, the Department had set up out-of-office email responses for eliminated staff, those emails are inaccurate and misleading. The emails stated that the

employee "is currently engaged in closing out their work activities and responsibilities as part of a planned transition.  They are working to ensure a smooth handover of key matters."

131.   That statement was false.  Eliminated employees were not "closing out their work activities" – they were on forced administrative leave, have lost access to all Department email, computers, and case and document management systems, and are unable to work.  The statement misleads complainants and recipients regarding the impact of the decimation of OCR.

132.   In Plaintiff Ms. Cupp's case, even after being contacted by an investigator to open up her complaint, months later she had not received contact and later received a bounce-back message from the investigator's email.  When she called the investigator, she received a message stating that the number was out of service.

133.   The initial freeze in processing Title VI and Title IX complaints and the permanent gutting of regional offices, and, if allowed to go into effect, the March RIF, disproportionately harm students of color, female students, and LGBTQ+ students, and their families and advocates, who are deprived of a vital pathway to seek vindication of their civil rights and safe and equal access to the nation's schools.  Upon information and belief, a disproportionate number of OCR complaints alleging Title VI and Title IX violations that have been obstructed pursuant to these actions were filed on behalf of students of color, women and girls, and LGBTQ+ students.  For instance, OCR's 2024 Report stated that Black students represented 37% of students who reported being harassed or bullied on the basis of race, despite representing only 15% of the total K-12 student population, and that girls accounted for 63% of students who reported being harassed or bullied on the basis of sex, despite making up only 49% of the total K-12 student enrollment.[114]

---

[114] U.S. Dep't of Educ., Office for Civil Rights, *2024 Fiscal Year Annual Report: Report to the President and Secretary of Education* (2024) at 17-18, https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf.

134.    Upon information and belief, OCR's opened investigations targeting programs aiming to ensure equal educational opportunity for students of color and LGBTQ+ students and disproportionately benefit white and cisgender students at the expense of students of color and LGBTQ+ students.

135.    Since the inauguration, OCR has not announced publicly any investigations or resolutions of complaints of race discrimination against Black, Latinx, or Indigenous students. Nor has it announced any investigations or resolutions of complaints that allege sexual harassment or other sex discrimination besides those based on policies or practices that permit transgender students to access school facilities and activities.    And, since the March RIF, OCR has not announced any investigations or resolution of a complaint into discrimination based on disability.[115]  Typically, each year, OCR resolves dozens of racial harassment complaints, but this year it has not entered into a single resolution agreement for one.[116]  Some of these complaints where OCR has failed to investigate include Plaintiff students and other Black students who have experienced extreme racial harassment and discrimination.  For instance, Black students in the Lubbock-Cooper school district in Texas were accosted by their white classmates with racial slurs and monkey sounds in their middle school hallway.  While their complaint was being actively investigated prior to the freeze and subsequent March closure of the Dallas office and the students' attorney felt that OCR was "close to making a determination," they have heard nothing since then.[117]  Now, parents and students say racial epithets are more common in public, and the NAACP

---

[115] Off. for Civil Rights, Dep't of Educ., Office for Civil Rights Recent Resolution Search, https://ocrcas.ed.gov/ocr-search (last accessed Dec. 9, 2025).
[116] Jennifer Smith Richards, *Monkey Sounds, "White Power" and the N-Word: Racial Harassment Against Black Students Ignored Under Trump*, (Dec. 19, 2025), https://www.propublica.org/article/trump-education-department-civil-rights-racial-harassment.
[117] *Id.*

chapter in Lubbock County fields frequent calls from parents seeking help in addressing racial incidents they no longer bother to report to the Education Department.[118]  As one parent, whose son's friend who is Black and was called the n-word, described:  "Things have absolutely gotten worse. The attitudes have always been there, but people acting on their attitudes is completely different;" "people have always had racist ideas, but now there's no consequences for being racist."[119]  Furthermore, due to the March RIF and the office closures, such complaints cannot be resolved in a prompt and equitable manner.  It is also unclear how many of the employees covered by the March RIF are currently employed by the Department and of those, who are actually working on investigations.

136.    Plaintiff A.W. filed an OCR complaint after her child's school failed to appropriately respond to the sexual harassment and assault her child experienced, failed to sufficiently protect students from such harm, retaliated against A.W. and her child for filing related complaints, and discriminated against A.W.'s child when they experienced significant emotional harm following the sexual harassment and assault, leading A.W. to withdraw them from school.  In June 2024, OCR notified A.W. that the agency was opening an investigation into whether the school responded to reports of sexual assault and harassment of A.W.'s child and other students consistent with Title IX, whether the school retaliated against A.W. and her child in violation of Title IX, and whether the school discriminated against A.W.'s child based on disability, in violation of Section 504 and Title II.

---

[118] Meredith Kolodner, *Probes of Racism in Lubbock Schools Have Stalled Under Trump*, Texas Tribune (Dec. 23, 2025), https://www.texastribune.org/2025/12/23/lubbock-racism-schools-investigations-trump/.
[119] *Id.*

137.    OCR stopped processing A.W.'s complaint pursuant to the freeze in processing Title VI and Title IX complaints.  On February 23, 2025, A.W. emailed her OCR contact requesting an update and was informed on February 24, 2025, that she would receive "an update as soon as possible."  A.W.'s follow-up message, stating, "I'd like to know today if [my case] is at least still open," went unanswered.  A.W. described learning about OCR's decision to freeze processing of Title IX claims as a "gut punch" after "so many dead ends."  A.W. has not received any subsequent updates or indication that OCR is proceeding with any investigation into her complaint.  And, upon information and belief, now, the decimation of OCR's workforce means that OCR cannot process A.W.'s complaint in a prompt and equitable manner.  As a result, she is left without resolution of her family's discrimination and retaliation claims, accountability for the school, and protection for the students who are still enrolled.

138.    Plaintiff K.D. filed an OCR complaint after her child, Plaintiff M.W., experienced disproportionate discipline and harassment based on her race on May 15, 2023.  After M.W. tried to break up a fight between her friend and a white student, her middle school principal identified M.W. as the aggressor to law enforcement and accused her of stomping on and kicking the white student.  Even after seeing video evidence to the contrary, the principal still gave M.W. a three-day suspension, which became part of M.W.'s school record.  As a result of the incident and suspension, other students harassed M.W., including threatening via social media to physically harm M.W.  Fearing for her safety, M.W. stayed at home pursuing "independent study" for more than two weeks after the incident.  Upon her return to school, the administration gave M.W. a safety plan that required her to have no contact with the students who had threatened her, or face suspension, expulsion, or other disciplinary measures.  K.D. and M.W. had to negotiate to remove the no-contact provision.  As a result of these incidents, M.W. attended several months of therapy.

The harassment, however, did not stop, either that school year, or after M.W. transitioned to a high school in the same district. During the 2024-2025 school year, students referred to M.W. using racial epithets in class and on social media. They called her "n*gger," "black monkey," and "b*tch," asked her if her "ops" (opponent) is the Ku Klux Klan, and played whipping sounds for M.W. to hear during a history class on slavery. M.W. and K.D. reported the harassment to teachers and administrators, but the school district did not take meaningful action to end the harassment.

139.    On July 31, 2023, OCR notified K.D. that they were investigating whether the school district "disciplined the Student more harshly than a white student who engaged in more serious conduct (fighting)" and whether it "subjected the Student to a hostile environment on the basis of race when it did not respond reasonably, timely and effectively to notice of harassment of the Student on the basis of race, including the use of racial epithets and other racially offensive harassment in her physical education class, and on social media." In December 2024, OCR sent a proposed voluntary resolution agreement to the school district, but the district did not agree to the proposal and the case remained in the investigation phase.

140.    OCR stopped processing K.D. and M.W.'s complaint during the February 2025 freeze on investigating Title VI and Title IX claims, and their case was then affected by the San Francisco regional office closure. In March 2025, K.D. contacted the OCR staff on her case and was informed that the school board had requested additional information regarding M.W.'s recent experience of discrimination. K.D. provided the requested information. OCR staff stated that they would reach out to the school board with the updated information and again propose the voluntary resolution. They also informed K.D. that due to the San Francisco office closure and terminations, her case would be transferred to the Seattle office. The OCR staff stated that they would flag her case because of its importance and proximity to resolution, but cautioned that an update from the

Seattle office could take a while. Since March 2025, K.D. has received no information indicating that OCR's investigation is ongoing and has received no communication from the Seattle office. Upon information and belief, the decimation of OCR's workforce means that OCR cannot process K.D. and M.W.'s complaint in a prompt and equitable manner. As a result, they are left without resolution of their discrimination claims, accountability for the school district, or correction of the ongoing harassment and resulting emotional harm that M.W. is experiencing in her current school setting. During the current school year, after the district's middle school merged with the high school, M.W. has been forced to interact with staff members who were the subject of her OCR complaint on a daily basis and has continued to experience harassment at the hands of those staff. Staff have also failed to address the ongoing harassment that M.W. has experienced from peers whose harassment was also the subject of her OCR complaint. Because of OCR's failure to resolve her complaint, M.W. has been denied the opportunity to have a normal high school experience, free from discrimination and harassment.

141.   Plaintiff Melissa Combs filed an OCR complaint on June 10, 2022, after her child, Plaintiff D.P., and other LGBTQ+ students at their school experienced discrimination and harassment based on gender/sexual identity. The complaint alleges that faculty in the district said that identifying as LGBTQ+ was a "mental illness" and penalized students for taking part in the National Day of Silence, an annual day of action to spread awareness about the effects of bullying and harassment on LGBTQ+ students. The students were subjected to frequent and pervasive homophobic and transphobic slurs by their classmates during class, and told to "go die" and "go kill" themselves multiple times. In another incident, a student attempted to yank a Pride Flag from D.P.'s neck. The school failed to effectively address the harassment. On August 10, 2022, OCR notified Ms. Combs that it was opening an investigation based on Ms. Combs' complaint. As a

result of the discrimination and harassment D.P. experienced at their local public school, Ms. Combs chose to move them to a school located outside their home school district, twenty-five to forty minutes, depending on traffic, away from their home, to safeguard their mental health and ability to access their education.  If Ms. Combs and D.P. received the relief requested in their OCR complaint, Ms. Combs would return D.P. to their local public school.

142.    OCR stopped processing Ms. Combs and D.P.'s complaint during the freeze on investigating Title VI and Title IX claims, and their case was then affected by the Boston regional office closure.  On March 11, 2025, Ms. Combs emailed OCR asking about her case.  She has not received a response.  Upon information and belief, the decimation of OCR's workforce means that OCR cannot process Ms. Combs and D.P.'s complaint in a prompt and equitable manner.  As a result, they are left without resolution of their discrimination claims, accountability for the school district, or the opportunity to return to their home school with improved policies and protections in place.

143.    Plaintiff A.M. filed an OCR complaint after her child's school district failed to adequately and timely respond to and investigate her report of sexual assault and harassment of her thirteen-year-old daughter.  A.M. reported to the school district that her child was sexually assaulted by a male classmate in a bathroom at a high school in the district, and was additionally subject to unwanted touching, inappropriate gestures, and solicitation of pictures of her body.  As a result of the district's inadequate investigation and response, A.M.'s child experienced frequent victim-shaming, bullying, and harassment by classmates.  A.M.'s daughter did not want to return to school and experienced a decline in her mental health that eventually led her to self-harm.  Consequently, A.M. transferred her daughter to a different school for eighth grade in the 2022-2023 school year and then withdrew her daughter from school altogether the following year, during

her daughter's freshman year, due to her daughter's mental health treatment and hospitalizations. Because of the school district's inadequate response, A.M. had to drive her daughter to school in another district about half an hour each way during the 2024-2025 school year, despite the high school in her home district being located less than two blocks from her house. Following that school's failure to implement her daughter's IEP and the resulting negative impacts on her daughter's mental health, A.M. moved her daughter to another school shortly after the start of the current school year.

144. A.M. filed her OCR complaint in January 2023. In March 2023, OCR facilitated a mediation with the school district, but it was unsuccessful. In May 2023, OCR notified A.M. that it was opening an investigation into whether the district was deliberately indifferent to her child's sexual harassment, and whether the district's personnel were properly trained in Title IX investigations. OCR stopped processing A.M.'s complaint during the freeze on investigating Title VI and Title IX claims, and her case was then affected by the closure of the Cleveland regional office. On March 17, 2025, A.M. was notified that her case had been transferred to the Denver office. Despite repeated attempts to contact the Denver office via both phone and email, A.M. has been unable to obtain any update regarding the status of the investigation, or to even speak with an employee of the Denver office. Upon information and belief, the decimation of OCR's workforce means that OCR cannot process A.M.'s complaint in a prompt and equitable manner. As a result, she and her daughter are left without resolution of their claims, accountability for the school district, or the opportunity to return to their home school with improved policies and protections in place.

145. Plaintiff Elizabeth Stewart-Williams filed her complaint on behalf of her daughter, Plaintiff A.S., on February 20, 2024, after A.S. was subjected to sexual harassment and assault by

another student at school throughout the fall semester of 2023. The other student continuously inappropriately touched A.S., including by "grabbing her butt," looked at A.S above and below the stall doors while she was in the locker room bathroom, and provoked her. A.S. wanted this behavior to stop and had repeatedly reported the harassment and assault to her track coach. In response to A.S.'s decision to report the harassment and assault she experienced, A.S.'s coaches told her that she was "not a leader," "not focused," "too emotional," and needed to "let it go." Instead of addressing the assault and harassment, A.S.'s coach retaliated against A.S. and removed her from her position as captain of the track team. In addition, other students threatened violence against A.S. and called her names. The school district refused to take the matter seriously and did not conduct a Title IX investigation. As a result, A.S. has endured frequent episodes of crying, depression, anxiety, fatigue, shame, guilt, agitation, irritability, loss of appetite, lack of confidence, and extreme stress, causing hives. As a result, A.S. and Ms. Stewart-Williams were forced to move out of the school district so that A.S. would be eligible to attend another school in Texas and qualify to play sports. A.S. and Ms. Stewart-Williams were forced to stay in temporary housing for a period of time. Ms. Stewart-Williams has been forced to take extensive time away from work and has incurred significant therapy costs for A.S. A.S. is still dealing with harassment by her former track teammates.

146. In her complaint, Ms. Stewart-Williams asks OCR to compel Little Elm Independent School District to conduct an appropriate, impartial Title IX investigation, to take disciplinary actions against the perpetrator and coach, to conduct sexual harassment and assault and Title IX training for staff and students, to achieve athletic culture change, and to provide compensation for the therapy costs incurred.

147.    On July 24, 2024, OCR conducted a mediation, but it was unsuccessful.  OCR last contacted Ms. Stewart-Williams on December 11, 2024, with an update from the investigator assigned to her case.  Ms. Stewart-Williams has not received any indication since then that her claim is being processed or investigated.  On April 4, 2025, Ms. Stewart-Williams reached out to the investigator for an update.  She received a bounce-back stating that "Elhouty, Samire is currently engaged in closing out their work activities and responsibilities as part of a planned transition.  They are working to ensure a smooth handover of key matters."  Upon information and belief, that investigator has been placed on administrative leave and is not "currently engaged in closing out their work activities and responsibilities."  Upon information and belief, the decimation of OCR's workforce means that OCR cannot process Ms. Stewart-Williams and A.S.'s complaint in a prompt and equitable manner.  As a result, they are left without resolution of their harassment claims, accountability for the school district, or access to the compensation for therapy services that they seek.

148.    Plaintiff Amy Cupp filed an OCR complaint on December 6, 2024, after school staff subjected her child, Plaintiff G.C., who has several identified disabilities, to multiple incidents of restraint and seclusion.  Most of these incidents were poorly documented and in one incident, four staff, including a wrestling coach and a football coach, restrained G.C., causing bruising on her upper arm.  Staff members have often restrained and secluded G.C. for behaviors such as attempting to leave the room, verbally refusing to follow school staff's commands, throwing things, or having a tantrum while lying on the floor.  During the 2024-2025 school year, Ms. Cupp

estimates that G.C. was restrained fifteen times and secluded fourteen times[120] for a total of twenty-three hours and six minutes.

149.    After Ms. Cupp filed her OCR complaint, she discovered that G.C.'s school had inappropriately altered G.C.'s Individualized Education Program (IEP) without her consent, including by requiring Ms. Cupp to allow the school to remove G.C. from school if behavioral interventions were unsuccessful and to waive G.C.'s procedural rights with respect to these prospective exclusions.  Ms. Cupp refused to sign the IEP that included these provisions.  The school district, Norwell Community Schools, then used this refusal as a pretext to file a retaliatory complaint against Ms. Cupp with the Indiana Department of Education, which proceeded to mediation.  After mediation, the school district was required to implement the previously agreed upon IEP without the objectionable provisions.

150.    Ms. Cupp finally made the decision to shorten G.C.'s school day as a necessary measure to protect G.C. from and limit her exposure to further restraint and seclusion.  Since February 24, 2025, G.C. attends ABA therapy in the morning and only attends her school for two hours each day in the afternoon.  If Ms. Cupp and G.C. received the relief requested in their OCR complaint, Ms. Cupp would return G.C. to full school days.

151.    On December 16, 2024, OCR scheduled a teleconference to obtain additional information from Ms. Cupp.  After the interview, Ms. Cupp and the OCR investigator continued to exchange emails providing updated information.  On January 14, 2025, OCR notified Ms. Cupp that they were "going to open [her] allegations in [her] complaint" and that Ms. Cupp "should receive an official notification letter soon."  On February 28, 2025, Ms. Cupp emailed the OCR

---

[120] Ms. Cupp's estimation for seclusion includes all instances where school staff either placed G.C. alone in a locked room, or placed G.C. alone in a room with a closed door and G.C. asked to leave.

investigator to ask if the investigator was allowed to communicate with families again after the complaint processing freeze.  On March 10, 2025, the OCR investigator responded asking Ms. Cupp for a time to discuss the case.  On March 11, 2025, Ms. Cupp had a phone call with the OCR investigator, who informed her that the investigator had drafted the opening letter and was waiting for approval, so Ms. Cupp should receive it within a week.  However, due to the Chicago regional office closure and reduction in staff, Ms. Cupp received no update about the processing and/or investigation of her complaint.  Due to the urgency of the matter, Ms. Cupp contacted her Senator for assistance in April 2025.  The Senator's office contacted OCR.  Soon thereafter, Ms. Cupp finally received a letter from OCR stating that her investigation was opened.  When she spoke to a representative from the Denver office, the investigator told her he had over 350 complaints and that the only reason she was contacted was because of her congressional inquiry.  Ms. Cupp attempted to reach out to the investigator in October but received a bounce-back message via email. She then attempted to contact the investigator by phone but received a message stating that the number was out-of-service.  Over one year after filing their complaint, G.C. and Ms. Cupp have not had their complaint resolved.  Upon information and belief, the decimation of OCR's workforce means that OCR cannot process Ms. Cupp and G.C.'s complaint in a prompt and equitable manner.  As a result, they are left without resolution of their discrimination claims, accountability for the school district, or the opportunity for G.C. to participate fully and safely in a regular school setting.

152.   Plaintiff Diane Wilson filed her complaint on behalf of her son, Plaintiff Austin Budd, on September 12, 2022, after Austin, who has learning disabilities, was subjected to discrimination and harassment on the basis of disability during the Spring 2022 semester by his art teacher at Sandwich STEM Academy.  The complaint alleges that the teacher forced Austin to sit alone at an

isolated table, mocked or ignored Austin's questions in front of the class, and made degrading statements towards him, such as "this is obvious," and calling Austin's project "really bad." The teacher also refused to follow the accommodations on his Individualized Education Program and targeted Austin with a "harassment prevention order," which was later dismissed. The school failed to effectively address the teacher's harassment. In her OCR complaint, Ms. Wilson asked that this teacher and the administration at Sandwich Public Schools receive training on how to interact with students with disabilities and that the teacher not be allowed to teach such students until she received the training. She also asked that the school administration revise its anti-bullying policies.

153.    Ms. Wilson disenrolled Austin and he was unable to finish his eighth-grade year, because she and Austin feared for his safety. While they have been waiting for OCR to resolve Austin's complaint, Austin has attended a small charter school outside the district. Austin has missed out on several educational opportunities because he was unable to attend his local public school. For his freshman and sophomore year, Ms. Wilson had to drive Austin thirty minutes each way to the charter school—a total of two hours per day. Since the fall of 2024, Austin has made this drive himself—one hour every school day. If he had been able to continue attending his local public school, a bus would have picked him up at the end of his driveway. Austin is a strong athlete and an avid hockey player. In the eighth grade, he played on the Sandwich High School Junior Varsity team. The small charter school he now attends has limited athletic opportunities and no hockey team, so Austin has been deprived of the opportunities he would have otherwise. Austin is still upset about this. The small charter school also does not have as many specialist teachers and aids as Austin's local public school. As a result, Ms. Wilson has been forced to spend thousands of dollars out of her own pocket on assistive technology and reading specialists to give

Austin the instruction he needs.  Had Austin been able to attend his local public school, these resources would have been available to him at school at no extra cost.  Austin was also forced to leave his core friend group, some of whom he had been friends with since elementary school. Austin was very close with those friends and they tried to carry him through the harassment he faced in school.  Because he was unable to attend high school in Sandwich, he lost touch with those friends.

154.    On March 27, 2023, Ms. Wilson received an official letter stating that OCR was opening an investigation of her complaint.  She corresponded with her investigator every few months.  Ms. Wilson told the investigator about the impact the bullying and harassment had on Austin.  On June 17, 2024, the investigator told her that the investigation was ongoing, and that he was in the process of interviewing witnesses.  OCR stopped investigating Ms. Wilson's complaint during the freeze, and their case was then affected by the Boston regional office closure.   Since the office closure, Ms. Wilson has received no information indicating that OCR's investigation is ongoing.  Upon information and belief, the decimation of OCR's workforce means that OCR cannot process Ms. Wilson and Austin's complaint in a prompt and equitable manner.  As a result, they are left without resolution of their discrimination claims, accountability for the school district, or correction of the failures in Sandwich School District's policies.

155.    Plaintiff Lisa Youngblood filed an OCR complaint after her child, Plaintiff M.Y., experienced disproportionate discipline based on her race on July 16, 2023.  On January 26, 2023, when M.Y. was thirteen years old and in the eighth grade in Lewisville I.S.D. schools, she overheard a student make a verbal threat, telling another classmate, "Don't come to school tomorrow."  M.Y. was concerned that this could present danger at school, and she sought feedback from her friends over text.  Within thirty minutes, she escalated her concern to her mother.  Before

Ms. Youngblood was able to call the school herself to make a report, school officials called her and reported that the school would investigate. M.Y. complied with the investigation and wrote an incident report, believing that she was helping the school. The next day, administrators reported the investigation was complete and that the threat was not an issue.

156.    On January 27, 2023, school administrators asserted that M.Y. made a false accusation or perpetrated a hoax resulting in a school disruption and punished her with three days of in-school-suspension and 73 days assigned to a disciplinary alternative education program. Ms. Youngblood appealed the punishment. Eventually, after a couple of appeals of the discipline and several days of missed school, M.Y. was finally allowed to return to school. During the appeal process, it was discovered that the administrators withheld evidence from other students validating M.Y.'s claims of the school threat.

157.    In March 2023, Lewisville I.S.D. announced they were hiring a third-party company to review the allegations. The file from the company's review was not fully released, but they reported to Ms. Youngblood the following: "I found it more likely than not that Ms. [M.Y.] was assigned an inappropriate consequence for her part in the events of January 26, 2023 and that the consequences assigned were inconsistent with the district guidelines and practices." However, the school district never acknowledged the wrongfulness of its actions and failed to notify Ms. Youngblood and M.Y. of their efforts to ensure the proper policies and training were in place to remedy the harm suffered by M.Y. and prevent future acts of discrimination.

158.    Prior to these events, M.Y. was a straight-A student. She never had any disciplinary problems and was generally quiet. Following the discriminatory suspension, M.Y. was diagnosed with depression and anxiety. She was given a working diagnosis of Post-Traumatic Stress Disorder as a direct result of the events in the preceding month and the school districts' handling

of the events.  M.Y. experienced panic attacks and felt as though she must be a bad person.  M.Y. also had trouble staying in school for the full day upon her return to school due to her anxiety and panic attacks.  She suffered a drop in her academic performance. She began receiving Section 504 accommodations in middle school, which continued into high school, and she remained on medication for her anxiety.

159.    On July 16, 2023, Ms. Youngblood filed a complaint on behalf of M.Y. with the OCR. In her complaint, she offered a detailed timeline of events and attached the punishment letter, student incident reports from witnesses, M.Y.'s mental health diagnoses, and prior grievances filed by other parents against the middle school administrator alleging racial discrimination.   On September 18, 2023, Ms. Youngblood received an email from an investigator in OCR's Dallas regional office, stating that OCR had identified her complaint for resolution through the Rapid Resolution Process (RRP).  On February 28, 2024, Ms. Youngblood reached out to OCR to inquire about the status of the investigation.  OCR replied and confirmed the complaint remained under investigation.  Later in 2024, Ms. Youngblood again reached out to OCR, who replied that they were continuing to work on the investigation.

160.    Following news of cuts to OCR's Dallas office, Ms. Youngblood reached out again to inquire about the investigation on March 12, 2025.  She did not receive a reply and has not heard from OCR in any capacity since 2024.  Because of OCR's failure to resolve her complaint, M.Y. has been denied equal educational opportunities and the opportunity to learn in schools free from discrimination and harassment.

161.    The schools against which A.W., K.D., Ms. Combs, A.M., Ms. Stewart-Williams, Ms. Cupp, Ms. Wilson, and Ms. Youngblood filed OCR complaints each receive federal financial

assistance and are therefore subject to Title VI, Title IX, and Section 504. They are also public entities within the meaning of Title II.

162.    COPAA members similarly report that investigations, resolution sessions, and mediations for disability-related violations have been halted, canceled, or postponed. Upon information and belief, because of the decimation of OCR's workforce, COPAA has parent members whose pending complaints OCR cannot resolve while their children continue to face discrimination and hostile environments or are denied equal access to education. Upon information and belief, because of the decimation of OCR's workforce, COPAA also has attorney and advocate members who have had their complaint processing obstructed and can no longer access this administrative process to vindicate their clients' rights, putting them at risk of losing clients and revenue. More than one COPAA member has voiced that they would rather use their state's complaint system because OCR is not functioning. One COPAA member no longer advises clients to submit OCR complaints. Absent OCR, many families do not have access to any alternative mechanism to file complaints concerning violations of Section 504, because many analogous state systems are designed to investigate violations of the Individuals with Disabilities Education Act ("IDEA"), rather than Section 504.

163.    One COPAA advocate member in Michigan represents more than a dozen families with pending complaints formerly handled in multiple regional offices, including the Cleveland regional office. Among these families, one had a mediation canceled in February and another was preparing for an early mediation to be held on March 19, 2025. These families have received no update on their canceled mediations or cases. At least one family has a pending complaint alleging a failure to provide supplementary aids for a student with a disability; that student is in limbo, unable to fully and equitably access educational services until the claims are addressed.

164.    As a result of first the freeze in investigations and now the decimation of OCR's workforce, COPAA's mission to provide resources and training and to assist its members in obtaining a free appropriate public education and equal educational opportunity for children with disabilities has been significantly frustrated.  To address its frustrated mission, COPAA has been forced to divert its resources and time to addressing concerns from its members about Defendants' actions and tracking the impact of those actions on COPAA members.  COPAA has had to update its training materials for its twelve-week online training course for new attorneys, its materials for its two-day in-person skills training for new attorneys, and its webinars for members on Section 504.  COPAA also had to add information regarding closed OCR offices and information on filing state complaints in lieu of OCR complaints to its Special Education Advocacy Training (SEAT) curriculum.

165.    As Defendants render the OCR complaint process meaningless, students continue to suffer harm.  While their complaints remain unprocessed, uninvestigated, and unresolved, students are forced to endure ongoing discrimination, harassment, and harm.  Many families have had to take drastic measures such as shortening their child's school day or withdrawing their child from school and transferring them to a different district much farther from their home. The lack of investigation and enforcement leaves these students vulnerable and denies them their right to a safe and equitable education, which directly contravenes the responsibilities and obligations of the Department as described in federal civil rights laws.

### V.    CAUSES OF ACTION

**Count One**
**Violation of the Administrative Procedure Act –**
**Arbitrary and Capricious Agency Action**
*[brought by All Plaintiffs against All Defendants]*

166.    Plaintiffs reallege and incorporate by reference all paragraphs above.

167.   Under the APA, courts shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

168.   Defendants' decimation of OCR's ability to process and investigate complaints through elimination of OCR regional offices and the March RIF constitutes a final reviewable agency action under the APA.

169.   Defendants' decimation of OCR's ability to process and investigate complaints is arbitrary and capricious.

170.   First, Defendants did not articulate a reasoned basis for their decision to sabotage OCR's ability to fulfill its statutory and regulatory functions, nor did they articulate a reason why specific regional offices and staff were eliminated.

171.   Second, Defendants failed to consider or acknowledge the serious reliance interests implicated by their decision, including the impact on families awaiting resolution of their complaints to access needed accommodations, return to the classroom, and remedy discrimination.

172.   Third, Defendants failed to offer a reasoned analysis justifying their departure from well-established procedures governing OCR's investigation and processing of complaints.

173.   Fourth, in gutting OCR's ability to process civil rights complaints, Defendants relied on facts inconsistent with Congress's delegation of authority and directives to the agency.

**Count Two**
**Violation of the Administrative Procedure Act –**
**Agency Action Not in Accordance with Law**
*[brought by All Plaintiffs against All Defendants]*

174.   Plaintiffs reallege and incorporate by reference all paragraphs above.

175.   Under the APA, courts shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5

U.S.C. § 706(2)(A).  In addition, the APA holds unlawful agency action found "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

176.    Defendants' decimation of OCR's ability to process and investigate complaints through elimination of OCR regional offices and the March RIF constitutes a final reviewable agency action under the APA.

177.    Defendants' decimation of OCR's ability to process and investigate complaints is not in accordance with law and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

178.    First, the sabotage of OCR's ability to fulfill its statutory and regulatory functions contradicts and exceeds Congress's express command in federal law that the Department of Education effectuate the protections of Title VI and Title IX.  *See* 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682.

179.    Second, the decimation of OCR's ability to process and investigate complaints obstructs OCR's ability and obligation to "make a prompt investigation" in response to indications of possible failures to comply with Title VI, Title IX, and Section 504, and, for Title II, to "promptly review" complaints, "promptly notify" complainants and public entities of the receipt and acceptance of complaints, and "investigate complaints for which it is responsible," rendering OCR in violation of its own rules and regulations.  *See* 28 C.F.R §§ 35.171, 35.172; 34 C.F.R § 100.7(c); 34 C.F.R. § 106.81; 34 C.F.R § 104.61.

180.    Third, the March RIF is also contrary to, and exceeds the authority granted to the Secretary under, the Continuing Appropriations Act, which provides that any RIF "executed, implemented, or otherwise taken" between October 1, 2025, and November 12, 2025, "shall have no force or effect." Pub. L. No. 119-37, § 120, 139 Stat. 495 (2025).  Although the March RIF

was first proposed and noticed in March, it was executed, implemented, and otherwise taken in October 2025, after the First Circuit stayed the preliminary injunction. The March RIF and office closures also violate and exceed the authority granted to Defendants under 20 U.S.C. § 3473(a), which provides that the Secretary may not "consolidate, alter, or discontinue" offices like OCR.

**Count Three**
**Violation of the Administrative Procedure Act –**
**Action Unlawfully Withheld or Unreasonably Delayed**
*[brought by All Plaintiffs against All Defendants]*

181.    Plaintiffs reallege and incorporate by reference all paragraphs above.

182.    Under the APA, a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

183.    Defendants' decimation of OCR's ability to process and investigate complaints through elimination of OCR regional offices and staff constitutes a final reviewable agency action under the APA.

184.    OCR is required to "make prompt investigation" in response to indications of possible failures to comply with Title VI, Title IX, Section 504, and Title II. 34 C.F.R § 100.7(c); 34 C.F.R. § 106.81; 34 C.F.R § 104.61; 28 C.F.R § 35.171. For Title II complaints, OCR is also required to "promptly review the complaint to determine whether it has jurisdiction over the complaint under section 504," accept all completed complaints over which it has jurisdiction, and "promptly notify the complainant and the public entity of the receipt and acceptance of the complaint." 28 C.F.R § 35.171.

185.    By decimating OCR's ability to process and investigate complaints through elimination of OCR regional offices and the March RIF, Defendants have actively obstructed OCR's ability to meet its obligation to make prompt investigations and functionally halted investigations.

Defendants thus cannot promptly investigate complaints and have unlawfully withheld and/or unreasonably delayed investigations of complaints within OCR's jurisdiction.

**Count Four**
**Ultra Vires Agency Action**
*[brought by All Plaintiffs against All Defendants]*

186.    Plaintiffs reallege and incorporate by reference all paragraphs above.

187.    Federal courts may set aside agency action or inaction that exceeds an agency's powers, including action or inaction that violates a clear and mandatory statutory command or that lacks a contemporaneous, reasoned justification.

188.    The decimation of OCR's ability to process and investigate complaints violates the clear mandates of Title VI, 42 U.S.C. § 2000d-1, and Title IX, 20 U.S.C. § 1682, to effectuate the provisions of those statutes.

189.    The March RIF is contrary to the Continuing Appropriations Act, which provides that any RIF "executed, implemented, or otherwise taken" between October 1, 2025, and November 12, 2025, "shall have no force or effect."  Pub. L. No. 119-37, § 120, 139 Stat. 495 (2025).

190.    The March RIF and office closures also violate 20 U.S.C. § 3473(a), which provides that the Secretary may not "consolidate, alter, or discontinue" offices like OCR.

191.    Defendants have not supported their decimation of OCR's ability to process and investigate complaints with a contemporaneous, reasoned justification.

192.    As a result, Defendants' decimation of OCR's ability to process and investigate complaints exceeds Defendants' lawful authority and should be set aside.

**Count Five**
**Violation of the Equal Protection Guarantee under the**
**Fifth Amendment to the U.S. Constitution**
*[brought by Plaintiffs K.D., M.W., Melissa Combs, D.P, Elizabeth Stewart-Williams, A.S., Lisa*
*Youngblood, and M.Y.]*
*against All Defendants]*

193.    Plaintiffs reallege and incorporate by reference all paragraphs above.

194.    The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws and protects individuals from discrimination on the basis of race, sex, sexual orientation, and gender identity.

195.    Defendants' actions discriminate on the basis of race, sex, sexual orientation, and gender identity.

196.    Defendants' actions are motivated, at least in part, by the discriminatory purpose of thwarting race- and sex-based discrimination complaints filed by or on behalf of students of color or LGBTQ+ students while advancing claims on behalf of white or cisgender claimants that are aligned with the Department's preferences and preferred groups, including the targeting of programs and practices that aim to ensure equal educational opportunity for students of color or LGBTQ+ students.

197.    Discriminatory purpose and intent are evident from Defendants' recently enacted policies and practices to treat Plaintiffs complaining of discrimination as people of color or LGBTQ+ individuals differently from other peer complainants, which constitute discrimination under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265 (1977).  The circumstances leading up to the recent policy and practice changes reflect an intent to undermine OCR's investigations for people of color or LGBTQ+ individuals, while advantaging complaints filed by white or cisgender complainants, including those challenging programs and services that provide equal educational opportunities to historically marginalized

students.  Discrimination is also evident from the various departures from normal OCR procedures; policies and practices that fail to align and even conflict with OCR's statutory mandates; the stated intentions and patterns of action taken by the administration and Defendants against people of color and LGBTQ+ individuals; and the disproportionate impact of Defendants' actions on complainants asserting claims on behalf of people of color or LGBTQ+ individuals.

198.   Defendants' discrimination against Plaintiffs cannot be justified with a compelling, important, or legitimate governmental interest.  Defendants' actions and inactions cannot survive rational basis review, let alone the heightened and strict scrutiny required by the intentionally discriminatory conduct at issue.

199.   Plaintiffs have been injured and continue to be injured because Defendants' actions and inactions subject them to discrimination on the basis of race, sex, sexual orientation, and gender identity and deprive them of equal access to OCR's civil rights complaint procedures.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1.   Assert jurisdiction over this action;

2.   Declare the Defendants' decimation of OCR's ability to process and investigate complaints unlawful because it violates the APA, exceeds Defendants' statutory authority, and violates the Fifth Amendment to the U.S. Constitution;

3.   Enter a permanent injunction:

    a.   Compelling Defendants to restore the investigation and processing capacity of OCR and to process OCR complaints promptly and equitably;

    b.  Ordering additional appropriately tailored remedies to ensure Defendants' future compliance with their obligations, such as periodic public reporting to this Court regarding OCR's processing and enforcement of complaints; and

    c.  Retaining continuing jurisdiction to oversee compliance with the Court's order;

4.  Award to Plaintiffs their costs and reasonable attorneys' fees pursuant to 28 U.S.C. § 2412; and

5.  Grant such other equitable relief as the Court deems just and proper.

Dated: January 9th, 2026.

Respectfully submitted,

/s/ David G. Hinojosa

Freya Pitts (admitted pro hac vice)
Hong Le (admitted pro hac vice)
Pallavi Bugga (admitted pro hac vice)
National Center for Youth Law
1212 Broadway, Suite 600
Oakland, CA 94610
(510) 835-8098
fpitts@youthlaw.org
hle@youthlaw.org
pbugga@youthlaw.org

Selene Almazan-Altobelli
(admitted pro hac vice)
Council of Parent Attorneys and Advocates, Inc.
PO Box 6767
Towson, MD 21285
844-426-7224, ext. 702
Selene@copaa.org

David G. Hinojosa (D.C. Bar No. 1722329)
Nina Monfredo (admitted pro hac vice)
National Center for Youth Law
818 Connecticut Ave NW, Suite 425
Washington, D.C. 20006
(202) 868-4782
dhinojosa@youthlaw.org
nmonfredo@youthlaw.org

Michael Tafelski (admitted pro hac vice)
Claire Sherburne (admitted pro hac vice)
Southern Poverty Law Center
150 E. Ponce de Leon Ave., Ste. 340
Decatur, GA 30030
(334) 430-9104
michael.tafelski@splcenter.org
claire.sherburne@splcenter.org

Sam Boyd (admitted pro hac vice)
Southern Poverty Law Center
2 Biscayne Blvd., Ste. 3750
Miami, FL 33131
(786) 560-0737
sam.boyd@splcenter.org

*Counsel for Plaintiffs*